**IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CHRISTIANA TAH )
1700 Rockville Pike, #400 )
Rockville, Maryland, MD 20852 )
United States of America )
)
and )
)
RANDOLPH MCCLAIN )
2100 Goddard Way ) JURY TRIAL DEMANDED
Waxhaw, North Carolina, NC 28173 )
United States of America )
)
    *Plaintiffs,* ) Civil Action No._____
)
    v. )
)
GLOBAL WITNESS PUBLISHING, INC. )
1100, 17th Street NW, Suite 501 )
Washington, DC 20036 )
United States of America )
)
and )
)
GLOBAL WITNESS )
Lloyds Chambers )
1 Portsoken Street, London E1 8BT )
United Kingdom )
)
    *Defendants.* )

---

## COMPLAINT

### I. Introduction

    1. This is an action for defamation and false light invasion of privacy brought by the

Plaintiffs, Christiana Tah and Randolph McClain, against the Defendant Global Witness

1

Publishing, Inc., incorporated in the District of Columbia, and the Defendant Global Witness, a non-government, not for profit organization incorporated in the United Kingdom. The two Defendants are referred to collectively throughout this Complaint simply as "Global Witness." The action arises from the publication of a Report by Global Witness on March 29, 2018, entitled: *Catch me if you can.* (Hereinafter referred to either as *"Catch me if you can"* or "Global Witness Report.") The *Catch me if you can* Global Witness Report is incorporated in this Complaint in its entirety and attached as Exhibit A. Physical copies of the *Catch me if you can* Global Witness Report were distributed throughout the District of Columbia and were made available word-wide on the Global Witness Internet Website. The *Catch me if you can* Global Witness Report chronicled the acquisition by the American oil company ExxonMobil Corporation (hereinafter "Exxon") of an offshore oil license in the waters off the coast of Liberia, known as "Block 13." The gist and sting of the *Catch me if you can* Global Witness Report was that Christiana Tah and Randolph McClain each accepted bribes of $35,000 and were complicit in corruption for what Global Witness depicted as their allegedly corrupt roles in negotiating a 120-million-dollar purchase by Exxon of Block 13. Alleging that these imputations of bribery and corruption are false and were published with knowledge of falsity or reckless disregard for its truth or falsity, Christiana Tah and Randolph McClain bring this action to vindicate their honor, reputation, and human dignity.

## II. The Parties

2. Christiana Tah is now a permanent resident of the United States and a resident of Maryland. Her address is: 1700 Rockville Pike, #400, Rockville, Maryland, MD 20852, United States of America. She was born in Liberia and is a citizen of Liberia. She has at various times in her life lived in Liberia and in the United States, engaged in advocacy, public service, and law

practice.  She holds a graduate degree in law from Yale University, and a Master of Arts degree in Sociology and Criminal Justice from Kent State University.    In Liberia, she worked as a public servant in the Ministry of Health, the Ministry of Justice and the Ministry of Finance as a junior official in the seventies and eighties.    In 2009, she was appointed Attorney General and Minister of Justice for Liberia by Liberian President Ellen Johnson Sirleaf.  President Sirleaf was the twenty-fourth President of Liberia, serving from 2006 to 2018.  President Sirleaf was the first elected female head of state on the continent of Africa and was awarded the Nobel Prize for Peace in 2011.  Christiana Tah served as the Liberian Minister of Justice from 2009 to 2014.  Christiana Tah is currently back in the United States engaged in advocacy and consulting practice in Maryland.

3.  Dr. Randolph Allen Kpokpo Weah McClain is a citizen of North Carolina.  His address is: 2100 Goddard Way, Waxhaw, North Carolina, NC 28173, United States of America. He was born in Liberia.  He received a B.Sc. in Chemistry from Cuttington College, in Liberia, in 1970.  He received a Management Certificate from Arthur D. Little, Inc., in the United States, in 1972, an MS in Chemical Engineering from the University of Kansas in 1974, and a Ph.D. in Chemical Engineering from the University of Kansas in 1977.  Randolph McClain had a distinguished career with the DuPont Company, occupying many positions of scientific and business leadership.  After his retirement, he returned to Liberia to offer leadership to his native country.   His service included the position of Chairman of the Board of the Liberia Telecommunications Corporation, Chief Executive Officer of the National Oil Company of Liberia, and Chairman of the Hydrocarbon Technical Committee.  Randolph McClain was the chair of the negotiation team that negotiated the contract between Liberia and Exxon for Block

13. Randolph McClain, a native of Liberia, is also a citizen of the United States and a citizen of North Carolina, where he is presently domiciled.

4. Global Witness is a non-profit and non-government organization. Its address is: Lloyds Chambers, 1 Portsoken Street, London E1 8BT, United Kingdom. Global Witness conducts its operations in the United States through its Global Witness Publishing, Inc. office in Washington, D.C., located at 1100 Seventeenth Street, N.W.

5. Global Witness Publishing, Inc. is incorporated under the laws of the District of Columbia and is a 501(c)(3) organization under American tax laws. Its address is: 1100, 17th Street N.W., Suite 501, Washington, DC 20036. Global Witness, according to its published mission statement, specializes in "global witness investigation." The mission of Global Witness is "exposing economic networks behind conflict, corruption, and environmental destruction." The Global Witness website also states: "Global Witness' activities in the USA are undertaken through Global Witness Publishing Inc., a company registered in Washington DC, USA."

### III. Jurisdiction and Venue Statement

6. This Court has diversity of citizenship subject matter jurisdiction under 28 U.S.C. § 1332. There is complete diversity among the parties, and the amount in controversy exceeds $75,000.

7. Venue is proper in the United States District Court for the District of Columbia under 28 U.S.C. § 133 (b)(3) and (c)(3), "a district in which any defendant is subject to the court's personal jurisdiction" with respect to this action.

8. Personal jurisdiction is proper in the District of Columbia under D.C. Code Ann. § 13–334 and the Due Process Clause of the Fifth Amendment to the Constitution of the United States.

9. Global Witness has purposefully availed itself of the privilege of conducting activities within the District of Columbia.

10. Global Witness Publishing, Inc., is incorporated in the District of Columbia, and has its principal place of business in the District of Columbia. The signature page of the *Catch me if you can* Global Witness Report recited the authorship of the Report as:

**Global Witness**
**Lloyds Chambers, 1 Portsoken St, London E1 8BT, United Kingdom**

**Global Witness**
**1100 17th Street NW, Suite 501, Washington, DC 20036, USA**

**ISBN 978-1-911606-14-7**

**© Global Witness 2018**

11. Jurisdiction in the District of Columbia is also appropriate because the publication *Catch me if you can* was targeted by Global Witness at the District of Columbia. Printed physical copies of the *Catch me if you can* Report were distributed in the District of Columbia, including physical copies distributed to high-ranking officials of the United States government. Through publication of *Catch me if you can*, Global Witness sought to influence policymakers and opinion-makers in the District of Columbia, including members of the United States Congress, the United States Department of Justice, the United States Department of State, the United States Securities and Exchange Commission, representatives of foreign governments, and non-governmental organizations resident in the District of Columbia. Venue is also proper in the District of Columbia because the Global Witness American headquarters in the District of Columbia and Global Witness targeted the District of Columbia in its publication.

12. On March 29, 2018, Global Witness sent a copy of the *Catch me if you can* Global Witness Report to Attorney General Jeff Sessions at the Attorney General's Office in the main

Justice Department Building on Pennsylvania Avenue in Washington.  Copies of the letter to

Attorney General Sessions were sent to the Justice Department Chief of the FCPA Unit, Daniel

Kahn, as well as to Deborah Connor, Acting Chief of the Justice Department Money Laundering

and Asset Recover Section. The letter to Attorney General Sessions was signed by Corinna

Gilfillan, "Head of US Office, Global Witness." The letter further invited Attorney General

Sessions to contact or meet with "Stefanie Ostfeld, Deputy Head of US Office at

sostfeld@globalwitness.org or (202) 621-6674."

13.  On March 29, 2018, Global Witness also sent a copy of *Catch me if you can* to Jay

Clayton, the Chairman of the United States Securities and Exchange Commission, in the District

of Columbia, also signed by Corinna Gilfillan, the Head of the United States Global Witness

Office in the District of Columbia, and also inviting the Chairman to meet with Global Witness

within the District of Columbia.

14.  A press release issued by Global Witness on April 3, 2018, republished the Global

Witness Report, and stated: "The Department of Justice and Securities and Exchange

Commission must investigate Exxon for potentially violating US anti-corruption laws in its 2013

Liberian oil deal."  The press release was issued under the contact information of Julie Anne

Miranda-Brobeck, United States Communications Manager for Global Witness. It stated:

"Global Witness calls on the US Department of Justice (DOJ) and the US Securities and

Exchange Commission (SEC) to investigate US oil giant Exxon for its 2013 business deal in the

West African country of Liberia, where the company spent $120 million on an oil block it knew

was tainted by corruption."

15.  Through its incorporation under the laws of the District of Columbia, its physical

continuous and ongoing presence in its District of Columbia office, which is its principal place of

6

business in the United States, its distribution of physical copies of *Catch me if you can* throughout the District of Columbia, and its deliberate and focused publication of *Catch me if you can* on readers within the District of Columbia, Global Witness has subjected itself to the jurisdiction of the District of Columbia.

16. Under the "single publication rule" applicable to actions for defamation and false light invasion of privacy, Christiana Tah and Randolph McClain are entitled to pursue recovery for the substantial damage to their reputation and their personal humiliation and anguish caused by Global Witness, within the District of Columbia and all other jurisdictions world-wide, in this one action filed in the District of Columbia.

### IV. General Factual Background

17. In this Complaint, Christiana Tah and Randolph McClain sue in Count I for "libel per se," based on the imputation by Global Witness in *Catch me if you can* that Christiana Tah and Randolph McClain each accepted a $35,000 bribe for assisting in the consummation of Exxon's purchase of Block 13. Christiana Tah and Randolph McClain also sue in Count II for "false light invasion of privacy" for the broader imputations made by Global Witness in *Catch me if you can* that Christiana Tah and Randolph McClain were guilty of corruption in their participation on behalf of Liberia in Exxon's purchase of Block 13. The facts pleaded in this Section of the Complaint provide general background information applicable to both Christiana Tah's and Randolph McClain's libel *per se* and false light claims.

18. "Block 13" is a rectangular plot of territory in the ocean waters off the coast of Liberia that potentially held valuable oil reserves, owned by the nation of Liberia. It would ultimately turn out that Block 13 failed to produce oil.

19. The National Oil Company of Liberia ("NOCAL") is a "public corporation" created pursuant to Liberia's Petroleum Law, responsible for the award of oil licenses. The mission of NOCAL is to develop Liberia's Hydrocarbon potentials for National self-sufficiency and sustainable development. Liberia's Petroleum Law mandates NOCAL to delineate, establish, and issue licenses for particular areas, fields, and blocks, as the case maybe, on such terms and conditions as shall be deemed appropriate, subject to the approval of the Board of Directors and final ratification by the President of Liberia.

20. In 2007, Liberia first licensed the rights to Block 13 to a company with both British and Liberian ties that was originally called Broadway Consolidated PLC, and later Peppercoast Petroleum PLC. Throughout the dispute this entity became commonly referred to as "BCP."

21. In 2010, it was determined that BCP was in default of certain terms in the production sharing contract with Liberia. Christiana Tah's position was that the contract with BCP should be cancelled for breach of BCP's contractual obligations. Following internal deliberations within the Liberian government, it was agreed that Liberia should obtain the advice of expert external legal counsel. The advice of that external counsel was that while Liberia did have plausible legal grounds for attempting the cancel the contract with BCP, any such effort was likely to be bogged down in years of litigation in arbitration proceedings. The alternative option, recommended by outside counsel and ultimately adopted as the most prudent course by the Liberian government, was to seek an outside buyer to come in and purchase Block 13 from BCP, on terms that would also be more favorable to the government of Liberia.

22. This strategy was adopted, and Liberia, with the aid of expert consultants, began the process of seeking prospective purchasers for Block 13. The prospective purchaser that emerged was Exxon. However, Exxon was not willing to buy Block 13 directly from BCP because of the

rumors of corruption surrounding the original purchase of Block 13 by BCP. Exxon proposed a deal in which Block 13 would first be sold to a third party, and then acquired by Exxon. The third-party buyer from BCP turned out to be Canadian Overseas Petroleum Limited (COPL). Most importantly, the negotiations led to an agreement in which Exxon would pay a substantial sum for Block 13, a total of $120 million, of which $50 million would go directly to Liberia itself. In its entire history Liberia had never received a payment of such magnitude for the rights to extract natural resources. Christiana Tah, Randolph McClain, and others within the Liberian government saw the Exxon deal as an historic victory for the Liberian people, in which the government of Liberia would for the first time receive a substantial payment for the sale of extraction rights. The new deal with Exxon had additional benefits, aside from the payment of $50 million to Liberia. The prior contract with BCP contained an onerous arbitration clause. The new contract with Exxon abrogated that arbitration language, substituting new arbitration provisions that limited enforcement of arbitration judgments only to the specific entity against whom the judgment was obtained rather than any and all assets of the Liberian government. The new contract also ended Liberia's unfortunate relationship with BCP, substituting a new majority contract partner, an internationally reputable oil company giant, Exxon and COPL.

23. The negotiations between Liberia and Exxon were conducted, on Liberia's part, by the Hydrocarbon Technical Committee ("HTC"), as provided for in the Liberian Petroleum Law of 2002. Although created in 2002, NOCAL did not avail itself of the services of the HTC until 2010. The role of the HTC in the Exxon negotiation for purchase of Block 13 became an issue central to the *Catch me if you can* Global Witness Report and is at the heart of this lawsuit by Christiana Tah and Randolph McClain against Global Witness.

24. The purpose animating the creation of the HTC was to superintend the negotiations between entities such as Exxon and the government of Liberia, through its state-owned oil company NOCAL.   At the time the Exxon contract was being negotiated, the HTC was comprised of the Chairman of the National Investment Commission, Natty B. Davies; the Minister of Lands, Mines & Energy, Patrick Sendolo; the Minister of Finance (represented by Deputy Minister James Kollie), the Legal Advisor to the President of Liberia, Seward M. Cooper, the Chief Executive Officer of NOCAL, Randolph McClain, and the Minister of Justice, Christiana Tah. The Committee was assisted by five consultants, Jeff Wood and Susan Maples from the United States, Kou Dorliae and Idella Cooper from Liberia, and Alpa Shah from the United Kingdom.

25. Several weeks after the HTC concluded the Exxon contract, Christiana Tah was in the Liberian President's office discussing government business with President Sirleaf.  President Sirleaf brought up the Exxon contract on her own, and stated to Christiana Tah, "you know, I will instruct NOCAL to pay bonuses to all those who participated in the negotiation of the Exxon contract. If the Government had hired you  to do this work, you would have made millions." Christiana Tah replied simply, "Thank you Madame President."  President Sirleaf did not discuss the amount of money she had directed NOCAL to pay out in bonuses.  The meeting ended, and Christiana Tah left the President's office.

26. The Board of NOCAL did receive instructions from President Sirleaf to distribute bonuses following the successful negotiation of the Exxon contract.  The Board of NOCAL passed a Resolution in pursuance of President Sirleaf's instruction.  That Resolution read:

> The undersigned, acting by consent of the Board of Directors (the "Board") of the National Oil Company of Liberia (NOCAL), a company duly organized and existing under the laws of the Republic of Liberia (herein referred to as the "Company"), do hereby certify that during an emergency meeting of the Board of

Directors of NOCAL held on Saturday, April 27, 2013, at which a quorum of the membership of the Board of Directors was present, the following resolution was unanimously adopted in full force and effect as of the date hereof:

Whereas the Government of Liberia, led by NOCAL, successfully concluded negotiations with ExxonMobil and Canadian Overseas Petroleum Ltd. (COPL) and signed a Revised Production Sharing Contract (PSC) for Liberian offshore block LB-13, which garnered an income of Fifty Million United States Dollars ($50,000,000.00) for the nation. The agreement will provide immense benefits to the nation and its people, including immediate and long-term financial benefits, strong social and environmental protections, a high royalty rate, state and citizen participation, as well as provisions to promote local content and job creation in Liberia.

Regarding the proposal that was approved by the President of the Republic of Liberia to use approximately ten percent of the income that NOCAL generated from the LB-13 transaction (which amounts to approximately Five Hundred Thousand United States Dollars ($500,000.00)) for the payment of bonuses to the Hydrocarbon Technical Committee and support Team, the Board of Directors, Management and Staff of NOCAL, for their hard work and dedication to ensuring the successful completion of the project, and on motion duly made, seconded and unanimously carried, it was

> **Resolved** that the Board of Directors hereby authorizes the president/CEO to disburse bonus payments in an amount not to exceed Five Hundred Thousand United States Dollars ($500,000 USD) in order to pay bonuses to the Hydrocarbon Technical Committee and Support Team, the Board of Directors, Management and staff of NOCAL for their hard work in accordance with the payment listing that was approved by the Board and is attached to this Resolution.

In witness whereof, we the undersigned have executed this resolution to be effective as of the 27th of April 2013.

Signed:

Randolph A.K.W. McClain, Ph.D                    Robert A. Sirleaf
SECRETARY                                        CHAIRMAN
Board of Directors, NOCAL                         Board of Directors, NOCAL

The Resolution was signed by Randolph McClain as Secretary to the Board and Robert Sirleaf as Chairman of the Board. Randolph McClain in turn convened an HTC meeting and asked two of the HTC members, the President's Legal Advisor, Seward Cooper, and Minister of Justice,

11

Christiana Tah, if payment of such bonuses would be legally permissible.  The two lawyers advised Randolph McClain and their fellow HTC members that they would research and analyze the issue.  The meeting was adjourned.

27.  Christiana Tah and Seward Cooper did in fact conduct a legal analysis, focusing on a Presidential Executive Order, "Executive Order # 38," which in § 9.10 contains a provision entitled "Receipt of Double Emoluments."  Section 9.10 of Executive Order # 38 reads:

> Receipt of Double Emoluments: A public servant shall not while receiving or being paid salaries by any public service office, at the same time receive or be paid salary by any other public office. Public servants providing service to other institutions, including service on boards, on account of a duty required by Government, shall not *demand and receive* any other benefits for such service.

(emphasis added).

28.  Christiana Tah and Seward Cooper concluded, for two legally independent reasons, that Executive Order #38 did not preclude payment of the proposed bonuses.  First, Executive Order # 38 was promulgated on January 6, 2012 and by its terms expired after one year.  The Executive Order had thus expired and was no longer legally operative.  Second, Christiana Tah and Seward Cooper looked to Article 90(b) of the Liberian Constitution, from which Executive Order #38 derived.  In a meeting with members of the HTC, they focused on the language "demand and receive," highlighted above.  They were asked whether anyone on the Committee had demanded to be paid a bonus or a reward of some sort for negotiating the Exxon Block 13 contract.  The members of the HTC answered in the negative.  No prospective recipient of the bonuses claimed to have demanded any such bonus payments.  Rather, the decision to make the bonus payments had come at the initiative of President Sirleaf.  The focus on the "demand and receive" language was logical, for it aligned the meaning of Executive Order # 38 with traditional notions of bribery and corrupt practices, in the form of public servants improperly

extracting payment for the performance of duties.  A bonus paid voluntarily, initiated by a superior, (in this case, the Liberian President) to subordinates as a reward for exceptionally well-done service, did not violate either the letter or the spirit of the Executive Order.  For these reasons, Christiana Tah and Seward Cooper advised Randolph McClain and the HTC that the bonus payments would be legal.

29.  The NOCAL Board then met to determine the amount of the bonuses, and the recipients of the bonuses.  The Board resolved to award bonuses to all employees of NOCAL, to all members of the HTC, and to the five consultants who had assisted the HTC in the negotiation of the contract.  The entire amount paid in bonuses totaled approximately $500,000.  This was 1% of the $50 million premium that Exxon had paid to the government of Liberia in purchasing the license for Block 13.  The members of the HTC, including Christiana Tah and Randolph McClain, received bonuses of $35,000 each.  The five consultants were each sent bonuses of $15,000.  The remaining balance of the $500,000, approximately $290,000 was distributed to all other NOCAL employees, numbering over 140 persons, including office staff, custodial workers and drivers.

## V. Count I—Libel *Per Se*

### A. Overall Defamatory Meaning

30.  The *entirety* of the *Catch me if you can* Global Witness Report conveys to ordinary reasonable average readers the defamatory imputation that Christiana Tah and Randolph McClain each accepted a $35,000 bribe in exchange for their actions recommending approval of the Exxon Block 13 contract in their role as members of the HTC.  This bribery accusation is the principal overall gist and sting of the *Catch me if you can* Global Witness Report as it refers to Christiana Tah and Randolph McClain.  Such an imputation of bribery is libel *per se* under the

defamation law of the District of Columbia, imputing to Christiana Tah and Randolph McClain the commission of felonious crimes of moral turpitude, and imputing to unfitness for their office and professions. The defamation by Global Witness has caused general damage to Christiana Tah's and Randolph McClain's reputations, as well as extreme personal anguish and humiliation.

31. The *Catch me if you can* Global Witness Report did include certain stock qualifying language plainly inserted to attempt to insulate Global Witness from defamation liability. Global Witness thus often inserted euphemisms such as "unusual, large payments," "unusual payments" or "unusual and suspicious payments" or "suspicious payments" for the outright words "bribe" or "bribery." These phrases are used over thirteen times in the Global Witness Report. Global Witness also called for investigations to determine if bribery had occurred. Those calls for investigation, however, failed to mask the manifest message that Global Witness was doing more than raising a question of bribery, it was asserting bribery, pure and simple. Christiana Tah's and Randolph McClain's Complaint here thus rests on reality. Their Complaint is grounded on what was *actually communicated* to ordinary reasonable average readers of the *Catch me if you can* Global Witness Report. What was *actually communicated*, and what Global Witness clearly *intended* to communicate, was that Christiana Tah and Randolph McClain each took a bribe in exchange for their roles in the Exxon purchase of Block 13.

## B. The Four Indicia of Defamatory Meaning

32. In a defamation action it is the jury's role to determine what was actually communicated. Christiana Tah's and Randolph McClain's burden in filing their Complaint is merely to allege credibly that the *Catch me if you can* Global Witness Report *could have been understood* by ordinary reasonable average readers as alleging their receipt of a bribe. Christiana Tah's and Randolph McClain's allegations on this point rest on four suppositions. First, a

reading of the *Catch me if you can* Global Witness Report itself manifestly demonstrates that this is the meaning Global Witness intended to convey to readers. Second, *actual* readers of the Global Witness *Catch me if you can* Report interpreted the Global Report as accusing Christiana Tah and Randolph McClain of bribery. Third, widespread media accounts summarizing the *Catch me if you can* Global Witness Report described the Report as accusing Christiana Tah, Randolph McClain, and other HTC members of taking bribes to facilitate the Exxon Block 13 purchase. Fourth, and most importantly, the current *government of Liberia itself* read the *Catch me if you can* Global Witness Report as accusing Christiana Tah, Randolph McClain, and other HTC members of accepting bribes as *quid pro quo* payments to facilitate the Exxon Block 13 deal.

33. When the text of the offending document itself, the actual reactions of average readers, the reactions of other news organizations, and the reactions of the Liberian government are all aligned in their understanding of the Global Witness Report as communicating that Christiana Tah and Randolph McClain each took a bribe, then certainly a jury question is presented as to whether in fact this is how the offending defamatory Global Witness Report was actually understood.

### C. The Intended Meaning Clearly Conveyed in the Global Witness Report

34. Christiana Tah and Randolph McClain are not required to point to any *one* passage, in isolation, that flatly accused them of bribery. Their Complaint here rather rests on the totality of the meaning conveyed, through headlines, sub-headings, text, and graphics, which combine to form a mosaic that unmistakably communicates the bribery allegations. The passages quoted below are thus pled in this Complaint for both their individual defamatory meaning, as set forth

in detail, as well as for their overall cumulative impact, imputing that Christiana Tah and Randolph McClain were guilty the crime of bribery.

35.   The defamatory mosaic begins with the title of the Global Witness Report, entitled *Catch me if you can*. The title plainly suggests that wrongdoing is afoot, and that the wrongdoers somehow brazenly assume they cannot be caught. The sub-heading, placed on the front page of the Global Witness Report, tells the reader that the wrongdoing is corruption in the Liberian oil sector. The sub-heading reads: "Exxon's complicity in Liberian oil sector corruption and how its Washington lobbyists fight to keep oil deals secret."

36.   Early on, the Global Witness Report zeroes in on members of the HTC as among its principal targets. The Global Witness Report thus describes the HTC as "The Liberian Government inter-ministerial body responsible for signing oil licenses." *Catch me if you can* at 4.

37.   The Global Witness Report proceeds to paint the picture of the Block 13 purchase as bathed in corruption, describing the London meeting in sinister terms:   "But Exxon was prepared, and arrived in London with a plan it thought would allow the company to buy Block 13 while skirting US anti-corruption laws. This would be done by having a third company act as a go-between, buying Block 13 from BCP and then selling the majority of the license to Exxon. The company Exxon would use was Canadian Overseas Petroleum Ltd (COPL)." *Catch me if you can* at 7.

38.   The *Catch me if you can* Report then deliberately linked the "corruption" attendant to the purchase by Exxon of Block 13 to the payments made to Christiana Tah and Randolph McClain and others at NOCAL and the HTC. *Catch me if you can* at 7. This is immediately followed by a statement on Page 7 that:" Evidence seen by Global Witness also suggests that

16

Exxon's 2013 deal was surrounded by unusual, large payments. This evidence shows that, in the month following the sale of Block 13 to Exxon and COPL, Liberia's oil agency paid $210,000 to Liberian officials who authorized the deal." *Catch me if you can* at 7.

