## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHRISTIANA TAH, et al., <br><br>         Plaintiffs, <br><br> v. <br><br> GLOBAL WITNESS <br> PUBLISHING, INC., et al. <br><br>         Defendants. | Case No. 1:18-cv-02109-RMC |

## DEFENDANTS' MOTION TO DISMISS

Defendants Global Witness and Global Witness Publishing, Inc. (together, "Global Witness"), by and through their undersigned counsel and pursuant to Fed. R. Civ. P. 12(b)(6), hereby move for dismissal with prejudice of the claims for defamation and false light invasion of privacy asserted in the Complaint of Plaintiffs Christiana Tah and Randolph McClain.

In support of this motion, Global Witness relies on the accompanying Memorandum of Points and Authorities. As demonstrated in that Memorandum, dismissal is warranted under Rule 12(b)(6) because the Complaint fails to state a claim as a matter of law for multiple, independent reasons: (1) the challenged report does not reasonably convey the implication that Plaintiffs engaged in *quid pro quo* bribery; (2) even if such an implication could reasonably be taken from the report, it would be a constitutionally protected opinion based upon fully disclosed facts; (3) statements in the report characterizing persons, groups, or industries as "corrupt" are not "of and concerning" Plaintiffs; (4) even if those statements were reasonably read as relating to Plaintiffs, they would likewise be constitutionally protected opinions based upon fully disclosed facts; and (5) Plaintiffs are public figures and have failed to plausibly allege that Global Witness

published the report with "actual malice" fault – *i.e.*, that the report conveyed some falsehood

about Plaintiffs published with knowledge of its falsity or with serious doubts about its truth.

### REQUEST FOR HEARING

Global Witness respectfully requests a hearing on its motion to dismiss.


Dated:  November 9, 2018                 Respectfully submitted,

                                         BALLARD SPAHR LLP

                                         /s/ *Chad R. Bowman*
                                         David A. Schulz (D.C. Bar No. 459197)
                                         Chad R. Bowman (D.C. Bar No. 484150)
                                         Maxwell S. Mishkin (D.C. Bar No. 1031356)
                                         1909 K Street, NW, 12th Floor
                                         Washington, DC 20006
                                         Telephone: (202) 661-2200
                                         Fax: (202) 661-2299
                                         schulzd@ballardspahr.com
                                         bowmanchad@ballardspahr.com
                                         mishkinm@ballardspahr.com

                                         *Counsel for Defendants Global Witness and*
                                         *Global Witness Publishing, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on this date, I caused Defendants' Motion to Dismiss, Memorandum of Points and Authorities in Support thereof, and Proposed Order to be filed and served electronically via the Court's ECF System upon counsel of record.

Dated:  November 9, 2018          /s/ *Chad R. Bowman*
                                                        Chad R. Bowman

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHRISTIANA TAH, et al.,<br><br>        Plaintiffs,<br><br><br>v.<br><br><br><br>GLOBAL WITNESS<br>PUBLISHING, INC., et al.<br><br>        Defendants. | Case No. 1:18-cv-02109-RMC |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

BALLARD SPAHR LLP

David A. Schulz (D.C. Bar No. 459197)
Chad R. Bowman (D.C. Bar No. 484150)
Maxwell S. Mishkin (D.C. Bar No. 1031356)
1909 K Street, NW, 12th Floor
Washington, DC 20006
Telephone: (202) 661-2200
Fax: (202) 661-2299
schulzd@ballardspahr.com
bowmanchad@ballardspahr.com
mishkinm@ballardspahr.com

*Counsel for Defendants Global Witness and Global Witness Publishing, Inc.*

Date: November 9, 2018

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... iii

PRELIMINARY STATEMENT ......................................................................1

RELEVANT BACKGROUND AND PROCEDURAL HISTORY..................................3

I.     THE PARTIES.................................................................................3

II.    THE REPORT ................................................................................5

       A.     The Battle Over Dodd-Frank Section 1504 ............................5

       B.     Corruption Surrounding Initial Sale Of Block 13 Rights .........7

       C.     Exxon's Acquisition Of The Block 13 Rights .........................8

       D.     The Payments To Liberian Officials.....................................11

III.    LIBERIA'S RESPONSE TO THE REPORT....................................14

IV.    THE COMPLAINT AGAINST GLOBAL WITNESS ......................15

ARGUMENT .............................................................................................16

I.     TO SURVIVE A MOTION TO DISMISS PLAINTIFFS MUST ALLEGE
     FACTS THAT COULD PLAUSIBLY ESTABLISH A CLAIM ...................16

II.    COUNT I SHOULD BE DISMISSED BECAUSE THE REPORT DOES
     NOT REASONABLY CONVEY THE DEFAMATORY IMPLICATION
     ALLEGED, WHICH WOULD BE NON-ACTIONABLE IN ANY EVENT .........19

       A.     Read As A Whole, The Report Does Not Reasonably Imply Plaintiffs
            Engaged In *Quid Pro Quo* Bribery ........................................19

       B.     Any Implication Of Bribery Would Be An Opinion Based On
            Disclosed Facts ...............................................................25

III.    COUNT II SHOULD BE DISMISSED BECAUSE THE REPORT'S
     BROAD USE OF THE TERMS "CORRUPT" AND "CORRUPTION"
     CANNOT GIVE RISE TO A CLAIM AS A MATTER OF LAW .................27

       A.     The Terms "Corrupt" And "Corruption" Are Not Used In Reference
            To Plaintiffs ...................................................................27

       B.     Describing The Payments As "Corrupt" Would Be A Nonactionable
            Opinion Based On Disclosed Fact ........................................29

IV.    THE COMPLAINT SHOULD ALSO BE DISMISSED BECAUSE IT DOES
NOT PLAUSIBLY ALLEGE THAT GLOBAL WITNESS PUBLISHED
THE REPORT WITH "ACTUAL MALICE" FAULT ....................................................32

    A.    Plaintiffs Are Public Officials Or Public Figures For The Purposes Of
This Action........................................................................................................33

        1.    Plaintiffs are public officials......................................................34

        2.    Plaintiffs are also limited purpose public figures .....................34

    B.    Plaintiffs Fail To Plausibly Allege That Global Witness Published
The Report With "Actual Malice" Fault.............................................................38

CONCLUSION......................................................................................................................43

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbas v. Foreign Policy Group, LLC*,
    975 F. Supp. 2d 1 (D.D.C. 2013) ................................................................ *passim*

*Abbas v. Foreign Policy Group, LLC*,
    783 F.3d 1328 (D.C. Cir. 2015) ...................................................................23, 24

*API v. SEC*,
    953 F. Supp. 2d 5 (D.D.C. 2013) ..................................................................6

*Armstrong v. Thompson*,
    80 A.3d 177 (D.C. 2013) ...............................................................17, 18, 27

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...................................................................16, 38, 39

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)...................................................................3, 38

*Biro v. Conde Nast*,
    883 F. Supp. 2d 441 (S.D.N.Y. 2012)...............................................20, 26

*Biro v. Conde Nast*,
    963 F. Supp. 2d 255 (S.D.N.Y. 2013)...............................................39

*Biro v. Conde Nast*,
    807 F.3d 541 (2d Cir. 2015)...........................................................38

*Boley v. Atlantic Monthly Group*,
    950 F. Supp. 2d 249 (D.D.C. 2013) ...........................................*passim*

*Cabello-Rondon v. Dow Jones & Co.*,
    2017 WL 3531551 (S.D.N.Y. Aug. 16, 2017) .........................................34

*Chapin v. Knight-Ridder*,
    993 F.2d 1087 (4th Cir. 1993) ...................................................20

*Coles v. Washington Free Weekly, Inc.*,
    881 F. Supp. 26 (D.D.C.1995)...................................................28

*Deripaska v. Associated Press*,
    282 F. Supp. 3d 133 (D.D.C. 2017) ...........................................*passim*

*Desai v. Hersh*,
719 F. Supp. 670 (N.D. Ill. 1989) ........................................................................34

*Egiazaryan v. Zalmayev*,
2011 WL 6097136 (S.D.N.Y. Dec. 7, 2011) ....................................................34, 39

*Farah v. Esquire Magazine*,
736 F.3d 528 (D.C. Cir. 2013) ..............................................................................3

*FEC v. Colorado Republican Federal Campaign Committee*,
533 U.S. 431 (2001) ............................................................................................30

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974) ............................................................................................32

*Gross v. New York Times Co.*,
623 N.E.2d 1163 (N.Y. 1993) ..............................................................................25

*Guilford Transportation Industries, Inc. v. Wilner*,
760 A.2d 580 (D.C. 2000) ......................................................................20, 21, 32

*Hourani v. Psybersolutions LLC*,
164 F. Supp. 3d 128 (D.D.C. 2016) ............................................................. *passim*

*Jankovic v. International Crisis Group*,
72 F. Supp. 3d 284 (D.D.C. 2014) ........................................................................40

*\*Jankovic v. International Crisis Group*,
822 F.3d 576 (D.C. Cir. 2016) ..................................................................... *passim*

*\*Kahl v. Bureau of National Affairs, Inc.*,
856 F.3d 106 (D.C. Cir. 2017) ......................................................................18, 37

*Kavanagh v. Zwilling*,
997 F. Supp. 2d 241 (S.D.N.Y. 2014) ..................................................................21

*Keene Corp. v. United States*,
508 U.S. 200 (1993) ............................................................................................22

*Lohrenz v. Donnelly*,
350 F.3d 1272 (D.C. Cir. 2003) ..............................................................33, 40, 41

*Mar-Jac Poultry, Inc. v. Katz*,
773 F. Supp. 2d 103 (D.D.C. 2011) ..............................................................18, 24

*Mayfield v. NASCAR, Inc.*,
674 F.3d 369 (4th Cir. 2012) ..............................................................................39

*McFarlane v. Sheridan Square Press, Inc.*,
  91 F.3d 1501 (D.C. Cir. 1996) ........................................................................43

*Michel v. NYP Holdings, Inc.*,
  816 F.3d 686 (11th Cir. 2016) ........................................................................38

*Miller v. Transamerican Press, Inc.*,
  621 F.2d 721 (5th Cir. 1980) ........................................................................33

*Moldea v. New York Times Co.*,
  22 F.3d 310 (D.C. Cir. 1994) ....................................................................25, 29

*New York Times Co. v. Sullivan*,
  376 U.S. 254 (1964)....................................................................................33, 38

*Nurriddin v. Bolden*,
  818 F.3d 751 (D.C. Cir. 2016) ........................................................................16

*OAO Alfa Bank v. Center for Public Integrity*,
  387 F. Supp. 2d 20 (D.D.C. 2005) ..................................................................35

*Parisi v. Sinclair*,
  845 F. Supp. 2d 215 (D.D.C. 2012) ............................................................17, 38

*Partington v. Bugliosi*,
  56 F.3d 1147 (9th Cir. 1995) ........................................................................25

*Phantom Touring, Inc. v. Affiliated Publications*,
  953 F.2d 724 (1st Cir. 1992)..........................................................................25

*Pippen v. NBCUniversal Media, LLC*,
  734 F.3d 610 (7th Cir. 2013) ........................................................................38

*Schatz v. Republican State Leadership Committee*,
  669 F.3d 50 (1st Cir. 2012)............................................................................39

*Sharon v. Time, Inc.*,
  599 F. Supp. 538 (S.D.N.Y. 1984) ................................................................34

*Shipkovitz v. Washington Post Co.*,
  571 F. Supp. 2d 178 (D.D.C. 2008) ................................................................18

*St. Amant v. Thompson*,
  390 U.S. 727 (1968)........................................................................................42

*Tavoulareas v. Piro*,
  817 F.2d 762 (D.C. Cir. 1987) ............................................................. *passim*

*Thomas v. News World Communications*,
681 F. Supp. 55 (D.D.C. 1988) .............................................................................32

*ToDay's Housing v. Times Shamrock Communications, Inc.*,
21 A.3d 1209 (Pa. Super. Ct. 2011) .......................................................................21

*\*Waldbaum v. Fairchild Publications, Inc.*,
627 F.2d 1287 (D.C. Cir. 1980) ........................................................................33, 35

*\*White v. Fraternal Order of Police*,
909 F.2d 512 (D.C. Cir. 1990) ....................................................................2, 20, 32

**Statutes**

Disclosure of Payments by Resource Extraction Issuers, Pub. L. No. 115-4, 131
Stat 9 (2017)............................................................................................................6

D.C. Code §§ 16-5501 *et seq.* ....................................................................................3

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-
203, 124 Section 1504 Stat. 1376 (2010)................................................................5

## PRELIMINARY STATEMENT

The Complaint in this action purports to state claims for libel by implication and false light invasion of privacy, but manifestly fails to do so for multiple reasons. It should be dismissed promptly pursuant to Fed. R. Civ. P. 12(b)(6).