39.     Any reasonable average reader would plainly understand the Report as communicating that the "corruption" that "surrounded" the purchase of Block 13 included the "unusual, large payments" as a corrupt *quid pro quo*, as evidenced by the statement that the agency "paid $210,000 to Liberian officials who authorized the deal." *Catch me if you can* at 7.

40.     The imputation of bribery in the Global Witness Report is immediately reinforced on the following page of the Report, through the sinister statement, "The payments were probably made from the same bank account into which Exxon had just deposited $5 million for Block 13." *Catch me if you can* at 8.

41.     The Report continued, "if the US does not require detailed reporting on what oil, gas, and mining companies pay foreign governments we may never find out how far they are prepared to go to obtain natural resources, nor will we be able to stop the corruption that keeps people poor and destabilizes countries." *Catch me if you can* at 8.  The Report further called for an investigation into violation of Liberian law, "including anti-bribery statutes." *Catch me if you can* at 8.

42.     On Page 9 of the *Catch me if you can* Report, Global Witness openly admitted that it launched its investigation because of NOCAL's "tarnished record of corrupt deals" and the "risk of bribery." *Catch me if you can* at 9. This is followed on the same page by the assertion, "people in corrupt, resource-rich countries can now see what their governments are being paid from individual resource projects and demand those who pay or receive bribes are held to account." *Catch me if you can* at 9. This passage again reinforces the imputation that Christiana

Tah, and Randolph McClain, and others were among those who "receive bribes" and should be "held to account."

39.   The conclusion that the payments made by Exxon included bribes paid to Christiana Tah, Randolph McClain, and others was further buttressed by statements made throughout *Catch me if you can* that payments made by companies such as Exxon at that are "disaggregated" and at the "project level" are intended to mask bribery and corruption. The Report on Page 9 describes "disaggregated project-level payments to governments," and then in turn on Page 11 plainly states the link between such payments and the corruption *documented in the report*, stating, "If extractive companies are required to disclose disaggregated, project-level payments to governments, this would help expose – and prevent – the very kind of corruption documented in this report." *Catch me if you can* at 11.   This passage is plainly referring to the purchase by Exxon of Block 13, and not to *past* corruption, and it plainly links the payment by Exxon for Block 13 as an example of "the very kind of corruption documented in this report," corruption that of course was understood by readers as including the payments made to Christiana Tah, Randolph McClain and others.

44.   On pages 14 and 15 of the *Catch me if you can* Report, Global Witness presented a "Timeline of events for the award of Block 13 in Liberia."   The pages consist of an elaborate chart with lines indicating major events from 1995 to 2018 involving Block 13.   The chart plainly communicates to readers that the purchase of Block 13 by Exxon was a continuation of an ongoing story of corruption surrounding the sale of Block 13, including Exxon's purchase. Of special importance are three events linked by yellow lines on the chart all plainly describing payments made in 2013 as corrupt.   Those events, stacked one on top of the other and visually linked, state:

> March 26, 2013: NOCAL makes $17,880 suspicious payment to Senator Cletus Wotorson, Chairman of the Senate's Lands, Mines, Energy and Environment Committee
>
> March 26, 2013: NOCAL makes $163,030 suspicious payment to Boima Folley Sports Center, headed by House of Representatives Deputy Director for Communications
>
> May, 2013: NOCAL makes $210,000 worth of unusual, large payments to Liberian Government officials, including Finance Minister, Justice Minister, Mining Minister, and NOCAL Board Chairman

*Catch me if you can* at 15.

45. Page 16 of *Catch me if you can* asserts that the earlier acquisition by BCP of Block 13 was effectuated by bribery, through a "bribery fund" paid to NOCAL. Page 16 thus reinforces the message of the time chart on Pages 14 and 15 that payments to Christiana Tah, Randolph McClain, and others were similar bribes paid for through a bribery fund operated by NOCAL, funded through the proceeds of Exxon's purchase of Block 13.

46. On page 19 of the *Catch me if you can* Report, a "sidebar" feature appearing against a dark brown background describes "The People With A Hand in Exxon's Block 13 Deal." Referencing the payments received by Christiana Tah, Randolph McClain and others, described in greater detail subsequently in the Report, this passage plainly communicates to readers that the payments were received as a *quid pro quo* for approval of the Exxon purchase. The critical passage communicating this linkage reads:

> As described in further detail below, multiple members of the Liberian Government signed the Block 13 deal. These officials received large payments from NOCAL after they signed.

*Catch me if you can* at 19.

47. Page 30 of *Catch me if you can* begins the most devastating defamatory group of passages in the Global Witness Report. It begins with the sensational heading:

**Monrovia, 2013:**
**AWASH IN CASH**
**SOME UNUSUAL, LARGE PAYMENTS**

*Catch me if you can* at 30.

48. The *Catch me if you can* Global Witness Report then brings on the salvo: "Evidence seen by Global Witness also suggests that unusual, large payments were made by NOCAL to Liberian Government officials in connection with the 2013 award of Block 13." *Catch me if you can* at 30. This passage does double-duty. By this point, in any ordinary reasonable average reader's understanding of the Global Witness Report, the phrase "unusual, large payments" has come to be clearly understood as the Global Witness wink-and-a-nod code for "***Bribe!***" This introductory sentence on Page 30 carries yet another nefarious purpose. It deliberately implies the existence of undisclosed "Evidence seen by Global Witness," suggesting to the reader that there is even more proof of crime against Christiana Tah, Randolph McClain, and others than Global Witness can fully reveal. The passage also implies that Christiana Tah, Randolph McClain, and others have evil deeds to hide, hidden conspiracies involving bribery and corruption. The defamatory meaning of this passage coincides with the statement prominent on Global Witness' website describing its mission, which states: "Global Witness exposes *the hidden links* between demand for natural resources, *corruption*, armed conflict and environmental destruction." (Emphasis supplied).

49. The *Catch me if you can* Global Witness Report next states: "In the month following the award of Block 13 to Exxon, NOCAL paid $210,000 to six key Liberian Government officials who signed the Exxon deal – $35,000 per official. These officials were National Investment Commission Chairman Natty Davis, Finance Minister Amara Konneh, NOCAL CEO

20

Randolph McClain, Mining Minister Patrick Sendolo, NOCAL Board Chairman Robert Sirleaf, and Justice Minister Christiana Tah." *Catch me if you can* at 30.

50. Again, using its technique of signaling to the reader that Global Witness asserts these payments to be bribes, while cleverly avoiding outright statement of the "b-word," *Catch me if you can* states: "Global Witness believes these payments to be unusual. According to NOCAL bank records covering several years surrounding this date, except for smaller yearly bonuses paid shortly before Christmas, there is no sign of equivalent bonuses during this time. Block 13 was the only oil license awarded during the period." *Catch me if you can* at 30.

51. The Global Witness Report then repeats one of the style conventions used throughout the *Catch me if you can* Report, which is to always place the words "bonuses" in quote marks, as part of a snidely constructed sentence that clearly is intended to communicate to readers that the words like "bonus" or "bonuses" are nothing but thinly disguised shamefaced cover-ups for what are in reality just plain bribes. Global Witness thus sarcastically sneers that these payments were "*called*" "bonuses," plainly intimating that whatever they were *called*, they were actually bribes: "These payments were called 'bonuses' by NOCAL and were made to the officials because they were members of Liberia's Hydrocarbon Technical Committee (HTC), the inter-ministerial body responsible for signing Liberia's oil licenses. They appear also to be linked to the HTC's signing of Block 13." *Catch me if you can* at 30. The final sentence in this passage, which states that the payments were "linked to the HTC's signing of Block 13," was also intentionally defamatory. By saying "linked to" Global Witness plainly intended for readers to understand, as any ordinary reasonable average reader *would* understand, that Global Witness meant *corruptly linked*, as in *quid pro quo* bribery—pay us these payments and we will grease the deal.

21

52. Global Witness then communicated to ordinary reasonable average readers that these payments were corrupt because of their size: "Global Witness calculates that the payments represented a 160 percent increase on the reported highest salary paid to a Liberian minister. Robert Sirleaf, however, was working for free according to newspaper reports. Yet he also received a $35,000 payment. For more detail on these payments, see the chart on page 31." *Catch me if you can* at 30. The explicit reference to the "chart on page 31" openly acknowledges that Global Witness intended for its various graphic and sensationalist charts, spread throughout the Report, to reinforce the shocking and defamatory meaning of its textual narrative.

53. The next passage in the Global Witness Report is crucial. The next passage deliberately and explicitly links everything that Global Witness has been overtly communicating to readers to the crime of bribery under Liberian law: 'Under Liberian criminal law, a bribe is defined as a payment given so a public servant will undertake an official act." *Catch me if you can* at 30.

54. The Global Witness Report then makes explicit one of the most egregious, outrageous, utterly inexcusable juxtapositions of its Report. Global Witness cynically and callously set out to destroy the reputation of Christiana Tah and Randolph McClain, who had been crusaders against corruption and worked tirelessly for the betterment of Liberia, through a trite and simplistic syllogism. The original 2006 and 2007 events surrounding the sale of Block 13 to BCP, Global Witness said to readers, was clouded in corruption. It therefore followed, Global Witness told readers, that the *new* resale of Block 13 *must also* have been tainted: "In 2006 and 2007, NOCAL made payments to members of the Liberian legislature to ensure the original award of Block 13 to BCP (see section called Bribery to get Broadway/ Peppercoast Block 13). In that case, NOCAL's payments – then called 'lobbying fees' – were made to

government officials who had the power to approve an oil license. These 2006 and 2007 payments have been classified as bribes by the Liberian Government's General Auditing Commission." *Catch me if you can* at 30. The defamatory meaning of this passage is obvious. In 2007, the original sale of Block 13 was tainted by bribes, which were disguised under the euphemism "lobbying fees." In 2013, the sale of Block 13 was also tainted by bribes, this time disguised under the euphemism "bonuses."

55. Again repeating a theme prominent throughout the *Catch me if you can* Report, Global Witness on page 31 included a note attempting to cement the link between the payments to Christiana Tah, Randolph McClain and others and Exxon itself: "Note: All payments made by NOCAL derived from the same bank account. It is likely that the $5 million paid by Exxon to NOCAL was also deposited into this account." *Catch me if you can* at 30.

56. Global Witness did print in its Report the denials of Christina Tah, Natty Davis, and Robert Sirleaf. The inclusion of those denials, however, does not detract from the unmistakable message of the overall Global Witness Report. To signal to readers that Global Witness did not credit the denials, it consistently put in quotation marks assertions that the payments were "bonuses" growing out of successful negotiations. Moreover, having stated and implied again and again throughout its *Catch me if you can* Report that the payments were bribes, the obligatory inclusion of the denials by the putative criminals did nothing to neutralize the devastating and damning message of complicity in bribery that Global Witness intentionally set out to communicate. The sarcastic positioning of the denials, against the backdrop of all Global Witness was presenting, actually accentuated the defamatory sting of the Report, by making Christiana Tah, Randolph McClain, and others out as liars engaged in cover-up of their nefarious acceptance of bribery.

57. The chart displayed on page 31 of the *Catch me if you can* Global Witness Report graphically reinforced the Global Witness message that the payments to Christiana Tah, Randolph McClain and other HTC members were bribes paid by Exxon that were laundered through the $5 million of the purchase price paid by Exxon that went to NOCAL.

58. The Chart bears the heading: "Unusual, large payment to Liberian government officials who signed Exxon's Block 13 deal, 2013."

59. The Chart then states, at the top of the diagram, "Exxon pays NOCAL $5,000,000." A line then moves directly down to the next block in the diagram, which states "NOCAL pays officials $210,000." The block in turn leads downward to individual blocks for members of the HTC, beginning with Christiana Tah, and including Randolph McClain, showing their individual payments of $35,000 each. The unmistakable meaning of the Chart was that money flowed from Exxon through NOCAL to the six named officials, as a *quid pro quo* bribe for their having "signed" the Exxon Block 13 deal.

60. Bizarrely, perversely, and hypocritically, Global Witness sought to cast a sinister light on the positive fact that the HTC negotiators had managed to negotiate a deal with Exxon that was reasonably favorable to Liberia and its people. The agreement with Exxon was much more favorable to Liberia than the original 2007 BCP contract for the same oil block. The *Catch me if you can* Global Witness Report thus asserted: "Exxon was under no obligation to pay most of the money it gave to NOCAL; $4 million of its $5 million payment was characterized as a "bonus" that is not required by Liberian law, but was rather negotiated by the company." *Catch me if you can* at 32. This was a deliberate effort by Global Witness to render a *positive* for Liberia a *negative*. It was *of course* true that Exxon was under no obligation to pay NOCAL $5 million, or Liberia as a nation $50 million, or for that matter to pay *anything* for Block 13 at all.

24

The entire point of Liberia's negotiation with Exxon was to extract from Exxon the highest price the negotiations would bear.  After generations of deals with oil companies that were not good for Liberia, finally with the sale of the rights to Block 13 Liberia began to turn things around and secure a fair price for the Liberian people.  Exxon was perfectly free to walk away from the table anytime it wanted.  That the efforts of HTC to secure a highly favorable purchase price succeeded, without Exxon balking and walking, was nothing evil or corrupt.  The insinuation by Global Witness to the contrary was yet another example of its intentional manipulation of readers to the service of its sensational tabloid-style Report seeking to paint the sale of Block 13 in the colors of corruption.

61.  The Global Witness Report continued with yet another insistence that the payments were made with Exxon's money:  "And in effect, the unusual payments made by NOCAL for which Global Witness has evidence were likely made with Exxon's money. They were made in the month after Exxon paid NOCAL $5 million, and they were likely paid from the same bank account into which Exxon's money was deposited." *Catch me if you can* at 32.  The sinister non-sequitur propagated by Global Witness here is the deliberately misleading equation of bonuses paid for out of the proceeds of a highly profitable deal and corrupt payments made as bribes to induce acceptance of the deal. The commercial reality throughout the civilized world is that payments made to those who successfully conclude transactions are *always* paid for from the proceeds of the transaction—lawyers are paid contingency fees from successful judgments or settlements, brokers are paid commissions on sales, firms pay employees bonuses from the proceeds of favorable transactions.  Such payments, which always come from the proceeds of a sale, are morally and legally distinguishable from *bribes*, payments corruptly made to public officials as the *quid pro quo* for approval of deals granting official benefits to the persons

engaged in the bribery.  In this case, it was *Liberia* that achieved the favorable terms.  Indeed, Block 13 ultimately turned up dry, yielding no useful production to Exxon.  There was no rationale or need for Exxon to bribe Liberian officials to accept a deal that was already historically lucrative from Liberia's perspective.  To the contrary, for once it was Liberia's turn to celebrate, and to reward those on its side for achieving favorable terms worth celebrating.

62.  The Global Witness Report continued its unremitting theme of communicating that the payments were bribes by making it manifestly clear to readers that the bribery allegations were allegations that Global Witness was willing to vouchsafe as true: "Global Witness believes that Exxon should have considered it possible that money the company provided to NOCAL could have been used as bribes in connection with Exxon's Block 13 deal. Global Witness has written to Exxon requesting information about those safeguards the company may have put in place to prevent the possible misuse of its funds by NOCAL." *Catch me if you can* at 32.  Piling on, Global Witness smugly asserted: "Given these circumstances of this exceptional deal, Global Witness believes that the Liberian Government should investigate payments made to officials by NOCAL in 2013 to determine whether any Liberian laws may have been broken." *Catch me if you can* at 32.  Given the *tour de force* of accusation and innuendo that Global Witness had mounted, however, no ordinary reasonable average reader could doubt what Global Witness was actually communicating.  This was not some arms-length innocent question, asking whether Liberian laws had been broken.  This way a deliberate laying down of the gauntlet, asserting that Liberian laws *had* been broken, and challenging Liberia, the American Justice Department, the American Securities and Exchange Commission, and the Congress of the United States, to do something about it.

63. Page 36 of the Global Witness Report contained yet another melodramatic graphic display. This time the display was of bank account records from "Ecobank: The Pan African Bank." These Ecobank records obtained by Global Witness were intentionally blurred to make them unreadable, in much the same way that a secret confidential source may appear on a television expose with a face blurred or voice altered to protect the source's identity. Certain selected lines from the Ecobank records, however, were highlighted and extracted by Global Witness with the entries unblurred, placed in red blocked boxes and enlarged for dramatic emphasis. A note by Global Witness to this melodramatic display of records stated: "Highlights and enlargements in red added by Global Witness for emphasis." *Catch me if you can* at 33.

64. The ominous bank record display on page 33 of the Global Witness Report is highlighted by the heading:

**Excerpts from NOCAL bank records showing unusual and suspicious payments surrounding Exxon's Block 13 deal in 2013**

65. This heading uses the word "excerpts," connoting that there is more than just what is revealed in the Global Witness Report. It also repeats the euphemism "unusual and suspicious payments," the Global Witness code for "bribe." The entire presentation is made to appear all the more reprehensible through the effects of the blurring of background text and the highlighting of the transactions Global Witness enlarged and unblurred, for emphasis, including one of the $35,000 payments to HTC members such as Christiana Tah and Randolph McClain.

66. The assertion that Global Witness was in possession of other defamatory facts not disclosed in the Report is made explicit by other text on this display page, asserting: "These bank records *represent a sample of the evidence seen by Global Witness showing NOCAL's unusual and suspicious payments* at the time Exxon obtained the oil block." *Catch me if you can* at 36 (emphasis added).

67.   The concluding pages of *Catch me if you can* added additional punctuation and emphasis to the messages communicated throughout the Report. These included statements such as, "Based upon the available evidence, Global Witness believes that Liberia's oil sector was corrupt, and Exxon's purchase of Block 13 made the company complicit." *Catch me if you can* at 36. "Exxon's 2013 deal was characterized by unusual, large payments to officials who signed the Exxon deal." *Catch me if you can* at 36. While admitting that "Global Witness cannot prove that these payments were improper," *Catch me if you can* at 36, the Global Witness Report relentlessly communicated to readers that in fact the payments *were* improper, indeed, that they were bribes. This conclusion is communicated, for example, by the call by Global Witness for the "public disclosure of disaggregated project-level payments to governments, with no exemptions, *to prevent this type of corruption from happening in the future.*" *Catch me if you can* at 34. This statement by Global Witness can have only one meeting for the ordinary reasonable average reader. That meaning is that the disaggregated project-level payment made by Exxon to Liberia for Block 13 was corrupt. The phrase "this type of corruption" and the phrase "from happening in the future" both plainly communicate that what happened in the 2013 sale of Block 13 was the "this" referred to in "this type of corruption."

68.   On page 35 of *Catch me if you can*, Global Witness added yet another dramatic visual touch to its condemnation of Christiana Tah, Randolph McClain and others, in the form of a photograph of a billboard depicting a young baby with a hand in the air in a "stop" gesture, stating "My Fate Is In Your Hands! Stop Destroying My Future!" and saying "STOP CORRUPTION!" Beneath the photograph was a caption stating: "Corruption is undermining Liberia's development. Credit: Global Witness"

### D. Average Readers of the Global Witness Report Understood It As Alleging the Corrupt Receipt of Bribes by Christiana Tah and Randolph McClain

69.  To be actionable as defamation, the Court need only determine that an average reader *could* have understood the Global Witness Report as alleging that Christiana Tah and Randolph McClain each took a bribe.  The best demonstration that an average reader *could* so understand the Global Witness Report is that readers in fact *did* so understand the Report.  Letters to the Editor of *Front Page Africa* from readers around the world interpreted the *Catch me if you can* Report as alleging corruption and bribery.  One such letter, for example, which was published by *Front Page Africa*, took umbrage at the gist of the Global Witness attack on Christiana Tah:

> I am appalled that Global Witness so cavalierly defames a great Liberian and a woman of undoubted integrity.
>
> To suggest that she was corrupted by EXXON in relation to its acquisition of rights to Block 13 is ludicrous. And those who have been positively affected by her exemplary conduct as Justice Minister know this to be true. And I believe that you are one of those who have been so positively affected (by Christiana Tah's exemplary conduct).

Lennart Dodoo, "Defending Former Justice Minister Christiana Tah in Global Witness' Report On Exxon," *Front Page Africa*, April 11, 2018, (reprinting letter to the editor by Jim Dube from Toronto, Canada), available at: https://frontpageafricaonline.com/opinion/letters-comments/defending-former-justice-minister-christiana-tah-in-global-witness-report-on-exxon/

**E.  Media Accounts of the Global Witness Report Described it as Alleging Bribery**

70.  News organizations world-wide, reporting on the *Catch me if you can* Global Witness Report, summarized the Global Witness Report as accusing Christiana Tah, Randolph McClain, and others of corruption and taking bribes to approve the Exxon Block 13 purchase.

71.  An article in *Front Page Africa* thus summarized the *Catch me if you can* Report as alleging bribery, stating: "In March, NOCAL became a subject of interrogation again when Global Witness released its stunning report, Catch Me If You Can, that alleged that several

29

Board members and members of the Hydrocarbon Technical Committee received bribes to the sign off on Block-13 to ExxonMobil." Lennart Dodoo, "Pres. Weah 'Ignores' Special Task Force Recommendation, Appoints New Team to NOCAL," *Front Page Africa*, June 20, 2018, available at: https://frontpageafricaonline.com/news/liberia-pres-weah-ignores-special-task-force-recommendation-appoints-new-team-to-nocal/

72.   An article in *Newsweek* summarizing the Global Witness report similarly communicated that Global Witness was implying corruption in the consummation of the Exxon Block 13 deal. The *Newsweek* article stated: "Under the leadership of former Secretary of State Rex Tillerson, oil giant Exxon Mobil signed a $120 million deal for an oil block in Liberia that company officials knew was rife with corruption, according to a new investigation by the transparency organization Global Witness."   Christina Maza, "Rex Tillerson's Exxon Mobil Involved in Corrupt Oil Deals in Liberia, Investigation Reveals." *Newsweek*, March 29, 2018, available at: http://www.newsweek.com/rex-tillersons-exxon-mobile-involved-corrupt-oil-deals-liberia-investigation-866026.

73.   Echoing the theme that Exxon funneled money to bribe Christiana Tah, Randolph McClain and others, the *Newsweek* article continued, "The six Liberian officials who approved Exxon's purchase were also simultaneously awarded suspicious payments of over $200,000 . . . according to the report." *Id.*   The *Newsweek* article then channeled the sinister suggestion of the Global Witness Report that the payments came from the same bank account in which Exxon had deposited its funds: "'The payments were probably made from the same bank account into which Exxon had just deposited $5 million for Block 13, although there is no evidence that Exxon itself directed or knew about payments to officials,' according to the report.'"

**F. The Liberian Government Understood the Global Witness Report
As Alleging that Christiana Tah, Randolph McClain and**

**HTC Members Had Accepted Bribes**

74.   The ultimate proof that the *Catch me if you can* Global Witness Report *could* have been reasonably understood as conveying the assertion that Christiana Tah, Randolph McClain, and others on the HTC accepted bribes is that this was how the President of Liberia and others in the Liberian government *in fact understood* the Global Witness Report.   Liberian President George Manneh Weah succeeded Ellen Sirleaf as the President of Liberia in 2018.   Following publication of the *Catch me if you can* Global Witness Report, President Weah appointed a Special Presidential Committee to investigate the allegations of bribery against Christiana Tah, Randolph McClain, and others identified in the Global Witness Report.   The Special Presidential Committee issued its findings in May 10, 2018.   *Report of the Special Presidential Committee Appointed to Examine the March 2018 Global Witness Report of the National Oil Company of Liberia (NOCAL)* (*"Special Presidential Committee Report."*)

75.   The *Special Presidential Committee Report* officially confirmed what all people of ordinary common sense already knew—that the gist and sting of the *Catch me if you can* Global Witness Report was that Christiana Tah, and Randolph McClain, and others had accepted bribes to effectuate the Exxon purchase of Block 13.   In the words of the *Special Presidential Committee Report*:

> His Excellency, **George Manneh Weah**, President of Liberia. constituted a five-member Special Presidential Committee (SPC) to examine the allegations of March 2018, made by **Global Witness (GW)**, an international anti-corruption watchdog based in London alleging, amongst other things, that in negotiating the Concession agreement between ExxonMobil and the Government of Liberia for Liberia's offshore Oil Block LB13, some prominent Liberian government officials who led   the negotiation received bribe in amounts ranging up to US $35,000 each. The report specifically named:
>
> 1.     Cllr. Christiana Tah (Fmr. Minister of Justice and Attorney General, R.L)
> 2.     Mr. Amara Konneh (Fmr. Minister Finance and Development Planning)

3.     Mr. Robert Sirleaf (Fmr. Chairman, Board of Directors of NOCAL during the period under review)
4.     Mr. Natty B. Davis (Fmr.  Director General, the National Investment Commission of Liberia)
5.     Mr. Patrick Sendolo (Fmr. Minister Lands, Mines and Energy) and
6.     Mr. Randolph A.K.W McClain ( Fmr. Member of Board; Secretary of Board at some point, NOCAL)

*Special Presidential Committee Report* at 3 (Bold emphasis in original).