Plaintiffs are former Liberian Minister of Justice Christiana Tah and former National Oil Company of Liberia ("NOCAL") CEO Randolph McClain, who seek through this lawsuit to punish Defendants Global Witness and Global Witness Publishing, Inc. (together, "Global Witness") for publishing a report that details the role of U.S. oil giant ExxonMobil in the corruption of the Liberian oil sector. The Global Witness report advocates for greater transparency for payments by U.S. oil, gas, and mining companies to foreign governments, and uses as its central case study a $120 million deal by which Exxon secured a license to extract oil off the coast of Liberia. That transaction was made complex because of the oil company's stated "concern over issues regarding US anti-corruption laws" created by irregularities surrounding the earlier privatization of that license. Plaintiffs object to the report's accurate disclosure that they received unusual $35,000 bonus payments from NOCAL after successfully negotiating a deal to transfer the license to Exxon, and to the report's suggestion that further investigation of these payments was warranted.

The Complaint does not allege that the facts presented by Global Witness are untrue or inaccurate in any respect. The Complaint alleges only that the accurate description of their bonus payments as "large" and "unusual," accompanied by a call for additional investigation, convey a defamatory *inference* that Plaintiffs criminally accepted *quid pro quo* bribes. It also alleges that the report as a whole casts Plaintiffs in a false light by characterizing aspects of the Liberian oil sector as "corrupt," even though they are never identified as being corrupt.

The Complaint fails as a matter of law for several independent and equally dispositive reasons.  Most fundamentally, no claim for libel by implication exists because the report's presentation of the undisputedly true facts does not reasonably convey the implication that Plaintiffs engaged in *quid pro quo* bribery.  And even if such an implication somehow could reasonably be taken from the report, despite express statements to the contrary in the report itself, such an implication would be a constitutionally protected opinion based upon fully disclosed facts.  *Abbas v. Foreign Policy Grp., LLC* ("*Abbas I*"), 975 F. Supp. 2d 1, 16 (D.D.C. 2013), *aff'd in relevant part*, 783 F.3d 1328, 1338 (D.C. Cir. 2015) ("*Abbas II*").  Moreover, to the extent that the report characterizes other persons, groups, or industries as "corrupt," those statements are not "of and concerning" Plaintiffs so as to make them actionable, and in any event such "statement[s] of opinion having no provably false factual connotation" are also nonactionable and "entitled to full constitutional protection."  *White v. Fraternal Order of Police*, 909 F.2d 512, 522 (D.C. Cir. 1990).

Plaintiffs have no claim for either defamation by implication or false light for the additional and independent reason they are public figures and must therefore allege, and ultimately prove, facts plausibly establishing "actual malice" fault.  *See, e.g.*, *Hourani v. Psybersolutions LLC*, 164 F. Supp. 3d 128, 132 (D.D.C. 2016) (Collyer, J.) (dismissing defamation claim by public figure former Kazakhstan businessman for failure to plead facts plausibly establishing actual malice fault).  Because the claims here arise solely from the alleged implications of a newsworthy report, Plaintiffs must demonstrate both (1) that the report on its face reveals an intent by Global Witness to convey the allegedly false implication, and (2) that the alleged facts plausibly establish that Global Witness published the report with knowledge that those implications were false or while seriously doubting their truth.  Plaintiffs do not and

cannot make these required showings.  For this reason as well, Plaintiffs' claims should be dismissed.

Finally, it bears note that Global Witness published the challenged report as part of its ongoing efforts to convince U.S. policymakers to combat global corruption by imposing and enforcing meaningful transparency requirements on the deals consummated with foreign governments by American oil, gas, and mining companies.  Because Plaintiffs are attempting to punish and chill this important advocacy on a matter of clear public concern, in addition to filing this motion to dismiss Global Witness is concurrently filing a special motion under the District of Columbia Anti-SLAPP Act, D.C. Code §§ 16-5501 *et seq.*

## RELEVANT BACKGROUND AND PROCEDURAL HISTORY[1]

### I.   THE PARTIES

Plaintiff Christiana Tah was Liberia's Attorney General and Minister of Justice from 2009 to 2014.  Compl. ¶ 2.  In addition to other responsibilities while in that office, Minister Tah served on Liberia's Hydrocarbon Technical Committee ("HTC"), a six-member body "provided for in the Liberian Petroleum Law of 2002" whose purpose is "to superintend the negotiations between [oil companies] and the government of Liberia, through its state-owned oil company NOCAL." *Id.* ¶¶ 23-24.  Minister Tah previously worked in Liberia's Ministry of Health, Ministry of Justice, and Ministry of Finance.  *Id.* ¶ 2.

Plaintiff Randolph McClain, PhD, is the former CEO of NOCAL and former Chair of the HTC.  *Id.* ¶ 3.  NOCAL "is a 'public corporation' created pursuant to Liberia's Petroleum Law,

---

[1] On a motion to dismiss, a court properly considers "the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice." *Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013) (citations omitted). Well-pleaded, plausible factual allegations in the Complaint are accepted as true solely for purposes of this motion. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

responsible for the award of oil licenses." *Id.* ¶ 19.  Before his work with NOCAL and the HTC, Dr. McClain had "occup[ied] many positions of scientific and business leadership" in the private sector, but "[a]fter his retirement, he returned to Liberia to offer leadership to his native country." *Id.* ¶ 3.

Global Witness is an international nonprofit organization working to end environmental and human rights abuses driven by the exploitation of natural resources and corruption in the global political and economic system.  As part of those efforts, Global Witness regularly engages in journalistic investigations to expose the hidden links between demand for natural resources, corruption, armed conflict, and environmental destruction.  In Liberia alone, Global Witness investigations in 2001 and 2002 preceded a decision by the U.N. Security Council to impose sanctions on the wartime trade of Liberian timber in 2003.[2]  A 2012 Global Witness investigation into secret illegal logging licenses resulted in a government investigation, cancellation of the licenses, and the conviction of government officials, and a 2016 Global Witness report exposing corruption in the nation's mining sector led to a government investigation and the indictment of several senior legislators.[3]

---

[2] *See, e.g.*, Global Witness, *Taylor-made: The Pivotal Role of Liberia's Forests and Flag of Convenience in Regional Conflict* (2d ed. Sept. 2001), https://www.globalwitness.org/sites/default/files/pdfs/taylormade2.pdf; Global Witness, *Logging Off: How the Liberian Timber Industry Fuels Liberia's Humanitarian Disaster and Threatens Sierra Leone* (Sept. 2002), https://www.globalwitness.org/documents/14625/logging_off_september_2008.pdf; U.N. Security Council Resolution 1521 (2003), http://unscr.com/en/resolutions/doc/1521.

[3] *See, e.g.*, James Harding Giahyue, *Liberia grand jury indicts Sable Mining, officials for bribery*, Reuters (May 25, 2016), https://uk.reuters.com/article/uk-sable-mining-liberia/liberia-grand-jury-indicts-sable-mining-officials-for-bribery-idUKKCN0YG32D (noting indictments following inquiry ordered by President Sirleaf "after the watchdog group Global Witness made accusations of wrong-doing in a report"); David Blair, *Saved: Liberia's rainforests win reprieve from logging*, The Telegraph (Dec. 23, 2013), https://www.telegraph.co.uk/news/worldnews/africaandindianocean/liberia/10535265/Saved-Liberias-rainforests-win-reprieve-from-logging.html (reporting cancellation of licenses following Global Witness report documenting "illegal granting of logging permits on a huge scale").

II.     **THE REPORT**

On March 29, 2018, Global Witness published an investigative report titled "Catch me if you can: Exxon's complicity in Liberian oil sector corruption and how its Washington lobbyists fight to keep oil deals secret" (hereafter, the "Report").  It remains available online,[4] and a copy is attached as Exhibit A to the Complaint.  The Report is 35 pages long and contains 125 endnotes, exhaustively disclosing sources for the facts presented, which range from NOCAL board meeting minutes to U.S. judicial records.  Report at 36-38.  Because the Complaint challenges implications allegedly conveyed by the Report, a discussion of the Report and its context is warranted.

### A.  The Battle Over Dodd-Frank Section 1504

The Report opens with a discussion of a key U.S. anti-corruption law, Section 1504 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010), in order to "set[] the scene" for its later discussion of the Exxon-Liberia deal for a tainted oil lease.  Report at 6-9.  Section 1504, the result of a bipartisan legislative effort led by U.S. Senators Ben Cardin and Richard Lugar, requires oil, gas, and mining companies listed on U.S. stock exchanges to report payments made to foreign governments, as well as payments related to natural resource extraction on public lands in the United States.  *Id.*  As the Report notes, dozens of countries, including Canada, the European Union, and the United Kingdom, have followed the lead of the United States since the passage of Section 1504 and "adopt[ed] laws requiring their oil, gas, and mining companies to disclose . . . payments they have made to governments."  *Id.* at 9.  These laws allow "people in corrupt, resource-rich countries [to] see

---

[4] *See* https://www.globalwitness.org/en/campaigns/oil-gas-and-mining/catch-me-if-you-can-exxon-complicit-corrupt-liberian-oil-sector/.

what their governments are being paid from individual resource projects and demand those who pay or receive bribes are held to account," such that as "transparency becomes the norm, companies will cease being able to operate in secrecy and will be deterred from bribery." *Id.*

The Report describes the history of Section 1504, noting that Exxon and other U.S. oil companies "consistently lobbied Congressional offices to try to kill" the disclosure provision. *Id.* at 11. Exxon's CEO and Chair of the influential American Petroleum Institute ("API") at that time, Rex Tillerson, "personally lobbied on Capitol Hill to prevent Section 1504's passage into law." *Id.* After Congress enacted Section 1504, the oil industry turned its attention to the Securities and Exchange Commission (SEC), in an effort to blunt the law through the SEC's implementing regulations. *Id.* The Report notes that, in the seven years after Section 1504 was passed, Exxon met with the SEC at least 16 times. *Id.* When the SEC first attempted to promulgate a rule implementing Section 1504, the API sued and the rule was blocked. *Id.*[5] The SEC issued a second rule in 2016, but the following year – just as Mr. Tillerson joined the Trump Administration as Secretary of State – that rule was invalidated by Congress. *Id.*; *see also* Disclosure of Payments by Resource Extraction Issuers, Pub. L. No. 115-4, 131 Stat 9 (2017). With no third rule yet to challenge, "API is now lobbying Congress to overturn Section 1504 entirely." Report at 11.