76.   The *Special Presidential Committee Report* articulated its mandate as a duty to "Examine the authenticity of the allegation contained in the Report issued by Global Witness on Liberia of March 2018," which it elaborated as requiring analysis of the more specific duty to "Determine if the individuals specifically and collaterally named in the Report indeed received perquisite, emoluments or benefits, directly or indirectly, on account of any duty required of them by the Government and, if yes, determine whether or not the amount so paid and received constitutes **Bribe** under our law." *Special Presidential Committee Report* at 4 (Emphasis in bold and underline in original).

77.   The *Special Presidential Committee Report* accurately summarized the *Catch me if you can* Global Witness Report as a "three-prong" story.  In the words of the *Special Committee Report*:

Clearly, from the preamble, the Report is three-prong:

1.     The story about Bribery, apparently, involving Liberian officials;
2.     Efforts by Exxon to by-pass US Anti-Corruption Law, by turning blind eyes to probable incidents of corruption in poor countries/locations, like Liberia, where they operate; and
3.     About how the United States can support efforts to mitigate corruption in all dealings involving its national corporations and the local countries where these companies operate.

*Special Presidential Committee Report* at 11.

78.  The *Special Presidential Committee Report* limited its inquiry to the first of these prongs: "This Committee, by its mandate, will limit itself to count 1 thereof that is: 'Story about Bribery, apparently involving Liberian officials'." *Special Presidential Committee Report* at 11.

79.  In short, the current government of Liberia read the Global Witness Report exactly as the Global Witness Report invited readers to read it, and exactly as ordinary average readers did read it, and exactly as other media organizations read it.  All of them read it as impugning Christiana Tah, Randolph McClain and other HTC members for accepting bribes to effectuate the Exxon Block 13 purchase deal.

## G.  Falsity

80.  The gist and sting of the Global Witness Report that Christiana Tah and Randolph McClain each took bribes for their roles in the Exxon Block 13 deal, is unequivocally and absolutely false.  Christiana Tah did not take a bribe.  Randolph McClain did not take a bribe. The payments they each received were bonuses for the successful completion of the Exxon Block 13 purchase on historically favorable terms for Liberia was just that and only that— bonuses.  The payments were voluntarily paid at the direction of the NOCAL Board at the voluntary behest of President Sirleaf.  Christiana Tah and Randolph McClain never solicited or demanded such payments, directly or indirectly.  There was no *quid quo pro* arrangement between Christiana Tah and Randolph McClain and Exxon, or anyone within the Liberian government, or any person or entity connected in any manner to the Exxon Block 13 purchase. All policy and legal advice rendered by Christiana Tah in the negotiation of the Exxon Block 13 deal was based on her independent and professional and entirely ethical judgment and was for the benefit of the people of Liberia.  All actions undertaken by Randolph McClain were based on his independent and professional and entirely ethical judgment and were for the benefit of the

people of Liberia. The defamatory imputations of bribery against Christiana Tah and Randolph McClain communicated by Global Witness in *Catch me if you can* were entirely false.

81. Christiana Tah's and Randolph McClain's allegations that the defamatory charge of bribery imputed to her by Global Witness was false rests on more than their own assertions, or the assertions of the other members of the HTC. The *Special Presidential Committee Report* squarely and unequivocally exonerated Christiana Tah and Randolph McClain of any guilt for accepting bribes, absolutely declaring the Global Witness allegation of bribery to be false:

> The Committee would like to immediately dispel the contention that the sums of money paid to HTC members who negotiated and sealed the ExxonMobil Agreement constitutes Bribe. The Committee finds no evidence to support such contention. In its Report, GW, in reliance on Liberian law, defines bribe as "a payment given so a public servant will undertake an official act". The Honorable Supreme Court of Liberia in the matter: Andrew et al v Gardner et al; 10 LLR 389 (1951), held that "Bribery involves a promise to give, or an acceptance of money or other thing of value. Almost anything may serve as a bribe as long as it is of sufficient value in the eyes of the person bribed to influence his official conduct." The Committee did not find that the amount paid to members of the HTC influenced their official conduct in negotiating the ExxonMobil Agreement, or that the amount so paid to the members of the HTC was made so they could undertake that official act. The Committee observed, however, that the payment may have been a promise made prior to the conclusion of the ExxonMobil deal, but, neither the GW Report nor any evidence seen by the Committee suggests that promises were made to the members of the HTC prior to the conclusion of the Exxon deal. Accordingly, while it is the finding of the Committee that members of the HTC did in fact receive payments made to them by NOCAL and variously referred to as bonus or honorarium, the Committee is not persuaded that the payment constitutes bribe within the context of our law, for the purposes of negotiating the ExxonMobil agreement for LB13.

*Special Presidential Committee Report* at 13.

82. This finding was again clearly articulated in closing section of the *Special Presidential Committee Report*, stating flatly "That the amounts received from NOCAL by members of the HTC after the successful negotiation of the ExxonMobil Agreement does not constitute bride within the context of our law." *Special Presidential Committee Report* at 13.

83. The *Special Presidential Committee* Report did go on to recommend that the payments to the HTC members be returned. That recommendation was widely perceived within Liberia as without legal foundation and incoherent, given the conclusion of the *Special Presidential Committee* that the HTC members had not accepted bribes and given the overwhelming evidence that members of the HTC, and specifically for the purposes of this lawsuit, the plaintiffs Christiana Tah and Randolph McClain, did not demand any money for work done on the Exxon contract, nor did they receive payments that were illegal under Liberian law in any way, shape, or form. The legal analysis of the *Special Presidential Committee*, for example, was flatly contradicted by a formal legal opinion issued in 2015 by then Justice Minister Benedict Sannoh, which had upheld the legality of payments to members of Boards who were also otherwise employed by the Liberian government, as legal under Liberian law. Minister Sannoh's legal opinion was among the legal sources cited by the HTC members and others in defending the legality of the Exxon Block 13 bonus payments by the Liberian government to the HTC for exceptional work. In fact, the HTC members, including Christiana Tah and Randolph McClain, have not returned their entirely ethical and legal bonus payments. Christiana Tah and Randolph McClain have alleged that they were not guilty of receiving bribes. The *Special Presidential Committee* Report fully agrees with Christiana Tah and Randolph McClain that they were not guilty of receiving bribes. It is the devastating accusation of felonious criminal conduct and betrayal of Liberia in taking bribes upon which Christiana Tah and Randolph McClain ground their defamation claim. That claim remains on entirely firm ground, whatever the ultimate resolution of the technical legality of the payments may turn out to be. There is a world of difference morally, ethically, legally, and in the "court of public opinion," between acceptance of a *bribe*, and acceptance of a *bonus*, even if the bonus turns out

35

in retrospect to be beyond the scope of the payor.  One is corrupt, evil, *malum in se,* the other is not.  Christiana Tah, Randolph McClain, and many others within Liberia firmly believe the bonuses paid to all NOCAL employees, as well as to those who successfully negotiated the Exxon Block 13 deal, were entirely appropriate and authorized.  Whether Christiana Tah and Randolph McClain are right or wrong on that score, however, is beside the point as far as this claim for defamation is concerned.  What matters for the purpose of this Complaint is that Global Witness imputed to Christiana Tah and Randolph McClain the taking of bribes.  *That* imputation, as the *Special Presidential Committee* found, is utterly and completely false.

### H. Fault

84.  In publishing *Catch me if you can* to a world-wide audience, and particularly to the readers within the District of Columbia, Global Witness acted with negligence and with actual malice, defined as knowledge of falsity or reckless disregard for truth or falsity.  In addition to whatever evidence of negligence or actual malice may be adduced through discovery, Christiana Tah and Randolph McClain allege the known facts below to establish negligence and actual malice.

85.  Global Witness deliberately and callously communicated to readers the defamatory accusation that Christiana Tah and Randolph McClain accepted a bribe even though at the time of its publication of *Catch me if you can* Global Witness was in possession of ample information discrediting the bribery allegation.  Global Witness subjectively *knew* that it had not been able to determine whether or not the payments of $35,000 to Christiana Tah and Randolph McClain were  corrupt bribery payments or an innocent and deserved bonuses.  Yet without resolving that subjective doubt, and notwithstanding the material in its possession that generated a high degree of subjective awareness that its story was false, Global Witness proceeded to present to readers

the defamatory message that in fact Christiana Tah and Randolph McClain had taken bribes. This behavior went beyond ordinary negligence and escalated to publishing the defamatory bribery falsehood with knowledge of falsity or reckless disregard for truth or falsity. To advance its sensationalist agenda, Global Witness presented to readers a bribery charge *as if it knew the charge to be true* when in fact *it knew it did not know*.

86. There are many indicia present in the factual circumstances highly probative of the existence of actual malice. One of the principal indicators of actual malice was the pre-conceived story line and partisan agenda that drove publication of the *Catch me if you can* Global Witness Report.

87. Global Witness had a pre-conceived story line prior to publishing its *Catch me if you can* Report. Global Witness was already determined to publish a sensational account accusing Exxon of paying bribes in order to secure the purchase of Block 13. From the thrust of the *Catch me if you can* Report, it is plain that Global Witness was advancing a partisan agenda, designed to embarrass and discredit Exxon, and its former President Rex Tillerson, the CEO of Exxon who had become the Secretary of State of the United States under President Donald Trump. The *Catch me if you can* Report, on its cover page, thus bears the sub-headline: "Exxon's complicity in Liberian oil sector corruption and how its Washington lobbyists fight to keep oil deals secret."

88. In the opening sections of the report, under the heading "People," in which key persons in the *Catch me if you can* Report narrative are previewed, Rex Tillerson is prominently featured, with the text: "US Secretary of State from February 2017 to March 2018. Tillerson was CEO of Exxon from 2004 to 2016, during which time he lobbied against Section 1504, a key anti-corruption law aimed at stopping corruption and bribery in oil and gas deals. He has also served as Board Chairman of the American Petroleum Institute." *Catch me if you can* at 5.

37

89. The *Special Presidential Committee Report* identified the effort to discredit Exxon as the principal thrust of the *Catch me if you can* Report:

> The main thrust of the Global Witness Report, in the opinion of the Committee, is to indict Exxon for its use of alleged unorthodox methods in acquiring Concession License for Natural Resources in poor countries around the world. The Report5 argued that in acquiring Liberia's offshore Oil Block 13, Exxon may have advertently encouraged corruption and that some Liberian officials involved in the transaction may have engaged in corrupt practices contrary to the laws of Liberia. The Committee observed that a number of the assertions in the GW Report as to the content relating to Liberia are speculative, and that the real object of its Report was not Liberia, but the conduct of Exxon.

*Special Presidential Committee Report* at 11.

90. In order for the *Catch me if you can* Report to have any genuine power to damage Exxon and Secretary of State Tillerson, however, Global Witness needed to do more than simply establish that Exxon had purchased Block 13, which had *previously* been sold under suspicious circumstances to a prior purchaser, BCP. For if Exxon's purchase of Block 13 was entirely clean, fair, and above-board, paying a fair purchase price without any corruption or bribery, the sensational "indictment" that Global Witness sought to pin upon Exxon would have been attenuated and anemic. That is why the *Catch me if you can* Report is permeated by accusations that Exxon's *current* purchase of Block 13 in 2013 was *also* accomplished through bribery, thereby directly linking Exxon *itself* to the practice of paying or facilitating bribes. The *Catch me if you can* narrative thus repeatedly insists that Exxon knew that the money it was distributing in "disaggregated" sums at the "project level" would be used to distribute bribes.

91. Global Witness *had already conceived of this story line* before it ever even completed its investigation. Global Witness was determined to make its narrative conform to these sensational allegations. The telltale proof came in the form of letters written by Jonathan Gant and Global Witness to Christiana Tah, Randolph McClain, and others, in which Global

Witness directly accused Christiana Tah, and Randolph McClain, and others of accepting bribes

in the amount of $35,000 as the *quid pro quo* to ensure that Block 13 would be sold to Exxon.

The letter to Christiania Tah, dated March 7, 2018, thus stated bluntly and brazenly, "we believe

that the payment made by NOCAL to you was most likely a bribe, paid as a reward to ensure that

LB 13 was negotiated successfully." With extraordinary arrogance, Global Witness sent this

letter to Christiana Tah on March 7, 2018, accusing her of the felonious crime of bribery, and

demanding a reply by Christiana Tah within one week, by 5:00 p.m. on March 14, 2018.

92.   An essentially identical letter was sent by Global Witness to Randolph McClain on

March 2, 2018. That letter demanded a response by 5:00 p.m., March 9, 2018, B.S.T. The letter

to Randolph McClain also embraced the pre-conceived story line of the Global Witness Report,

stating, "we believe that the payment made by NOCAL to you was most likely a bribe, paid as a

reward to ensure that LB 13 was negotiated successfully."

93.   Christiana Tah did reply in a forceful and unequivocal letter to Mr. Gant and Global

Witness, dated March 12, 2018. In her letter she told the truth in blunt detail:

> We have never spoken, and I have no idea what your agenda is. I am appalled by the fact that you think it is ethical to allege bribery without first seeking out the facts. Indeed, I am of the impression that it makes little difference to you whether you have your facts right before making these allegations; hence I am copying both the Chair of the Advisory Board of Global Witness and the CEO with this response. I understand that the Chair of the Advisory Board has already expressed a cautionary note within Global Witness concerning the anticipated publication. Hopefully, this letter (along with any other responses which I expect you are receiving) will give Global Witness cause for concern that not only are you acting recklessly with respect to reputational injury to innocent people but also acting in a manner that cast aspersion on the reputation and credibility of Global Witness.

> Bonus payments were authorized by NOCAL's Board of Directors to all NOCAL Staff and others who performed exceptionally in conducting the negotiations on the Exxon Contract. These bonus payments were made long after the Exxon deal was concluded. I understand that even drivers received bonuses.

Do you mean to tell me that Exxon was so desperate that it even bribed the drivers?

I did not receive money or an offer to pay money from Exxon-Mobil for the award of the oil contract related to Block #13; neither am I aware of anyone who may have requested or received a bribe from the aforesaid company, directly or indirectly. The suggestion that there was a "quid pro quo" link between entering into the contract and the payments, by using the term "bribe," is malicious, and appears to be deliberate and purposeful.

I served the Government of Liberia in the capacity of Attorney General/Minister of Justice for five years and did not at any time solicit concessionaires or any individual or entity seeking a contract with the Government to pay me anything.

I advise that you consult with your counsel on the legal ramifications of malice in publishing defamatory statements. I will not sit by and allow you to defame my good name.

94.   Randolph McClain also forcefully replied to Global Witness.  His reply stated:

Dear Mr. Gant:

I finally received a March 2, 2018 letter of Global Witness that you forwarded to me via Facebook Messenger. I rarely visit Facebook Messenger for mail communications. Please forward this response to the unknown contact at Global Witness.

In the letter sent, Global Witness, in essence, accuses me of accepting a bribe in the form of "a reward to ensure that LB13 was negotiated successfully" with ExxonMobil. I did not take any bribe in connection with the LB13 ExxonMobil Contract of 2013. I do not take bribes. That Contract is acknowledged as a landmark contract and extraordinary enough to be now used as a model for all future contracts of this nature.  Any bonus given by our superiors was in acknowledgement of the Team's extraordinary work after the completion of the landmark Contract.

Sincerely,

Randolph A.K.W. McClain, PhD
Former CEO, NOCAL
Chairman, LB13 Negotiation Team

95. The pre-conceived story line and agenda that drove the Global Witness publication of *Catch me if you can* is further evidenced by other correspondence sent by Global Witness to persons involved in the Exxon negotiations in the weeks prior to publication.  Global Witness, for example, sent letters to other Liberian officials accusing them of bribery.  Global Witness received cogent responses from officials other than Christiana Tah and Randolph McClain, including Natty Davis and Robert Sirleaf, carefully explaining that the payments were not bribes, but bonuses appropriately earned given the extraordinary success of the Exxon negotiations.

96. So too, in March 2018, Jonathan Gant at Global Witness sent a message to Susan Maples, one of the American consultants who advised the HTC on the Exxon negotiations, stating that Global Witness believed that the payment of $15,000 to Susan Maples was  most likely "a bribe, paid as a reward to ensure that LB 13 was negotiated successfully."  Susan Maples responded by expressing her stunned dismay at the false allegations.

97. Jeff Wood, another American consultant on the Exxon Block 13 negotiation, also wrote pointedly to Jonathan Gant to clearly articulate the false premises of the Global Witness bribery allegations, including very deliberately explaining that the payments made by Exxon, including the $5 million that went to NOCAL, was in no sense "voluntary," as Jonathan Gant and Global Witness had asserted, but was a bargained-for payment successfully negotiated by Liberia as part of Exxon's purchase price.  Jeff Wood explained that he would testify as a witness in any defamation action brought against Global Witness regarding the false bribery allegations.  Jeff Wood's statements to Jonathan Gant also made it clear that it was deliberately misleading for Global Witness to equate the bribery allegations surrounding the original purchase of Block 13 by BCP in 2006 and 2007 with the very different bonus payments awarded following the highly successful 2013 Exxon deal.  Jeff Woods' statements also explained how

41

the bonus payments to all NOCAL employees, "all the way down to the drivers and housekeeping staff," was "hardly consistent with an intent to bribe, and completely consistent with the payment of a bonus." Jeff Wood's communication to Jonathan Gant and Global Witness also painstakingly explained that the suggestion by Global Witness that the payments were corrupt because there had been no similar payments in recent years was entirely baseless, because there had simply been no successful NOCAL sales deals consummated during those years. There had simply been no success to reward.

98. Additional indicia of the existence of actual malice by Global Witness rests in the inexplicably inconsistent manner with which it ultimately treated various participants in the Exxon Block 13 deal. Global Witness had written to the five consultants involved in advising the HTC, accusing those consultants of also taking bribes to facilitate the Exxon contract. As set forth above, certain of those consultants pushed back against Global Witness, asserting that the payments were not bribes, either to the consultants, or any of the employees of NOCAL, or other participants in the negotiations on behalf of Liberia. In final publication of the *Catch me if you can* Global Witness Report, no accusations against the consultants for taking bribes were included, *even though the consultants had offered explanations aligned with those of the HTC members who responded.* This internal contradiction, hidden from readers of the Global Witness Report, is powerful evidence probative of actual malice—knowledge of falsity or reckless disregard for truth or falsity.

99. An additional glaring internal inconsistency probative of actual malice in the *Catch me if you can* Global Witness Report was its stunning failure to include the name of the Legal Advisor to President Sirleaf, Seward Cooper, as among the HTC members who received a $35,000 bonus. Indeed, while the HTC had six members, as Global Witness knew, the sinister

chart it displayed to graphically communicate its point that bribe money had flowed from Exxon

through NOCAL to the HTC members contained only *five* of the six members, conspicuously

leaving out Seward Cooper's name. This deliberate omission is powerful evidence probative of

actual malice, because the entire narrative advanced by the *Catch me if you can* Global Witness

Report treating the payments as bribes rather than bonuses would be undermined by evidence

that the payments had come voluntarily at the directive of President Sirleaf *after* successful

completion of the contract with Exxon as a deserved bonus for a job well done. Yet this was

exactly the conclusion of President Sirleaf's *own legal advisor*, who had been asked to opine,

with Christiana Tah, on the legality of the bonus payments. That legal opinion was *grounded* in

the supposition that there was *no quid pro quo*, not even a *demand*, for payment by any HTC

member, including Seward Cooper himself. Thus, a jury could conclude that the conspicuous

omission of Presidential Legal Advisor Seward Cooper's name and title from its *Catch me if you

can* Report was a deliberate manipulation to mask from readers a glaring inconsistency in its

narrative, a manipulation highly probative of actual malice.

100.   The letters sent by Global Witness to United States Attorney General Jeff Sessions

and to Securities and Exchange Commission Chairman Jay Clayton, with copies of the *Catch me

if you can* Global Witness Report, also displayed the partisan sensationalist agenda driving the

Global Witness publication. The letter to Attorney General Sessions, entitled "Letter regarding

evidence of corruption, Exxon Mobil Corp, and Liberia," for example, included the following

recitation:

> There is evidence that, in 2013, Liberian Government officials responsible for
> signing Exxon's Block 13 purchase received unusual, large payments of $35,000,
> representing an estimated 160 percent of the officials' annual salary. They were
> made by Liberia's oil agency (NOCAL) and were likely made from the same
> bank account into which Exxon had recently deposited funds it owed the
> government for purchasing Block 13. There is no evidence that Exxon was aware

of these payments, although it was aware that bribes had previously been paid by NOCAL to ensure the approval of oil licenses, including Block 13 in 2007.

101.  The letter to Attorney General Sessions unmistakably linked the phrase "unusual, large payments of $35,000" to bribery, by following the phrase with the statement that Exxon "was aware that bribes had previously been paid by NOCAL to ensure the approval of oil licenses, including Block 13 in 2007," thereby plainly communicating that the payments of $35,000 were "bribes" made "to ensure the approval of oil licenses, including Block 13." Global Witness sent this letter to the Attorney General, which unmistakably was intended to be understood as asserting bribery and corruption in the consummation of the purchase of Block 13 by Exxon, at a time in which Global Witness already knew the credibility of those charges had been discredited and undermined.

102.  An identical letter was sent to the Chairman of the Securities and Exchange Commission, Jay Clayton.

103.  In the cold calculation that presenting its sensational narrative would advance the reputation of Global Witness as a muckraking transparency organization, Global Witness was willing to recklessly destroy the reputation of Christiana Tah and Randolph McClain. Everything presented in *Catch me if you can* was dramatically and sensationally narrated and displayed to generate the maximum defamatory impact on the minimum of actual verified fact.

### VI.  Count II—False Light Invasion of Privacy

104.  Christiana Tah and Randolph McClain re-plead and incorporate all the paragraphs in this Complaint above for their False Light claims.

105.  In addition to the specific charge of bribery alleged in Christiana Tah's and Randolph McClain's claim for defamation, Global Witness also imputed to Christiana Tah and Randolph McClain a more generalized charge of "corruption" in the conduct of their duties as a

participant in the Exxon Block 13 purchase. The word "corrupt" appears *ninety-two* times in the Global Witness Report. The word "corruption" appears *seventy-three* times. The *Catch me if you can* Report, as alleged above, repeatedly and incessantly use terms such as "large, unusual payments," "suspicious payments," and "corruption" to describe the Exxon Block 13 deal and Christiana Tah's and Randolph McClain's participation in the Exxon Block 13 negotiation. While Christiana Tah and Randolph McClain insist that what readers understood was an allegation of outright bribery, there is simply no turning away from the manifest reality that *at the very least* the Global Witness *Catch me if you can* report accused Christiana Tah and Randolph McClain of "corruption." That charge of "corruption" was not generalized euphemism, but a fact-laden specific allegation of dishonest, fraudulent, and illegal abuse of power in the negotiation and consummation of the Exxon contract for Block 13, as set forth in detail in the prior paragraphs of this Complaint. This was both defamatory and a false light invasion of privacy. Global Witness gave world-wide publicity to a false charge of corruption that would be highly offensive to an ordinary reasonable person. The false charge of corruption was in fact highly offensive to Christiana Tah and Randolph McClain. For all of the reasons previously pleaded in this Complaint, and incorporated in this False Light count, Global Witness published the false charge of corruption with actual malice—knowledge of falsity or reckless disregard for truth or falsity. In placing them in a false light in the public eye, Global Witness has caused Christiana Tah and Randolph McClain extreme personal anguish and humiliation. While Christiana Tah and Randolph McClain strenuously allege that they are entitled to recover defamation, they are certainly at the very least entitled to recover for false light invasion of privacy.

## VII. DAMAGES

106.  Christiana Tah and seeks recovery of special damages, presumed damages, actual damages, and punitive damages.

107.  Christiana Tah has suffered special damages in the form of lost employment and consulting opportunities of $10,000.00.

108.  Christiana Tah has suffered general damage to her reputation, recoverable as presumed and actual damages on her defamation claim, as well as damages arising from personal humiliation and anguish, recoverable under both her defamation and false light claims, in the total amount of $5,000,000.

109.  Christiana Tah seeks punitive damages for the reckless, intentional, and malicious actions of Global Witness in defaming her and placing her in a false light in the public eye, in the amount of $1,000,000.

110.  Randolph McClain seeks recovery of presumed damages, actual damages, and punitive damages.

112.  Randolph McClain has suffered general damage to his reputation, recoverable as presumed and actual damages on his defamation claim, as well as damages arising from personal humiliation and anguish, recoverable under both his defamation and false light claims, in the total amount of $5,000,000.

113.  Randolph McClain seeks punitive damages for the reckless, intentional, and malicious actions of Global Witness in defaming him and placing him in a false light in the public eye, in the amount of $1,000,000.

## VIII. JURY DEMAND

114.  Christiana Tah and Randolph McClain respectfully request a trial by jury.

Respectfully submitted,

Dated: 7 September 2018

Arthur V. Medel, Esq.  (D.C. Bar # 416029)
MEDEL SANFILIPO
1701 Pennsylvania Avenue, N.W., Suite 200
Washington, D.C. 20006
Tel:  202 683 2008
Cell: 703 945 9137
Fax: 703 991 8014
avmedel@medsanlaw.net

*Of Counsel*:

Rodney A. Smolla
4601 Concord Pike
Wilmington, DE 19807
rodsmolla@gmail.com
(864) 373-3882
*Pro Hac Vice Motion Pending*

*Attorneys for Plaintiffs Christiana Tah and Randolph McClain*

# EXHIBIT

# A



**global witness**

# Catch me
## if you can

Exxon's complicity in
Liberian oil sector corruption
and how its Washington lobbyists
fight to keep oil deals secret

**MARCH 2018**



Map not to scale. License location approximated.