---

[5] That court noted that Section 1504 "addresses a phenomenon known as the 'resource curse,' whereby 'oil, gas reserves, and minerals . . . can be a bane, not a blessing, for poor countries, leading to corruption, wasteful spending, military adventurism, and instability' when 'oil money intended for a nation's poor ends up lining the pockets of the rich or is squandered on showcase projects instead of productive investments.'" *API v. SEC*, 953 F. Supp. 2d 5, 8 (D.D.C. 2013) (quoting 156 Cong. Rec. S3816 (May 17, 2010) (statement of Sen. Lugar)).

**B.  Corruption Surrounding Initial Sale Of Block 13 Rights**

With this background, the Report turns to a case study of the sale of an oil lease by Liberia, observing that "[t]o understand why Exxon likes to keep things opaque it is helpful to go back to 2004 in the West African country of Liberia." *Id.*  At that time, the Report continues, "Liberia's oil sector, administered by the government's oil agency NOCAL, was essentially dormant with poorly understood oil reserves and no operating companies." *Id.*  That changed when "NOCAL decided to auction some of Liberia's 17 offshore oil blocks." *Id.* at 12.

The Report accurately explains how oil company Broadway Consolidated PLC ("BCP") bid in 2004 on a license to drill in an area off the Liberian coast known as Block 13.  While Liberia's "official account is that BCP was the only applicant for Block 13," Global Witness identified "grounds to suspect that BCP obtained Block 13 because the company was likely part-owned by government officials with the power to influence the award of oil licenses." *Id.* at 11, 12.  The Report notes that "[i]t is illegal under Liberian law for companies to be owned by officials and hold oil blocks at the same time," and that this restriction "prevent[s] officials from awarding themselves state assets." *Id.* at 12.  After laying out the evidence supporting these suspicions, the Report concludes that "Global Witness considers it likely that . . . officials violated Liberia's 2002 Petroleum Law and abused their office when NOCAL signed a contract with BCP in 2005." *Id.* at 13.

BCP's license for Block 13 was subsequently approved by the Liberian legislature in 2007, and the Report states that NOCAL spent more than $100,000 "to bribe members of the Liberian legislature so that they would approve the award of Block 13 to BCP, alongside three oil blocks for [another] company." *Id.* at 16.  NOCAL itself described these payments as "compensation" or "lobbying fees," but the Report explains that "they were paid directly to state officials, not to lobbyists, and were determined by the Liberian Government's General Auditing

Commission to be bribes." *Id.* The Report reveals that NOCAL specifically discussed a $75,000 payment from BCP at its August 2006 board meeting. *Id.* Later that same month, NOCAL paid a $50,000 bribe to the Liberian legislature. *Id.* at 14.

Though BCP successfully acquired the rights to Block 13, it failed to drill wells in the area and the company soon "fell behind on payments it owed to the Liberian Government," leading Liberia to explore its options. *Id.* at 17. The Report notes that "the government discussed a possible sale to Chevron," but that "[a]ccording to a former Liberian official with knowledge of the negotiations, Chevron refused to buy Block 13 because it could not verify BCP's ownership." *Id.* In January 2011, the Liberian government finally ordered BCP to sell its license for Block 13. *Id.* The Complaint does not contend that the Report misstates any of these carefully documented facts.

### C. Exxon's Acquisition Of The Block 13 Rights

NOCAL would not approve of BCP's initial proposal to sell Block 13 to a Canadian oil company, COPL. *Id.* In November 2011, however, Exxon entered into a tentative agreement with COPL to buy the majority of Block 13 so long as NOCAL would sign off on the deal. *Id.* That arrangement led to a December 2011 meeting in London between representatives from Exxon, COPL, and the Liberian government, at which Exxon gave "a slick presentation." *Id.* Quoting from and excerpting that presentation, the Report states that Exxon voiced "concern over issues regarding US anti-corruption laws," specifically flagging (1) "Liberian shareholders/beneficial owners of [BCP who] may have been government officials at the time of the allocation," and (2) "[p]ayments made to Legislators by NOCAL as outlined in the Liberian Auditor General's Report and September 2011 published report by Global Witness." *Id.* at 17-18. Exxon sought assurance from Liberia that what it called "past irregularities" would not affect the proposed deal or Block 13's new owners. *Id.* However, the Report notes that even as

Exxon made this presentation, a BCP investor known to Exxon had been elected to Liberia's legislature; that investor later became chair of the "House's committee responsible for Liberia's oil deals – and therefore one of the most important legislators when it came to ratifying Exxon's contract." *Id.* at 19.

Exxon proposed a complex deal across *two* contracts "due to [its] concern" about U.S. anti-corruption laws, according to the Report. *Id.* at 20. Under that arrangement, "Exxon would not buy Block 13 from BCP directly. Instead COPL would buy the oil block from BCP, and then Exxon would buy [the majority] of the block from COPL." *Id.* In this way, Exxon could "use COPL as a go-between that would, Exxon appears to have thought, shield it from any US legal risks posed by Block 13." *Id.* The Report then poses a simple question: "[I]f Exxon was satisfied that buying Block 13 was legal, why did the company still feel the need to use COPL as a go-between and negotiate so hard for Liberian legal guarantees in its final contract?" *Id.* at 27. The Report considers two possibilities. On the one hand, Exxon may have been "simply exercising an over-abundance of caution, perhaps even attempting to create legal safeguards against new, unforeseen legal risks." *Id.* On the other hand, Exxon may have "continued to be concerned about US anti-corruption laws," both because of the possibility that Liberian officials were among the BCP owners selling the lease and because "the bribes paid so BCP could originally obtain Block 13 were still bribes, were still publicly reported, and Exxon was aware of them when it bought the license from BCP." *Id.* The Report further identifies links between the leadership of COPL and BCP that "could create a perception that transactions between the two were not conducted at arm's length." *Id.*

The Block 13 deal was completed in April 2013, and the Report choreographs the complex dance between Exxon, COPL, BCP, and the Liberian government as follows:

**Step 1:** A Liberian branch of the bank Ecobank approves NOCAL for a $68.5 million "loan," contingent on Exxon agreeing to repay that debt.

**Step 2:** Ecobank draws down the NOCAL "loan" and pays $68.5 million to BCP.

**Step 3:** BCP transfers 100% of Block 13 to COPL.

**Step 4:** COPL transfers 80% of Block 13 to Exxon.

**Step 5:** Exxon transfers $120 million from a U.S. bank account to an account at Ecobank.

**Step 6:** Ecobank pays $5 million to NOCAL.

**Step 7:** Ecobank pays $45 million to Liberia's Finance Ministry.

**Step 8:** Ecobank pays itself $68.5 million to retire the "loan" to NOCAL and keeps the remaining $1.5 million as fees.

*Id.* at 21.[6]  The Complaint similarly makes no allegation that the Report's presentation of these facts is incorrect.

After describing this deal, the Report calls for an investigation to determine whether any laws were broken over the course of these transactions.  It specifically asks whether Exxon violated "US anti-money laundering laws by purchasing an oil block from BCP, which BCP had acquired illegally," whether Exxon violated "the US Foreign Corrupt Practices Act (FCPA) by purchasing Block 13 from BCP if . . . a sitting government official with the power to approve Exxon's deal . . . retained an interest when a legislator," whether any of BCP's owners violated Liberian anti-corruption laws if they "illegally acquired and profited from the sale of Block 13," and whether BCP or COPL violated UK or Canadian anti-corruption laws.  *Id.* at 27-30.

---

[6] This April 2013 transaction for Block 13 is diagrammed on page 22 of the Report.

### D.  The Payments To Liberian Officials

In the next section, relevant to Plaintiffs' claims, the Report discusses "unusual, large payments [that] were made by NOCAL to Liberian Government officials in connection with the 2013 award of Block 13." *Id.* at 30.  As the Report explains:

> In the month following the award of Block 13 to Exxon, NOCAL paid $210,000 to six key Liberian Government officials who signed the Exxon deal – $35,000 per official.  These officials were National Investment Commission Chairman Natty Davis, Finance Minister Amara Konneh, NOCAL CEO Randolph McClain, Mining Minister Patrick Sendolo, NOCAL Board Chairman Robert Sirleaf, and Justice Minister Christiana Tah.
>
> Global Witness believes these payments to be unusual.  According to NOCAL bank records covering several years surrounding this date, except for smaller yearly bonuses paid shortly before Christmas, there is no sign of equivalent bonuses during this time. Block 13 was the only oil license awarded during the period.
>
> These payments were called "bonuses" by NOCAL and were made to the officials because they were members of Liberia's Hydrocarbon Technical Committee (HTC), the inter-ministerial body responsible for signing Liberia's oil licenses.  They appear also to be linked to the HTC's signing of Block 13.
>
> Global Witness calculates that the payments represented a 160 percent increase on the reported highest salary paid to a Liberian minister.  Robert Sirleaf, however, was working for free according to newspaper reports.  Yet he also received a $35,000 payment.

*Id.*  None of these stated facts are disputed in the Complaint.

The Complaint admits the payments and asserts that they were made at the direction of President Sirleaf.  Compl. ¶ 25.  Plaintiffs allege that "[s]everal weeks after the HTC concluded the Exxon contract," President Sirleaf "brought up the Exxon contract on her own," stating to Minister Tah: "[Y]ou know, I will instruct NOCAL to pay bonuses to all those who participated in the negotiation of the Exxon contract.  If the Government had hired you to do this work, you would have made millions." *Id.*  NOCAL then passed a resolution – signed by Dr. McClain and

President Sirleaf's son Robert – authorizing the disbursement of the payments to, among others, the HTC (of which Minister Tah and Dr. McClain were members) and the NOCAL Board of Directors (on which Dr. McClain and Robert Sirleaf both sat).  *Id.* ¶ 26.[7]  Dr. McClain then "convened an HTC meeting and asked two of the HTC members," one of whom was Minister Tah, "if payment of such bonuses would be legally permissible."  *Id.*  Minister Tah and her colleague "conduct[ed] a legal analysis" and "advised . . . that the bonus payments would be legal."  *Id.* ¶¶ 27-28.