# CONTENTS

**THE CAST AND THE ACRONYMS** .................................................................. **4**
Companies and government agencies .......................................................... 4
People .................................................................................................................. 5
Additional abbreviations ................................................................................ 5

**SETTING THE SCENE** .......................................................................................... **6**
Washington, DC, Spring 2010: Exxon CEO Tillerson lobbies the Senator .... 6
London, December 2011: Exxon concocts a plan ..................................... 6
Monrovia, Liberia, April 2013: The $120 million deal ............................ 7
Washington, DC, Present day ......................................................................... 8
Recommendations ............................................................................................ 8

**BAD INFLUENCE: SECTION 1504 AND HOW EXXON LOBBIES
TO HIDE THE TYPE OF EVIDENCE THAT SPARKED THIS INVESTIGATION** .......... **9**

**MONROVIA, 2004-2007: BLOCK 13 IS BORN IN THE SHADOWS** ............ **11**
Broadway/Peppercoast and its Liberian owners ..................................... 11
The other Liberian owner: Representative Adolph Lawrence ............... 13
Bribery to get Broadway/Peppercoast Block 13 ..................................... 16

**LONDON, 2011: EXXON'S ESCAPE PLAN** ................................................... **17**
The prize goes up for sale ............................................................................. 17
Enter an anxious Exxon ................................................................................. 17
An ingenious escape plan ............................................................................. 20
> The deal is done ........................................................................................... 20
> What the likely Liberian owners of Broadway/Peppercoast would get .... 23
> Blame Canada: Why COPL got a slice and why it was still being used by Exxon ... 23

The stumbling block ........................................................................................ 27
The long arm of the law ................................................................................ 27
> US anti-money laundering laws ................................................................ 27
> US Foreign Corrupt Practices Act ............................................................ 29
> Liberian anti-corruption laws ................................................................... 29
> UK and Canadian anti-corruption laws ................................................. 30

**MONROVIA, 2013: AWASH IN CASH** ........................................................... **30**
Some unusual, large payments .................................................................... 30
Suspicious transfers ....................................................................................... 31
Staff bonuses ................................................................................................... 32
Exxon should have known better ................................................................ 32

**WASHINGTON, DC, PRESENT DAY** ............................................................... **34**

**RECOMMENDATIONS** ...................................................................................... **34**



Credit iStock

# THE CAST AND THE ACRONYMS

## COMPANIES AND GOVERNMENT AGENCIES



**API**
American Petroleum Institute. The US' largest oil industry trade association. API lobbies against financial reporting requirements in Section 1504 of the Dodd-Frank Wall Street Reform and Consumer Protection Act.

**BCP**
Broadway/Peppercoast. Liberian-Anglo oil company that was originally called Broadway Consolidated PLC and later changed its name to Peppercoast Petroleum PLC. Obtained Liberian Oil Block 13 in 2007, and later sold it to Exxon and COPL in 2013.

**COPL**
Canadian Overseas Petroleum Ltd and Canadian Overseas Petroleum (Bermuda) Ltd. This report will refer to the two companies together as just COPL. For further detail see endnote 74.

**COPL UK**
Canadian Overseas Petroleum UK Ltd. UK subsidiary of COPL.

**Exxon**
ExxonMobil Exploration and Production Liberia Ltd (Bahamas) and Exxon Mobil Corp (US). As ExxonMobil Liberia is controlled by Exxon Mobil Corp, this report will refer to the two companies together as just Exxon. For further detail see endnote 74. One of the world's largest oil companies, Exxon bought Block 13 from BCP in 2013 and lobbies against financial reporting requirements in Section 1504 of the Dodd-Frank Wall Street Reform and Consumer Protection Act.

**HTC**
The Hydrocarbon Technical Committee. The Liberian Government inter-ministerial body responsible for signing oil licenses.

**NOCAL**
National Oil Company of Liberia. The Liberian Government's oil agency that leads on the award of oil licenses.

**SEC**
The US Securities and Exchange Commission. Currently drafting a new rule to implement Section 1504 of the Dodd-Frank Wall Street Reform and Consumer Protection Act.

 **PEOPLE**

### David Jallah
Liberian lawyer. The only Liberian owner of BCP listed in the company's official shareholder filings.

### Adolph Lawrence
Liberian Representative since 2012.

### Jonathan Mason
Liberian Mining Minister from 2003 to 2005.

### Richard Mays
Director and Board Chairman of BCP. Mays was also a Director of Svenska Petroleum Exploration along with Arthur Milholland and is currently a Director of COPL UK with Milholland.

### Randolph McClain
President of NOCAL from 2012 to 2015.

### Arthur Milholland
President of COPL from 2009 to the present. Milholland was also a Director of Svenska Petroleum Exploration along with Richard Mays and is currently a Director of COPL UK with Mays.

### Robert Sirleaf
Board Chairman of NOCAL from 2012 to 2013. Sirleaf is the son of former President Ellen Johnson Sirleaf.

### Rex Tillerson
US Secretary of State from February 2017 to March 2018. Tillerson was CEO of Exxon from 2004 to 2016, during which time he lobbied against Section 1504, a key anti-corruption law aimed at stopping corruption and bribery in oil and gas deals. He has also served as Board Chairman of the American Petroleum Institute.

### Mulbah Willie
Liberian Deputy Mining Minister from 2003 to at least 2005. Willie passed away in 2012.

## ADDITIONAL ABBREVIATIONS

### Block 13
The Liberian oil license Offshore Block 13. Awarded to BCP by NOCAL in 2005 and ratified by the Liberian legislature in 2007. Bought by Exxon from BCP in 2013.

### EITI
The Extractive Industries Transparency Initiative. International standard promoting transparency in natural resource sectors. Countries that adopt the standard commit to publishing contracts, payments made by companies, and companies' owners.

### LEITI
The Liberian Extractive Industries Transparency Initiative. Liberian semi-autonomous government agency that implements EITI in Liberia. Published payments made by Exxon to the Liberian Government that led to this investigation.

### Section 1504
Part of the US Dodd-Frank Wall Street Reform and Consumer Protection Act, passed in 2010. Requires oil, gas, and mining companies listed on US stock exchanges to report the payments they make to governments. The Securities and Exchange Commission is currently drafting a new rule to implement Section 1504, after the previous rule was vacated as one of the first acts of the Trump administration in 2017.

# SETTING THE SCENE

**This is a story of bribery, suspected secret shareholders, and an audacious attempt by oil giant Exxon to bypass US anti-corruption laws. It is a story of how the American company – headed by Rex Tillerson – appears to have turned a blind eye to earlier corruption when buying an oil license in the impoverished West African country of Liberia. Finally, this is a story of how the US can help end corruption by requiring that oil companies report in detail what they pay to governments.**

## WASHINGTON, DC, SPRING 2010: EXXON CEO TILLERSON LOBBIES THE SENATOR

In 2010, a bill aimed at curbing corruption in foreign oil deals was gaining steam in Congress, and oil executives were getting anxious. One such executive, then-Exxon CEO Rex Tillerson, was reportedly *"deeply worried."* In a last ditch effort to stop the bill, Tillerson jumped on a plane to meet with the bill's co-sponsor Senator Richard Lugar (R-IN).[1]

The legislation causing sleepless nights for the industry was Section 1504 of the Dodd-Frank Wall Street Reform and Consumer Protection Act. After decades of high-profile scandals linked to oil companies, Congress had introduced this anti-corruption legislation requiring oil, gas, and mining companies to declare the payments they make to governments.

Meeting Lugar, Tillerson was *"red-faced angry,"* arguing that outfits like Exxon should not have to publish what they pay to foreign governments.[2] Undeterred, the Senator told the CEO they would have to *"agree to disagree."*[3] Soon thereafter Section 1504 passed into law.

Why was Tillerson so alarmed? And why would Exxon and its lobbyists at the American Petroleum Institute (API) spend the next eight years vehemently fighting Section 1504? What did Exxon have to fear from a law that lets people know how much companies are paying to other governments?

Part of the answer of why transparency is unwelcome may be found in Liberia, where Exxon spent $120 million for an oil license three years later. Exxon would become complicit in Liberia's corrupt oil sector when it proceeded to buy the license despite multiple corruption red flags.

## LONDON, DECEMBER 2011: EXXON CONCOCTS A PLAN

Fast forward to just over a year later – 2011 – and Tillerson was still running Exxon. The company was going into a meeting with Liberian officials to discuss purchasing Block 13, a license Exxon knew had corruption risks.

In London, Exxon laid out its plan in the form of a slick presentation. According to this presentation – which Global Witness has obtained – Exxon wanted to buy Block 13, but the company had *"concern over issues regarding US anti-corruption laws."* There were, according to Exxon, two issues in particular: the company from which Exxon wanted to buy Block 13 – Broadway/Peppercoast (BCP) – may have been owned by former government officials, and the license was originally granted through bribery.

Exxon had every reason to be worried. First, evidence seen by Global Witness suggests BCP was probably owned by, among others, former Liberian mining ministers Jonathan Mason and Mulbah Willie. These likely owners were hidden behind the name of BCP's Liberian lawyer, who was the only official Liberian owner of the company when Exxon purchased Block 13. In 2005, as serving government ministers, Mason and Willie were in positions of influence over the awarding of oil blocks.

Global Witness has also obtained evidence showing that a Liberian elected representative – Adolph Lawrence – also held a BCP ownership interest in 2011, prior to his taking



As Exxon CEO, Rex Tillerson lobbied against US anti-corruption legislation. Credit: Jason Janik/Bloomberg via Getty Images

office. Global Witness does not have evidence of Lawrence's interests following 2011, but if he kept this interest after he became a legislator it would have been illegal under Liberian law.

Second, by 2011 it was already common knowledge that the original award of Block 13 to BCP was tainted by bribery. That year, a Liberian Government audit report found that Liberia's oil agency had paid bribes to members of the legislature with the power to ratify oil licenses, resulting in the passage of four contracts – including Block 13.

But Exxon was prepared, and arrived in London with a plan it thought would allow the company to buy Block 13 while skirting US anti-corruption laws. This would be done by having a third company act as a go-between, buying Block 13 from BCP and then selling the majority of the license to Exxon. The company Exxon would use was Canadian Overseas Petroleum Ltd (COPL).

## MONROVIA, LIBERIA, APRIL 2013: THE $120 MILLION DEAL

With a few small changes, Exxon appears to have had its way. In 2013, the company signed a deal to pay $120 million to buy Block 13, using COPL as a go-between with BCP, which meant Exxon would not pay BCP directly.

If, as the evidence suggests, BCP was part-owned by Mason and Willie then millions of dollars would have gone to these individuals when Exxon bought Block 13. Global Witness research has also found that COPL's Chief Executive had connections to BCP's Chairman – calling into question the idea that COPL was a truly independent purchaser of the block.

Evidence seen by Global Witness also suggests that Exxon's 2013 deal was surrounded by unusual, large payments. This evidence shows that, in the month following the sale of Block 13 to Exxon and COPL, Liberia's oil agency paid $210,000 to Liberian officials who authorized the deal.

One recipient was Robert Sirleaf, who was the oil agency's Chairman and, as son of then-President Ellen Johnson Sirleaf, was reportedly working *pro bono*. The officials state that these large payments – which amounted to 160 percent of a minister's salary – were *"bonuses"* authorized by the oil agency's Board of Directors.

The payments were probably made from the same bank account into which Exxon had just deposited $5 million for Block 13, although there is no evidence that Exxon itself directed or knew about payments to officials.

In March 2018, Global Witness wrote to Exxon, COPL, the Liberian Government, BCP, and its suspected owners requesting comment on the Block 13 deal. As of the date of publication, only COPL has responded. The company stated that it was *"aware of the allegations concerning Peppercoast's [BCP] minority shareholders,"* but that its due diligence did not find that former officials were part-owners of BCP and all shareholders signed agreements promising their payments would not go to others. Additionally, any payments made to Lawrence as a result of his BCP ownership interest were reported to the Liberian Government. And according to COPL, the Block 13 deal was structured as a two-step process because the Liberian Government wanted to sign a new oil license with Exxon and COPL rather than amending the older BCP license.

## WASHINGTON, DC, PRESENT DAY

This investigation shows the lengths to which Exxon went to buy a suspect oil license. But it also shows how important it is that people have information on what companies like Exxon pay to governments. Global Witness started this research because Liberia published payment data specific to the Block 13 project. However, many oil producing countries do not publish this critical information, which is why Section 1504 – which aims to curb corrupt oil deals – must be protected and implemented correctly. Today, Exxon and its lobbyists at API are still fighting Section 1504. They are lobbying the SEC to produce a rule that does not adequately implement the law, and they are lobbying Congress to eliminate the law entirely.

It is crucial that these efforts do not succeed. Because if the US does not require detailed reporting on what oil, gas, and mining companies pay foreign governments we may never find out how far they are prepared to go to obtain natural resources, nor will we be able to stop the corruption that keeps people poor and destabilizes countries.

## RECOMMENDATIONS

A full list of recommendations is included at the end of this report. In summary:

**1. The Securities and Exchange Commission (SEC) should ensure that its forthcoming rule implementing Section 1504 of the Dodd-Frank Act is closely aligned with the global reporting standard already enacted by 30 other countries.** The rule must require US-listed oil, gas, and mining companies to publicly report payments they make to governments on a project-by-project basis, with no exemptions. This would help prevent corruption of the type uncovered in this investigation.

**2. The US Congress should continue to support the implementation of Section 1504** by urging the SEC to ensure a strong new rule is published and by voting against any efforts to weaken or repeal the law.

**3. US Government authorities, including the Department of Justice and the SEC, should investigate Exxon** to assess whether the company broke anti-money laundering laws or the Foreign Corrupt Practices Act (FCPA) by purchasing an oil block originally awarded through bribery from a company likely owned by former Liberian Government officials.

**4. The Liberian Government should investigate Exxon and BCP to assess whether the companies broke Liberian law,** including anti-bribery statutes, and reporting requirements under the Liberian Extractive Industries Transparency Initiative (LEITI). The government should also investigate current and former government officials who illegally owned BCP or have received payments. LEITI should take steps to ensure future audits of companies' owners are conducted thoroughly and sufficient penalties are imposed if companies fail to report accurately.

**5. Authorities in Canada and in the UK should investigate COPL and BCP** to determine if the companies or individuals attached to them broke anti-corruption laws in either country.

**6. The US Department of the Interior should recommit the US to implementing the Extractive Industries Transparency Initiative.**



LEITI produced the evidence that led to this investigation. Credit: Global Witness

# BAD INFLUENCE:
Section 1504 and how Exxon lobbies to hide the type of evidence that sparked this investigation

This investigation was made possible thanks to publicly available data published by the Liberian Extractive Industries Transparency Initiative (LEITI), a semi-autonomous Liberian agency that requires natural resource companies to report money they pay to the government.[4] Without this data, a sample of which is included on page 10, Liberian citizens and NGOs would not know what companies pay.

In 2015, LEITI published information on the payments Exxon made to the Liberian Government in 2013.[5] Because Exxon only had one project in Liberia, this included the payments the company made for one specific project – the Block 13 license. LEITI also detailed how much money Exxon paid to Liberia's oil agency NOCAL, which has a history of corruption. With this critical information from LEITI, and given NOCAL's tarnished track record of corrupt deals, Global Witness saw there was a risk of bribery and began its investigation.

Many countries that depend on natural resources for income do not have an agency like LEITI. And even in countries that have similar agencies, there is a danger of the programs being shut down, stopping the publication of payment information – much like the US did in late 2017 under the Trump administration.[6] Seeing the danger back in 2010, Congress passed the bi-partisan Cardin-Lugar anti-corruption provision known as Section 1504 of the Dodd-Frank Wall Street Reform and Consumer Protection Act.

Like LEITI, Section 1504 requires all oil, gas, and mining companies to report the payments they make to governments – although in this case the reporting is at the project-level. The law applies to companies listed on US stock exchanges, including Chinese and Brazilian state-owned companies.[7]

The Section 1504 law has inspired 30 other countries around the world – Canada, Norway, the UK, and the other 27 members of the European Union – to adopt laws requiring their oil, gas, and mining companies to disclose project-level payments they have made to governments. As these laws have been implemented, people in corrupt, resource-rich countries can now see what their governments are being paid from individual resource projects and demand those who pay or receive bribes are held to account. As transparency becomes the norm, companies will cease being able to operate in secrecy and will be deterred from bribery in the future.

If Section 1504 was being implemented along with these 30 other countries, more than two-thirds of the top 200 publicly-listed oil, gas, and mining companies would be disclosing project-level payments. Thirty percent of these companies are listed solely in the US.[8]

However, back in the US, Section 1504 is not being implemented. Instead, President Trump and Congress have rolled back key anti-corruption measures for oil and gas companies, while also abdicating the US' global leadership in the fight against corruption. One of the first things President Trump and Congress did in 2017 was to pass legislation discarding a rule by the SEC that implemented Section 1504.[9] This rule, which was finalized the year before, would have brought the Section 1504 law into effect by requiring detailed project-level reporting by oil, gas, and mining companies.

The SEC is currently working on a new rule to implement Section 1504. Despite the rule being overturned, the SEC is still required to issue a rule that meets the statutory mandate of the law. On this, Congress and the law are clear: the rule needs to align with the global standard for payment disclosure by requiring public disclosure of disaggregated project-level payments to governments, without country exemptions. This is critical for citizens in corrupt countries to have the information they need to investigate bribery and corruption, and demand better from their governments.

## Data that led to the investigation: The 2013 Liberia Extractive Industries Transparency Initiative Report

Below is an excerpt from the 2013 LEITI Report containing information on payments made by Exxon to the Liberian Government for the Block 13 oil license. The detail listed in this report, including separate payments made to NOCAL and the Liberian Revenue Authority (part of the Ministry of Finance), is invaluable for Liberians and civil society watchdogs like Global Witness. This detail led Global Witness to undertake this investigation. Highlights in green added by Global Witness for emphasis. Highlights in red have been added by LEITI and are found in the report as published by the agency.[18]



**LEITI**  Liberia Extractive Industries Transparency Initiative

**MOORE STEPHENS**          PARKER & ASSOCIATES, LLC.

**LIBERIA EXTRACTIVE INDUSTRIES TRANSPARENCY INITIATIVE (LEITI)**

**EITI RECONCILIATION REPORT FOR THE YEAR ENDED 30 JUNE 2013**

December 2015

*LEITI Reconciliation report for the year ended 30 June 2013*

**(b)  Tax paid reported but outside the period covered**

These are payments reported, but which fall outside the reconciliation period, i.e. before 1 July 2012 or after 30 June 2013. We set out in the table below a summary of the adjustments made to company payments:

| Company | Tax paid reported but outside the period covered (USD) |
|---|---|
| ExxonMobil Exploration and Production Liberia Ltd | (947,000) |
| Western Cluster Limited | (351,498) |
| Chevron Liberia Limited (B, C & D) | (150,000) |
| Cavalla Rubber Corporation | (74,707) |
| China Union (Investment) (Liberia) Bong Mines CO. Ltd | (48,708) |
| Afro Diam Company Inc. | (22,616) |
| Mandra - LTTC Inc. | (1,800) |
| **Total adjustments** | **(1,496,829)** |

**(c)  Tax paid reported but outside the reconciliation scope**

These are payments reported, but which fall outside the reconciliation scope. We set out in the table below a summary of the adjustments made to company payments:

| Company | Tax paid reported but outside the reconciliation scope (USD) |
|---|---|
| ExxonMobil Exploration and Production Liberia Ltd [(a)] | (70,000,000) |
| National Oil Company of Liberia (NOCAL) [(b)] | (1,075,000) |
| **Total adjustments** | **(71,075,000)** |

[(a)] ExxonMobil made a payment of USD 120 million on 5 April 2013 to NOCAL for the Block LB13 (in compliance with PSC Obligation - Article 40).

The breakdown of this payment is as follows:

| Designation | Status | Amount (USD) |
|---|---|---|
| Amount paid to Peppercoast on the transaction | Transferred to Peppercoast | 70,000,000 |
| Bonus payment received by Government of Liberia | Transferred to LRA | 17,250,000 |
| Income tax on the 100% equity transfer from Peppercoast to COPL | Transferred to LRA | 18,000,000 |
| Income tax on the 80% equity transfer from COPL to Exxon Mobil | Transferred to LRA | 12,750,000 |
| Bonus payment received by NOCAL on the transaction | Kept by NOCAL | 4,000,000 |
| Transfer fees paid to NOCAL on the transactions between COPL / Peppercoast and ExxonMobil / COPL | Kept by NOCAL | 1,000,000 |
| **Total amount paid by Exxon Mobil on the Block 13 Transaction** | **Total** | **120,000,000** |

We have removed the amount of USD 70 million paid to NOCAL and transferred later to Peppercoast since it corresponded to a transaction's price and not an extractive revenue.

[(b)] This is an annual training reported by NOCAL as an extractive revenue. We have reclassified it as a social contribution.

**(d)  Tax amount incorrectly reported**

These are payments incorrectly reported, i.e. duplicate payments. We set out in the table below a summary of the adjustments made to company payments:

| Company | Tax amount incorrectly reported (USD) |
|---|---|
| Bean Lonoyear Corporation Liberia | (212,130) |
| Mandra Forestry Liberia Ltd. | (179,600) |
| Mandra - LTTC Inc. | (114,127) |
| Forest Venture Inc. (FVI) | (7,028) |

Moore Stephens LLP

However, there is considerable pressure on the SEC to issue a weak rule because US oil companies like Exxon and its associates at the American Petroleum Institute (API) have spent years lobbying against Section 1504. They argue that it will cost too much to implement and damage companies' competitiveness. But these arguments have been repeatedly debunked. Companies already reporting in other markets have shown that initial cost estimates were vastly overestimated, particularly once reporting systems have been established.[11]

**Hundreds of oil, gas, and mining companies – including Exxon's subsidiaries that are registered in countries that have laws similar to Section 1504 – have already disclosed project-level payments worth almost $300 billion with no harm.[12]**

This has not, of course, stopped Exxon and API from engaging in years of aggressive litigation and lobbying to hinder Section 1504's implementation. Perhaps the most famous opponent has been Rex Tillerson, who was President Trump's first Secretary of State until March 2018. Previously, Tillerson served as both CEO for Exxon and Board Chairman of API.[13] In 2010, while heading Exxon, he personally lobbied on Capitol Hill to prevent Section 1504's passage into law.[14]

But Tillerson's efforts have only been part of a wider attack. Records show that between 2008 and 2010 Exxon and API representatives consistently lobbied Congressional offices to try to kill what would later become Section 1504.[15] After Section 1504 passed in 2010, they tried to get Congress to overturn the law[16] while simultaneously lobbying the SEC to weaken the rule it was drafting to implement the law. Between 2010 and 2017, at a minimum, Exxon met with the SEC 16 times (14 of which were also attended by API representatives) and submitted six sets of comments on the rule. API submitted thirteen comments and had three additional meetings with the SEC.[17]

In 2012, the SEC finalized a rule implementing Section 1504, but API continued its fight and sued the SEC over the rule.[18] (At the time, Exxon Vice President and Controller Patrick Mulva was also Chairman of API's General Finance Committee.[19]) As a result, this first rule was vacated, requiring the SEC to issue a second rule, which it did in 2016.[20]

And it appears that their efforts have paid off. The 1504 rule finalized by the SEC in 2016 was repealed only two weeks after Tillerson was confirmed as Secretary of State in 2017. Ten months later, the US also announced it would no longer implement its version of LEITI (US EITI), which would have required companies to report the money they pay to the US government.[21] Not yet satisfied, API is now lobbying Congress to overturn Section 1504 entirely.[22]

Evidence presented in this report suggests the possible consequences of undermining Section 1504 and its implementing rule. If extractive companies are required to disclose disaggregated, project-level payments to governments, this would help expose – and prevent – the very kind of corruption documented in this report. This report also shows why the SEC should not be swayed by lobbying efforts by some members of the oil industry and instead issue a strong Section 1504 rule requiring more detailed reporting by companies, akin to those requirements included in other jurisdictions.

## Monrovia, 2004-2007:
# BLOCK 13 IS BORN IN THE SHADOWS

### BROADWAY/PEPPERCOAST AND ITS LIBERIAN OWNERS

To understand why Exxon likes to keep things opaque it is helpful to go back to 2004 in the West African country of Liberia. At the time, Liberia was emerging from a bloody civil war that lasted from 1989 to 2003. The war had devastated the country, claiming 250,000 lives and displacing 1.3 million people.[23] State institutions were shattered, and the caretaker government that ran Liberia for two years after the war was chaotic and deeply corrupt.[24] Indeed the situation was so bad that, in exchange for reconstruction funds, international donors demanded signing power over expenditures by the country's ministries.[25] Liberia's oil sector, administered by the government's oil agency NOCAL, was essentially dormant with poorly understood oil reserves and no operating companies.



NOCAL's Monrovia offices. Credit: Global Witness

## THE US' VALUABLE AND EXPENSIVE EFFORTS TO REBUILD LIBERIA

Liberia and the US have a shared history. This started in the 1820s when thousands of enslaved Americans were emancipated and migrated to Liberia, and continued through 2003 when the threat of US military intervention helped unseat warlord-turned-President Charles Taylor and end the country's 14 year war.

Since 2003, the US has spent $2.8 billion to help Liberia – a country of 4 million people – get back on its feet.[25] This aid has been used to rebuild the country's decimated infrastructure, promote economic development, and fight the 2014 Ebola epidemic. But in most years the largest portion of US aid, over $700 million since 2003, has been spent promoting good governance.[26] This money has rebuilt government agencies and created new anti-corruption institutions like the Anti-Corruption Commission and the Liberia Extractive Industries Transparency Initiative.