Global Witness sought comment as part of its investigation and the Report contains the explanation for the payments offered in the Complaint.  The Report includes Minister Tah's response that "bonus payments were authorized by NOCAL's Board of Directors to all NOCAL Staff and others who performed exceptionally in conducting the negotiations on the Exxon Contract," and that "[t]hese bonus payments were made long after the Exxon deal was concluded."  Report at 30.  Noting that "[u]nder Liberian criminal law, a bribe is defined as a payment given so a public servant will undertake an official act," the Report quotes Minister Tah's denial that she had engaged in bribery: "I did not receive money or an offer to pay money from Exxon Mobil for the award of the oil contract."  *Id.*

The Report likewise quotes Robert Sirleaf's emphatic statement to Global Witness that "after the contract was signed and the funds transferred, NOCAL paid a bonus to ALL officers, board members and employees of NOCAL (approx. 140+) including drivers, janitors, secretaries

---

[7] Contrary to Plaintiffs' allegation that President Sirleaf thought of the payments on her own, the resolution itself, as quoted in the Complaint, refers to "the proposal that was approved by the President of the Republic of Liberia to use approximately ten percent of the income that NOCAL generated from the [Block 13] transaction . . . for the payment of bonuses."  Compl. ¶¶ 25-26.

and clerks.  I'm very sure one wouldn't draw any conclusions that a bonus paid to the ENTIRE company including all junior staff was a 'bribe.'" *Id.*

The Report states explicitly that "Global Witness has no evidence that Exxon directed NOCAL to pay Liberian officials, nor that Exxon knew such payments were occurring." *Id.* at 31.  In a subsection titled "Exxon Should Have Known Better," the Report nonetheless criticizes Exxon because it "knew the risk posed by giving NOCAL a large signature bonus: the agency had previously acted on behalf of [another oil company] by bribing officials so that oil blocks would be approved." *Id.* at 32.  It offers Global Witness's view "that Exxon should have considered it possible that money the company provided to NOCAL *could have* been used as bribes in connection with Exxon's Block 13 deal," and notes that "Global Witness has written to Exxon requesting information about those safeguards the company may have put in place to prevent the *possible* misuse of its funds by NOCAL." *Id.* (emphases added).  "Given these circumstances of this exceptional deal," the Report calls on Liberia to investigate the payments "to determine whether any Liberian laws may have been broken," adding that "[w]ere it to be determined that there has been any illegality, the US Department of Justice should investigate Exxon to determine if the company violated the FCPA." *Id.*

Wrapping up, the Report lays out three reasons why, "[b]ased upon the available evidence, Global Witness believes that Liberia's oil sector was corrupt, and Exxon's purchase of Block 13 made the company complicit." *Id.* at 33.  First, "Block 13 had been corrupted when it was originally awarded in 2007 through the use of bribes." *Id.*  Second, "the evidence suggests Block 13 likely had corrupt owners," as "it is likely that BCP was owned by former ministers who played a part in awarding Block 13 to their company." *Id.*  Third, "Exxon's 2013 deal was characterized by unusual, large payments to officials who signed the Exxon deal." *Id.*  Global

Witness does not identify these payments as bribes and specifically states that it "cannot prove that these payments were improper," but asserts that it "believe[s] they warrant investigation to determine whether they broke Liberian or US law." *Id.*

Finally, the Report offers a series of recommendations to bring sunlight to future deals between extractive companies and foreign governments, key among them asking Congress to "support the implementation of Section 1504 by urging the SEC to ensure a strong new rule is published and by voting no on any efforts to weaken or repeal the statute." *Id.* at 34. The Report then calls for a series of investigations to determine whether the Block 13 transaction violated any laws in the United States, Liberia, or other nations, including "an investigation into whether NOCAL violated any Liberian law when it distributed payments in 2013 to officials who signed the Block 13 license." *Id.* The Report adds that Liberia's government "should also review its policies on bonuses paid to staff." *Id.*

## III.   LIBERIA'S RESPONSE TO THE REPORT

Following the publication of the Report, President Sirleaf's successor established a Special Presidential Committee to investigate the Block 13 deal. Compl. ¶ 74. The investigation culminated in a report entitled "Report of the Special Presidential Committee Appointed to Examine the March 2018 Global Witness Report of the National Oil Company of Liberia (NOCAL)," which was released in May 2018 ("Presidential Committee Report"). *Id.* The Complaint focuses almost exclusively on the first of two separate findings by the Committee: that although "the payment may have been a promise made prior to the conclusion of the ExxonMobil deal," it had found "no evidence" of such promises to support the conclusion that the payments were bribes "within the context of [Liberian] law." *Id.* ¶¶ 81-82 (quoting Presidential Committee Report). The Complaint heralds this lack of evidence as "absolutely declaring" their exoneration. *Id.* ¶ 81.

While trumpeting this first finding of the Presidential Committee Report, the Complaint dismisses as incoherent and lacking legal foundation its second finding – that the payments were *illegal* and must be returned. *Id.* ¶ 83. As widely reported at the time, the Presidential Committee Report ordered restitution – including from Minister Tah and Dr. McClain – in order for recipients of bonuses to avoid criminal charges for misuse of public money. *See, e.g.*, *Liberia: Legislature Backs Special Presidential Committee Report on NOCAL*, Front Page Africa (May 30, 2018), https://frontpageafricaonline.com/news/2016news/liberia-legislature-backs-special-presidential-committee-report-on-nocal/ ("'Failure to make said payment or restitution as recommended, they the members should be charged and prosecuted for receiving an unlawful reward under section 12.51 and 12.12 of the New Penal Law.'") (quoting Presidential Committee Report); Reuben Sei Waylaun, *Liberia: Pay 500k or Face Prosecution*, All Africa (May 29, 2018), https://allafrica.com/stories/201805300401.html (same); *see also* Festus Poquie, *Liberian Panel Wants Ex-President Sirleaf's Son Prosecuted*, Bloomberg (May 30, 2018), https://www.bloomberg.com/news/articles/2018-05-30/liberian-panel-wants-ex-president-sirleaf-s-son-prosecuted (noting Presidential Committee Report's characterization of bonuses as "'economic sabotage and misuse of public money'").[8]

## IV.    THE COMPLAINT AGAINST GLOBAL WITNESS

Minister Tah and Dr. McClain filed this lawsuit against Global Witness on September 10, 2018, purporting to state claims for defamation (Count I) and false light invasion of privacy (Count II).

---

[8] *See also, e.g.*, Constitution art. 90(b) (1986) (Liberia) ("No person holding public office shall demand and receive any other perquisites, emoluments or benefits, directly or indirectly, on account of any duty required by Government.").

For their defamation claim, Plaintiffs assert that the Report conveys the allegedly false implication that they "each accepted a $35,000 bribe in exchange for their actions recommending approval of the Exxon Block 13 contract in their role as members of the HTC."  Compl. ¶ 30. For their false light claim, Plaintiffs assert that the Report "imputed to [them] a more generalized charge of 'corruption' in the conduct of their duties as a participant in the Exxon Block 13 purchase."  *Id.* ¶ 105.

Based on these allegedly false inferences, Plaintiff each seek $5,000,000 in compensatory damages for reputational and emotional harm, as well as $1,000,000 in punitive damages.  *Id.* ¶¶ 108-09, 112-13.  Minister Tah additionally seeks $10,000 in special damages for "lost employment and consulting opportunities."  *Id.* ¶ 107.

## **ARGUMENT**

I.   **TO SURVIVE A MOTION TO DISMISS PLAINTIFFS MUST ALLEGE FACTS THAT COULD PLAUSIBLY ESTABLISH A CLAIM**

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.  In conducting this review, the Court should not "accept inferences drawn by a plaintiff if such inferences are unsupported by the facts set out in the complaint." *Nurriddin*, 818 F.3d at 756 (citation omitted).  Nor should the Court "accept legal conclusions couched as factual allegations."  *Id.* (citation omitted).

In the District of Columbia, a defamation plaintiff must plausibly allege facts establishing "(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that

the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm." *Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 140-41 (D.D.C. 2017) (quoting *Solers, Inc. v. Doe*, 977 A.2d 941, 948 (D.C. 2009)).[9]  Moreover, "[t]he First Amendment requires that where a public figure pursues a libel action, the public figure must ultimately 'demonstrate by clear and convincing evidence that the defendant published the defamatory falsehood with "actual malice," that is, with "knowledge that it was false or with reckless disregard of whether it was false or not."'" *Id.* at 141 (quoting *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1292 (D.C. Cir. 1988)).  Thus, a public figure libel plaintiff must allege facts that could plausibly establish publication with actual malice.  *See, e.g.*, *Deripaska*, 282 F. Supp. 3d at 144 (dismissing claim where pleaded facts failed to establish "that [defendant] acted with actual malice or reckless disregard for the facts when it published the article in question"); *Hourani*, 164 F. Supp. 3d at 132 (same); *Boley v. Atl. Monthly Grp.*, 950 F. Supp. 2d 249, 263 (D.D.C. 2013) (same); *Parisi v. Sinclair*, 845 F. Supp. 2d 215, 218 (D.D.C. 2012) (same).

A plaintiff alleging false light invasion of privacy must plausibly allege facts establishing "(1) publicity (2) about a false statement, representation, or imputation (3) understood to be of and concerning the plaintiff, and (4) which places the plaintiff in a false light that would be offensive to a reasonable person." *Armstrong v. Thompson*, 80 A.3d 177, 188 (D.C. 2013)

---

[9] Given that the challenged Report concerns overseas conduct and the Plaintiffs have chosen to pursue claims in the District of Columbia for alleged damages "within the District of Columbia and all other jurisdictions world-wide," Compl. ¶ 16, Global Witness assumes that, to the extent its defenses are governed by state law rather than the limitations on speech claims required by the First Amendment, D.C. law applies.

(quoting *Kitt v. Capital Concerts, Inc.*, 742 A.2d 856, 859 (D.C. 1999)).  "These elements are similar to those involved in analysis of a defamation claim, and 'a plaintiff may not avoid the strictures of the burdens of proof associated with defamation by resorting to a claim of false light invasion.'"  *Id.* (quoting *Moldea v. New York Times Co.*, 22 F.3d 310, 319 (D.C. Cir. 1994)). Thus, "where a plaintiff brings defamation and false light claims based on the same underlying allegations, the claims will be analyzed in the same manner."  *Shipkovitz v. Washington Post Co.*, 571 F. Supp. 2d 178, 183 (D.D.C. 2008) (internal marks omitted), *aff'd*, 408 F. App'x 376 (D.C. Cir. 2010).

As the D.C. Circuit has emphasized, the district court's obligation to evaluate claims targeting speech on a matter of public concern is a weighty one:

> The First Amendment guarantees freedom of speech and freedom of the press.  Costly and time-consuming defamation litigation can threaten those essential freedoms.  To preserve First Amendment freedoms and give reporters . . . the breathing room they need to pursue the truth, the Supreme Court has [therefore] directed courts to expeditiously weed out unmeritorious defamation suits.

*Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 109 (D.C. Cir. 2017), *cert. denied*, 138 S. Ct. 366 (2017).  Because valuable speech can be chilled by the burdens of litigation "even if a defendant ultimately prevails," courts in this jurisdiction and elsewhere have recognized that these cases should be resolved "through summary procedures when and as soon as possible." *Mar-Jac Poultry, Inc. v. Katz*, 773 F. Supp. 2d 103, 111 (D.D.C. 2011) (citing *Coles v. Washington Free Weekly, Inc.*, 881 F. Supp. 26, 30 (D.D.C. 1995), *aff'd*, 88 F.3d 1278 (D.C. Cir. 1996), and *McBride v. Merrell Dow & Pharms., Inc.*, 717 F.2d 1460, 1466 (D.C. Cir. 1983)). Plaintiffs' Complaint fails to state a viable defamation or false light claim for multiple, independent reasons, and it should therefore be dismissed now.

II.     **COUNT I SHOULD BE DISMISSED BECAUSE THE REPORT DOES NOT REASONABLY CONVEY THE DEFAMATORY IMPLICATION ALLEGED, WHICH WOULD BE NON-ACTIONABLE IN ANY EVENT**

On a motion to dismiss a claim for libel a court must determine as a matter of law, whether the challenged publication "(1) contains express or implied verifiably false statements of fact, which (2) are reasonably capable of defamatory meaning or otherwise place [Plaintiffs] in an offensive false light."  *Boley*, 950 F. Supp. 2d at 259 (quoting *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 623 (D.C. Cir. 2001)).  Comparing the Report to the Complaint plainly fails to survive this review.