The main aim of this assistance has been to create a stable Liberia that benefits its people and no longer poses a security threat to its neighbors or to the US. It was also provided in large part because the US believed that President Johnson Sirleaf, who led the country from 2006 to January 2018, was a reformer.

But such aid is undermined if the government it supports fails to act in the interest of the Liberian people, or if companies with whom the government does business fail to play by the rules. As this report will show, it appears that Exxon effectively undermined the essential work of the US Government to rebuild institutions in Liberia, efforts funded by billions of dollars from US taxpayers.

That year, NOCAL decided to auction some of Liberia's 17 offshore oil blocks and BCP put in a bid for one of these licenses. By its own admission the company did not *"have a specific track record of petroleum agreements."*[28] It also confessed to having no money of its own, only *"firm commitments from investors."*[29] Nonetheless, in June 2005, NOCAL signed a contract with BCP for a license called Block 13.[30] This did not actually finalize the deal as Liberian oil licenses are traditionally also approved by the country's legislature. Two years later, in April 2007, the Liberian legislature finally approved BCP's Block 13 license.[31]

A timeline of events surrounding the award of Block 13 can be found on pages 14-15.

But why was the untested BCP awarded a contract to drill for oil? The Liberian Government's official account is that BCP was the only applicant for Block 13.

There is another explanation, however. There are grounds to suspect that BCP obtained Block 13 because the company was likely part-owned by government officials with the power to influence the award of oil licenses. It is illegal under Liberian law for companies to be owned by officials and hold oil blocks at the same time, a key anti-corruption provision that exists precisely to prevent officials from awarding themselves state assets.[32]

According to BCP's shareholder documents, the company was owned by a number of UK residents and one Liberian: the lawyer David Jallah. These documents were filed in the Isle of Man, where BCP was registered, and contain shareholder information up to 2010. However, when

In 2004, Exxon was not yet involved in Liberia. But other oil companies were showing interest, including one with whom Exxon would later come across: Broadway Consolidated. Broadway would later change its name to Peppercoast Petroleum, and so for clarity, this report will refer to it as BCP.[a]

---

a The company that submitted a bid for a Liberian oil block in 2004 was called Broadway Mineral Resources PLC, while the company that was awarded Block 13 was called Broadway Consolidated PLC. In 2005, following the submission of its bid but prior to the ratification of Block 13 by the Liberian legislature in 2007, the assets of Broadway Mineral were *"transferred"* to Broadway Consolidated. However, the two companies shared many of the same shareholders. In 2011, Broadway Consolidated changed its name to Peppercoast Petroleum PLC. See Broadway Mineral Resources PLC, Application of Submission of Bids, October 26, 2004, p. 7; Production Sharing Contract between NOCAL and Broadway Consolidated Offshore Block 13, April 16, 2007; Broadway Mineral Resources PLC, Annual Return, March 30 2005; Broadway Consolidated PLC, Report and Financial Statements, August 31, 2006, p. 2, 10; Peppercoast Petroleum PLC, Company Re-Registration, February 18, 2011.

interviewed by Global Witness, David Jallah stated that he was a BCP shareholder up to the point that BCP sold Block 13 to Exxon, which was in 2013. Jallah also stated that he was BCP's only Liberian shareholder.[33]

Global Witness has seen evidence suggesting that Jallah was acting as a front. A family of five linked companies all sharing the name 'Broadway' were set up between 1995 and 1996. All five were originally part-owned by former Mining Minister Jonathan Mason, while one was part-owned by former Deputy Minister Mulbah Willie. Additionally, in 2005 the news magazine Africa Intelligence reported Mason ran a company called Broadway Hydrocarbon, which appears to be related to the other 'Broadways' set up in Liberia.[34] David Jallah did not hold shares in these companies at that time, but acted as a lawyer for two of them.[b]

However, when the Liberian Petroleum Law was passed in 2002 and officials were prohibited from owning shares in oil blocks, the names of Mason and Willie stopped appearing in subsequent Broadway companies – including BCP – all of which were registered in England and the Isle of Man. Instead, the only Liberian shareholder listed was David Jallah. It is possible that Mason and Willie sold their BCP interests when they became government officials. However, in Global Witness' opinion, it is probable that Mason and Willie remained the real owners of BCP, but Jallah held shares on their behalf. This interest appears to have amounted to eight percent of BCP's shares and 51 percent of the company's options, at least in 2011 when evidence of the figures is last available.

Any ownership by Mason and Willie would have been illegal under the 2002 law because the pair were officials when BCP was first awarded Block 13 by NOCAL. Between the end of 2003 and 2005, Jonathan Mason served as Liberia's Minister for Lands, Mines, and Energy, while Mulbah Willie served as a Deputy Minister in the same agency.[35] These positions would have given Mason and Willie considerable influence over the awarding of Block 13 by NOCAL to BCP in 2005. The Mining Minister is a member of both NOCAL's Board of Directors and the inter-government body that negotiates oil licenses – the Hydrocarbon Technical Committee.[36]

Global Witness considers it likely that the two officials violated Liberia's 2002 Petroleum Law and abused their office when NOCAL signed a contract with BCP in 2005. As discussed later, these questions over the award of Block 13 to BCP are intensely problematic for Exxon.

In a July 2011 letter to Global Witness, a representative of BCP denied that Jonathan Mason held shares in the company.[37] In March 2018, Global Witness wrote to Mason and again to BCP, but received no response.  A Calgary-based company, Canadian Overseas Petroleum Ltd (COPL), that would later become involved with BCP did respond to Global Witness' request for comment. As discussed further below, COPL stated that its due diligence found no evidence that officials owned BCP shares.[38]

## THE OTHER LIBERIAN OWNER: REPRESENTATIVE ADOLPH LAWRENCE


Adolph Lawrence.
Credit: liberianlawmakerswatch.org

Global Witness has also obtained evidence showing that another Liberian, Adolph Lawrence, held an ownership interest in BCP in 2011. Since January 2012, Adolph Lawrence has served as a Representative in Liberia's House of Representatives and Chairman for the Committee on Hydrocarbons (formerly the Committee on Lands, Natural Resources, and Environment). He also held this position in 2013 at the time Exxon's purchase of Block 13 was approved by the legislature, giving him considerable influence over the license's legislative ratification.[39]

In May 2011, BCP signed an agreement with the oil company COPL. According to this agreement, Lawrence owned rights to buy BCP shares, called options.[40] Global Witness does not have evidence showing that Lawrence held his interest after 2011. However, if Lawrence had retained a BCP ownership interest after becoming a legislator in 2012 it would have been illegal under Liberian law.

The May 2011 agreement is discussed in more detail below, and excerpts are included on pages 24-25. Lawrence did not respond to a request for comment. COPL has, and its response is detailed later in this report.

---

b Liberian oil company documents are filed with multiple agencies: the National Oil Company of Liberia, the Ministry of Lands, Mines, and Energy, the Center for National Documents and Records Agency, the Liberian Extractive Industries Transparency Initiative, the Ministry of Foreign Affairs, the National Investment Commission, the National Bureau of Concessions, and the Liberian Business Registry. In addition to BCP and the five Broadway companies set up in Liberia in the 1990s, Global Witness has found evidence that the people behind BCP also registered ten Broadway companies in the Isle of Man and England and Wales. Like BCP, these companies did not list Jonathan Mason and Mulbah Willie as shareholders. However, also like BCP, these companies were registered after 2002, when Liberian law began prohibiting ownership by government officials.

## Timeline of events for the award of Block 13 in Liberia

**2003–2005:** Jonathan Mason serves as Mining Minister

**2003–2005:** Mulbah Willie serves as Deputy Mining Minister

**September 19, 2006:** $26,900 bribe paid by NOCAL to Liberian legislature facilitating approval of Block 13 to BCP and three oil blocks to Oranto

**April 4, 2007:** $25,000 bribe paid by NOCAL to Liberian legislature facilitating approval of Block 13 to BCP and three oil blocks to Oranto

**August 22, 2006:** NOCAL Board discusses $75,000 payment from BCP

**August 28, 2006:** $50,000 bribe paid by NOCAL to Liberian legislature facilitating approval of Block 13 to BCP and three oil blocks to Oranto

**April 5, 2007:** $15,000 bribe paid by NOCAL to Liberian legislature facilitating approval of Block 13 to BCP and three oil blocks to Oranto

**2002:** New Liberian Petroleum Law bars officials from owning companies holding oil blocks

**April 17, 2007:** $1,500 bribe paid by NOCAL to Liberian legislature facilitating approval of Block 13 to BCP and three oil blocks to Oranto

| 1995 – 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|

**October 26, 2004:** BCP submits bid for Liberian oil block

**June 16, 2005:** NOCAL approves award of Block 13 to BCP

**April 16, 2007:** Liberia legislature ratifies award of Block 13 to BCP

**1995-1996:** Five Broadway companies created in Liberia, all of which are part-owned by Jonathan Mason, and one of which is part-owned by Mulbah Willie. David Jallah serves as lawyer for two of the five companies but is not a shareholder in any of them

**February 16, 2004 and March 4, 2005:** Broadway Mineral Resources PLC formed. In 2005, Block 13 bid transferred to Broadway Consolidated PLC, which was subsequently awarded contract. David Jallah is listed as shareholder, but Jonathan Mason and Mulbah Willie are not. Here referred to as BCP

**August 11, 2003:** Charles Taylor steps down as Liberian President, ending civil war

14



**May, 2011:** Evidence that Adolph Lawrence holds options to buy BCP shares

**January, 2012-Present:** Adolph Lawrence serving in Liberian House of Representatives, Chairman of the House's Lands, Mines, Energy and Environment Committee (now called the Hydrocarbon Committee)

**December 2, 2011:** London meeting, in which Exxon, COPL, and Liberian Government discuss Exxon's *"concern over issues regarding US anti-corruption laws"*

**March 26, 2013:** NOCAL makes $17,880 suspicious payment to Senator Cletus Wotorson, Chairman of the Senate's Lands, Mines, Energy and Environment Committee

**March 26, 2013:** NOCAL makes $163,030 suspicious payment to Boima Folley Sports Center, headed by House of Representatives Deputy Director for Communications

**May, 2013:** NOCAL makes $210,000 worth of unusual, large payments to Liberian Government officials, including Finance Minister, Justice Minister, Mining Minister, and NOCAL Board Chairman

| 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 - 2018 |

**May, 2011:** BCP agrees to sell Block 13 to COPL, a deal rejected by NOCAL

**June, 2013:** COPL transfers additional three percent of Block 13 to Exxon, taking Exxon's total ownership to 83 percent

**March, 2018:** SEC working on another draft Section 1504 rule

**January, 2011:** NOCAL demands BCP sell Block 13

**April 5, 2013:** Exxon pays $120 million to buy Block 13. This includes $68.5 million to BCP and $5 million to NOCAL

**March, 2018:** Rex Tillerson fired as Secretary of State

**November, 2010:** Chevron in talks with BCP, later aborted, to buy Block 13

**April 5, 2013:** BCP transfers Block 13 to COPL. COPL transfers 80 percent of Block 13 to Exxon

**February 14, 2017:** Second Rule implementing Section 1504 is repealed by President Trump and US Congress

**August 23, 2010:** Liberia legislature ratifies transfer of LB11, 12, and 14 from Oranto to Chevron

**March 26, 2013:** Liberia legislature ratifies transfer of Block 13 from BCP to COPL and Exxon

**February 1, 2017:** Rex Tillerson confirmed as Secretary of State by US Senate

**2010:** Rex Tillerson, then Exxon's CEO, lobbies Senator Richard Lugar against Section 1504

**July 21, 2010:** Section 1504 of the Dodd-Frank Wall Street Reform and Consumer Protection Act becomes law, requiring US stock market-listed oil, gas, and mining companies report payments to governments

**August 22, 2012:** First Rule implementing Section 1504 is adopted by the SEC

**July 2, 2013** First Rule implementing Section 1504 is vacated following lawsuit by API and others

**June 27, 2016:** Second Rule implementing Section 1504 is adopted by the SEC



In 2006 and 2007 Liberian legislators received bribes to award Block 13 to BCP. Credit: Global Witness

## BRIBERY TO GET BROADWAY/ PEPPERCOAST BLOCK 13

Despite BCP's suspected true owners, before the company could acquire Block 13 in 2007, an additional hurdle needed to be cleared: getting the Liberian legislature to ratify the license.

At the time, Liberian law did not require that oil blocks be ratified by the legislature, although in practice all were.[41] Liberian law does make clear, however, that it is illegal for anyone – including officials at NOCAL – to bribe a government official, including a legislator.[42] If such bribery is connected to the award of an oil license, that license will have been obtained through corruption.

This prohibition notwithstanding, in 2006 and 2007 NOCAL spent $118,400 to bribe members of the Liberian legislature so that they would approve the award of Block 13 to BCP, alongside three oil blocks for a company called Oranto.[43] The final two payments totaling $41,500 fell just on either side of Block 13's ratification in April 2007. NOCAL termed these payments alternately a *"small thing,"* *"compensation,"* or *"lobbying fees."*[44] However, they were paid directly to state officials, not to lobbyists, and were determined by the Liberian Government's General Auditing Commission to be bribes.[45]

Where did the money NOCAL used to bribe come from? There is evidence that one of the bribes was financed by Oranto: a small $1,500 payment made in April 2007.[46] The oil blocks Oranto subsequently obtained were later bought from the company, in 2010, by Chevron.[47] Chevron did not

respond to a 2011 Global Witness request for comment regarding the oil blocks it purchased from Oranto.

There are grounds to suspect that part of NOCAL's bribery fund may also have come from BCP. According to minutes from a meeting of NOCAL's Board of Directors in August 2006, BCP had paid the oil agency $75,000.[48] Six days after the meeting, on August 28, NOCAL paid the first of its bribes to the legislature.[49]

It is not clear why BCP provided NOCAL with this money – neither the company nor NOCAL responded to questions on the payment. As discussed further below, COPL did respond and stated that its investigations into past payments had uncovered nothing improper. And it is possible that BCP's $75,000 payment was for a legitimate purpose. But even NOCAL's Board seemed unclear why the agency had received the money. According to the minutes from a later Board meeting:

### *"Finally, after a lengthy discussion, it was decided to let the matter rest until Broadway [BCP] brings it to our attention."*[50]

The bribes paid by NOCAL to the Liberian legislature and the authorization of a bribe by Oranto have been previously published, including by both Liberia's General Auditing Commission and Global Witness in 2011.[51] The payment of $75,000 by BCP to NOCAL has apparently not previously been published, although evidence of this payment is included in minutes of the oil agency's Board of Directors.

# London, 2011: **EXXON'S ESCAPE PLAN**

## THE PRIZE GOES UP FOR SALE

It was not long after BCP obtained Block 13 that the inexperienced company ran into trouble. Between 2007 and 2010 the company sunk no exploratory wells and failed even to buy the geophysical data it needed to see if there was oil to find. The company was also low on money and fell behind on payments it owed to the Liberian Government.

By 2010, enough was enough. NOCAL had a new boss and, with oil prices high, large companies were now interested in Liberia's oil blocks.[52] That year Chevron purchased the three licenses located near Block 13 and, frustrated that BCP was not operating, the government discussed a possible sale to Chevron. This deal did not pan out. According to a former Liberian official with knowledge of the negotiations, Chevron refused to buy Block 13 because it could not verify BCP's ownership. In March 2018 Chevron responded to a Global Witness letter, stating that - when examining potential commercial opportunities in Liberia - the company conducted a full due diligence process.

Undaunted, the Liberian Government kept pushing BCP and in January 2011 ordered it to sell Block 13.[53] By May, BCP had found a willing buyer and signed two agreements with the above-mentioned Canadian oil company COPL. In one of these agreements COPL loaned BCP $15 million so it could settle obligations to buy geophysical data.[54] In the other COPL agreed to buy Block 13 from BCP in exchange for cash and COPL shares, subject to approval by NOCAL.[55] Unfortunately for both parties NOCAL did not approve of COPL buying the block, stating that the firm was too inexperienced.[56] A brief stalemate ensued, with BCP formally disputing the government's decision while the government continued threatening to strip BCP of Block 13.

## ENTER AN ANXIOUS EXXON

By late 2011 this stalemate seems to have ended, as Exxon entered the picture. In November 2011, Exxon signed an agreement with COPL in which the American company promised to buy 70 percent of Block 13 from the Canadians if NOCAL agreed.[57] (As discussed below, this deal would later increase Exxon's share to 80 percent, and ultimately 83 percent.) In December, representatives from the Liberian



Exxon has done deals all over the world. As Exxon's CEO, in 2013 Tillerson was awarded Russia's Order of Friendship. Credit Mikhail Klimentyev\TASS via Getty Images

Government, Exxon, and COPL all met in London to begin negotiating the sale of Block 13.

In London, Exxon laid out its plan in the form of a slick presentation, excerpts of which are included on page 18. According to these extracts, Exxon wanted to buy Block 13. But the company had:

### *"concern over issues regarding US anti-corruption laws."*[58]

There were, according to the company, two issues in particular. First, Exxon described in its presentation that it was worried:

### *"Liberian shareholders/beneficial owners of Peppercoast [BCP] may have been government officials at the time of the allocation."*[59]

This concern appears to reference the likely part-ownership of BCP by Mining Minister Jonathan Mason and Deputy Minister Mulbah Willie. Again, both of these individuals were high-ranking officials in Liberia's Mining Ministry with influence over the oil sector when NOCAL approved BCP's award of Block 13 in 2005, although both of them had left these positions by the time of Exxon's involvement in 2011.

Excerpts from Exxon's
December 2011 London
PowerPoint presentation

Highlights in red added by
Global Witness for emphasis.

**Meeting concerning Liberia Block 13 PSC**

**NOCAL / COPL / ExxonMobil**

**December 2, 2011**                           **London**

Confidential to Government of Liberia, NOCAL, COPL & ExxonMobil          Page 1                    ExxonMobil Exploration Company

---

### The Overall (Proposed) Transaction

**The Overall Transaction - two contracts result in ExxonMobil 70% and COPLB 30%**

**Two contracts due to ExxonMobil concern over issues regarding US anti-corruption laws**
- Liberian shareholders/beneficial owners of Peppercoast may have been government officials at the time of the allocation
- Payments made to Legislators by NOCAL as outlined in the Liberian Auditor General's Report and September 2011 published report by Global Witness

**Outline of transaction**
- NOCAL / Government of Liberia approval of the transaction / assignments
  - Novation of PSC to COPLB
  - Novation of 70% of PSC to ExxonMobil
- Legislative ratification of changes to the PSC
- The two contracts close on or near to the same day to effect the following:
  - Assignment to COPLB is effective
  - $85 million in stock and cash is paid directly to Peppercoast shareholders
    - Shareholders generally have ability to request stock or cash or combination
    - As a step in regard to closing, Peppercoast to undertake action to limit payment to certain shareholders to cash
  - Peppercoast is dissolved
  - Assignment of 70% to ExxonMobil is effective
  - $55 million in cash is paid to COPLB
  - ExxonMobil responsible for
    - 100% of the costs of operation through first well
    - 100% of the first well costs up to $120 million
  - Second Well subject to automatic assignment to the other party if they do not join
  - Development provides sole risk option to allow development in the event the venture participants do not agree
  - Joint Operating Agreement in place to govern the approval and operations process (Drafted to include NOCAL)

Confidential to Government of Liberia, NOCAL, COPL & ExxonMobil          Page 5                    ExxonMobil Exploration Company

---

### Assistance from Liberia to Close the Transactions

**Due Diligence Discussions**
- Meetings with Ministry of Justice, Ministry of Finance, Ministry of Lands, Mines and Energy and NOCAL
- Assurance that PSC is valid
- Past irregularities will not affect the PSC or its new owners
- Despite any past irregularities, transactions are lawful under all applicable laws and regulations of Liberia

**Approval of the Assignments**

**Modification of the PSC through Legislative ratification**

Confidential to Government of Liberia, NOCAL, COPL & ExxonMobil          Page 8                    ExxonMobil Exploration Company



Elijah White, President Johnson Sirleaf, Ed Turner, and Walter Kansteiner, likely April 2013. Credit: Front Page Africa[63]

## THE PEOPLE WITH A HAND IN EXXON'S BLOCK 13 DEAL

Global Witness has determined an incomplete list of individuals involved in the negotiation and signing of Block 13 for Exxon and the Liberian Government. In addition to the people below, it is likely that others were involved.

Representing Exxon was Elijah White, who in 2013 acted as President of the entity that obtained Block 13 – ExxonMobil Exploration and Production Liberia. White signed the Block 13 contract that gave Exxon the right to operate the oil license.[64] He currently acts as Exxon's Vice President for Geoscience.[65]

At some point soon after Block 13 was signed – likely April 2013 – other Exxon staffers joined Elijah White at a reception to celebrate the deal's completion. These included Walter Kansteiner, who in 2017 was Exxon's Senior Director for Africa & International Government Relations[66] and Ed Turner, who in 2017 was serving as one of the company's in-house lawyers.[67]

Rex Tillerson was CEO of Exxon during the time the company negotiated and obtained Block 13. Global Witness has no evidence that he was directly involved in the Block 13 transaction. However, one source closely involved in negotiations claimed Exxon officials told him Tillerson had knowledge of the deal, as might be expected. Exxon did not respond to a request for comment regarding staff involved in the Block 13 deal.

As described in further detail below, multiple members of the Liberian Government signed the Block 13 deal. These officials received large payments from NOCAL after they signed. They include Randolph McClain, who in 2013 was the President of NOCAL and Robert Sirleaf, who in 2013 served as the Chairman of NOCAL's Board of Directors. Sirleaf is the son of Ellen Johnson Sirleaf, who at the time was the President of Liberia. Interviewed by the UK's Observer newspaper in 2017, the President said she appointed her son to NOCAL because he *"knew the players. He brought the big American companies in."*[68]

Randolph McClain
Credit: NOCAL

Robert Sirleaf
Credit: Front Page Africa

It is unclear from the presentation precisely why Exxon suspected that BCP may have been owned by former Liberian officials. It is possible that Exxon's suspicions were partly-based on the 2005 Africa Intelligence report that BCP was previously run by Jonathan Mason.[60] It is also possible that Exxon had been made aware of BCP's ownership by the Liberian Government. According to David Jallah, government officials had previously asked him if he was BCP's sole Liberian owner. Jallah had insisted that he was.[61]

His assurances appear to have been insufficient. In the May 2011 agreement between COPL and BCP, Jallah was listed as a shareholder who *"will receive any shareholder distribution made at Closing in cash rather than shares."* The Liberian Government also wanted to make sure certain unspecified individuals were excluded from any interest in Block 13 following its sale. In a December 2011 letter sent by COPL to NOCAL, the company acknowledged a *"desire by NOCAL for Peppercoast [BCP] shareholders to be excluded from any opportunity for ongoing ownership in the PSC [the Block 13 Production Sharing Contract]."*[62]

One source from which Exxon certainly could have found evidence of BCP's ownership is the same source from which Global Witness obtained its evidence: Liberian company documents. As stated, this information shows that Mason and Willie owned companies with the name 'Broadway' set up in Liberia during the 1990s. This information can be filed with multiple Liberian agencies and would have been accessible to any company conducting reasonable due diligence upon an oil block it was considering purchasing.

It should be noted that Exxon's reference to BCP owners who may have been officials *"at the time of the allocation"* suggests that Exxon was not considering Adolph Lawrence as a possible owner. When Exxon made its presentation in December 2011, Lawrence was not yet an official: he had won his seat in the House of Representatives in Liberia's general election two weeks earlier, but did not formally assume office until January 2012.

However, in December 2011 Exxon must have known that Adolph Lawrence had held BCP options as his interest was listed in the May 2011 COPL-BCP agreement that Exxon was relying upon in its November 2011 agreement with COPL. Exxon also would have known or could easily discover that Lawrence was a member of the House of Representatives when the company's Block 13 contract was finally approved in 2013. At this time, he was Chairman of the House's committee responsible for Liberia's oil deals – and therefore one of the most important legislators when it came to ratifying Exxon's contract. Global Witness is unaware of what due diligence Exxon conducted to determine whether Lawrence had continued to hold a BCP ownership interest after he took office in 2012.

The second Block 13 corruption issue that Exxon described in its presentation as a cause for concern was *"Payments made to Legislators by NOCAL as outlined in the Liberian Auditor General's Report and September 2011 published report by Global Witness."*[69]

This appears to be a reference to the $118,400 payments regarded as bribes made in 2006 and 2007 so that Block 13 and three additional oil blocks would be ratified by the legislature. The payment of bribes by NOCAL was public knowledge, as outlined in Exxon's presentation, and had even been reported by the Wall Street Journal two months prior to the London meeting.[70] Additionally, evidence of the transfer of $75,000 by BCP to NOCAL at the same time the oil agency was bribing the legislature could have been obtained by Exxon during its due diligence process as it was reported in the minutes of NOCAL's Board of Directors.

In March 2018, Global Witness wrote to Exxon and COPL requesting comment on the corruption issues raised in the December 2011 presentation. As of the date of publication, Exxon has not responded to Global Witness.