Plaintiffs allege that the Report defamed them by conveying the implication that they "each accepted a $35,000 bribe in exchange for their actions recommending approval of the Exxon Block 13 contract in their role as members of the HTC."  Compl. ¶ 30.  In advancing this claim, the Complaint makes two significant concessions.  Plaintiffs concede that nothing in the Report directly "accuse[s] them of bribery," and that the Report does not misstate even a single fact concerning the sale of Block 13's rights to Exxon and Plaintiffs' role in that sale.  Plaintiffs argue that they nonetheless are defamed by "the totality of the meaning conveyed, through headlines, sub-headings, text, and graphics, which combine to form a mosaic that unmistakably communicates the bribery allegations."  *Id.* ¶ 34 (emphasis omitted).

This claim for libel by implication fails as a matter of law because the Report on its face does not reasonably convey the implication alleged, and even if it did, this implication would constitute an opinion based on fully disclosed facts for which no defamation liability exists.

A.     **Read As A Whole, The Report Does Not Reasonably Imply Plaintiffs Engaged In *Quid Pro Quo* Bribery**

In this Circuit "where the expressed facts are literally true," a plaintiff alleging defamation-by-implication "must make an especially rigorous showing" to survive a motion to

dismiss. *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 596 (D.C. 2000) (quoting

*Chapin v. Knight-Ridder*, 993 F.2d 1087, 1092-93 (4th Cir. 1993)).  Such a showing is necessary

"because the Constitution provides a sanctuary for truth."  *Id.*  In reviewing such a claim, the

court must conclude not only that the challenged language on its face can "be *reasonably* read to

impart the false innuendo," but must also find that the language used in the publication at issue

affirmatively suggests "the author *intends or endorses* the inference."  *Id.* (emphases added).

The D.C. Circuit clarified this controlling standard in *White v. Fraternal Order of Police*,

where the plaintiff, a police officer, claimed that he was defamed by implications conveyed in

letters and news reports describing irregularities in the handling of a drug test he had taken while

seeking a promotion.  909 F.2d at 514-16.  The court noted that defamation by implication is "an

area fraught with subtle complexities," and cautioned that "[i]n entertaining claims of defamation

by implication, courts must be vigilant not to allow an implied defamatory meaning to be

manufactured from words not reasonably capable of sustaining such meaning."  *Id.* at 518-19.  It

therefore held that "if a communication, viewed in its entire context, merely conveys materially

true facts from which a defamatory inference can reasonably be drawn, the libel is not

established."  *Id.* at 520.  Rather, the alleged implication must be reasonably conveyed by the

challenged language and the language must convey the author's intent to adopt or endorse the

allegedly false implication.  *Id.*; *see also Chapin*, 993 F.2d at 1092-93 (adopting two-part *White*

test for implications allegedly arising out of true statements "because the constitution provides a

sanctuary for truth"); *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 466 (S.D.N.Y. 2012) (same).

Here, too, the Report is not reasonably capable of conveying the alleged implication that

Plaintiffs engaged in *quid pro quo* bribery, nor does it affirmatively suggest that Global Witness

intended or endorsed that implication.  To the contrary, the Report itself refutes the alleged

implication.  The Complaint takes fully 45 pages to conjure up an implication that does not exist,

using the type of "imagined slights" the D.C. Court of Appeals has cautioned should not properly

"become the basis for costly litigation."  *Guilford*, 760 A.2d at 596.

As a threshold matter, an implication of *quid quo pro* bribery is not reasonably conveyed

by the Report for several reasons.  First, the Report expressly states that "Global Witness has no

evidence that Exxon directed NOCAL to pay Liberian officials, nor that Exxon knew such

payments were occurring," directly disavowing any assertion that bribery occurred.  Report at

31.  It further makes abundantly clear the payments to Plaintiffs were made after the deal was

closed and were described as "bonuses" for work performed, *id.* at 30, includes denials of

wrongdoing by recipients of the funds, *id.*, and specifically disclaims any conclusion that the

payments were improper, *id.* at 33.  In such a circumstance, "[n]othing in law or common sense

supports saddling a libel defendant with civil liability for a defamatory implication nowhere to be

found in the published article itself."  *Tavoulareas v. Piro*, 817 F.2d 762, 781 (D.C. Cir. 1987);

*see also Guilford*, 760 A.2d at 601 (adopting *Tavoulareas* analysis); *Deripaska*, 282 F. Supp. 3d

at 148 (no defamation by implication claim where challenged report "specifically includes facts

that negate the implications that [plaintiff] conjures up").[10]

Second, the Report readily describes other payments as "bribes" but never uses this term

to describe the payments to Plaintiffs, reinforcing the Report's explanation that Global Witness

had no proof of impropriety in the bonuses paid to Plaintiffs.  The Complaint pounces upon the

Report's characterization of the payments as "unusual" and "large," describing them as

---

[10] *See also, e.g.*, *Kavanagh v. Zwilling*, 997 F. Supp. 2d 241, 255 (S.D.N.Y. 2014) (rejecting claim for an alleged implication explicitly contradicted by statements in the report), *aff'd*, 578 F. App'x 24 (2d Cir. 2014); *ToDay's Hous. v. Times Shamrock Commc'ns, Inc.*, 21 A.3d 1209, 1216 (Pa. Super. Ct. 2011) (defamation by implication claim fails where challenged publication "explicitly refuted any such implication").

"euphemisms . . . for the outright words 'bribe' or 'bribery,'" Compl. ¶ 31, but ignores that the Report repeatedly uses those exact words – "bribe" and "bribery" – to describe other payments in the original award of Block 13 to BCP.[11]  It never applies that same descriptor to the $35,000 Payment to Plaintiffs, about which it simply raised questions.  *Compare* Report at 14 (timeline entries noting "bribe[s]" paid by NOCAL from August 2006 through April 2007), *with id.* at 15 (timeline entry noting "unusual, large payments" by NOCAL to Plaintiffs in May 2013).  Given its actual language, the Report cannot reasonably be read to suggest Global Witness intended to convey a conclusion it disavows expressly.  *Cf. Keene Corp. v. United States*, 508 U.S. 200, 208, (1993) (where legislative author "includes particular language in one section of a statute but omits it in another, it is generally presumed that [the author] acts intentionally and purposely in the disparate inclusion or exclusion") (citation, internal marks and alterations omitted).

Third, the Report calls for official investigations to determine *whether* the payments broke Liberian or U.S. law, once again rendering unreasonable both the implication allegedly conveyed and any inference that Global Witness intended to convey the implication.  *See, e.g.*, Report at 32 ("Global Witness believes that the Liberian Government should investigate payments made to officials by NOCAL in 2013 to determine whether any Liberian laws may have been broken."); *id.* at 33 ("While Global Witness cannot prove that these payments were improper, we do believe they warrant investigation to determine whether they broke Liberian or US law."); *id.* at 35 (calling for "[a]n investigation into whether NOCAL violated any Liberian

---

[11] *See, e.g.*, Report at 6 ("the license was originally granted through bribery"); *id.* at 7 ("by 2011 it was already common knowledge that the original award of Block 13 to BCP was tainted by bribery"); *id.* at 16 ("in 2006 and 2007 NOCAL spent $118,400 to bribe members of the Liberian legislature so that they would approve the award of Block 13 to BCP"); *id.* at 20 ("payment of bribes by NOCAL was public knowledge"); *id.* at 27 ("the bribes paid so BCP could originally obtain Block 13 were still bribes"); *id.* at 29 ("Block 13 was acquired by BCP in 2007 through bribes paid by NOCAL to the Liberian legislature").

law when it distributed payments in 2013 to officials who signed the Block 13 license"). The Complaint claims this call for inquiries was "not some arms-length innocent question, asking whether Liberian laws had been broken," but rather "a deliberate laying down of the gauntlet, asserting that Liberian laws *had* been broken." Compl. ¶ 62. This Circuit, however, has foreclosed this strained basis for defamation liability.

In *Abbas v. Foreign Policy Group, LLC*, the plaintiff argued that two questions posed in the challenged publication – asking whether plaintiff was "growing rich off [his] father's system" and whether plaintiff had "enriched [himself] at the expense of regular Palestinians" – implied that plaintiff *was* in fact "wrongfully and possibly criminally getting rich off of his 'father's system' or . . . enriching himself 'at the expense of regular Palestinians.'" *Abbas I*, 975 F. Supp. 2d at 16. The district court held that those questions "cannot reasonably be read to imply the meaning that [plaintiff] alleges . . . nor can they be read to imply the assertion of objective facts," because "the questions invite the reader to form her own judgments," such that "[t]he reader could arrive at a number of different conclusions." *Id.* The court thus noted that plaintiff's preference "that readers do not answer the questions in the affirmative is not sufficient to support his defamation claim," and stated that "the invitation in the [challenged publication] for the reader to form her own opinion is not libel, rather it 'is the paradigm of a properly functioning press.'" *Id.* (quoting *Chapin*, 993 F.2d at 1096).

The D.C. Circuit affirmed. It noted that "it is generally settled as a matter of defamation law . . . that a question, 'however embarrassing or unpleasant to its subject, is not accusation.'" *Abbas II*, 783 F.3d at 1338 (quoting *Chapin*, 993 F.2d at 1094). The court warned of the "severe infringement on free speech that would ensue" from treating questions as accusations, and it even included the hypothetical inquiry, "Did the Governor accept bribes?"

among the "kinds of questions" to which "D.C. law has not previously extended defamation liability." *Id.* at 1339; *see also Katz*, 773 F. Supp. 2d at 123-24 (dismissing claimed defamatory implication of money laundering as "speculation and surmise" protected by the First Amendment).

The D.C. Circuit further explained that "[q]uestions indicate a defendant's '*lack* of definitive knowledge about the issue.'" *Abbas II*, 783 F.3d at 1338 (quoting *Partington v. Bugliosi*, 56 F.3d 1147, 1157 (9th Cir. 1995)) (emphasis added). And imposing liability on speakers for asking questions would "ensnare a substantial amount of speech that is essential to the marketplace of ideas and would dramatically chill the freedom of speech in the District of Columbia." *Id.* at 1339. A similar situation was recently addressed in *Deripaska v. Associated Press*, where plaintiff alleged that he was defamed when the challenged report quoted a U.S. Senator's statement that "if [Paul Manafort is] getting millions of dollars from [plaintiff], to basically undermine democratic movements, that's something I'd want to know about.'" 282 F. Supp. 3d at 147. As the court held, the quote was nonactionable because a statement to the effect that the speaker "would like to know more . . . expresses a desire for more information, rather than a statement laden with factual content." *Id.* (citation and internal marks omitted).

Here, by asking questions about *whether* the payments were illegal and calling for an investigation, the Report did not reasonably convey an implied assertion that the payments were illegal, nor did it affirmatively suggest that Global Witness intended to convey that implication. Rather, the Report reasonably communicated Global Witness's desire for more information about a suspicious set of facts, which – like the challenged questions in *Abbas* – cannot as a matter of law support a claim for defamation.

24

### B.    Any Implication Of Bribery Would Be
### An Opinion Based On Disclosed Facts

Even if the Court were to find that the Report on its face *both* reasonably conveyed the

implication that the payments were bribes *and* affirmatively suggested that Global Witness

intended to communicate that meaning, that unstated implication still could not give rise to a

defamation claim because it would be an opinion based on fully disclosed facts.