COPL did respond, stating that it was *"aware of the allegations concerning Peppercoast's [BCP] minority shareholders"* but that its due diligence did not find *"credible evidence"* that former officials – including Jonathan Mason – were part-owners of BCP. COPL says that both it and Exxon completed *"extensive due diligence"* and obtained legal advice on the deal and its anti-corruption and anti-money laundering obligations in Liberia, the US, the UK, and Canada. The company stated it conducted a forensic audit of BCP, which retained a respected independent financial advisor. The company also stated that all BCP shareholders signed *"compliance certificates"* promising that their payments would not be given to anyone else. According to COPL, in 2011 Lawrence was a manager for BCP and *"held a small amount of share options."* Upon being elected to the Liberian legislature, Lawrence resigned and *"played no further part in the company's affairs."* Regarding any payments Lawrence may have received, COPL stated *"ultimately any sums paid to Mr. Lawrence were reported openly to the Liberian tax authorities and NOCAL and any withholding tax paid on any distribution."*

According to COPL, Exxon, BCP, and COPL all investigated *"historic payments"* but did not find evidence of wrongdoing.

## AN INGENIOUS ESCAPE PLAN

Having outlined its concerns about US anti-corruption laws, Exxon did not walk away. Instead the company had a plan, which it described in its London presentation. Exxon would not buy Block 13 from BCP directly. Instead COPL would buy the oil block from BCP, and then Exxon would buy 70 percent of the block from COPL. These transactions would occur quickly: *"close on or near to the same day."*[71]

In short, Exxon proposed to use COPL as a go-between that would, Exxon appears to have thought, shield it from any US legal risks posed by Block 13. In Exxon's words, it wanted:

### *"Two contracts due to ExxonMobil concern over issues regarding US anti-corruption laws."*[72]
Emphasis added by Global Witness.

Exxon also seemed to appreciate concerns held by NOCAL that some BCP shareholders should not be involved in Liberia's oil sector following Exxon's purchase. As a solution, Exxon proposed that:

### *"Peppercoast [BCP] to undertake action to limit payment to certain shareholders to cash."*[73]

Exxon has not responded to Global Witness' request for comment regarding why it wanted COPL involved in the Block 13 transaction. COPL has stated that the deal was so structured because the government wanted to award a new oil license to the two companies rather than amend BCP's original license. The company also noted that Block 13 was ratified by the Liberian legislature.

### THE DEAL IS DONE

Evidently Exxon's conditions were satisfactory to the Liberian Government, and in April 2013 Block 13 was transferred to COPL, then Exxon.[74] Global Witness has seen evidence showing Exxon pressed the Liberian Government hard to ensure it had expansive guarantees covering the company against any eventuality under Liberian law. In its 2011 presentation, Exxon had wanted reassurance that *"past irregularities will not affect [the contract] or its new owners."*[75] During negotiations in 2012, it even suggested contractual language that, if included, may have prevented the Liberian Government from holding accountable those who broke the law during the 2007 award of Block 13.



## Exxon's plan, as set out in its December 2011 PowerPoint presentation

**BCP**

Owns Block 13 License, which according to Exxon has *"issues regarding US anti-corruption laws."*

**Sells 100% of Block 13 to COPL**

**COPL**

Shields Exxon from US anti-corruption law

**Sells 70% of Block 13 to Exxon (eventually upped to 83%)**

**Exxon**

Eventually, however, the company settled for a simple promise that, under no circumstances, would past illegalities cause the Liberian Government to strip Exxon of its license:

*"NOCAL and the State hereby waive any claim, demand, action, or proceeding of whatsoever nature against the Contractor [Exxon and COPL]... in relation to any matter arising out of or in connection with the Original Contract including any breaches of Law related thereto..."* [76]

The transfer of Block 13 from BCP to Exxon in 2013 was also executed in the manner designed by Exxon in its London presentation: a two-step process in which COPL was used as a go-between before Exxon bought it. A diagram describing this complicated transaction is located on page 22.

On March 26, 2013, the Liberian legislature ratified an agreement allowing BCP to transfer Block 13 to Exxon and COPL. BCP then transferred Block 13 to COPL, and COPL, in turn, transferred 80 percent of Block 13 to Exxon – upped from the 70 percent previously discussed.[77] Both transfers occurred on the same day: April 5.[c]

All told, this transaction cost Exxon $120 million, all of which was also distributed on April 5. On that day, Exxon paid $120 million from a Citibank account in New York to an account with a branch of Ecobank in Liberia, the financial institution used by NOCAL. Ecobank then used this money to pay the Liberian Government $50 million in signature bonuses and transfer fees, an amount equivalent to more than 70 percent of the country's health care expenditure that year.[78] Of this money $45 million went to the Ministry of Finance while $5 million went to NOCAL. The bank also paid itself $1.5 million in fees.[79]

The remaining $68.5 million of Exxon's money went to BCP, also paid on April 5.[80] This money was actually paid by Ecobank to BCP just before BCP transferred Block 13 to COPL and thus also just before Ecobank had received money from Exxon. This is because BCP stated it wanted to be paid before it transferred Block 13 and Exxon wanted Block 13 before it would pay its $120 million. To resolve this impasse, NOCAL had secured a bridge loan with Ecobank for the exact amount owed by Exxon to BCP.[81] Technically therefore, the money paid to BCP for Block 13 was Ecobank's money loaned to NOCAL, and $68.5 million of Exxon's $120 million was being used to pay back this loan. However, this loan was approved by Ecobank partly upon the condition that Exxon promised to pay it back,[82] and Exxon did pay it back on the very same day.

Global Witness has written to Exxon, COPL, and BCP regarding the April 2013 transactions. As of publication, Exxon and BCP did not respond, while COPL stated that the Block 13 license was *"obtained in accordance with the laws of Liberia."*

---

c According to COPL, the transfer of Block 13 from BCP to COPL and Exxon occurred on April 5, 2013. According to the loan agreement between NOCAL and Ecobank, BCP would not transfer Block 13 until it was paid $68.5 million. According to bank transfer receipts, BCP was paid its money on April 5 and NOCAL was paid its money on April 5. As such, Ecobank must have paid BCP its money on April 5, BCP then transferred Block 13 on 5 April, and Exxon paid Ecobank money on 5 April – as it was a share of Exxon's money that was ultimately paid to NOCAL. Canadian Overseas Petroleum Ltd, Canadian Overseas Petroleum Limited Closes LB-13 Transaction, April 5, 2013; Ecobank, A secured and committed short term loan facility for $68,500,000, March 8, 2013, Schedule 1, sec. k; Receipt for transfer of $68,500,000, April 5, 2013; Receipt for transfer of $5,000,000, April 5, 2013.



## The final 2013 deal: How Exxon got Block 13

**NOCAL**

**March 8**
NOCAL approved for $68.5 million loan with Ecobank, contingent upon Exxon's agreement to pay the loan back ❶

**April 5**
Ecobank pays NOCAL $5 million ❻

**Liberian Ministry of Finance**

**April 5**
Ecobank pays Finance Ministry $45 million ❼

**April 5**
Exxon pays $120 million to Ecobank ❺

**Ecobank**

**April 5**
Ecobank pays itself $68.5 million to retire loan to BCP and $1.5 million in fees ❽

**Exxon**

**April 5**
COPL transfers 80% of Block 13 to Exxon ❹

**April 5**
Following ratification of Block 13 by Liberian legislature, Ecobank draws down NOCAL loan and pays $68.5 million to BCP ❷

**COPL**

**April 5**
BCP transfers 100% of Block 13 to COPL ❸

**BCP**

**Reported Liberian Owners:**
> **David Jallah**, Lawyer

**Suspected Liberian Owners:**
> **Jonathan Mason,** Mining Minister between 2003 and 2005

> **Estate of Mulbah Willie,** Deputy Minister between 2003 and at least 2005. Died 2012

22

## WHAT THE LIKELY LIBERIAN OWNERS OF BROADWAY/PEPPERCOAST WOULD GET

Global Witness has seen earlier offers for Block 13. Based on these, we estimate that David Jallah and any individuals for whom he may have held a BCP interest should have received more than $3.3 million of the money paid by Exxon. If, as Global Witness believes, Jallah was holding BCP shares on behalf of former Liberian officials Jonathan Mason and Mulbah Willie, then they would have received a share of the money provided to Jallah. Mulbah Willie died in 2012, and so any money due to him in 2013 would, in theory, have been paid to his estate. Jallah, again, denied that he held shares for other Liberians, while Mason did not respond to Global Witness request for comment.

As outlined earlier, Representative Adolph Lawrence held a BCP ownership interest in 2011. If he continued to hold this interest in 2013, we estimate its value would have been $15,000. Lawrence did not respond to a Global Witness request for comment.

Lawrence's name appears as a holder of BCP options in a May 2011 agreement between BCP and COPL. However, the version of this agreement in which Lawrence's name appears has not been made publicly available. The version of the May 2011 agreement that has previously been made public was only published by COPL in March 2013, after it had been amended to reflect the intervening agreement between COPL and Exxon.[83] The March 2013 version of the BCP-COPL agreement is missing the list of Broadway employees and shareholders – including Lawrence – that was contained in the original version. Excerpts of the two agreements are included on pages 24-25.

In a March 2018 statement, COPL said that Lawrence's name was removed from the March 2013 agreement because this agreement no longer provided payments in shares to option- and shareholders.

## BLAME CANADA: WHY COPL GOT A SLICE AND WHY IT WAS STILL BEING USED BY EXXON

It is notable that, sitting in the middle of this April 2013 transaction, COPL did not pay any money but did end up with a percentage of Block 13. COPL's final share in the license was 17 percent – not 20 percent – because the company gave Exxon an additional three percent of Block 13 in June 2013 after it failed to pay Exxon money it owed.[84]

One reason why COPL was able to obtain any interest is likely because the company loaned BCP $15 million in May 2011 for geophysical data. Combining the money paid to BCP by both COPL ($15 million in May 2011) and Exxon ($68.5 million in April 2013), COPL paid slightly less than 18 percent of the total BCP received. This could be argued to have entitled COPL to roughly 17 percent of Block 13.

Of course, even if COPL was due a slice of Block 13 it was still being used by Exxon as a go-between. According to Exxon's December 2011 PowerPoint presentation, the two step process of transferring Block 13 using COPL was structured *"due to"* Exxon's legal concerns. That COPL may have obtained a percentage it was owed along the way does not negate Exxon's ostensible intention of shielding the American company from US anti-corruption laws. As stated, neither company responded to Global Witness questions regarding COPL's involvement in the Block 13 transaction.

Liberia's Surpeme Court: Those who may have broken Liberian laws should be investgiated. Credit Global Witness.



DRAFT 12: 18 MAY 2011

DATED 18  MAY 2011

(1) PEPPERCOAST PETROLEUM PLC

and

(2) CANADIAN OVERSEAS PETROLEUM (BERMUDA) LIMITED

and

(3) CANADIAN OVERSEAS PETROLEUM LIMITED

SALE AND PURCHASE AGREEMENT
in respect of a Production Sharing Contract
relating to Block LB-13, Liberia

McCarthy Tétrault
125 Old Broad Street
London EC2N 1AR
Tel: +44 (0)20 7786 5700
Fax: +44 (0)20 7786 5702
www.mccarthy.ca

mccarthy
tetrault

---

## The missing employee and shareholder information in the BCP and COPL Sale and Purchase Agreement

The original agreement signed by BCP (here named Peppercoast) and COPL on May 18, 2011 contains employee and shareholder information. This version of the agreement has not previously been made public. It lists Adolph Lawrence as an employee, but also as the holder of 150 options to buy BCP shares. Excerpts from this agreement are below. Highlights and enlargements in red added by Global Witness for emphasis.



Termination payment for release of 150 options



David Jallah will receive any shareholder distribution made at Closing in cash rather than shares.

Termination payment for release of 7,900 options

---

DRAFT 12: 18 MAY 2011

#### CONTENTS

1. Definitions .......................................................... 2
2. Sale and Purchase of Interest ...................................... 11
3. Conditions Precedent to Closing ................................... 11
4. Consideration ...................................................... 15
5. Covenants in Interim Period ....................................... 16
6. Closing and Post Closing .......................................... 19
7. Employees .......................................................... 21
8. Apportionments ..................................................... 22
9. Warranties ......................................................... 22
10. Further Assurance ................................................. 32
11. Termination ....................................................... 32
12. Announcement ...................................................... 33
13. Notices ........................................................... 33
14. Costs and Expenses ................................................ 34
15. Taxation .......................................................... 35
16. Confidentiality ................................................... 36
17. Guarantee ......................................................... 37
18. Variation ......................................................... 38
19. Assignment ........................................................ 38
20. General ........................................................... 38
21. Rights of Third Parties .......................................... 39
22. Governing Law, Jurisdiction and Arbitration ...................... 39
23. Counterparts ...................................................... 41
Schedule 1 – Closing Payments ....................................... 42
Schedule 2 – Employees .............................................. 51
Schedule 3 – PROPOSED amendments to psc ............................ 53
Schedule 4 – PSC Novation ........................................... 54
Schedule 5 – Amendment to a Lease ................................... 55
Schedule 6 – MOT USED ............................................... 56
Schedule 7 – Assignment of Lease and Facility Agreement ............ 67
Schedule 8 – Particulars of the Interest ........................... 70

The March 8, 2013 amended version of the May 18, 2011 BCP and COPL agreement was made after COPL had signed a separate agreement with Exxon. Employee information, including Adolph Lawrence's name, has been redacted from the 2013 version. Shareholder information is not referenced at all in the 2013 version. In a March 2018 statement, COPL said that Lawrence's name was removed from the March 2013 agreement because this agreement no longer provided payments in shares to option- and shareholders. This version of the agreement has been made public, and is found with filings submitted by COPL to the Canadian Securities Administrators.[91] Relevant excerpts from this agreement are below. Highlights in red added by Global Witness for emphasis.

---

EXECUTION VERSION

**DATED 18 MAY 2011**

(AS AMENDED AND RESTATED ON 8 March 2013)

(1) PEPPERCOAST PETROLEUM PLC

and

(2) CANADIAN OVERSEAS PETROLEUM (BERMUDA) LIMITED

and

(3) CANADIAN OVERSEAS PETROLEUM LIMITED

**SALE AND PURCHASE AGREEMENT**
*in respect of a Production Sharing Contract*
*relating to Block 1.B-13, Liberia*

McCarthy Tétrault
125 Old Broad Street
London EC2N 1AR
Tel: +44 (0)20 7786 5700
Fax: +44 (0)20 7786 5702
www.mccarthy.ca

C1420186.DOCX1
MT DOCS 12041635v6

26067943T916

m:carthy
tétrault

---

EXECUTION VERSION

SCHEDULE 1 – SPEECHLY UNDERTAKING................................................... 46
SCHEDULE 2 – EMPLOYEES ............................................................................ 51
SCHEDULE 3 – CONFIRMATIONS OF CLOSING AND COMPLETION.......... 52
SCHEDULE 4 – PSC NOVATION........................................................................ 54
SCHEDULE 5 – SELLER COMPLIANCE CERTIFICATE.................................. 61
SCHEDULE 6 – PURCHASER COMPLIANCE CERTIFICATE........................ 62
SCHEDULE 7 – ASSIGNMENT OF LEASE........................................................ 63
SCHEDULE 8 – PARTICULARS OF THE INTEREST....................................... 66

C1420186.DOCX1
26067943T916
MT DOCS 12041635v6

---

**SCHEDULE 2 – EMPLOYEES**

[Table listing employee information redacted]

C1420186.DOCX1
26067943T916
MT DOCS 12041635v6

51

## CATCHING UP WITH EXXON AROUND THE WORLD

Liberia is far from the only country in which Exxon and the company it absorbed in 1998 – Mobil – have conducted questionable deals. Two examples are instructive: Equatorial Guinea and Kazakhstan.

Equatorial Guinea has the highest GDP per capita in sub-Saharan Africa.[86] Yet its population remains destitute, the country's oil wealth squandered on villas and supercars[87] by President Teodoro Obiang and his family. Exxon's dubious behavior in the country emerged during a 2004 US Senate inquiry into Riggs Bank, one of the oldest banks in America.

Investigators uncovered Exxon's links with Abayak, a construction and real estate company owned by President Obiang (but controlled by his wife, according to testimony from ExxonMobil). Abayak had a 15 percent share in Exxon's Equatorial Guinea subsidiary Mobil Equatorial Guinea, a significant conflict of interest.[88] Meanwhile, an Exxon subsidiary leased office space from a compound owned by Obiang and his wife for $175,500 per year over several years from 1996.[89]

Other ministers also received payments from Exxon subsidiaries for use of their property. A house belonging to the Minister of Agriculture was leased for $45,020 and a company owned by the Interior Minister received more than $236,000.[90] Accounts into which oil companies, including Exxon, paid money were used to fund tuition fees for dozens of students, many of whom were the children of government officials. It is unclear whether the oil companies knew this, the Senate report said.[91]

Today, Exxon remains Equatorial Guinea's largest oil producer.[92] Since beginning production in the Zafiro oilfield in 1996, it has pumped more than a billion barrels from the concession, and added new oil blocks to its acreage in recent years.[93] Andrew Swiger, an Exxon Executive Vice President, insisted the payments were legal, saying: *"We maintain the highest ethical standards [and] comply with all applicable laws and regulations. These principles … apply to our operations in Equatorial Guinea."*[94] He said that in Equatorial Guinea *"virtually all government officials have some business interests of their own"* and the company sometimes had to do business with them.

For its part, Riggs Bank was fined $25 million in May 2004 for failing to monitor suspicious transactions worth

hundreds of millions of dollars. Shortly afterwards the bank collapsed and was sold at a discount.[95]

Exxon was also allegedly involved in dubious payments to government officials in Kazakhstan where tens of millions of dollars from US firms ended up in the bank accounts of its dictatorial president, Nursultan Nazarbayev. In 1996, soon before its merger with Exxon, Mobil obtained a 25 percent share in the vast Tengiz oil field. There was no formal tendering process for this block despite what Mobil's then-CEO Lucio Noto called *"substantial competition."*[96] One Mobil employee who was there told the New Yorker how at one meeting, Nazarbayev demanded the company buy him a Gulfstream Jet – a request that appears to have been declined.[97]

Instead, Mobil chose to deal with James Giffen, a consultant from California who played middle-man between Mobil and the Kazakh Government. Giffen was charged with corruption offences in 2003, accused of channeling $78 million to Nazarbayev and the Kazakh oil minister, from funds paid by international oil companies that then won oil concessions in Kazakhstan.[98] *"Mobil executives raised questions about whether [the arrangement] would violate the Foreign Corrupt Practices Act,"* said a related indictment against a Mobil executive accused of involvement in the bribery scheme.[99]

Mobil nonetheless directed $22 million to Giffen's company, which made onwards payments to Nazarbayev, say the indictments.[100] Some $45,000 of the cash was used to pay for the exclusive Swiss schooling of Nazarbayev's daughter, the US prosecutors alleged.[101] Yet when Giffen was charged for violating the FCPA by paying bribes to land six deals – including the Tengiz concession – Mobil was not held accountable. Giffen pled guilty to a lesser charge and was sentenced to time served.[102]

*"ExxonMobil has no knowledge of any illegal payments made to Kazakh officials by any current or former Mobil employees,"* an ExxonMobil spokesman told the New York Times as the case against Giffen was progressing.[103]

When Exxon bought Mobil in 1998 it inherited the spoils of this saga: Exxon retains its 25 percent stake in Tengiz to this day.[104] Lucio Noto, an architect of the deal, became Vice Chairman of ExxonMobil.[105]

Exxon did not respond to a Global Witness' letter regarding is activities in Equatorial Guinea and Kazakhstan.

## THE STUMBLING BLOCK

Global Witness is unaware what due diligence Exxon may have undertaken between the December 2011 London meeting with the Liberian Government and April 2013, when it purchased Block 13. When asked in March 2018, the company did not provide a response. It is therefore possible that any research carried out convinced the company that it was legal to buy Block 13: that BCP was not owned by former Liberian officials and that the bribes in 2006 and 2007 were not a liability under US law.

But if Exxon was satisfied that buying Block 13 was legal, why did the company still feel the need to use COPL as a go-between and negotiate so hard for Liberian legal guarantees in its final contract? One explanation is that it was simply exercising an over-abundance of caution, perhaps even attempting to create legal safeguards against new, unforeseen legal risks.

However, it is more likely that Exxon structured the deal with COPL in the middle because, in 2013, it continued to be concerned about US anti-corruption laws. The evidence suggests that BCP was indeed part-owned by former Liberian officials Jonathan Mason and Mulbah Willie, and Exxon could have accessed the same evidence from which Global Witness has drawn this conclusion. And the bribes paid so BCP could originally obtain Block 13 were still bribes, were still publicly reported, and Exxon was aware of them when it bought the license from BCP.

Regardless of why Exxon attempted to clean Block 13, there is evidence that this process was not successful and any US legal violations raised by the purchase of Block 13 – detailed in the next section – should apply to Exxon.

First, the transaction's structuring as a two-step process is a fiction and it should instead be treated as a one-step process in which Exxon purchased Block 13 directly from BCP. The full $120 million paid in the deal originated with Exxon and it was not until this money left Exxon's account that all other parties, including BCP, received their payments. Additionally, the entire transaction occurred on the same day as previously planned by Exxon. And most important, in its London presentation Exxon explicitly stated an intent to undertake a two-step transaction for the purposes of avoiding US legal exposure.

Second, there is evidence that COPL may not actually have served as the independent go-between Exxon thought it needed in terms of perception because senior managers from COPL and BCP had a very close relationship. Directors

from COPL and BCP had worked together running the same company just before Exxon began its Block 13 negotiations in 2011 and worked together again running a different company soon after the Block 13 deal was finalized in 2013. Global Witness is not aware of evidence that COPL and BCP had common Directors or shareholders at the time that Exxon purchased Block 13.

Until 2009, the UK nationals Arthur Milholland and Richard Mays were both Directors of the UK oil company Svenska Petroleum Exploration.[106] When Svenska went bankrupt that year, Milholland became CEO of COPL and Mays became a Director (and eventually Board Chairman) for BCP.[107] The two remained separate until 2014, when Mays became a Director of a company called Canadian Overseas Petroleum UK (COPL UK).[108] COPL UK is a subsidiary of the other COPL, and in addition to being the head of the parent company, Milholland is also a Director of COPL UK with Mays.[109] A diagram describing these relationships is located on the following page.

Milholland, Mays, and Exxon did not respond to Global Witness' questions regarding the links between the two businessmen. In its March 2018 statement, COPL also did not address this relationship. Global Witness believes that, at a minimum, the close relationship between Milholland and Mays could create a perception that transactions between the two were not conducted at arm's length. As such, Exxon's attempt to use COPL to shield itself from US anti-corruption laws may have been misguided.

## THE LONG ARM OF THE LAW

Based upon this evidence, Global Witness believes that Exxon should be investigated to determine whether it may have broken US laws by purchasing Block 13, while BCP, COPL and involved Liberians should be investigated for laws they may have broken in Liberia, the UK, and Canada.[110]

### US ANTI-MONEY LAUNDERING LAWS

Exxon may have violated US anti-money laundering laws by purchasing an oil block from BCP, which BCP had acquired illegally. Under 18 US Code § 1957, a US company cannot use a US financial institution to pay more than $10,000 to another company for an asset that the US company knew was acquired through the use of bribery or the embezzlement of public funds in a foreign country.[111] In other words, buying such an asset would help the other company or person launder something obtained illegally.



**The close relationship between Arthur Milholland and Richard Mays and their companies BCP and COPL**

- Arthur Milholland
- Richard Mays
- Arthur Milholland and Richard Mays
- Exxon

*Just before – and just after – BCP, COPL, and Exxon did their deal, BCP and COPL were closely related. From 2008 to 2009 **Arthur Milholland and Richard Mays** were Directors of the same company, Svenksa. BCP and COPL began negotiating for Block 13 in 2011, as did COPL and Exxon. The deal was concluded in 2013. In 2014, Milholland and Mays rejoined forces, with Mays becoming a Director of COPL UK, a company for which Milholland had been a Director since 2009. COPL UK is owned by COPL Canada, a company for which Milholland has served as CEO since 2009.*

2007

**Svenska Petroleum Exploration**

**Arthur Milholland: Director**
April 30, 2008 – May 25, 2009

2008

**Richard Mays: Director**
April 30, 2008 – May 25, 2009

2009

**COPL UK**

**COPL (Canada)**

2010

**Arthur Milholland: Director**
May 27, 2009 – Present

COPL (Canada) owns COPL UK

**Arthur Milholland: CEO**
August 7, 2009 – Present

**BCP**

**Richard Mays: Director**
March 10, 2010 – May 1, 2013

2011

**Exxon**

COPL (Canada) and
BCP sign Block 13
deal May 18, 2011

2012

Exxon and COPL
sign Block 13 deal
November 11, 2011

2013

Transfers 80%
Block 13 to Exxon
April 5, 2013

Transfers Block 13
to COPL April 5, 2013

Pays BCP $68.5 million
April 5, 2013

Transfers additional
3% Block 13 to Exxon
June, 2013

2014

2015

**Richard Mays: Director**
December 8, 2014 –
Present

2016

2017

Present

Block 13 was acquired by BCP in 2007 through bribes paid by NOCAL to the Liberian legislature. If, as the evidence seen by Global Witness suggests, BCP was owned by Liberian officials with the power to award themselves Block 13, then BCP likely obtained the block because these officials abused their positions. It was also illegal under Liberian law for BCP to be owned by the officials.

Exxon knew the payments made in 2007 were a concern, and suspected that former officials owned BCP. And the transaction in which Exxon purchased Block 13 from BCP involved a branch of Citibank based in the US and was valued at $68.5 million, counting only the money Exxon paid to BCP. On the basis of this evidence, Exxon should be investigated by the US Department of Justice to see if there were any violations of anti-money laundering laws.