In *Abbas I*, after concluding that the two questions mentioned above did not reasonably

convey the implications alleged by plaintiff, the court held that "[e]ven if [those] questions . . .

were capable of defamatory meaning," they still could not give rise to a defamation claim

because, "[w]here the factual basis for a conclusion is outlined in the article, or, as is the case

here, for the questions, those statements are protected by the First Amendment" as essentially

statements of opinion.  *Abbas I*, 975 F. Supp. 2d at 16; *see also Moldea*, 22 F.3d at 317 (where

"the reader understands that such supported opinions represent the writer's interpretation of the

facts presented, and because the reader is free to draw his or her own conclusions based upon

those facts, this type of statement is not actionable in defamation") (internal marks omitted);

*Partington*, 56 F.3d at 1156 ("even if [defendant] had explicitly written what [plaintiff] contends

his statements imply, the statements would be protected since, read in context, they are not

statements implying the assertion of objective facts but are instead interpretations of the facts

available to both the writer and the reader"); *Phantom Touring, Inc. v. Affiliated Publ'ns*, 953

F.2d 724, 730 (1st Cir. 1992) ("Because all sides of the issue, as well as the rationale for [the

author]'s view, were exposed, the assertion of deceit reasonably could be understood only as [the

author's] personal conclusion about the information presented, not as a statement of fact.");

*Gross v. New York Times Co.*, 623 N.E.2d 1163, 1169 (N.Y. 1993) ("accusations of criminality

could be regarded as mere hypothesis and therefore not actionable if the facts on which they are

based are fully and accurately set forth and it is clear to the reasonable reader or listener that the accusation is merely a personal surmise built upon those facts"). As another federal judge summarized the principle: "If the Constitution protects an author's right to draw an explicit conclusion from fully disclosed facts, then an unstated inference that may arise in a reader's mind after reading such facts is also protected as an implicit expression of the author's opinion." *Biro*, 883 F. Supp. 2d at 468.

Like the "rhetorical questions" in the challenged publication in *Abbas*, any implication of *quid pro quo* bribery in the Report is "supported by facts provided in [the] article as well as hyperlinked source material" in the Report's endnotes. *Abbas I*, 975 F. Supp. 2d at 16. Plaintiffs do not dispute that they received the payments after they signed the Exxon deal. *See* Report at 30-31. Plaintiffs do not dispute that the payments were larger than the annual salary at the time of Liberia's highest-paid ministers. *Id.* at 30 & n.113. And Plaintiffs do not challenge that NOCAL euphemistically described bribes it had paid years earlier as "compensation" or "lobbying fees." *Id.* at 16 & n.44. A reader of the Report could therefore conclude, based on those disclosed and undisputed facts, that even if Plaintiffs had not demanded anything in advance of the Exxon deal, the payments were meant to be understood by the Plaintiffs as a *quid* to encourage the *quo* of their approving future deals in which NOCAL receives large payments, regardless of whether those deals are in the best interest of the Liberian public.

The Complaint only provides further bases for drawing that same conclusion, since it concedes that Plaintiffs received the payments from NOCAL as a reward for their successful negotiation of the Exxon deal, "in which the government of Liberia would for the first time receive a substantial payment for the sale of extraction rights," Compl. ¶¶ 22, 25-26, 28, 80. The Complaint also admits that as members of the HTC, Plaintiffs were in position to "superintend

the negotiations between entities such as Exxon and the government of Liberia, through its state-owned oil company NOCAL" on future deals following the 2013 Exxon transaction, *id.* ¶ 24. Even if the Report were to convey that the payments were bribes, therefore, that conclusion cannot give rise to a defamation claim where the underlying facts have been fully disclosed and are not disputed. For this reason, too, Plaintiffs' defamation claim fails and should be dismissed with prejudice.

## III.   COUNT II SHOULD BE DISMISSED BECAUSE THE REPORT'S BROAD USE OF THE TERMS "CORRUPT" AND "CORRUPTION" CANNOT GIVE RISE TO A CLAIM AS A MATTER OF LAW

Count II of the Complaint challenges Global Witness's use of the terms "corrupt" and "corruption" throughout the Report. *See* Compl. ¶ 105. This claim also runs aground for at least two reasons.[12] First, those terms are not used in reference to Plaintiffs. Second, even if the Report could reasonably be read to convey a view that the payments were "corrupt," that description would again constitute a non-actionable opinion.

### A.   The Terms "Corrupt" And "Corruption" Are Not Used In Reference To Plaintiffs

"Defamation is personal; a plaintiff who alleges defamation must show that the statement was published 'of and concerning' him." *Deripaska*, 282 F. Supp. 3d at 144 (quoting *Provisional Gov't of Republic of New Afrika v. ABC, Inc.*, 609 F. Supp. 104, 108 (D.D.C. 1985)). The same is true for false light claims. *Armstrong*, 80 A.3d at 188. "To satisfy the 'of and concerning' element, it suffices that the statements at issue lead the listener to conclude that the

---

[12] Plaintiffs allege that "[t]he word 'corrupt' appears *ninety-two* times" in the Report, while "[t]he word 'corruption' appears *seventy-three* times." Compl. ¶ 105. Without conceding that word counts in a long report have anything to do with the merits of claims as to *these* Plaintiffs, Global Witness is constrained to note that the characterization is both false and misleading. The word "corrupt" appears by itself just 16 times (six of which are in the phrase "Foreign Corrupt Practices Act"), and most usages of "corruption" appear in the phrase "anti-corruption" or in titles cited within the Report's endnotes. *See generally* Report.

speaker is referring to the plaintiff by description." *Deripaska*, 282 F. Supp. 3d at 145 (quoting *Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1088-89 (D.C. Cir. 2007)).  Plaintiffs cannot satisfy this element:  Even if the terms "corrupt" and "corruption" communicate some false and defamatory meaning, the Report does not use those terms to describe these Plaintiffs.

The application of the "of and concerning" requirement at the motion to dismiss stage was recently demonstrated in the *Deripaska* case, where plaintiff alleged that he was defamed by defendant's reporting that a lobbyist he hired failed to register under the Foreign Agents Registration Act.  *Id.* at 145.  The court held that any defamatory meaning conveyed by this statement was not "of and concerning" plaintiff, because "[i]f it implies that anyone broke the law, the subject of that implication is limited to [the lobbyist] only."  *Id.*  Similarly, in *Coles v. Washington Free Weekly*, the court dismissed plaintiff's defamation claim, holding that the challenged statements were "not of and concerning" the plaintiff because they "describe [plaintiff's client's] activities and behavior, not [plaintiff's] activities and behavior."  881 F. Supp. at 33; *see also Abbas I*, 975 F. Supp. 2d at 19 (statements concerning the alleged "ill-gotten gains" of plaintiff's father "cannot be the basis of any libel claim brought by [plaintiff], because they are not of and concerning him").

Similarly, the Report does not use the challenged terms "corrupt" or "corruption" in connection with Plaintiffs.  *See* Report at 6 & 33 (referring to "Liberia's corrupt oil sector"); *id.* at 8 (referring to "corrupt oil deals"); *id.* at 9 (referring to NOCAL's "history of corruption" and its "tarnished track record of corrupt deals"); *id.* (referring to "corrupt, resource-rich countries" and "corrupt countries"); *id.* at 11 (referring to the "deeply corrupt" Liberian "caretaker government" in 2004); *id.* at 20 (referring to the "Block 13 corruption issue" concerning NOCAL's payments to Liberian legislators in 2006-2007); *id.* (referring to the "corruption issues

raised in [Exxon's] December 2011 presentation"); *id.* at 26 (referring to the "corruption offences" with which consultant James Giffen was charged in 2003); *id.* at 29 (referring to the "corruption risk" of "scenarios like the purchase of Block 13"); *id.* (referring to Exxon's knowledge that "corruption was pervasive in Liberia"); *id.* at 33 (referring to Block 13's "corrupt owners" at BCP); *id.* (referring to the "corruption 'issues'" that Exxon knew about with respect to Block 13); *id.* at 34 (referring to the Liberian public's frustration "that many of their government officials are corrupted"); *id.* (referring to Block 13's having been "corruptly obtained by BCP in 2007").  The Report never describes Minister Tah or Dr. McClain as "corrupt" or as engaged in "corruption," and therefore any meaning conveyed by those terms is not "of and concerning" these Plaintiffs.

### B. Describing The Payments As "Corrupt" Would Be A Nonactionable Opinion Based On Disclosed Fact

Even if the Court were to determine that the Report reasonably conveys the view that the payments to Plaintiffs were "corrupt," that implication still could not give rise to a defamation or false light claim because it would be an opinion based on disclosed facts.  Again, as the D.C. Circuit has explained, where "the reader understands that [challenged] opinions represent the writer's interpretation of the facts presented," and "the reader is free to draw his or her own conclusions based upon those facts," such a statement of opinion "is not actionable in defamation."  *Moldea*, 22 F.3d at 317; *see also Deripaska*, 282 F. Supp. 3d at 141 ("[I]f it is plain that a speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable.") (quoting *Guilford*, 760 A.2d at 597).

Any implication conveyed by the Report that Plaintiffs engaged in corruption would, under that doctrine, be an opinion based on disclosed facts – namely, that (1) the payments were

disbursed to Liberian officials, including Plaintiffs, who approved the Block 13 deal with Exxon, *see* Report at 30; (2) the payments were larger than the annual salary of Liberia's highest-paid ministers, *id.* at 30 & n.114; (3) the payments were unlike any bonuses NOCAL had paid in recent years, *id.* at 30; and (4) one of the recipients of the payments was the Liberian President's own son, *id.* at 19.  Describing the payments as "corrupt" would be a nonactionable opinion based on those fully disclosed and now-conceded facts.

In an attempt to avoid this conclusion, the Complaint asserts that any characterization of "corruption" would be "a fact-laden specific allegation of dishonest, fraudulent, and illegal abuse of power in the negotiation and consummation of the Exxon contract for Block 13."  Compl. ¶ 105.  But the concept of "corruption" is far more expansive than Plaintiffs' interpretation, which would appear to define corruption as limited to criminality.  The U.S. Supreme Court, for its part, has expressly stated that "political corruption" can mean more than "*quid pro quo* agreements," encompassing the broader notion of "undue influence on an officeholder's judgment, and the appearance of such influence."  *FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 440-41 (2001) (citation omitted).

Whether Plaintiffs demanded the payments as a condition of signing the Exxon deal (which the Report does not allege) or merely accepted them afterwards, it would be fair to express "a subjective view, an interpretation, a theory, conjecture, or surmise" based on the facts disclosed in the Report that the payments create an undue influence on the judgment of HTC members.  In the shadow of the payments, when it comes time to negotiate the next agreement, HTC members may be willing to reach a deal that is otherwise not the best choice for the Liberian public, but that provides the largest payment to NOCAL, based on an expectation  that NOCAL will in turn provide them with another bonus afterwards.  Even if no demand for

payment is voiced and as a result no bribe within the scope of Liberian law is paid, that unspoken arrangement could still be viewed as "corrupt," at least as the U.S. Supreme Court understands the term.

Adopting Plaintiffs' narrow, legalistic interpretation of the term "corrupt," by contrast, would chill plainly protected commentary about a host of questionable but legal behaviors. It cannot be actionable, for instance, to offer the opinion that it is "corrupt" to pay six figures to become a member of Mar-a-Lago and thus "buy insider access to a place the president frequents," even if that practice remains lawful.[13] It likewise cannot be actionable to describe as "corrupt" Senator Clinton's decision to accept six-figure speaking fees from the financial services sector after she left the State Department but before she announced her presidential campaign, even though such payments were lawful.[14] Thus, even if the Report could be read to imply a view that the payments were corrupt, and even if Plaintiffs acted lawfully in receiving the payments, any characterization of "corruption" in this context must be considered an opinion based on disclosed fact.