## US FOREIGN CORRUPT PRACTICES ACT

Additionally, Exxon may have violated the US Foreign Corrupt Practices Act (FCPA) by purchasing Block 13 from BCP if Representative Adolph Lawrence – a sitting government official with the power to approve Exxon's deal – retained an interest when a legislator. Lawrence has declined to clarify to Global Witness whether he still held a BCP interest when Exxon purchased Block 13 in 2013.

Under 15 US Code § 78dd–1, a US company may not pay a foreign government official in order to obtain or retain business. This would include paying a legislator so that she or he helps a company's oil block obtain legislative ratification.[d]

There is evidence that, in 2011, Adolph Lawrence held BCP share options that Global Witness estimates were worth $15,000 in 2013. If Lawrence had continued to hold these options in 2013, then this amount of Exxon's money would have gone to him. At the time of Exxon's Block 13 purchase, Adolph Lawrence served as Chairman of the Committee on Lands, Natural Resources, and Environment in Liberia's House of Representatives. This position not only made it illegal for him to hold a BCP ownership interest under

Liberian law, but it also gave him considerable influence over the ratification of Exxon's Block 13 contract.

Exxon was likely aware that Lawrence held a BCP interest in 2011 and would have known the Representative held a critical position in the Legislature in 2013. The company also knew that legislators had previously received bribes (or, in Exxon's words, *"payments"*) to ratify oil licenses, including Block 13 in 2007.

Exxon has itself stated that scenarios like the purchase of Block 13 pose a corruption risk. In its 2015 Anti-Corruption Legal Compliance Guide the company outlines multiple scenarios that are *"potentially sensitive from an anti-corruption standpoint."* One of these scenarios is where a company *"proposes to acquire an interest in a discovered undeveloped oil and gas property that was acquired by a local company five years ago without a public tender in a country with a reputation for corruption."*[112]

In the absence of any clarification from Adolph Lawrence, Global Witness believes Exxon should be investigated by the US Department of Justice and SEC to determine whether any of the company's payment to BCP went to Adolph Lawrence, whether any such transfer violated the FCPA, and whether the facts outlined above could demonstrate conspiracy to violate the FCPA.

## LIBERIAN ANTI-CORRUPTION LAWS

BCP, Exxon, COPL, and involved Liberian citizens should be held accountable for any laws they may have broken in Liberia. Liberian prosecutors should investigate to determine whether, as the evidence suggests, BCP was owned by government officials, namely Jonathan Mason and Mulbah Willie. Any such individual should also be held accountable if it is found they illegally acquired and profited from the sale of Block 13. The Liberian Government should also investigate whether BCP provided NOCAL with $75,000

---

**d** 15 US Code § 78dd–1, Prohibited foreign trade practices by issuers, available at https://www.law.cornell.edu/uscode/text/15/78dd-1. Note that evidence regarding Exxon's behavior in Liberia holds similarities to facts outlined in the 2011 ruling in *United States v. Kozeny, et al*. In the case, an American was found to have violated the FCPA when bribes were paid for his benefit and he was deemed to have knowledge of these bribes despite not paying them himself. This is because the individual engaged in behavior suggesting he was aware of the corruption, knew his partner had a reputation for corruption, and took active steps to shield himself from potential liability. In the case of Exxon and Block 13, the company knew corruption was pervasive in Liberia, was aware of misconduct on behalf of some of the parties involved in the transaction, and aimed to shield itself from liability by including COPL in the deal. See also US Department of Justice, A Resource Guide to the US Foreign Corrupt Practices Act, p. 23, available at https://www.sec.gov/spotlight/fcpa/fcpa-resource-guide.pdf.

in 2006 with the intention of NOCAL using this money to bribe legislators so that the company could obtain Block 13 in 2007, or for some other purpose.

### UK AND CANADIAN ANTI-CORRUPTION LAWS

Finally, BCP, its shareholders, and COPL should be investigated in the UK and Canada to determine whether they violated anti-corruption laws in either country.

## Monrovia, 2013:
# AWASH IN CASH

### SOME UNUSUAL, LARGE PAYMENTS

Evidence seen by Global Witness also suggests that unusual, large payments were made by NOCAL to Liberian Government officials in connection with the 2013 award of Block 13.

In the month following the award of Block 13 to Exxon, NOCAL paid $210,000 to six key Liberian Government officials who signed the Exxon deal – $35,000 per official. These officials were National Investment Commission Chairman Natty Davis, Finance Minister Amara Konneh, NOCAL CEO Randolph McClain, Mining Minister Patrick Sendolo, NOCAL Board Chairman Robert Sirleaf, and Justice Minister Christiana Tah.

Global Witness believes these payments to be unusual. According to NOCAL bank records covering several years surrounding this date, except for smaller yearly bonuses paid shortly before Christmas, there is no sign of equivalent bonuses during this time. Block 13 was the only oil license awarded during the period.

These payments were called *"bonuses"* by NOCAL and were made to the officials because they were members of Liberia's Hydrocarbon Technical Committee (HTC), the inter-ministerial body responsible for signing Liberia's oil licenses. They appear also to be linked to the HTC's signing of Block 13.

Global Witness calculates that the payments represented a 160 percent increase on the reported highest salary paid to a Liberian minister.[113] Robert Sirleaf, however, was working for free according to newspaper reports.[114] Yet he also received a $35,000 payment. For more detail on these payments, see the chart on page 31.

Under Liberian criminal law, a bribe is defined as a payment given so a public servant will undertake an official act. In 2006 and 2007, NOCAL made payments to members of the Liberian legislature to ensure the original award of Block 13 to BCP (see section called Bribery to get Broadway/ Peppercoast Block 13). In that case, NOCAL's payments – then called *"lobbying fees"* – were made to government officials who had the power to approve an oil license. These 2006 and 2007 payments have been classified as bribes by the Liberian Government's General Auditing Commission.[115]

Global Witness has written to NOCAL and the HTC members requesting comment on the payments they received in 2013. As of the date of publication, we have received three responses. Former National Investment Commission Chair Natty Davis confirmed that each HTC member received a $35,000 payment, but that each payment was a *"bonus… growing out of the successful negotiations,"* of what Davis stated was Liberia's best oil agreement. Davis also stated that, *"the decision to make this payment to the HTC members who negotiated the production sharing agreement was taken by the board of directors of NOCAL."*[116]

A similar response was received from former Justice Minister Christiana Tah, who stated that *"bonus payments were authorized by NOCAL's Board of Directors to all NOCAL Staff and others who performed exceptionally in conducting the negotiations on the Exxon Contract. These bonus payments were made long after the Exxon deal was concluded."* According to Tah, *"I did not receive money or an offer to pay money from Exxon Mobil for the award of the oil contract."*[117]

According to Robert Sirleaf, *"after the contract was signed and the funds transferred, NOCAL paid a bonus to ALL officers, board members and employees of NOCAL (approx. 140+) including drivers, janitors, secretaries and clerks. I'm very sure one wouldn't draw any conclusions that a bonus paid to the ENTIRE company including all junior staff was a 'bribe.'"* [Emphasis in original.] Sirleaf also stated that *"the signature bonus Liberia received for the Block 13 contract was about fifteen times"* larger than any preceding bonus.[118]

In 2013, NOCAL's Board did have the authority to set compensation levels for Board members and the agency's



Christiana Tah
Credit: Front Page Africa

Patrick Sendolo
Credit: Front Page Africa

Amara Konneh
Credit: Front Page Africa

**April 5**
**Exxon pays NOCAL**
## $5,000,000

**NOCAL pays officials**
## $210,000

Unusual, large payment to Liberian Government officials who signed Exxon's Block 13 deal, 2013

| Name and Government Post | Amount | Role in Block 13 Deal |
|---|---|---|
| **Christiana Tah** Justice Minister | $35,000 | Member of the Hydrocarbon Technical Committee. Signed Exxon's Block 13 concession agreement. In March 2018, stated that payment she received was a "bonus" authorized by the NOCAL Board, similar to bonuses provided to all NOCAL staff. |
| **Patrick Sendolo** Mining Minister | $35,000 | Member of the Hydrocarbon Technical Committee. Signed Exxon's Block 13 concession agreement. Did not respond to Global Witness request for comment. |
| **Robert Sirleaf** NOCAL Board of Directors Chair | $35,000 | Signed Exxon's Block 13 concession agreement. Son of then-President Ellen Johnson Sirleaf. In March 2018, stated that payment he received was a "bonus" authorized by the NOCAL Board, similar to bonuses provided to all NOCAL staff. |
| **Natty Davis** National Investment Commission Chair | $35,000 | Member of the Hydrocarbon Technical Committee. Signed Exxon's Block 13 concession agreement. In March 2018, stated that payment he received was a "bonus" authorized by the NOCAL Board for negotiating a deal he stated was very good. |
| **Randolph McClain** NOCAL President | $35,000 | Member of the Hydrocarbon Technical Committee. Signed Exxon's Block 13 concession agreement. Did not respond to Global Witness request for comment. |
| **Amara Konneh** Finance Minister | $35,000 | Member of the Hydrocarbon Technical Committee. Signed Exxon's Block 13 concession agreement. Did not respond to Global Witness request for comment. |

May 1
May 1
May 2
May 7
May 9
May 20

**Note:** All payments made by NOCAL derived from the same bank account. It is likely that the $5 million paid by Exxon to NOCAL was also deposited into this account.

management.[119] Global Witness has requested, but not yet received, a copy of the NOCAL Board resolution Davis and Tah state authorized the payments made by NOCAL.

Three members of NOCAL's five-person Board (Amara Konneh, Patrick Sendolo, and Robert Sirleaf) and the Board's Secretary (Randolph McClain) were also HTC members who received $35,000 payments.[120]

Global Witness has no evidence that Exxon directed NOCAL to pay Liberian officials, nor that Exxon knew such payments were occurring.

## SUSPICIOUS TRANSFERS

In addition to these unusual payments to officials, in the period immediately surrounding the award of Block 13 to Exxon, NOCAL made two suspicious transfers that merit investigation. The first of these was a $163,030 payment to a sporting goods company called the Boima Folley Business Center. This payment was made on March 26, 2013, the day that Block 13 was ratified by the Liberian legislature. The company is run by a man named Boima Folley, who in 2012 also worked for the House of Representatives as Deputy Director for Communications. The company also has a store selling sporting goods across the street from the legislature.

NOCAL does have a history of sponsoring Liberian sporting events, in particular soccer matches, and it is possible that the payment to Boima Folley Business Center was a legitimate purchase of equipment. However, $163,030 appears to be a very large amount for NOCAL to spend on such gear. In December 2017, Global Witness inquired as to the price of soccer shirts sold at the store and was told that, for the price paid by NOCAL, one could buy just over 26,000 soccer shirts.

Global Witness believes the Liberian Government should investigate this payment. In 2006 and 2007 bribes paid by NOCAL were, on one occasion, not given directly to legislators but to a legislative staff member, who was then expected to further distribute



Boima Folley Business Center, which received $163,030 on the day Exxon's Block 13 deal was ratified, is run by a legislative clerk and is across the street from the legislature.
Credit: Global Witness



Celtus Wotorson
Credit: Front Page Africa

the money.[121] As of the date of publication, Boima Folley and NOCAL had not responded to a Global Witness request for comment.

The second payment that Global Witness believes merits investigation was made by NOCAL to Liberian Senator Cletus Wotorson, who in 2013 served as Chairman of the Senate's Lands, Mines, Energy and Environment Committee.[122] On March 26, 2013, again the day the legislature ratified Block 13, NOCAL paid Wotorson $17,880, allegedly to cover expenses. As the Chairman of the Senate committee responsible for reviewing oil agreements, Wotorson's consent was necessary if Block 13 was to be awarded to Exxon. Global Witness wrote to Wotorson and NOCAL in March 2018 inquiring about this payment but has not received a response. It is thus unclear why expenses for essentially administrative acts should be so high.

## STAFF BONUSES

As alluded to in the above responses from Christiana Tah and Robert Sirleaf, in the month following Exxon's deal NOCAL also distributed $290,000 in what the agency called bonuses to over 140 members of staff and consultants. The vast majority of these payments were smaller than those made to HTC members by two orders of magnitude. Also, unlike payments to the HTC members, these staff payments were not made to people who signed the Exxon deal.

## EXXON SHOULD HAVE KNOWN BETTER

Exxon was under no obligation to pay most of the money it gave to NOCAL; $4 million of its $5 million payment was characterized as a *"bonus"* that is not required by Liberian law, but was rather negotiated by the company.[e] Exxon also knew the risk posed by giving NOCAL a large signature bonus: the agency had previously acted on behalf of the oil company Oranto by bribing officials so that oil blocks would be approved. Indeed, in its London presentation Exxon expressed concern regarding payments made in 2006 and 2007 to gain earlier passage of the very oil block it wanted.

And in effect, the unusual payments made by NOCAL for which Global Witness has evidence were likely made with Exxon's money. They were made in the month after Exxon paid NOCAL $5 million, and they were likely paid from the same bank account into which Exxon's money was deposited.

Global Witness believes that Exxon should have considered it possible that money the company provided to NOCAL could have been used as bribes in connection with Exxon's Block 13 deal. Global Witness has written to Exxon requesting information about those safeguards the company may have put in place to prevent the possible misuse of its funds by NOCAL. However, the company has not responded.

Given these circumstances of this exceptional deal, Global Witness believes that the Liberian Government should investigate payments made to officials by NOCAL in 2013 to determine whether any Liberian laws may have been broken. Were it to be determined that there has been any illegality, the US Department of Justice should investigate Exxon to determine if the company violated the FCPA.

---

e When licensing oil concessions, some countries do require by law the payment by companies of signing bonuses. Liberian law allows for such payments but does not require them. Global Witness has calculated Exxon's signing bonus to be $4 million and not $5 million because $1 million of the money paid by Exxon to NOCAL was characterized as a *"transfer fee."* Liberia's 2002 Petroleum Law, which was in force in 2013, states that transfer fees can be paid by NOCAL and that fees should be listed in Liberia's Revenue Code. Global Witness was unable to verify the amount Liberia's Revenue Code would require Exxon to have paid as a transfer fee, and as such has assumed for the purposes of this report that this $1 million was legally required and non-negotiable. See Production Sharing Agreement between NOCAL, ExxonMobil Exploration and Production Liberia Ltd, Canadian Overseas Petroleum (Bermuda) Ltd, March 26, 2013, sec. 40.6(ii), (iii); Petroleum Law, 2002, sec. 10.1, 10.10.





These bank records represent a sample of the evidence seen by Global Witness showing NOCAL's unusual and suspicious payments at the time Exxon obtained the oil block. Highlights and enlargements in red added by Global Witness for emphasis.

## WHY GLOBAL WITNESS STATES THAT EXXON WAS COMPLICIT IN LIBERIA'S CORRUPT OIL SECTOR

Based upon the available evidence, Global Witness believes that Liberia's oil sector was corrupt, and Exxon's purchase of Block 13 made the company complicit. Global Witness has also put this position to Exxon, but as of publication, the company has not responded.

First, Block 13 had been corrupted when it was originally awarded in 2007 through the use of bribes. Exxon knew this when it purchased the license in 2013, although the company called the bribes *"payments."* Exxon thus knew it was buying a license with illegal origins, ultimately rewarding those who had previously broken the law.

Second, the evidence suggests Block 13 likely had corrupt owners. As Exxon itself suspected, it is likely that BCP was owned by former ministers who played a part in

awarding Block 13 to their company. In buying Block 13 from BCP, Exxon's money probably went to these owners – monetizing their illegal ownership. A member of Liberia's House of Representatives had also held an ownership interest in BCP, although it is unclear whether Adolph Lawrence held this interest after he became a legislator and when Exxon purchased Block 13.

Exxon's 2013 deal was characterized by unusual, large payments to officials who signed the Exxon deal. While Global Witness cannot prove that these payments were improper, we do believe they warrant investigation to determine whether they broke Liberian or US law.

By buying Block 13, Exxon knew it was purchasing a license with corruption "issues," issues that the evidence suggests were very real. Yet the company did not walk away from the deal, instead constructing a transaction designed to skirt legal exposure. As such, Global Witness considers Exxon complicit in Liberia's oil sector corruption.

## Washington, DC, Present day

Nearly five years after Exxon bought Block 13 it is fairly clear who emerged as a winner, and who has lost.

BCP, its creditors, and its owners all received a share of $68.5 million. The lawyer David Jallah surely received something, although sitting in his downtown Monrovia law office he did not want to talk about it. If, as the evidence suggests, Jonathan Mason was a BCP owner, then he likely received money also. Mulbah Willie passed away in 2012 and it is unknown what happened to money that was probably due him. Adolph Lawrence still sits in Liberia's House of Representatives as Chairman for the now-renamed Committee on Hydrocarbons.[123]

Liberia as a country has not done as well. Despite Exxon's money, Liberia remains one of the world's poorest countries, its economy hampered by low international commodity prices and corruption.[124] It is clear to Global Witness that Liberian people are also frustrated, believing that many of their government officials are corrupted and self-serving. In Liberia's 2017 elections these frustrations contributed to the rejection of former President Ellen Johnson Sirleaf's political party and the election as President of her long-time opponent George Weah.

For Exxon and its staff the picture is more mixed, but things are looking up. The company did not find oil in Liberia and in 2017 surrendered Block 13, pulling out of the country entirely.[125] Staff members, however, have gone on to greater things. Elijah White, who signed the deal as head of Exxon Liberia, has moved up and is now an Exxon Vice President. From February 2017 to March 2018 Rex Tillerson served as the US Secretary of State – the world's most powerful diplomat and the man setting America's policies towards countries like Liberia.

But perhaps the most positive development for Exxon in recent years is that its efforts to stop deals like this from becoming public have been increasingly successful. Lobbying by Exxon and API to delay Section 1504's implementation and strip it of detailed reporting requirements are working. As outlined earlier, only two weeks after Tillerson became Secretary of State, President Trump overturned an SEC rule giving real teeth to Section 1504.

The SEC is now working on a new rule and API and Exxon are lobbying hard to ensure it is weak, by failing to require disaggregated financial reporting that would help expose – and prevent – corruption. Not content with a weak Section

1504 rule, Exxon and API are also targeting the underlying Section 1504 statute, pushing Congress to get the entire law overturned.

This investigation was made possible because Liberia publicly disclosed Exxon's project-specific payment, which is the type of information that Section 1504 should also make public. If Exxon and other oil companies are able to prevent the publication of this information, then millions of people worldwide will not have the same chance we did – a chance to hold the corrupt to account and maybe prevent bribery in the first place.

For Exxon, its biggest win may be making sure we cannot see what it is up to next.

# RECOMMENDATIONS

**1. The US should ensure that data uncovering – and preventing – future bribery is made public. To do this the SEC should produce a strong rule implementing Section 1504. This rule should require the public disclosure of disaggregated project-level payments to governments, with no exemptions, to prevent this type of corruption from happening in the future. The rule should align with the common global standard for mandatory payment transparency, as implemented in Canada, Norway, the UK and 27 other member states of the EU.**

**2. The US Congress should continue to support the implementation of Section 1504 by urging the SEC to ensure a strong new rule is published and by voting no on any efforts to weaken or repeal the statute.**

**3. Authorities with the US Government should investigate Exxon to assess whether the company broke US law. This should include:**

❷ The Department of Justice should investigate Exxon to determine whether the company violated anti-money laundering laws by purchasing Block 13 from BCP because Block 13 was corruptly obtained by BCP in 2007. Bribes were paid in 2006 and 2007 to ensure BCP was awarded Block 13 and BCP was likely illegally owned by former Liberian Government officials who had awarded themselves the contract.

❷ The Department of Justice and the SEC should also investigate Exxon to determine whether the company violated the FCPA. This should include determining whether Adolph Lawrence continued to hold a BCP ownership



Corruption is undermining Liberia's development. Credit: Global Witness

interest at the time Exxon purchased Block 13 from the company. Were it the case that Lawrence held such an interest while also serving as a legislator with the power to approve Exxon's purchase, Exxon should be investigated to determine whether the company violated the FCPA. Additionally, if it were determined that NOCAL's unusual 2013 payments to Liberian officials were illegal, Exxon should also be investigated to determine if the company violated the FCPA.

**4. Authorities with the Liberian Government should investigate Exxon and BCP to assess whether the companies broke Liberian law. This should include:**

❯ An investigation into whether BCP, Jonathan Mason, and Adolph Lawrence violated Liberia's Petroleum Law.

❯ An investigation into whether BCP violated anti-bribery provisions within the Liberian Penal Code by providing NOCAL with funds in 2006 that may have been intended for use as bribes.

❯ An investigation into whether NOCAL violated any Liberian law when it distributed payments in 2013 to officials who signed the Block 13 license. The government should also review its policies on bonuses paid to staff.

**5. Authorities in the UK and Canada should investigate BCP, its shareholders, and COPL to determine whether either company broke anti-corruption laws in either country.**

**6. Exxon and COPL should undertake internal investigations to determine whether the companies broke anti-corruption laws.**

**7. The US Department of the Interior Office of Natural Resources Revenue should recommit the US to implement the Extractive Industries Transparency Initiative (EITI), ensuring that oil, gas, and mining companies operating in the US publish the payments they make in the US.**

**8. The International EITI Board should remove Exxon from the Board for failing to comply with a core requirement of the EITI standard by refusing to disclose tax payments made to the US Government.**

**9. LEITI should establish strong penalties for companies that fail to report their beneficial owners and undertake regular beneficial ownership reporting audits to determine if other natural resource companies are illegally owned by government officials.**

# ENDNOTES

1 Politico, Rex Tillerson Tried to Get This Rule Killed. Now Congress Is About to Do It for Him, February 1, 2017, available at https://www.politico.com/magazine/story/2017/02/rex-tillerson-tried-to-get-this-rule-killed-now-congress-is-about-to-do-it-for-him-214725.

2 New Yorker, Rex Tillerson at the Breaking Point, October 16, 2017, available at https://www.newyorker.com/magazine/2017/10/16/rex-tillerson-at-the-breaking-point.

3 Politico, Rex Tillerson Tried to Get This Rule Killed. Now Congress Is About to Do It for Him, February 1, 2017, available at https://www.politico.com/magazine/story/2017/02/rex-tillerson-tried-to-get-this-rule-killed-now-congress-is-about-to-do-it-for-him-214725.

4 For more information on LEITI, see http://www.leiti.org.lr/.

5 Liberian Extractive Industries Transparency Initiative, EITI Reconciliation Report for the Year Ended 30 June 2013, December 2015, p. 51, available at http://www.leiti.org.lr/.

6 Global Witness, Global Witness opposes US withdrawal from extractive Industries Transparency Initiative, November 2, 2017, available at https://www.globalwitness.org/en/press-releases/global-witness-opposes-us-withdrawal-extractive-industries-transparency-initiative/.

7 Global Witness, Revenue disclosure laws – Cardin-Lugar and the Global Transparency Standard, January 30, 2017, available at https://www.globalwitness.org/en/campaigns/oil-gas-and-mining/turn-towards-transparency/.

8 Publish What You Pay-US, Position Statement on Section 1504 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, March 24, 2014, p. 45. Available at the Securities and Exchange Commission: https://www.sec.gov/comments/df-title-xv/resource-extraction-issuers/resourceextractionissuers-28.pdf.

9 The Guardian, Donald Trump lifts anti-corruption rules in "gift to the American oil lobby," February 14, 2017, available at https://www.theguardian.com/us-news/2017/feb/14/donald-trump-anti-corruption-rules-dodd-frank-oil-companies.

10 In this report, LEITI listed BCP as receiving $70 million, not the $68.5 million that the company ultimately did receive. This is because BCP was originally due $70 million, but $1.5 million of this was paid to Ecobank as fees to process its loan to BCP.

11 Claigan Environmental, Submission to the SEC: Cost Estimates for Section 1504 of the Dodd-Frank Act, February 16, 2016, available at: https://www.sec.gov/comments/s7-25-15/s72515-26.pdf.

12 Natural Resource Governance Institute, A repository of open-source data on oil, gas and mining projects, available at www.resourceprojects.org, last visited January 30, 2018.

13 Bloomberg, Executive Profile: Rex Tillerson, available at https://www.bloomberg.com/research/stocks/private/person.asp?personId=1127018&privcapId=5477573, last visited February 7, 2018.

14 New Yorker, Rex Tillerson at the Breaking Point, October 16, 2017, available at https://www.newyorker.com/magazine/2017/10/16/rex-tillerson-at-the-breaking-point.

15 American Petroleum Institute, Lobbying Reports submitted to the Clerk of the House of Representatives and to the Secretary of the Senate, 2008-2009. Exxon Mobil Corp, Lobbying Reports submitted to the Clerk of the House of Representatives and to the Secretary of the Senate, 2008-2009, available at http://disclosures.house.gov/ld/ldsearch.aspx.

16 American Petroleum Institute, Lobbying Reports submitted to the Clerk of the House of Representatives and to the Secretary of the Senate, 2011; Exxon Mobil Corp, Lobbying Reports submitted to the Clerk of the House of Representatives and to the Secretary of the Senate, 2011, available at http://disclosures.house.gov/ld/ldsearch.aspx.