Statements like these – characterizing as "corrupt" certain intersections of money and power – are classic expressions of opinion shielded from liability by the First Amendment. As the D.C. Court of Appeals has explained:

> To say that one is unfair to labor is not a statement of a fact, but of an opinion. Likewise to say of one: you are reactionary, you are undemocratic, you are a nationalist, you are an isolationist, you are

---

[13] Walter M. Schaub Jr., *Mar-a-Lago isn't the 'Winter White House.' It's just an embarrassing cash grab*, The Washington Post (May 7, 2018), https://www.washingtonpost.com/news/posteverything/wp/2018/05/07/mar-a-lago-isnt-the-winter-white-house-its-just-an-embarrassing-cash-grab/.

[14] Jeff Stein, *Hillary Clinton was asked why Goldman paid her $675K for 3 speeches. Her answer wasn't great*, Vox (Feb. 4, 2016), https://www.vox.com/2016/2/4/10917138/hillary-clinton-wall-street.

> a New Dealer, you are a Union Leaguer, you are opposed to labor,
> you are a coddler of labor, is similarly to express an opinion.

*Guilford*, 760 A.2d at 598 (quoting *Montgomery Ward & Co. v. McGraw-Hill Publ'g Co.*, 146

F.2d 171, 176 (7th Cir. 1944)); *see also Thomas v. News World Commc'ns*, 681 F. Supp. 55, 63

(D.D.C. 1988) ("A charge that plaintiffs' signs are 'unAmerican,' for example, is not objectively

capable of proof or disproof.").  Likewise, even if the Report did convey that the payments to

Plaintiffs were "corrupt," that implication could not give rise to a claim as a matter of law

because such "statement[s] of opinion having no provably false connotation [are] entitled to full

constitutional protection."  *White*, 909 F.2d at 522.

## IV.    THE COMPLAINT SHOULD ALSO BE DISMISSED BECAUSE IT DOES NOT PLAUSIBLY ALLEGE THAT GLOBAL WITNESS PUBLISHED THE REPORT WITH "ACTUAL MALICE" FAULT

The Complaint should be dismissed for the separate and independent reason that

Plaintiffs fail to allege facts that, if proven, could plausibly establish that Global Witness

published the Report with the requisite level of fault.

It is well-established that, for purposes of defamation suits, the First Amendment

distinguishes private figures, who are entitled to greater protection from reputational harm, from

public officials and public figures.  The latter are individuals "who hold governmental office" or

"who, by reason of the notoriety of their achievements or the vigor and success with which they

seek the public's attention," assume a place on the public stage and thereby both "run[] the risk

of closer public scrutiny" and achieve "access to the channels of effective communication" to

correct alleged falsehoods published about them.  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323,

342-44 (1974).  In light of this country's "profound national commitment" to the debate of public

issues, *Jankovic v. International Crisis Group*, 822 F.3d 576, 584 (D.C. Cir. 2016) (quoting *New

York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)), those who have chosen to engage in

32

public endeavors or participate in public debate accept a greater risk of critical public comment and scrutiny, *Lohrenz v. Donnelly*, 350 F.3d 1272, 1279 (D.C. Cir. 2003).  Thus, to prevail on a defamation claim, public officials or public figures must plead, and ultimately prove, by clear and convincing evidence, "actual malice" fault – a term of art requiring proof that a challenged statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *Sullivan*, 376 U.S. at 279-80.

A defamation plaintiff's status as a public official or public figure "is a question of law for the court to resolve." *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1293 n.12 (D.C. Cir. 1980).  This question of a defamation plaintiff's status "is pervasive, and it should be answered as soon as possible." *Miller v. Transamerican Press, Inc.*, 621 F.2d 721, 724 (5th Cir. 1980).  Courts in this district regularly resolve the issue on preliminary motions on the basis of the pleadings and records subject to judicial notice.  *E.g.*, *Deripaska*, 282 F. Supp. 3d at 138 (finding plaintiff to be a public figure on motion to dismiss); *Hourani*, 164 F. Supp. 3d at 142-44 (same); *Boley*, 950 F. Supp. 2d at 260-62 (same).

### A. Plaintiffs Are Public Officials Or Public Figures For The Purposes Of This Action

The "touchstone" of the public figure analysis "remains whether an individual has 'assumed [a] role[ ] of especial prominence in the affairs of society . . . [that] invite[s] attention and comment.'" *Tavoulareas*, 817 F.2d at 773 (quoting *Gertz*, 418 U.S. at 345).  There is no question that Plaintiffs are public figures under this rubric, as their Complaint essentially concedes.  *See* Compl. ¶¶ 84-103 (alleging actual malice as the standard governing Global Witness's conduct in publishing the Report).

### 1. Plaintiffs are public officials

The clearest indication that Plaintiffs are public figures is that they were senior Liberian officials with central roles in the negotiation of the Exxon Block 13 deal. *See, e.g.*, Compl. ¶¶ 23-24. Courts have routinely held that comparable foreign officials are public figures. *See, e.g.*, *Cabello-Rondon v. Dow Jones & Co.*, 2017 WL 3531551, at *7 (S.D.N.Y. Aug. 16, 2017) (finding that "'accomplished Venezuelan public servant and government official'" who "served 'in a number of high-ranking positions within the Venezuelan government'" is public figure), *aff'd*, 720 F. App'x 87 (2d Cir. 2018); *Egiazaryan v. Zalmayev*, 2011 WL 6097136, at *4 (S.D.N.Y. Dec. 7, 2011) (Russian member of lower house of parliament was public figure); *Desai v. Hersh*, 719 F. Supp. 670, 673 (N.D. Ill. 1989) (confirming stipulation that former high official in the Indian government was public figure); *Sharon v. Time, Inc.*, 599 F. Supp. 538, 563 (S.D.N.Y. 1984) ("parties properly assume[d]" former Israeli defense minister, was "'public official,' or, in any event, a 'public figure'"). These Plaintiffs are likewise public officials.

### 2. Plaintiffs are also limited purpose public figures

The U.S. Supreme Court has identified two categories of non-governmental public figures: "general purpose" and "limited purpose." *Tavoulareas*, 817 F.2d at 772. Even if the Court were to decide that Plaintiffs do not qualify as public officials despite their senior roles in Liberian government, therefore, it still can and should find that Plaintiffs are at least limited purpose public figures. *See, e.g.*, *Boley*, 950 F. Supp. 2d at 260 n.6 (where court "finds that [plaintiff] is a limited purpose public figure, it need not address whether his status as a former official of a foreign government alone makes him a public official").

In this Circuit, a defamation plaintiff qualifies as a limited purpose public figure if (1) there is a pre-existing public controversy, (2) the plaintiff played a significant role in that controversy, and (3) the challenged statements are germane to plaintiff's participation in the

controversy.  *Waldbaum*, 627 F.2d at 1296-98.  Dr. McClain and Minister Tah plainly are public figures under this three-part test.

First, a public controversy existed before the publication of the Report over the risk of corruption arising out of opaque payments that oil, gas, and mining companies make to foreign governments to secure the right to engage in extractive activities.  A public controversy is "a real dispute" that "has received public attention" because it "affects the general public or some segment of it in an appreciable way."  *Waldbaum*, 627 F.2d at 1296.  A public controversy exists, for example, when the "press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment."  *Id.* at 1297; *see also OAO Alfa Bank v. Ctr. for Pub. Integrity*, 387 F. Supp. 2d 20, 46-47 (D.D.C. 2005) ("To qualify as a public controversy, the law requires only that the issue be discussed publicly, and that the resolution of the issue affect others besides the immediate participants in the debate.").

It is clear that persons and groups, including Global Witness, "actually were discussing" this "specific question" before the publication of the Report.  *E.g.*, *Liberia Passes Historic Oil Law Requiring Companies to Publish Names of Their Owners*, Global Witness (Nov. 28, 2016), https://www.globalwitness.org/en/press-releases/liberia-passes-historic-oil-law-requiring-companies-publish-names-their-owners/; *Transparency Adds Value to Extractive Industries in Liberia, Tanzania and Ethiopia*, The World Bank (Jan. 30, 2014), http://www.worldbank.org/en/news/feature/2014/01/30/transparency-adds-value-to-extractive-industries-in-liberia-tanzania-and-ethiopia; Alphonso Toweh, *Liberian president's son quits as head of state oil firm*, Reuters (Sept. 17, 2013), https://www.reuters.com/article/us-liberia-oil/liberian-presidents-son-quits-as-head-of-state-oil-firm-idUSBRE98G1C120130917; Afua Hirsch, *Liberia natural resources deals not compliant with law, find auditors*, The Guardian (May 8, 2013),

https://www.theguardian.com/world/2013/may/08/liberia-natural-resources-deal-audit; Johnny

Dwyer, *Big Oil, Small Country*, Foreign Policy (Feb. 22, 2012), https://foreignpolicy.com/2012/

02/22/big-oil-small-country/.  The ongoing dispute over Section 1504, discussed above, is part

and parcel of that controversy in the United States.  *E.g.*, Michael Grunwald, *Rex Tillerson Tried*

*to Get This Rule Killed. Now Congress Is About to Do It for Him*, Politico Magazine (Feb. 1,

2017), https://www.politico.com/magazine/story/2017/02/rex-tillerson-tried-to-get-this-rule-

killed-now-congress-is-about-to-do-it-for-him-214725; Alice Ross, *Dodd-Frank's bid to clean*

*up extractive industries stymied by oil business*, The Guardian (July 22, 2015),

https://www.theguardian.com/global-development/2015/jul/22/dodd-frank-act-section-1504-

natural-resources-extractive-industries-oil-api-sec.

Courts have consistently held that debates of precisely this type meet the test for public

controversies.  In *Jankovic*, the D.C. Circuit held that the test for public controversies was

satisfied by "'the progress of political and economic reform in Serbia and the integration of

Serbia into international institutions' in the post-Milosevic Serbian government."  822 F.3d at

585 (citation omitted).  In *Tavoulareas*, the court identified a "national controversy over the state

of the oil industry" and "the manner in which the United States should respond to the rise of

OPEC and the ensuing energy crisis."  817 F.2d at 767, 772-74.  In *Boley*, the court

acknowledged a "controversy concerning the Liberian Civil War."  950 F. Supp. 2d at 261.  And

in *Deripaska*, the court recently recognized the controversy over "Russian oligarchs acting on

behalf of the Russian government."  282 F. Supp. 3d at 142.  The debate over the risk of

corruption arising out of payments that extractive industries make to foreign governments, a

debate that resulted in passage of a law in the United States, likewise falls within the scope of a

"public controversy" as contemplated in *Waldbaum*.

Second, there can be little doubt that Minister Tah and Dr. McClain voluntarily injected themselves into this controversy. Minister Tah advocated for BCP's Block 13 license to be cancelled in favor of another oil company as early as 2010. Compl. ¶ 21. As members of the HTC, Minister Tah and Dr. McClain subsequently negotiated the new Block 13 agreement with Exxon on behalf of Liberia. *Id.* ¶¶ 23-24. Dr. McClain later signed the NOCAL resolution authorizing the disbursement of the payments to the HTC, among others, for "ensuring the successful completion of the project." *Id.* ¶ 26. Minister Tah then conducted the legal analysis finding that the HTC members, herself included, could lawfully receive the payments. *Id.* ¶¶ 27-28. And finally, as part of the NOCAL Board, Dr. McClain assisted in determining the size of the bonus that he and Minister Tah would receive out of the funds provided by Exxon. *Id.* ¶ 29.

Third, the Report is germane to this controversy on its face. The germaneness prong "'ensure[s] that the allegedly defamatory statement – whether true or not – is related to the plaintiff's role in the relevant public controversy." *Kahl*, 856 F.3d at 115 (quoting *Jankovic*, 822 F.3d at 589). The inquiry specifically asks whether the challenged statement was not "wholly unrelated" to the controversy. *Jankovic*, 822 F.3d at 589 (quoting *Waldbaum*, 627 F.2d at 1298).