17 Securities and Exchange Commission, Comments on Proposed Rule: Disclosure of Payments by Resource Extraction Issuers: Submitted Comments and Meetings, available at https://www.sec.gov/comments/s7-42-10/s74210.shtml#meetings, last visited January 31, 2018; Securities and Exchange Commission, Comments on Proposed Rule: Disclosure of Payments by Resource Extraction Issuers: Submitted Comments and Meetings, available at https://www.sec.gov/comments/s7-25-15/s72515.shtml#meetings, last visited January 31, 2018; Securities and Exchange Commission, Specialized Disclosures: Title XV Provisions of the Dodd-Frank Wall Street Reform and Consumer Protection Act: Submitted Comments and Meetings, available at https://www.sec.gov/comments/df-title-xv/specialized-disclosures/specialized-disclosures.shtml, last visited February 26, 2018; Securities and Exchange

Commission, Specialized Disclosures; Resource Extraction Issuers Title XV Provisions of the Dodd-Frank Wall Street Reform and Consumer Protection Act: Submitted Comments and Meetings, available at https://www.sec.gov/comments/df-title-xv/resource-extraction-issuers/resource-extraction-issuers.shtml, last visited February 26, 2018; and Securities and Exchange Commission, Comments on Motion for Stay for File No. s7-42-10, available at https://www.sec.gov/rules/final/2012/34-67717-comments-stay-motion.shtml, last visited February 26, 2018.

18 Global Witness, Global Witness condemns API lawsuit to strike down Dodd-Frank oil, gas and mining transparency provision, October 12, 2012, available at https://www.globalwitness.org/en/archive/global-witness-condemns-api-lawsuit-strike-down-dodd-frank-oil-gas-and-mining-transparency/.

19 Patrick Mulva was the Chairman of API's General Finance Committee from at least 2008 through 2014. See https://www.sec.gov/comments/s7-15-08/s71508-68.pdf and at https://www.sec.gov/comments/df-title-xv/resource-extraction-issuers/resourceextractionissuers-34.pdf.

20 Global Witness, History will show DC District Court has drawn the wrong conclusions on Dodd-Frank 1504, July 4, 2013, available at https://www.globalwitness.org/en/archive/history-will-show-dc-district-court-has-drawn-wrong-conclusions-dodd-frank-1504/; Securities and Exchange Commission, SEC adopts rules for resource extraction issuers under Dodd-Frank Act, June 27, 2016, available at https://www.sec.gov/news/pressrelease/2016-132.html.

21 Global Witness, Global Witness opposes US withdrawal from the Extractive Industries Transparency Initiative, November 2, 2017, available at https://www.globalwitness.org/en/press-releases/global-witness-opposes-us-withdrawal-extractive-industries-transparency-initiative/.

22 American Petroleum Institute, Lobbying Reports submitted to the Clerk of the House of Representatives and to the Secretary of the Senate, 2017, available at http://disclosures.house.gov/ld/ldsearch.aspx.

23 United Nations Commission on Human Rights, Report of the United Nations High Commissioner for Human Rights and Follow-Up to the World Conference on Human Rights – Situation of Human Rights and Fundamental Freedoms in Liberia, August 12, 2003, p. 5, 7, available at https://documents-dds-ny.un.org/doc/UNDOC/GEN/G03/158/31/PDF/G0315831.pdf?OpenElement.

24 BBC News, Liberia probe into graft remarks, June 21, 2007, available at http://news.bbc.co.uk/1/hi/world/africa/6225422.stm.

25 Liberia Governance and Economic Management Assistance Program, available at http://www.gemap-liberia.org/, last visited January 13, 2018.

26 USAID, Complete Aid Dataset, available at https://explorer.usaid.gov/data.html, last visited January 13, 2018; World Bank, Liberia: Overview, available at http://www.worldbank.org/en/country/liberia/overview, last visited 9 January 2018.

27 USAID, US Aid by Foreign Country: Liberia, available at https://explorer.usaid.gov/cd/LBR?fiscal_year=2017&measure=Obligations, last visited January 13, 2018.

28 Broadway Mineral Resources PLC, Application of Submission of Bids, October 26, 2004, p. 7.

29 Broadway Mineral Resources PLC, Application of Submission of Bids, October 26, 2004, p. 8.

30 Production Sharing Contract between NOCAL and Broadway Consolidated Offshore Block 13, April 16, 2007, p. 61.

31 Production Sharing Contract between NOCAL and Broadway Consolidated Offshore Block 13, April 16, 2007, Legislature Ratification Cover Pages.

32 Liberia's 2002 Petroleum Law bars companies owned by government officials from holding oil blocks. Petroleum Law, 2002, sec. 2.4.8. Versions of this law containing the date on which it was enacted are not available. For enactment date, see NOCAL, Timeline: Liberia's oil sector, April 19, 2013, available at http://www.nocal.com.lr/pdf/Press_Releases/Background_Briefing_on_Liberia.pdf, last visited January 31, 2018. Section 2.4.9 of the law does allow companies owned by government officials to hold oil blocks if that company was created five years prior to the law's enactment, e.g. before 1997. However, this section of the law does not apply to BCP as the company was registered in 2005. Broadway Consolidated PLC, Articles of Incorporation, May 4, 2005.

33 Broadway Consolidated PLC, Report and Financial Statements, August 31, 2006, p. 2, 24; Broadway Consolidated PLC, Annual Return, March 7, 2010, p. 5; Global Witness, Interview with David Jallah, December 15, 2017.  The Isle of Man is a self-governing British Crown dependency in the British Isles. Many companies choose to register here because of its generous tax laws.

34 Africa Intelligence, Broadway Lands License 13, June 1, 2005.

35 Africa Intelligence, Jonathan Mason, December 17, 2003; Mineral Development Agreement between Liberia and Mittal Steel Holdings, August 17, 2005, p. 40; The Inquirer, Dissolved Moses Blah's Government Makes Several nominations to Transition-

al Government In Liberia, October 17, 2003, available at http://www.theperspective.org/inquirer/nominations_blah.html, last visited January 13, 2018; IRIN News, UN reveals suspect diamond deal, March 30, 2005, available at http://www.irinnews.org/news/2005/03/30/un-reveals-suspect-diamond-deal, last visited January 13, 2013.

36 Petroleum Law, 2002, sec. 4.4-4.5.

37 Peppercoast Letter to Global Witness, July 20, 2011.

38 Carter-Ruck on behalf of COPL, Letter to Global Witness, March 27, 2018.

39 National Democratic Institute, Know Your Representatives, July 2012, p. 21; IREDD, Liberia Lawmaker Watch, available at http://www.liberianlawmakerswatch.org/lawmaker/adolph-lawrence, last visited January 13, 2018.

40 Peppercoast Petroleum PLC, Canadian Overseas Petroleum (Bermuda) Ltd, Canadian Overseas Petroleum Ltd, Sale and Purchase Agreement, May 18, 2011, p. 42.

41 Petroleum Law, 2002, sec. 2.1.

42 Penal Code, 1978, sec. 12.40.

43 Receipt for "Lobbying Fees": $50,000, August 28, 2006; Receipt for "Lobbying Fees": September 19, 2006; Receipt for "Lobbying Fees": $25,000, April 4, 2007; Receipt for "Lobbying Fees": $15,000, April 5, 2007; Receipt for "Lobbying Fees": $1,500, April 17, 2007; General Auditing Commission, Report of the Auditor General on the National Oil Company of Liberia (NOCAL) for FY 2006/07 and 2007/08, April 20, 2011, p. ii; NOCAL Board of Directors, Meeting Minutes, May 15, 2007, p. 2.

44 NOCAL Board of Directors, Meeting Minutes, August 22, 2006, p. 2.

45 General Auditing Commission, Report of the Auditor General on the National Oil Company of Liberia (NOCAL) for FY 2006/07 and 2007/08, April 20, 2011, p. ii.

46 General Auditing Commission, Report of the Auditor General on the National Oil Company of Liberia (NOCAL) for FY 2006/07 and 2007/08, April 20, 2011, p. 143.

47 Addenda to Production Sharing Contracts between NOCAL, Oranto Petroleum Ltd, and Chevron Liberia Ltd, LB 11, LB12, LB14, August 23, 2010.

48 NOCAL Board of Directors, Meeting Minutes, August 22, 2006, p. 2.

49 Receipt for "Lobbying Fees": $50,000, August 28, 2006.

50 NOCAL Board of Directors, Meeting Minutes, April 5, 2007, p. 3.

51 General Auditing Commission, Report of the Auditor General on the National Oil Company of Liberia (NOCAL) for FY 2006/07 and 2007/08, April 20, 2011; Global Witness, Curse or Cure, September 2011, available at https://www.globalwitness.org/en/archive/curse-or-cure-how-oil-can-boost-or-break-liberias-post-war-recovery/.

52 TLC Africa, President Sirleaf Calls Newly Reconstituted Cabinet "The Right People for the Job", December 3, 2010, available at http://www.tlcafrica.com/news_new_cabinet_11_2010.htm.

53 NOCAL The Divestiture of Liberia Off-Shore Petroleum Block LB #13, p. 1, April 19, 2013, available at http://www.nocal.com.lr/news-and-media/the-divestiture-of-liberia-off-shore-petroleum-block-lb-13, last visited January 13, 2018.

54 Canadian Overseas Petroleum Corp, Canadian Overseas Petroleum to Acquire Offshore Liberian Interest, May 18, 2011.

55 Peppercoast Petroleum PLC, Canadian Overseas Petroleum (Bermuda) Ltd, Canadian Overseas Petroleum Ltd, Sale and Purchase Agreement, May 18, 2011, sec. 2, 4.

56 NOCAL The Divestiture of Liberia Off-Shore Petroleum Block LB #13, p.2, April 19, 2013, available at http://www.nocal.com.lr/news-and-media/the-divestiture-of-liberia-off-shore-petroleum-block-lb-13, last visited January 13, 2018.

57 Canadian Overseas Petroleum (Bermuda) Ltd, ExxonMobil Exploration and Production Liberia Ltd, Asset Purchase Agreement, November 16, 2011, as Amended March 8, 2013.

58 ExxonMobil Exploration Company, Meeting concerning Liberia Block 13 PSC: NOCAL/COPL/ExxonMobil, December 2, 2011.

59 ExxonMobil Exploration Company, Meeting concerning Liberia Block 13 PSC: NOCAL/COPL/ExxonMobil, December 2, 2011.

60 Africa Energy Intelligence, Broadway Lands License 13, June 1, 2005.

61 Global Witness, Interview with David Jallah, Monrovia, December 15, 2017.

62 Canadian Overseas Petroleum Ltd, Letter to Christopher Neyor, December 9, 2011.

63 Front Page Africa, Sigh of Relief: US Fetes ExxonMobil Team After Liberia Oil Block 13 is Sealed, April 22, 2013, available at https://web.archive.org/web/20130425231259/http://frontpageafricaonline.com/businesstech/marketfinance/5817-sigh-of-relief-us-embassy-fetes-exxonmobil-team-after-oil-block-13-is-sealed.html.

64 Production Sharing Agreement between NOCAL, ExxonMobil Exploration and Production Liberia Ltd, Canadian Overseas Petroleum (Bermuda) Ltd, March 26, 2013, p. 119.

65 Exxon, Developing Leadership Capabilities, available at http://corporate.exxonmobil.com/en/company/about-us/global-diversity/developing-leadership-capabilities, last visited January 13, 2018.

66 Corporate Council on Africa, 2017 Africa-Business Summit: Agenda for June 14 2017, available at http://www.ccausafricasummit.com/program-116952.html, last visited January 10, 2018.

67 Natural Resources and the Law of the Sea, Editors, May 2017, available at https://arbitrationlaw.com/books/natural-resources-and-law-sea-exploration-allocation-exploitation-natural-resources-areas, last visited January 10, 2018.

68 The Observer, Can Ellen Johnson Sirleaf save Liberia? July 23, 2017, available at https://www.theguardian.com/global-development/2017/jul/23/can-president-ellen-johnson-sirleaf-save-liberia.

69 ExxonMobil Exploration Company, Meeting concerning Liberia Block 13 PSC: NOCAL/COPL/ExxonMobil, December 2, 2011.

70 Wall Street Journal, Liberia Should Reform Oil Sector to Prevent Corruption, Report Says, September 27, 2011.

71 ExxonMobil Exploration Company, Meeting concerning Liberia Block 13 PSC: NOCAL/COPL/ExxonMobil, December 2, 2011.

72 ExxonMobil Exploration Company, Meeting concerning Liberia Block 13 PSC: NOCAL/COPL/ExxonMobil, December 2, 2011.

73 ExxonMobil Exploration Company, Meeting concerning Liberia Block 13 PSC: NOCAL/COPL/ExxonMobil, December 2, 2011.

74 National Oil Company of Liberia, Liberia and ExxonMobil complete historic offshore deal, April 5, 2013. The entity awarded Block 13 is called ExxonMobil Exploration and Production Liberia Ltd and is registered in the Bahamas. In its 2013 Financial and Operational Review, Exxon Mobil Corp., the US-registered parent of Exxon Liberia, listed Block 13 as an asset operated under the control of the parent. This report therefore will refer to the entity awarded Block 13 as simply Exxon. ExxonMobil, 2013 Financial and Operational Review, 2013, p. 36, available at http://cdn.exxonmobil.com/~/media/Global/Files/Financial-Review/2013_ExxonMobil_Financial_and_Operating_Review.pdf. The entity awarded Block 13 is called Canadian Overseas Petroleum (Bermuda) Limited and is registered in Bermuda. In its press release announcing the award of Block 13, Canadian Overseas Petroleum Corp, the Canadian-registered parent of COPL, Bermuda, listed Block 13 as an asset operated under the control of the parent. This report therefore will refer to the entity awarded Block 13 as simply COPL. Canadian Overseas Petroleum Ltd, Canadian Overseas Petroleum Limited Closes LB-13 Transaction, April 5, 2013.

75 ExxonMobil Exploration Company, Meeting concerning Liberia Block 13 PSC: NOCAL/COPL/ExxonMobil, December 2, 2011.

76 Production Sharing Agreement between NOCAL, ExxonMobil Exploration and Production Liberia Ltd, Canadian Overseas Petroleum (Bermuda) Ltd, March 26, 2013, sec. 2.1(a).

77 Production Sharing Agreement between NOCAL, ExxonMobil Exploration and Production Liberia Ltd, Canadian Overseas Petroleum (Bermuda) Ltd, March 26, 2013, sec. 40.5.

78 Government of Liberia, National Budget FY12-13, p. 34.

79 Production Sharing Agreement between NOCAL, ExxonMobil Exploration and Production Liberia Ltd, Canadian Overseas Petroleum (Bermuda) Ltd, March 26, 2013, sec. 40.4 - 40.6; Ecobank, A secured and committed short term loan facility for $68,500,000, March 8, 2013; Ecobank, Receipt for transfer of $68,500,000, April 5, 2013; Ecobank, Receipt for transfer of $5,000,000, April 5, 2013. For complete transfer timings, see footnote c and the diagram on page 22.

80 Receipt for transfer of $68,500,000, April 5, 2013.

81 Ecobank, A secured and committed short term loan facility for $68,500,000, March 8, 2013, Schedule 1, sec. d.

82 Ecobank, A secured and committed short term loan facility for $68,500,000, March 8, 2013, Conditions Precedent sec. 4.

83 Canadian Securities Administrators, Canadian Overseas Petroleum Ltd: Other Material Contracts [Sale and Purchase Agreement Dated 18 May 2011, as amended and restated on 8 March 2013], March 18, 2013, available at https://www.sedar.com/DisplayCompanyDocuments.do?lang=EN&issuerNo=00021327.

84 Canadian Overseas Petroleum Ltd, Amended and Restated Preliminary Short Form Prospectus, June 26, 2013, p. 10; Canadian Overseas Petroleum Limited Unaudited Condensed Interim Consolidated Financial Statements as at September 30, 2013, November 15, 2013, p. 9.

**85** Canadian Securities Administrators, Canadian Overseas Petroleum Ltd: Other Material Contracts [Sale and Purchase Agreement Dated 18 May 2011, as amended and restated on 8 March 2013], March 18, 2013, available at https://www.sedar.com/DisplayCompanyDocuments.do?lang=EN&issuerNo=00021327.

**86** Central Intelligence Agency, Country Comparison: GDP Per Capita, available at https://www.cia.gov/library/publications/the-world-factbook/rankorder/2004rank.html, last visited January 11, 2018.

**87** Global Witness, The Secret Life of a Shopaholic, November 17, 2009, p. 2, available at https://www.globalwitness.org/en/campaigns/corruption-and-money-laundering/banks/secret-life-shopaholic/.

**88** US Senate Committee on Governmental Affairs Permanent Subcommittee on Investigations, Hearing on Money Laundering and foreign corruption: Enforcement and effectiveness of the Patriot Act, July 15, 2004, p. 7, 49, available at https://www.gpo.gov/fdsys/pkg/CHRG-108shrg95501/pdf/CHRG-108shrg95501.pdf.

**89** US Senate Committee on Governmental Affairs Permanent Subcommittee on Investigations, Report on Money Laundering and foreign corruption: Enforcement and effectiveness of the Patriot Act, July 15, 2004, p. 100-101, available at https://www.hsgac.senate.gov/imo/media/doc/ACF5F8.pdf. https://www.hsgac.senate.gov/imo/media/doc/ACF5F8.pdf.

**90** US Senate Committee on Governmental Affairs Permanent Subcommittee on Investigations, Report on Money Laundering and foreign corruption: Enforcement and effectiveness of the Patriot Act, July 15, 2004, p. 101, available at https://www.hsgac.senate.gov/imo/media/doc/ACF5F8.pdf.

**91** US Senate Committee on Governmental Affairs Permanent Subcommittee on Investigations, Report on Money Laundering and foreign corruption: Enforcement and effectiveness of the Patriot Act, July 15, 2004, p. 59 and p. 104-5, available at https://www.hsgac.senate.gov/imo/media/doc/ACF5F8.pdf.

**92** ExxonMobil, Locations: Equatorial Guinea, available at http://corporate.exxonmobil.com/en/company/worldwide-operations/locations/equatorial-guinea#About, last visited January 12, 2018.

**93** Oil and Gas Year, Equatorial Guinea, 2015, p11, available at http://www.theoilandgasyear.com/content/uploads/2015/10/TOGY_Equatorial-Guinea-2015.pdf.

**94** US Senate Committee on Governmental Affairs Permanent Subcommittee on Investigations, Hearing on Money Laundering and foreign corruption, July 15, 2004, available at https://www.gpo.gov/fdsys/pkg/CHRG-108shrg95501/pdf/CHRG-108shrg95501.pdf.

**95** New York Times, At Riggs Bank, A Tangled Path Led to Scandal, July 19, 2004, available at http://www.nytimes.com/2004/07/19/us/at-riggs-bank-a-tangled-path-led-to-scandal.html; Global Witness, Undue Diligence, March 2011, p. 8, available at https://www.globalwitness.org/en/campaigns/corruption-and-money-laundering/banks/undue-diligence/.

**96** Global Witness, Time for Transparency, March 2004, p. 10, available at https://www.globalwitness.org/documents/17833/time_for_transparency.pdf.

**97** New Yorker, The Price of Oil, July 9, 2001, p. 52, available at https://www.newyorker.com/magazine/2001/07/09/the-price-of-oil.

**98** Economist, Big oil's dirty secrets, May 8, 2003, available at http://www.economist.com/node/1770490.

**99** Global Witness, Time for Transparency, March 2004, p. 10, available at https://www.globalwitness.org/documents/17833/time_for_transparency.pdf.

**100** US District Court, SDNY, Indictment: US v. James H. Griffen, April 2, 2003, p. 34, available at https://www.justice.gov/sites/default/files/criminal-fraud/legacy/2011/02/16/04-02-03giffen-indict.pdf.

**101** US District Court, SDNY, Indictment: US v. James H. Griffen, April 2, 2003, p. 9-10, available at https://www.justice.gov/sites/default/files/criminal-fraud/legacy/2011/02/16/04-02-03giffen-indict.pdf.

**102** Associated Press, NY judge: Kazakh bribe defendant is a Cold War hero, November 19, 2010.

**103** New York Times, Oil, Cash and Corruption, November 5, 2006, available at http://www.nytimes.com/2006/11/05/business/yourmoney/05giffen.html.

**104** Financial Times, ExxonMobil says reported reserves fell sharply in 2016 on low oil and gas prices, February 22, 2017, available at https://www.ft.com/content/dae9c324-791c-3203-9187-6bf2b794f2ba.

**105** Bloomberg, Profile: Lucio A. Noto, available at https://www.bloomberg.com/research/stocks/private/person.asp?personId=406346&privcapId=365436, last visited January 2012, 2018.

**106** Svenska Petroleum Exploration UK Ltd, Appointment of a Director: Richard Mays, April 30, 2008; Svenska Petroleum Exploration UK Ltd, Appointment of a Director: Arthur Milholland, April 30, 2008. Note that Svenska has since been purchased by

a company called Premier Oil Exploration ONS Ltd, although company records for Svenska can still be found in the England and Wales Company House under Company Number 01241035.

**107** Premier Oil, Interim Management Statement, May 19, 2019, available at http://www.premier-oil.com/premieroil/media/press/interim-management-statement-10, last visited January 13, 2018; Canadian Overseas Petroleum Ltd, Board of Directors, available at http://www.canoverseas.com/board-of-directors/, last visited January 13, 2018; Peppercoast Petroleum PLC, Annual Return, March 7, 2011, p. 4.

**108** Canadian Overseas Petroleum (UK) Ltd, Appointment of Director: Richard Mays, December 8, 2014.

**109** North Sea Exploration Ltd, Articles of Incorporation, May 27, 2009; Canadian Overseas Petroleum (UK) Ltd, Annual Report and Financial Statements, October 9, 2017, p. 2.

**110** The entity awarded Block 13 is called ExxonMobil Exploration and Production Liberia Ltd and is registered in the Bahamas. Nonetheless, Exxon Liberia's US parent company, Exxon Mobil Corp., should be held accountable for any illegal acts performed by Exxon Liberia. In its 2013 Financial and Operational Review, Exxon Mobil Corp. listed Block 13 as an asset operated under the control of the parent, ExxonMobil, 2013 Financial and Operational Review, 2013, p. 36, available at http://cdn.exxonmobil.com/~/media/Global/Files/Financial-Review/2013_ExxonMobil_Financial_and_Operating_Review.pdf. Additionally, an Exxon entity based in the US was involved in the negotiation of Block 13: ExxonMobil Exploration Co, which authored the December 2011 London PowerPoint presentation, is based in the US. Orbis, Exxon Exploration, retrieved on January 10, 2018.

**111** 18 US Code § 1957, Engaging in monetary transactions in property derived from specified unlawful activity, available at https://www.law.cornell.edu/uscode/text/18/1957. See also 18 US Code § 1956.

**112** ExxonMobil, Anti-Corruption Legal Compliance Guide, 2014, p. 10, available at http://cdn.exxonmobil.com/~/media/global/files/other/2015/anti-corruption-legal-compliance-guide.pdf.

**113** The largest salary paid to a minister at the time of these payments was $21,600 per year, after tax. New Dawn, Ministers Get Pay Rise, November 19, 2013, available at http://allafrica.com/stories/201311190726.html.

**114** The New Dispensation, Liberia: Bewilderment and Outrage Mirrored Oil Talks With Diaspora Citizens in United States, August 20, 2012, available at https://thenewdispensation.com/2012/08/20/liberia-bewilderment-and-outrage-mirrored-oil-talks-with-diaspora-citizens-in-united-states/.

**115** Auditing Commission, Report of the Auditor General on the National Oil Company of Liberia (NOCAL) for FY 2006/07 and 2007/08, April 20, 2011, p. ii.

**116** Natty Davis, Email to Global Witness, March 6, 2018.

**117** Christiana Tah, Email to Global Witness, March 13, 2018.

**118** Robert Sirleaf, Email to Global Witness, March 13, 2018

**119** Petroleum Law, 2002, sec. 8(e)-(f).

**120** ExxonMobil, NOCAL Organizational Structure, June 18, 2013, available at https://web.archive.org/web/20130618015723/http://www.nocal.com.lr:80/about-nocal/organization; NOCAL Board of Directors, Meeting Minutes, August 22, 2006; NOCAL Board of Directors, Meeting Minutes, April 5, 2007.

**121** Receipt for "Lobbying Fees": $1,500, April 17, 2007; Auditing Commission, Report of the Auditor General on the National Oil Company of Liberia (NOCAL) for FY 2006/07 and 2007/08, April 20, 2011, p. iii.

**122** National Democratic Institute, Know Your Senators, July 2012, p. 19.

**123** Front Page Africa, Liberia's New Speaker Appoints House Committees Heads and Members, January 19, 2018, available at http://frontpageafricaonline.com/index.php/news/6687-liberia-s-new-speaker-appoints-house-committees-heads-and-members.

**124** UNDP, 2016 Human Development Report, p. 200, available at http://hdr.undp.org/sites/default/files/2016_human_development_report.pdf; World Bank, Liberia: Overview, available at http://www.worldbank.org/en/country/liberia/overview, last visited January 9, 2018; Heritage Foundation, 2017 Index of Economic Freedom: Liberia, available at http://www.heritage.org/index/country/liberia, last visited January 9, 2018

**125** Offshore Energy Today, Exxon Mobil's Liberian offshore well comes up dry, December 16, 2016, available at https://www.offshoreenergytoday.com/exxon-mobils-liberian-offshore-well-comes-up-dry/, last visited January 9, 2018; COPL, Canadian Overseas Petroleum Files Q3 2017 Results, November 10, 2017, p. 10.





**global witness**

Global Witness investigates and campaigns
to change the system by exposing the
economic networks behind conflict,
corruption and environmental destruction.

Global Witness is a company limited by
guarantee and incorporated in England (No.2871809)

Global Witness
Lloyds Chambers, 1 Portsoken St,
London E1 8BT, United Kingdom

Global Witness
1100 17th Street NW, Suite 501,
Washington, DC 20036, USA

ISBN 978-1-911606-14-7

© Global Witness 2018