As detailed above, there was an ongoing public debate over the risk of corruption arising out of payments made by extractive industries to foreign countries, including a debate over whether the U.S. government could and should address that risk through Section 1504 and other anti-corruption measures. That is precisely the issue that the Report addresses. It is also precisely what Plaintiffs allege was conveyed by the Report: that they engaged in corruption by receiving the payments after a U.S. oil company transferred tens of millions of dollars a foreign government for the right to drill oil off of that nation's coast. At a minimum, the relationship between the Report and the controversy was not "wholly unrelated" to this broader debate. *E.g.*,

*Jankovic*, 822 F.3d at 589 (germane where allegations about plaintiff's relationship with deposed dictator are not "'wholly unrelated' to the controversy" over current national reform effort) (citation omitted); *Tavoulareas*, 817 F.2d at 773-74 (statement germane where "alleged nepotism by [plaintiff] was not 'wholly unrelated' to a public controversy").

Plaintiffs are therefore public figures as well as public officials for purposes of this litigation, and must meet the high burden of proof required by the First Amendment to state a claim – including to survive a motion to dismiss.

### B.     Plaintiffs Fail To Plausibly Allege That Global Witness Published The Report With "Actual Malice" Fault

As public officials and/or public figures, Plaintiffs must plead, and ultimately prove, by clear and convincing evidence, that Global Witness published the Report with "actual malice" fault – *i.e.*, that the Report conveyed some falsehood about Plaintiffs that was published "with knowledge that it was false or with reckless disregard of whether it was false or not." *Sullivan*, 376 U.S. at 279-80.  Given the Supreme Court's requirement that to satisfy Rule 8 a complaint must contain "enough facts to state a claim to relief that is plausible on its face," *Twombly*, 550 U.S. at 570, including state-of-mind fault, *Iqbal*, 556 U.S. at 686-87, "actual malice" allegations must be supported by plausible factual allegation sufficient to meet the standard.  *See, e.g.*, *Deripaska*, 282 F. Supp. 3d at 144 (dismissing claim where pleaded facts failed to establish "that [defendant] acted with actual malice or reckless disregard for the facts when it published the article in question"); *Hourani*, 164 F. Supp. 3d at 132 (same); *Boley*, 950 F. Supp. 2d at 263 (same); *Parisi*, 845 F. Supp. 2d at 218 (same).[15]

---

[15] Every Circuit to consider the issue has endorsed a similar analysis.  *See Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016); *Biro v. Conde Nast*, 807 F.3d 541, 544-45 (2d Cir. 2015); *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013);

Thus, to state a viable claim Plaintiffs must allege in their Complaint "enough facts from which [actual] malice might reasonably be inferred."  *Schatz*, 669 F.3d at 58 (citing *Iqbal*, 556 U.S. at 686-87).  A defamation complaint "us[ing] actual-malice buzzwords" that are not "backed by well-pled facts" cannot survive a motion to dismiss.  *Id.* at 56; *Hourani*, 164 F. Supp. 3d at 143-44 (rejecting "conclusory allegations" of actual malice); *see also, e.g.*, *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 279-80 (S.D.N.Y. 2013) (pleading "actual-malice buzzwords" is simply not enough to nudge a case into discovery) (citation omitted); *Egiazaryan*, 2011 WL 6097136, at *8 (dismissing claim where plaintiff's "repeated assertion" that defendant had published with actual malice was inadequate "legal conclusion" not supported by relevant facts). In *Schatz*, for example, the First Circuit dismissed a complaint that alleged in conclusory terms that the defendant "had 'knowledge' that its statements were 'false' or had 'serious doubts' about their truth and a 'reckless disregard' for whether they were false," but failed to allege facts plausibly supporting those conclusions.  669 F.3d at 56, 58.  In *Mayfield*, the Fourth Circuit similarly dismissed a complaint alleging that defendants' statements "were known by [them] to be false at the time they were made . . . or were made with reckless disregard as to their veracity" holding that plaintiff's "entirely insufficient" allegations "simply do not suggest" facts from which the court could infer that defendants "knew their statements were false or . . . were reckless with respect to their veracity."  674 F.3d at 378.

Here, the Complaint advances four bases for alleging actual malice, none of which "nudge[s]" their claim "across the line from conceivable to plausible."  *Iqbal*, 556 U.S. at 680.

---

*Mayfield v. NASCAR, Inc.*, 674 F.3d 369, 377-78 (4th Cir. 2012); *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 58 (1st Cir. 2012).

First, the Complaint alleges in conclusory fashion that prior to publishing the Report, "Global Witness was in possession of ample information discrediting the bribery allegation," and had "material in its possession that generated a high degree of subjective awareness that its story was false."  Compl. ¶ 85.  Yet the Complaint never identifies what that "information" or "material" is, let alone how possessing it necessarily amounts to publication with actual malice.  On the contrary, the Complaint points only to the comments that Global Witness solicited from Plaintiffs and other recipients of the payments, who denied that those payments were bribes.  *Id.* ¶¶ 93-97.  As a matter of law, such denials, "however vehement," cannot establish actual malice because "such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error." *Lohrenz*, 350 F.3d at 1285 (quoting *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 691 n.37 (1989)) (internal marks omitted).

Second, the Complaint asserts the well-worn trope that Global Witness "had a pre-conceived story line prior to publishing" the Report.  Compl. ¶¶ 86-97.  Even assuming that were true, "allegedly having a pre-conceived story line is not sufficient to demonstrate actual malice." *Jankovic v. International Crisis Group*, 72 F. Supp. 3d 284, 312 (D.D.C. 2014) (citing *Tucker v. Fischbein*, 237 F.3d 275, 286 (3d Cir. 2001), for the proposition that "theories of actual malice grounded on allegations of poor journalistic practices such as a preconceived story-line . . . are without support in the case law") (internal marks and alterations omitted), *aff'd*, 822 F.3d at 597 ("[e]vidence of . . . preconceived notions about [plaintiff] does little to show actual malice").  In any event, Plaintiffs' own pleadings *rebut* the notion that Global Witness acted according to a preconceived narrative.  According to the Complaint: (1) before publishing the Report, Global Witness sought comment from persons who received the payments, Compl. ¶¶ 91-92; (2) Global

Witness specifically sought comment on whether the payments were bribes, *id.*; (3) Plaintiffs and others responded to Global Witness, denying that the payments were bribes, *id.* ¶¶ 93-97; and (4) when Global Witness published the Report, it did not refer to the payments as "bribes" and it included both statements from recipients that the payments were *not* bribes, Report at 30, as well as that "Global Witness has no evidence that Exxon directed NOCAL to pay Liberian officials, nor that Exxon knew such payments were occurring," but that investigation was warranted, *id.* at 31.  Thus, even assuming as true for the purposes of this motion that Global Witness had a "pre-conceived story line" about the payments, the Report inarguably included multiple statements *challenging* that story line, and "reporting perspectives at odds with the publisher's own, tends to rebut a claim of malice, not to establish one."  *Lohrenz*, 350 F.3d at 1286 (alterations and internal marks omitted).

Third, the Complaint challenges the allegedly "inconsistent manner" with which Global Witness "treated various participants in the Exxon Block 13 deal."  Compl. ¶¶ 98-99.  For example, Plaintiffs gripe that the Report did not criticize the smaller payments received by HTC's consultants, to whom Global Witness also reached out for comment and who likewise denied having received bribes.  *Id.* ¶ 98.  Plaintiffs call this an "internal contradiction" that is "powerful evidence probative of actual malice," *id.*, but the basis for that claim is obscure.  It can hardly be disputed that large payments from NOCAL to HTC members – who will negotiate oil deals time and again and who will exert significant control over how much money NOCAL receives from those deals – deserve more scrutiny than smaller payments to HTC consultants who may work only on discrete deals.

Plaintiffs also object that the Report did not "include the name of the Legal Advisor to President Sirleaf, Seward Cooper, as among the HTC members who received a $35,000 bonus."

*Id.* ¶ 99.  Plaintiffs argue that the "narrative" that the payments were bribes "would be undermined" if the Report had noted that Cooper, too, "had been asked to opine . . . on the legality of the bonus payments."  *Id.*  This, too, is baffling.  Plaintiffs – who feel that the Report suggests unfairly that the payments were corrupt – are criticizing the Report for not *also* mentioning that *yet another* HTC member who *likewise* stood to receive a payment from NOCAL joined Minister Tah in opining that it would lawful for them both to receive these funds.

Fourth, and finally, the Complaint accuses Global Witness of publishing the Report to advance an undefined "partisan agenda."  Compl. ¶¶ 86, 100.[16]  Such an agenda – even if Global Witness had one beyond the dissemination of the accurate, journalistic investigative reports for which it is widely respected in Liberia and elsewhere, *see supra* at 4 – would be immaterial to the actual malice analysis as a matter of law.  As the D.C. Circuit has explained, where a speaker "may have adopted an adversarial stance" toward the subject of a challenged statement, that "attitude is not 'antithetical to the truthful presentation of facts.'"  *Jankovic*, 822 F.3d at 597 (quoting *Tavoulareas*, 817 F.2d at 795).  Simply put, the First Amendment applies to advocates as well as to journalists.

In sum, none of these allegations would if proven plausibly establish that Global Witness knowingly published false and defamatory statements about Plaintiffs in the Report, nor were such statements "so inherently improbable that only a reckless man would have put them in circulation."  *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968); *see also Jankovic*, 822 F.3d at 589 ("[I]t is not enough to show that defendant should have known better; instead, the plaintiff must offer evidence that the defendant in fact harbored subjective doubt.").  That conclusion

---

[16] Global Witness is a nonprofit, independent international environmental and human rights watchdog.  *See, e.g.*, "About Us," Global Witness, https://www.globalwitness.org/en/about-us/.

remains the same whether these allegations are considered individually or collectively:  as the D.C. Circuit held in *McFarlane v. Sheridan Square Press, Inc.*, when each of plaintiff's arguments "provides little or no additional support for a finding of actual malice" on their own, even when viewed all together "cumulatively, they do not amount to much, and surely not enough under the standard set by the Supreme Court."  91 F.3d 1501, 1516 (D.C. Cir. 1996); *accord Jankovic*, 822 F.3d at 597 (stating that plaintiff's individual arguments on actual malice "fare no better when viewed in the aggregate," and concluding that "[e]ven taking these flawed evidentiary assertions together, no reasonable jury could find by clear and convincing evidence that [defendant] acted with actual malice").

Plaintiffs have simply failed to carry their burden to allege a plausible claim of actual malice, and that failure constitutes an independently sufficient basis for dismissal of the Complaint with prejudice.

## CONCLUSION

For each and all the foregoing independent reasons, Global Witness respectfully requests that this Court enter an order dismissing the Complaint, with prejudice, and grant such other and further relief as the Court deems just and proper.

Dated:  November 9, 2018       Respectfully submitted,

BALLARD SPAHR LLP

   */s/ Chad R. Bowman*
David A. Schulz (D.C. Bar No. 459197)
Chad R. Bowman (D.C. Bar No. 484150)
Maxwell S. Mishkin (D.C. Bar No. 1031356)
1909 K Street, NW, 12th Floor
Washington, DC 20006
Telephone: (202) 661-2200
Fax: (202) 661-2299
schulzd@ballardspahr.com
bowmanchad@ballardspahr.com
mishkinm@ballardspahr.com

*Counsel for Defendants Global Witness and*
*Global Witness Publishing, Inc.*