**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CHRISTIANA TAH, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cv-02109-RMC |
| | ) | |
| GLOBAL WITNESS | ) | |
| PUBLISHING, INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |

**PLANTIFFS' REPSONSE TO DEFENDANTS'
MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

Rodney A. Smolla
4601 Concord Pike
Wilmington, DE 19807
rodsmolla@gmail.com
(864) 373-3882
*Pro Hac Vice*

Arthur V. Medel, Esq.  (D.C. Bar # 416029)
Alima Joned, Esq. (D.C. Bar # 446659)
MEDEL SANFILIPO
1701 Pennsylvania Avenue, N.W., Suite 200
Washington, D.C. 20006
Tel:  202 683 2008
Cell: 703 945 9137
Fax: 703 991 8014
avmedel@medsanlaw.net
ajoned@medsanlaw.net
*Attorneys for Plaintiffs Christiana Tah and Randolph McClain*
November 30, 2018

# TABLE OF CONTENTS

TABLE OF AUTHORITIES                                                               iv

INTRODUCTION                                                                        1

ARGUMENT                                                                           1

I.  THE GLOBAL WITNESS REPORT CLEARLY AND INTENTIONALLY
 CONVEYED THE DEFAMATORY MEANING THAT CHRISTIANA
TAH AND RANDLOPH MCCLAIN TOOK BRIBES.                                               1

A.      The Overall Gist and Sting Communicates Bribery                            1

B.      Detailed Examination of the Report is Required and Appropriate             1

C.      The Plaintiffs Bear Only the Modest Burden of
        Showing that One Reasonable Reading of the Global Witness
        Report is Defamatory                                                       2

D.      The Report Plainly and Intentionally Implies Bribery                       3

E.      The Text of the Global Witness Report Implied Bribery                      3

F.      Readers Understood the Report as Alleging Bribery                          14

G.      Media Accounts of the Report Described it as Alleging Bribery              15

H.      The Liberian Government Understood the Global Witness Report
        As Alleging that Christiana Tah, Randolph McClain and
        HTC Members Had Accepted Bribes                                            16

I.      Summary                                                                    18

II.  THE DEFAMATORY STATEMENTS ARE NOT OPINION                                     19

A.      The Controlling *Ollman* Test                                              19

B.      There is No Textual Ambiguity                                              19

C.      The Existence or Non-Existence of Bribery is Verifiable                    20

D.       The Entire Context of the Report Supports the Bribery Imputation          22

E.      The Broader Social Context Supports the Imputation of Bribery              22

1.      No Full Disclosure Existed                                                                      22

2.      The Genre of the Global Witness Report Supports the Imputation of Bribery      25

III.    THE FALSE LIGHT CLAIM RESTS ON STATEMENTS
"OF AND CONCERNING" THE PLAINTIFFS                                              26

IV.  THE FALSE LIGHT CLAIMS SHOULD NOT BE DISMISSED AS OPINION      29

V. THE ACTUAL MALICE ALLEGATIONS HERE CANNOT BE
DECIDED ON THE PLEADINGS                                                               31

A.      Motions to Dismiss are Not the Same as Summary Judgment                    31

B.      Global Witness is Making Jury Argument                                             31

C.      A Pre-Conceived Story Line is Probative of Actual Malice                        32

1.      A Pre-Conceived Story Line Has Been Plausibly Alleged                          32

2.      The Pre-Conceived Story Line Doctrine is Not Mere "Trope"                     34

D.      Circumstantial Evidence is Sufficient                                                 36

E.      Evidence of Inconsistency is Probative Circumstantial Evidence               37

F.      Vindictive Motive is Probative of Actual Malice                                    38

G.      Ignoring Contrary Evidence is Probative of Avoidance of the Truth          40

H.      The Plaintiffs Benefit from All Inferences                                          42

CONCLUSION                                                                                     44

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Abbas v. Foreign Policy Group, LLC*, 975 F. Supp. 2d 1 (D.D.C. 2013)           28

*Afro-American Publishing Co. v. Jaffe*, 366 F.2d 649 (D.C. Cir. 1966) (en banc).   4, 6, 7, 20

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986)           37

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)           1

*Backes v. Misko*, 486 S.W.3d 7, 26 (Tex. App. 2015)           14

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)           1

*Bose Corp. v. Consumers Union of United States, Inc.*, 692 F.2d 189
(1st Cir.1982), *aff'd*, 466 U.S. 485 (1984)           37

*Brown v. Petrolite Corp.*, 965 F.2d 38 (5th Cir.1992)           36

*Burnett v. Nat'l Enquirer, Inc.*, 144 Cal. App. 3d 991, 999,
193 Cal. Rprt. 206, 209 (Ct. App. 1983)           44

*Coles v. Washington Free Weekly, Inc.*, 881 F. Supp. 26 (D.D.C. 1995)           28

*Competitive Enterprise Institute v. Mann*, 150 A.3d 1213 (D.C. 2016)           25, 43

*Curtis Pub. Co. v. Butts*, 388 U.S. 130 (1967)           44

*Doe v. Bernabei & Wachtel, PLLC*, 116 A.3d 1262 (D.C. 2015)           29

*Deripaska v. Associated Press*, 282 F. Supp. 3d 133 (D.D.C. 2017)           27, 28, 29

*Eastwood v. National Enquirer, Inc.*, 123 F.3d 1249 (9th Cir. 1999)           37

*Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862 (W.D. Va. 2016)           35

*Fairbanks v. Roller*, 314 F. Supp. 3d 85 (D.D.C. 2018)           19

*Falwell v. Flynt*, 797 F.2d 1270, 1277 (4th Cir. 1986),
*judgment rev'd on other grounds*, 485 U.S. 46 (19880           34

*Guam Federation of Teachers. v. Ysrael*, 492 F.2d 438, (9th Cir. 1974),
*cert. denied*, 419 U.S. 872 (1974)           36

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974)     45

*Gertz v. Robert Welch, Inc.*, 680 F.2d 527, 539 (7th Cir. 1982)     34

*Goldwater v. Ginzburg*, 414 F.2d 324, 337, 339 (2nd Cir. 1969),
*cert. denied*, 396 U.S. 1049 (1970)     34

*Harte-Hanks Communications Inc. v. Connaughton*,
491 U.S. 657 (1989)     39, 42

*Harrison v. Washington Post Co.*, 391 A.2d 781 (D.C. 1978)     12

*Harris v. City of Seattle*, 152 Fed.Appx. 565 (9th Cir.2005).     35

*Howard University v. Best*, 484 A.2d 958 (D.C. 1984)     7

*Hourani v. Psybersolutions LLC*, 164 F. Supp. 3d 128, 144 (D.D.C. 2016)     31

*Hustler Magazine, Inc., v. Falwell*, 485 U.S. 46 (1988)     34

*Jankovic v. International Crisis Group*, 4
94 F.3d 1080 (D.C. Cir. 2007) ("*Jankovic I*")     21

*Jankovic v. International Crisis Group*
("*Jankovic II*"), 593 F.3d 22 (D.C. Cir. 2010)     21, 23, 24

*Jankovic v. International Crisis Group* (*Jankovic III*), 822 F.3d 576
(D.C. Cir. 2016)     37

*Lasky v. ABC*, 631 F.Supp. 962 (S.D.N.Y.1986)     10

*Levy v. American Mutual Insurance Co.*, 196 A.2d 475 (D.C.1964)     2

*Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991)     36

*Manzari v. Associated Newspapers Ltd.*, 830 F.3d 881 (9th Cir. 2016)     36

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990)     23, 25

*Mizell v. SunTrust Bank*, 26 F.Supp.3d 80, 85 (D.D.C. 2014)     31

*Moldea v. New York Times Co.*, 15 F.3d 1137 (D.C. Cir. 1994),
*modified*, 22 F.3d 310 (D.C. Cir. 1994)     24

*Moss v. Stockard*, 580 A.2d 1011 (D.C. 1990)     2
*Moldovan v. Polito*, No. 05-15-01052-CV, 2016 WL 4131890

(Tex. App. Aug. 2, 2016)                                                    14


*Nyambal v. Alliedbarton Sec. Servs., LLC,* No. CV 14-1904 (EGS)
2018 WL 5045332 (D.D.C. Oct. 17, 2018)                                     10

*Olinger v. American Savings & Loan Association*, 409 F.2d 142 (1969)       7, 12

*Ollman v. Evans*, 750 F.2d 970 (D.C. Cir. 1984)                            *passim*

*Rosenblatt v. Baer*, 383 U.S. 75 (1966)                                    45

*Schiavone Construction Co. v. Time, Inc.*, 847 F.2d 1069 (3d Cir.1988)     36

*Shoen v. Shoen*, 48 F.3d 412 (9th Cir. 1995)                               39

*Southern Air Transport, Inc.  v. American Broadcast Companies, Inc.,*
877 F.2d 1010, 1015 (D.C. Cir. 1989)                                        9, 10

*St. Amant v. Thompson*, 390 U.S. 727 (1968)                                36

*Tavoulareas v. Piro*, 759 F.2d 90, 98 (D.C. Cir. 1985),
*vacated and superseded on other grounds by opinion en banc,*
817 F.2d 762 (D.C. Cir. 1987)                                               40

*Tavoulareas v. Piro*, 817 F.2d 762, 780 (D.C.Cir.1987) (en banc),
*cert. denied*, 484 U.S. 870 (1987)                                         3, 10

*U.S. ex rel. Miller v. O'Leary*, 651 F. Supp. 174 (N.D. Ill. 1986),
*aff'd*, 828 F.2d 22 (7th Cir. 1987)                                        34

*Weyrich v. New Republic, Inc.,* 235 F.3d 617 (D.C. Cir. 2001)              30, 44

*White v. Fraternal Order of Police*, 909 F.2d 512 (D.C. Cir. 1990)         2, 3, 12

*Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257 (D.D.C. 2017)       *passim*

**Liberian Authorities**

*Report of the Special Presidential Committee Appointed to Examine the*
*March 2018 Global Witness Report of the*
*National Oil Company of Liberia (NOCAL)*                                   *passim*

*Andrew et al v Gardner* et al; 10 LLR 389 (Liberian Supreme Court 1951)    20

**Other Authorities**

Lennart Dodoo, "Defending Former Justice Minister Christiana Tah in
Global Witness'
Report On Exxon," *Front Page Africa*, April 11, 2018,
available at:
https://frontpageafricaonline.com/opinion/letters-comments/defending-
former-justice-minister-christiana-tah-in-global-witness-report-on-exxon/          15

Lennart Dodoo, "Pres. Weah 'Ignores' Special Task Force Recommendation,
Appoints New Team to NOCAL," *Front Page Africa*, June 20, 2018,
available at: https://frontpageafricaonline.com/news/liberia-pres-
weah-ignores-special-task-force-recommendation-appoints-new-team-to-nocal/          15

Oliver Wendell Holmes, Collected Legal Papers, 311 (1918)          34

Christina Maza, "Rex Tillerson's Exxon Mobil Involved in
Corrupt Oil Deals in Liberia, Investigation Reveals."
*Newsweek*, March 29, 2018, available at:
http://www.newsweek.com/rex-tillersons-exxon-mobile-
involved-corrupt-oil-deals-liberia-investigation-866026          16

Rodney Smolla, *Law of Defamation* (1990)          3, 26, 35

## INTRODUCTION

Plaintiffs Christiana Tah and Randolph McClain file this Response to the Motion to Dismiss filed by the Defendants Global Witness and Global Witness Publishing, Inc. (collectively, "Global Witness.")

## ARGUMENT

### I.  THE GLOBAL WITNESS REPORT CLEARLY AND INTENTIONALLY CONVEYED THE DEFAMTORY MEANING THAT CHRISTIANA TAH AND RANDOLPH MCCLAIN TOOK BRIBES.

### A.     The Overall Gist and Sting Communicates Bribery

The entirety of the *Catch me if you can* Global Witness Report conveys to ordinary reasonable average readers the defamatory imputation that Christiana Tah and Randolph McClain each accepted a $35,000 bribe in exchange for their actions recommending approval of the Exxon Block 13 contract in their role as members of the Liberia's Hydrocarbon Technical Committee (HTC).  This bribery accusation is the principal overall gist and sting of the *Catch me if you can* Global Witness Report as it refers to Christiana Tah and Randolph McClain.  Complaint, ¶ 30.

### B.     Detailed Examination of the Report is Required and Appropriate

In its Motion to Dismiss Global Witness mocks Christiana Tah and Randolph McClain for the painstaking detail with which the defamatory meaning conveyed by the Global Witness Report is explained in their Complaint, derisively chiding them for taking "fully 45 pages to conjure up an implication that does not exist."  *Motion to Dismiss* at 21.  Detail in pleading, however, is not a vice, but a virtue.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  Christiana Tah and Randolph McClain have indeed taken care in demonstrating that the imputations of bribery they allege plainly *do* exist, and could *only* have been intentional. This exercise in careful pleading is case-making, not case-conjuring.

**C.     The Plaintiffs Bear Only the Modest Burden of Showing that One Reasonable Reading of the Global Witness Report is Defamatory**

Throughout its Motion, Global Witness acts as if Christiana Tah and Randolph McClain bear a weighty burden.  They do not.  At this pleading stage their burden is minimal.  The law of defamation at the pleading stage is deliberately asymmetrical.  All the plaintiffs must do is to show that a defamatory meaning is *one* permissible reading of the offending statements.  They are not required to demonstrate it is the *only* reasonable reading.  "If it appears that the statements are at least capable of a defamatory meaning, whether they were defamatory and false are questions of fact to be resolved by the jury." *Moss v. Stockard*, 580 A.2d 1011, 1023 (D.C. 1990).  In contrast, Global Witness must demonstrate that its innocent, sanitized reading of its report is, *as a matter of law*, the only plausible understanding of the *Report.*   In baseball, ties go to the runner.   In defamation pleading, ties go to the plaintiff.

"Under District of Columbia defamation law, which governs this diversity case, a court's power to find that a statement is not defamatory as a matter of law is limited." *White v. Fraternal Order of Police*, 909 F.2d 512, 518 (D.C. Cir. 1990).  "It is only when the court can say that the publication is not reasonably capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense that it can rule as a matter of law, that it was not libelous." *Levy v. American Mutual Insurance Co.*, 196 A.2d 475, 476 (D.C. 1964).

For Global Witness to prevail, it must demonstrate that its Report was capable of only *one* meaning, which was that it was *not* claiming that Christiana Tah or Randolph McClain took bribes.  In contrast, all that Christiana Tah and Randolph McClain must do is plausibly posit that *some* reasonable readers read it differently.  "If the meaning of the words as published is unambiguous and fairly susceptible of but one meaning, it is for the court to say whether the meaning is defamatory." *Levy*, 196 A.2d at 476 "However, if the language is capable of *two* meanings, one

2

actionable and the other not, it is for the jury to determine which of the two meanings would be attributed to it by persons of ordinary understanding under the circumstances." *Id.* (emphasis added.)

### D.     The Report Plainly and Intentionally Implies Bribery

Christiana Tah and Randolph McClain offer to this Court four separate grounds in support of the modest proposition that at least *one* reasonable reading of the Global Witness Report was the thinly veiled implication that they took a bribe. First, a reading of the *Catch me if you can* Global Witness Report itself manifestly demonstrates that this is the meaning Global Witness intended to convey to readers.  The Global Witness Report is quite simply dripping with imputations of bribery.  Second, *actual readers* of the Global Witness *Catch me if you can* Report interpreted the Global Witness Report as accusing Christiana Tah and Randolph McClain of bribery.  Third, widespread media accounts summarizing the *Catch me if you can* Global Witness Report described the Report as accusing Christiana Tah, Randolph McClain, and other HTC members of taking bribes to facilitate the Exxon Block 13 purchase. Fourth, and most importantly, the current government of Liberia itself read the *Catch me if you can* Global Witness Report as accusing Christiana Tah, Randolph McClain, and other HTC members of accepting bribes as quid pro quo payments to facilitate the Exxon Block 13 deal.  Complaint, ¶ 30.

### E.     The Text of the Global Witness Report Implied Bribery

"A defamation by implication stems not from what is literally stated, but from what is implied." *White v. Fraternal Order of Police*, 909 F.2d at 518, *citing Tavoulareas v. Piro*, 817 F.2d 762, 780 (D.C.Cir.1987) (en banc), *cert. denied*, 484 U.S. 870 (1987), and Rodney Smolla, *Law of Defamation*, § 4.05 (1990).

3

The defamatory mosaic in this case begins with the title of the Global Witness Report, entitled *Catch me if you can*. The title plainly suggests that wrongdoing is afoot, and that the wrongdoers somehow brazenly assume they cannot be caught. The sub-heading, placed on the front page of the Global Witness Report, tells the reader that the wrongdoing is corruption in the Liberian oil sector. The sub-heading reads: "Exxon's complicity in Liberian oil sector corruption and how its Washington lobbyists fight to keep oil deals secret." Complaint, ¶ 30  These headlines and captions are probative of the Report's overall defamatory meaning. *Afro-American Publishing Co. v. Jaffe*, 366 F.2d 649, 655 (D.C. Cir. 1966) (en banc).

The *Catch me if you can* Report then deliberately linked the "corruption" attendant to the purchase by Exxon of Block 13 to the payments made to Christiana Tah and Randolph McClain and others at NOCAL and the HTC. *Catch me if you can* at 7.  This is immediately followed by a statement on Page 7 that:" Evidence seen by Global Witness also suggests that Exxon's 2013 deal was surrounded by unusual, large payments. This evidence shows that, in the month following the sale of Block 13 to Exxon and COPL, Liberia's oil agency paid $210,000 to Liberian officials who authorized the deal." *Catch me if you can* at 7.  Complaint, ¶ 30 Any reasonable average reader would plainly understand the Report as communicating that the "corruption" that "surrounded" the purchase of Block 13 included the "unusual, large payments" as a corrupt quid pro quo, as evidenced by the statement that the agency "paid $210,000 to Liberian officials who authorized the deal." *Catch me if you can* at 7. Complaint, ¶ 30

The Report continued, "if the US does not require detailed reporting on what oil, gas, and mining companies pay foreign governments we may never find out how far they are prepared to go to obtain natural resources, nor will we be able to stop the corruption that keeps people poor and destabilizes countries." *Catch me if you can* at 8.  The Report further called for an investigation

4

into violation of Liberian law, "including anti-bribery statutes." *Catch me if you can* at 8. Complaint, ¶ 41.

On Page 9 of the *Catch me if you can* Report, Global Witness openly admitted that it launched its investigation because of NOCAL's "tarnished record of corrupt deals" and the "risk of bribery." *Catch me if you can* at 9. This is followed on the same page by the assertion, "people in corrupt, resource-rich countries can now see what their governments are being paid from individual resource projects and demand those who pay or receive bribes are held to account." *Catch me if you can* at 9. This passage again reinforces the imputation that Christiana Tah, and Randolph McClain, and others were among those who "receive bribes" and should be "held to account." Complaint, ¶ 43.

The conclusion that the payments made by Exxon included bribes paid to Christiana Tah, Randolph McClain, and others was further buttressed by statements made throughout *Catch me if you can* that payments made by companies such as Exxon that are "disaggregated" and at the "project level" are intended to mask bribery and corruption. The Report on Page 9 describes "disaggregated project-level payments to governments," and then in turn on Page 11 plainly states the link between such payments and the corruption *documented in the report*, stating, "If extractive companies are required to disclose disaggregated, project-level payments to governments, this would help expose – and prevent – the very kind of corruption documented in this report." *Catch me if you can* at 11. This passage is plainly referring to the purchase by Exxon of Block 13, and not to *past* corruption, and it plainly links the payment by Exxon for Block 13 as an example of "the very kind of corruption documented in this report," corruption that of course was understood by readers as including the payments made to Christiana Tah, Randolph McClain and others." Complaint, ¶ 43.

In its Motion to Dismiss, Global Witness seeks refuge in the inclusion of stock qualifying language plainly inserted to attempt to insulate Global Witness from defamation liability.  Global Witness thus often inserted euphemisms such as "unusual, large payments," "unusual payments" or "unusual and suspicious payments" or "suspicious payments" for the outright words "bribe" or "bribery."   These phrases are used over thirteen times in the Global Witness Report.   Global Witness also called for investigations to determine if bribery had occurred.   Those calls for investigation, however, failed to mask the manifest message that Global Witness was doing more than raising a question of bribery, it was asserting bribery, pure and simple. Christiana Tah's and Randolph McClain's Complaint here thus rests on reality.   Their Complaint is grounded on what was *actually communicated* to ordinary reasonable average readers of the *Catch me if you can* Global Witness Report.   What was *actually communicated*, and what Global Witness clearly *intended* to communicate, was that Christiana Tah and Randolph McClain each took a bribe in exchange for their roles in the Exxon purchase of Block 13. Complaint, ¶ 30.

The common law of defamation is grounded in the common sense of the community.   That lawyers and editors may have plied their trade to avoid too much outright repetition of the "B-Word" and the unequivocal assertion that Christiana Tah and Randolph McClain were complicit in bribery does not insulate Global Witness when accusations of bribery were plainly and intentionally communicated.   *Afro–American Publishing Co*., 366 F.2d at 655 ("In determining what the 'gist' of a statement is, the jury is not bound by technical meanings of terms such as 'misappropriation' . . . , which appellants contend accurately portrayed Stockard's conduct because she used disbursed funds in a manner inconsistent with department policy. Rather, the "publication must be taken as a whole, and in the sense in which it would be understood by [those] to whom it was addressed.")

6

This Court must read the Global Witness *Catch me if you can* Report for itself, placing itself in the mindset of the average reader. *Olinger v. American Savings & Loan Association*, 409 F.2d 142, 144 (1969) (per curiam).  The Court is not to read the report as a judge, lawyer, or scholar would read it, but simply as an average reader within the audience to which it was directed would read it.  "What counts is not the painstaking parsing of a scholar in his study, but how the newspaper article is viewed through the eyes of a reader of average interest."  *Afro-American Publishing*, 366 F.2d at 655.  "The trial judge has the responsibility to determine whether the statements in question are capable of carrying a defamatory meaning; only when the court can say that the publication is not reasonably capable of any defamatory meaning and cannot reasonably be understood in a defamatory sense, can it rule as a matter of law that it was not libelous." *Howard University v. Best*, 484 A.2d 958, 989 (D.C. 1984).

This Court must therefore consider, applying this standard, how average readers *could* have understood the Global Witness Report.  On pages 14 and 15 of the *Catch me if you can* Report, Global Witness presented a "Timeline of events for the award of Block 13 in Liberia."  The pages consist of an elaborate chart with lines indicating major events from 1995 to 2018 involving Block 13.  The chart plainly communicates to readers that the purchase of Block 13 by Exxon was a continuation of an ongoing story of corruption surrounding the sale of Block 13, including Exxon's purchase.  Of special importance are three events linked by yellow lines on the chart all plainly describing payments made in 2013 as corrupt.  Those events, stacked one on top of the other and visually linked, state:

> March 26, 2013: NOCAL makes $17,880 suspicious payment to Senator Cletus Wotorson, Chairman of the Senate's Lands, Mines, Energy and Environment Committee
> March 26, 2013: NOCAL makes $163,030 suspicious payment to Boima Folley Sports Center, headed by House of Representatives Deputy Director for Communications

May, 2013: NOCAL makes $210,000 worth of unusual, large payments to Liberian Government officials, including Finance Minister, Justice Minister, Mining Minister, and NOCAL Board Chairman. *Catch me if you can* at 15.  Complaint, ¶ 43.

Page 16 of *Catch me if you can* asserts that the earlier acquisition by BCP of Block 13 was effectuated by bribery, through a "bribery fund" paid to NOCAL.  Page 16 thus reinforces the message of the time chart on Pages 14 and 15 that payments to Christiana Tah, Randolph McClain, and others were similar bribes paid for through a bribery fund operated by NOCAL, funded through the proceeds of Exxon's purchase of Block 13. Complaint, ¶ 44.

On page 19 of the *Catch me if you can* Report, a "sidebar" feature appearing against a dark brown background describes "The People With A Hand in Exxon's Block 13 Deal."  Referencing the payments received by Christiana Tah, Randolph McClain and others, described in greater detail subsequently in the Report, this passage plainly communicates to readers that the payments were received as a *quid pro quo* for approval of the Exxon purchase.  The critical passage communicating this linkage reads:

> As described in further detail below, multiple members of the Liberian Government signed the Block 13 deal. These officials received large payments from NOCAL after they signed.

*Catch me if you can* at 19. Complaint, ¶ 44.

Page 30 of *Catch me if you can* begins the most devastating defamatory group of passages in the Global Witness Report.  It begins with the sensational heading:

**Monrovia, 2013:**
**AWASH IN CASH**
**SOME UNUSUAL, LARGE PAYMENTS**

*Catch me if you can* at 30. Complaint, ¶ 47.

The *Catch me if you can* Global Witness Report then brings on the salvo: "Evidence seen by Global Witness also suggests that unusual, large payments were made by NOCAL to Liberian

Government officials in connection with the 2013 award of Block 13." *Catch me if you can* at 30. This passage does double-duty.  By this point, in any ordinary reasonable average reader's understanding of the Global Witness Report, the phrase "unusual, large payments" has come to be clearly understood as the Global Witness wink-and-a-nod code for "***Bribe!***"  This introductory sentence on Page 30 carries yet another nefarious purpose.  It deliberately implies the existence of undisclosed "Evidence seen by Global Witness," suggesting to the reader that there is even more proof of crime against Christiana Tah, Randolph McClain, and others than Global Witness can fully reveal.  The passage also implies that Christiana Tah, Randolph McClain, and others have evil deeds to hide, hidden conspiracies involving bribery and corruption.  The defamatory meaning of this passage coincides with the statement prominent on Global Witness' website describing its mission, which states: "Global Witness exposes *the hidden links* between demand for natural resources, *corruption*, armed conflict and environmental destruction." (Emphasis supplied). Complaint, ¶ 48.

While Global Witness sarcastically derides Christiana Tah and Randolph McClain for their detailed demonstration of the actual communicative impact of the Global Witness Report, accusing them of "conjuring" an accusation that does not exist, the conjuring is in fact all on Global Witness, conjuring an antiseptic reading of its Report that was plainly never intended when the Report was released, with all its accompanying sensationalist hoopla.  The law not only allows, but *requires* the Court to take into account all the surrounding colorations that impacted the meaning of the Global Witness Report.  *Southern Air Transport, Inc.  v. American Broadcast Companies, Inc.,* 877 F.2d 1010, 1015 (D.C. Cir. 1989) ("We must also take into account the impact of the visual effects as well as the text because 'the television medium offers the publisher the opportunity, through visual presentation, to emphasize certain segments in ways that cannot be ascertained from

a mere reading of the transcript.'") *quoting Lasky v. ABC*, 631 F.Supp. 962, 970 (S.D.N.Y.1986), *and citing Tavoulareas*, 817 F.2d at 779 ("entire context" of story must be considered).

The Global Witness Report was printed, not televised, but the full graphic impression still matters—the colors, the charts, the arrows, the side-bars, the careful turns of phrase—all of them count in the mix. "Only by considering the text in conjunction with the accompanying visual images can one understand the possible emotive impact of the story, as it is the juxtaposition of the audio and visual elements that conveys the meaning intended." *Southern Air Transport,* 877 F.2d at 1015.

In assessing the defamatory impact of the Global Witness Report, this Court is also entitled and obligated to view it through the prism of all those in the Liberian, American, and world-wide communities who knew and admired Christiana Tah and Randolph McClain as conscientious public servants dedicated to the people of Liberia and the triumph in Liberia of the rule of law. It is difficult to imagine a Report more devastating to their reputations, and all that their lives have stood for. *See Nyambal v. Alliedbarton Sec. Servs., LLC,* No. CV 14-1904 (EGS), 2018 WL 5045332, at *5 (D.D.C. Oct. 17, 2018) (A statement is "defamatory" if it tends to injure the plaintiff in his trade, profession or community standing, or lower him in the estimation of the community.)

The *Catch me if you can* Global Witness Report was all about lowering the esteem of Christiana Tah and Randolph McClain, among others. The Report thus trumpeted: "In the month following the award of Block 13 to Exxon, NOCAL paid $210,000 to six key Liberian Government officials who signed the Exxon deal – $35,000 per official. These officials were National Investment Commission Chairman Natty Davis, Finance Minister Amara Konneh, NOCAL CEO Randolph McClain, Mining Minister Patrick Sendolo, NOCAL Board Chairman Robert Sirleaf, and Justice Minister Christiana Tah." *Catch me if you can* at 30. Complaint, ¶ 49.

10

Again, using its technique of signaling to the reader that Global Witness asserts these payments to be bribes, while cleverly avoiding outright statement of the "b-word," *Catch me if you can* states: "Global Witness believes these payments to be unusual. According to NOCAL bank records covering several years surrounding this date, except for smaller yearly bonuses paid shortly before Christmas, there is no sign of equivalent bonuses during this time. Block 13 was the only oil license awarded during the period." *Catch me if you can* at 30.  Complaint, ¶ 50.

One of the style conventions used throughout the *Catch me if you can* Report is to always place the words "bonuses" in quote marks, as part of a snidely constructed sentence that clearly is intended to communicate to readers that the words like "bonus" or "bonuses" are nothing but thinly disguised shamefaced cover-ups for what are in reality just plain bribes.  Global Witness thus sarcastically sneers that these payments were "*called*" "bonuses," plainly intimating that whatever they were *called*, they were actually bribes: "These payments were called 'bonuses' by NOCAL and were made to the officials because they were members of Liberia's Hydrocarbon Technical Committee (HTC), the inter-ministerial body responsible for signing Liberia's oil licenses. They appear also to be linked to the HTC's signing of Block 13." *Catch me if you can* at 30. The final sentence in this passage, which states that the payments were "linked to the HTC's signing of Block 13," was also intentionally defamatory.  By saying "linked to" Global Witness plainly intended for readers to understand, as any ordinary reasonable average reader *would* understand, that Global Witness meant *corruptly linked*, as in *quid pro quo* bribery—pay us these payments and we will grease the deal.  Complaint, ¶ 51.

Global Witness may huff and puff all it wants in arguing here that all of these statements were innocent.  But that is jury argument, not the stuff of a Motion to Dismiss. *Olinger v. American*

*Savings & Loan Association*, 409 F.2d at 144  ("It is apparent that both charges are at least capable of defamatory meaning. It is for the jury to determine whether the statement was so understood.")

Global Witness repeatedly clings to the truism that many of the subsidiary facts recited in its Report are true.  To the law of defamation, however, this does not matter, if the arrangement and concomitant implication of the facts presented communicates a darker defamatory innuendo. *White v. Fraternal Order of Police*, 909 F.2d at 518 ("Furthermore, District of Columbia law, which governs this diversity case, clearly contemplates the possibility that a defamatory inference may be derived from a factually accurate news report: 'As to the falsity of the broadcast, appellant conceded in his deposition that both the WTOP–TV news broadcast and the film strip were accurate and true.... However, in determining whether the broadcast was defamatory in light of extrinsic facts, as appellant claims, the trial court must decide if the words (and herein, the accompanying film strip) are reasonably susceptible of or reasonably could be understood to have the meaning suggested by the innuendo.'") *quoting Harrison v. Washington Post Co.*, 391 A.2d 781, 783 (D.C. 1978).

Global Witness thus communicated to ordinary reasonable average readers that these payments were corrupt because of their size: "Global Witness calculates that the payments represented a 160 percent increase on the reported highest salary paid to a Liberian minister. Robert Sirleaf, however, was working for free according to newspaper reports. Yet he also received a $35,000 payment. For more detail on these payments, see the chart on page 31." *Catch me if you can* at 30.  The explicit reference to the "chart on page 31" openly acknowledges that Global Witness intended for its various graphic and sensationalist charts, spread throughout the Report, to reinforce the shocking and defamatory meaning of its textual narrative.  Complaint, ¶ 52.

12

The next passage in the Global Witness Report is crucial.  The next passage deliberately and explicitly links everything that Global Witness has been overtly communicating to readers to the crime of bribery under Liberian law: 'Under Liberian criminal law, a bribe is defined as a payment given so a public servant will undertake an official act." *Catch me if you can* at 30. Complaint, ¶ 53.

The Global Witness Report then makes explicit one of the most egregious, outrageous, utterly inexcusable juxtapositions of its Report.  Global Witness cynically and callously set out to destroy the reputation of Christiana Tah and Randolph McClain, who had been crusaders against corruption and worked tirelessly for the betterment of Liberia, through a trite and simplistic syllogism.  The original 2006 and 2007 events surrounding the sale of Block 13 to BCP, Global Witness said to readers, was clouded in corruption.  It therefore followed, Global Witness told readers, that the *new* resale of Block 13 *must also* have been tainted: "In 2006 and 2007, NOCAL made payments to members of the Liberian legislature to ensure the original award of Block 13 to BCP (see section called Bribery to get Broadway/ Peppercoast Block 13). In that case, NOCAL's payments – then called 'lobbying fees' – were made to government officials who had the power to approve an oil license. These 2006 and 2007 payments have been classified as bribes by the Liberian Government's General Auditing Commission." *Catch me if you can* at 30. The defamatory meaning of this passage is obvious.  In 2007, the original sale of Block 13 was tainted by bribes, which were disguised under the euphemism "lobbying fees."  In 2013, the sale of Block 13 was also tainted by bribes, this time disguised under the euphemism "bonuses." Complaint, ¶ 54.

Again repeating a theme prominent throughout the *Catch me if you can* Report, Global Witness on page 31 included a note attempting to cement the link between the payments to

Christiana Tah, Randolph McClain and others and Exxon itself: "Note: All payments made by NOCAL derived from the same bank account. It is likely that the $5 million paid by Exxon to NOCAL was also deposited into this account." *Catch me if you can* at 30.  Complaint, ¶ 55.

###### F.     Readers Understood the Report as Alleging Bribery

To be actionable as defamation, the Court need only determine that an average reader *could* have understood the Global Witness Report as alleging that Christiana Tah and Randolph McClain each took a bribe.  The best demonstration that an average reader *could* so understand the Global Witness Report is that readers in fact *did* so understand the Report.  Other courts have recognized that while "Readers' conclusions alone do not establish liability for defamation . . . comments lend support . . . regarding the gist of the article." *Moldovan v. Polito*, No. 05-15-01052-CV, 2016 WL 4131890, at *10 (Tex. App. Aug. 2, 2016); *accord*, *Backes v. Misko*, 486 S.W.3d 7, 26 (Tex. App. 2015).

Letters to the Editor of *Front Page Africa* from readers around the world interpreted the *Catch me if you can* Report as alleging corruption and bribery.  One such letter, for example, which was published by *Front Page Africa*, took umbrage at the gist of the Global Witness attack on Christiana Tah:

> I am appalled that Global Witness so cavalierly defames a great Liberian and a woman of undoubted integrity.
>
> To suggest that she was corrupted by EXXON in relation to its acquisition of rights to Block 13 is ludicrous. And those who have been positively affected by her exemplary conduct as Justice Minister know this to be true. And I believe that you are one of those who have been so positively affected (by Christiana Tah's exemplary conduct).

Lennart Dodoo, "Defending Former Justice Minister Christiana Tah in Global Witness' Report On Exxon," *Front Page Africa*, April 11, 2018, (reprinting letter to the editor by Jim Dube from Toronto,      Canada),      available      at:      https://frontpageafricaonline.com/opinion/letters-

comments/defending-former-justice-minister-christiana-tah-in-global-witness-report-on-exxon/

Complaint, ¶ 69.

### G.     Media Accounts of the Report Described it as Alleging Bribery

News organizations world-wide, reporting on the *Catch me if you can* Global Witness Report, summarized the Global Witness Report as accusing Christiana Tah, Randolph McClain, and others of corruption and taking bribes to approve the Exxon Block 13 purchase.  Complaint, ¶ 70.

An article in *Front Page Africa* thus summarized the *Catch me if you can* Report as alleging bribery, stating: "In March, NOCAL became a subject of interrogation again when Global Witness released its stunning report, Catch Me If You Can, that alleged that several Board members and members of the Hydrocarbon Technical Committee received bribes to the sign off on Block-13 to ExxonMobil."   Lennart Dodoo, "Pres. Weah 'Ignores' Special Task Force Recommendation, Appoints New Team to NOCAL," *Front Page Africa*, June 20, 2018, available at: https://frontpageafricaonline.com/news/liberia-pres-weah-ignores-special-task-force-recommendation-appoints-new-team-to-nocal/   Complaint, ¶ 72.

An article in *Newsweek* summarizing the Global Witness report similarly communicated that Global Witness was implying corruption in the consummation of the Exxon Block 13 deal. The *Newsweek* article stated: "Under the leadership of former Secretary of State Rex Tillerson, oil giant Exxon Mobil signed a $120 million deal for an oil block in Liberia that company officials knew was rife with corruption, according to a new investigation by the transparency organization Global Witness."   Christina Maza, "Rex Tillerson's Exxon Mobil Involved in Corrupt Oil Deals in Liberia, Investigation Reveals."   *Newsweek*, March 29, 2018, available at:

http://www.newsweek.com/rex-tillersons-exxon-mobile-involved-corrupt-oil-deals-liberia-investigation-866026.  Complaint, ¶ 72.

Echoing the theme that Exxon funneled money to bribe Christiana Tah, Randolph McClain and others, the *Newsweek* article continued, "The six Liberian officials who approved Exxon's purchase were also simultaneously awarded suspicious payments of over $200,000 . . . according to the report." *Id.*   The *Newsweek* article then channeled the sinister suggestion of the Global Witness Report that the payments came from the same bank account in which Exxon had deposited its funds: "'The payments were probably made from the same bank account into which Exxon had just deposited $5 million for Block 13, although there is no evidence that Exxon itself directed or knew about payments to officials,' according to the report.'"   Complaint, ¶ 73.

H.     **The Liberian Government Understood the Global Witness Report As Alleging that Christiana Tah, Randolph McClain and  HTC Members Had Accepted Bribes**

The ultimate proof that the *Catch me if you can* Global Witness Report *could* have been reasonably understood as conveying the assertion that Christiana Tah, Randolph McClain, and others on the HTC accepted bribes is that this was how the President of Liberia and others in the Liberian government *in fact understood* the Global Witness Report.  Liberian President George Manneh Weah succeeded Ellen Sirleaf as the President of Liberia in 2018.  Following publication of the *Catch me if you can* Global Witness Report, President Weah appointed a Special Presidential Committee to investigate the allegations of bribery against Christiana Tah, Randolph McClain, and others identified in the Global Witness Report.  The Special Presidential Committee issued its findings in May 10, 2018.  *Report of the Special Presidential Committee Appointed to Examine the March 2018 Global Witness Report of the National Oil Company of Liberia (NOCAL)* ("*Special Presidential Committee Report*.")  Complaint, ¶ 74.

16

The *Special Presidential Committee Report* officially confirmed what all people of ordinary common sense already knew—that the gist and sting of the *Catch me if you can* Global Witness Report was that Christiana Tah, and Randolph McClain, and others had accepted bribes to effectuate the Exxon purchase of Block 13.  In the words of the *Special Presidential Committee Report*:

> His Excellency, **George Manneh Weah**, President of Liberia. constituted a five-member Special Presidential Committee (SPC) to examine the allegations of March 2018, made by **Global Witness (GW)**, an international anti-corruption watchdog based in London alleging, amongst other things, that in negotiating the Concession agreement between ExxonMobil and the Government of Liberia for Liberia's offshore Oil Block LB13, some prominent Liberian government officials who led the negotiation received bribe in amounts ranging up to US $35,000 each. The report specifically named:
>
> 1.   Cllr. Christiana Tah (Fmr. Minister of Justice and Attorney General, R.L)
> 2.   Mr. Amara Konneh (Fmr. Minister Finance and Development Planning)
> 3.   Mr. Robert Sirleaf (Fmr. Chairman, Board of Directors of NOCAL during the period under review)
> 4.   Mr. Natty B. Davis (Fmr.  Director General, the National Investment Commission of Liberia)
> 5.   Mr. Patrick Sendolo (Fmr. Minister Lands, Mines and Energy) and
> 6.   Mr. Randolph A.K.W McClain ( Fmr. Member of Board; Secretary of Board at some point, NOCAL)

*Special Presidential Committee Report* at 3 (Bold emphasis in original).  Complaint, ¶ 75.

The *Special Presidential Committee Report* articulated its mandate as a duty to "Examine the authenticity of the allegation contained in the Report issued by Global Witness on Liberia of March 2018," which it elaborated as requiring analysis of the more specific duty to "Determine if the individuals specifically and collaterally named in the Report indeed received perquisite, emoluments or benefits, directly or indirectly, on account of any duty required of them by the Government and, if yes, determine whether or not the amount so paid and received constitutes **<u>Bribe</u>** under our law." *Special Presidential Committee Report* at 4 (Emphasis in bold and underline in original).  Complaint, ¶ 76.

The *Special Presidential Committee Report* accurately summarized the *Catch me if you can* Global Witness Report as a "three-prong" story.   In the words of the *Special Committee Report*:

> Clearly, from the preamble, the Report is three-prong:
>
> 1.   The story about Bribery, apparently, involving Liberian officials;
> 2.   Efforts by Exxon to by-pass US Anti-Corruption Law, by turning blind eyes to probable incidents of corruption in poor countries/locations, like Liberia, where they operate; and
> 3.   About how the United States can support efforts to mitigate corruption in all dealings involving its national corporations and the local countries where these companies operate.

*Special Presidential Committee Report* at 11.  Complaint, ¶ 77.

The *Special Presidential Committee Report* limited its inquiry to the first of these prongs: "This Committee, by its mandate, will limit itself to count 1 thereof that is: 'Story about Bribery, apparently involving Liberian officials'."  *Special Presidential Committee Report* at 11. In short, the current government of Liberia read the Global Witness Report exactly as the Global Witness Report invited readers to read it, and exactly as ordinary average readers did read it, and exactly as other media organizations read it.  All of them read it as impugning Christiana Tah, Randolph McClain and other HTC members for accepting bribes to effectuate the Exxon Block 13 purchase deal.  Complaint, ¶¶ 78-79.

## I.   Summary

In sum, the text of the Global Witness report overwhelmingly implied bribery.  On its face, that construction is plainly *one* reasonable construction.  Moreover, for this Court to hold that the construction Christiana Tah and Randolph McClain place in the Report is not reasonable, the Court would necessarily have to hold that readers who posted comments, news organizations such as

*Front Page Africa* and *Newsweek*, and the Liberian Government itself were all *unreasonable* in their reading of the Report.

## II.  THE DEFAMATORY STATEMENTS ARE NOT OPINION

### A.     The Controlling *Ollman* Test

Global Witness, perhaps sensing the implausibility of its opening argument that its Report cannot be read as implying that Christiana Tah and Randolph McClain took bribes, proceeds to advance an alternative back-up position.  The imputations of bribery, Global Witness asserts, are mere expressions of opinion.   The argument is conceptually incoherent, and under the circumstances here, utterly unpersuasive.

In 1984 the District of Columbia Circuit, sitting *en banc*, adopted a four-prong test for separating fact from opinion, in *Ollman v. Evans*, 750 F.2d 970, 979 (D.C. Cir. 1984).  *Ollman* continues to be applied by District Courts in this Circuit. *See Fairbanks v. Roller*, 314 F. Supp. 3d 85, 90 (D.D.C. 2018) (applying the four-part *Ollman* test).  Under the first fact, courts "analyze the common usage or meaning of the specific language of the challenged statement itself." *Ollman*, 750 F.2d at 979. The "analysis of the specific language under scrutiny will be aimed at determining whether the statement has a precise core of meaning for which a consensus of understanding exists or, conversely, whether the statement is indefinite and ambiguous."

### B.     There is No Textural Ambiguity

Applying the first *Ollman* factor here, there is nothing whatsoever that is ambiguous about imputations of bribery.  The term "bribe" has a distinct meaning, well-established over centuries in Anglo-American law, as well as the law of Liberia.  The *Special Committee Report* invoked this well-established meaning its it report, quoting precedent from the Supreme Court of Liberia: "The Honorable Supreme Court of Liberia in the matter: *Andrew et al v Gardner* et al; 10 LLR 389

(1951), held that 'Bribery involves a promise to give, or an acceptance of money or other thing of value. Almost anything may serve as a bribe as long as it is of sufficient value in the eyes of the person bribed to influence his official conduct.'" *Special Committee Report* at 13; Complaint ¶ 81.

The argument advanced by Global Witness is indistinguishable from an identical argument advanced by the Appellant and rejected by the Court of Appeals *en banc* in *Afro-American Publishing*, 366 F.2d at 655 ("Appellant contends that as a matter of law the article is not libelous, since Mr. Stone did not flatly state that plaintiff was prejudiced, and because it is not a statement of fact about plaintiff's conduct but a statement of opinion about his attitude. Where readers would understand a defamatory meaning liability cannot be avoided merely because the publication is cast in the form of an opinion, belief, insinuation or even question.").

### C.    The Existence or Non-Existence of Bribery is Verifiable

The Second *Ollman* factor is verifiability.   The Court is to "consider the statement's verifiability—is the statement capable of being objectively characterized as true or false?" *Ollman*, 750 F.2d at 979.   As applied here, the second *Ollman* factor cuts decisively in favor of Christiana Tah and Randolph McClain.   Bribes are bribes.   They either took place or they did not. *Ollman* instructed, "Insofar as a statement lacks a plausible method of verification, a reasonable reader will not believe that the statement has specific factual content." *Id.* Plainly, courts are perfectly equipped to verify the existence of briber [check].   In litigation, such determinations are routinely entrusted to the triers of fact, who decide the matter based on evidence, not speculation. *Id* ("And, in the setting of litigation, the trier of fact obliged in a defamation action to assess the truth of an unverifiable statement will have considerable difficulty returning a verdict based upon anything but speculation.") *Id.*   The entire criminal law of bribery is built on the supposition that

the existence or non-existence of a bribe payment is a *fact*, which may be objectively proven or disproven.  Individuals are sent to prison on the confidence of the legal system that the existence of bribery may be established as a fact.

A case on point is *Jankovic v. International Crisis Group* ("*Jankovic II*"), 593 F.3d 22 (D.C. Cir. 2010).  The *Jankovic* litigation, which stretched for nearly a decade and resulted in three decisions by the Court of Appeals, centered on a report by an international watchdog group, International Crisis Group, that could be construed as implying that a Serbian business leader, Philip Zepter (previously known as Jankovic), had been a corrupt "crony" of the infamous "Buther of the Balkans," the war criminal Slobodan Milosevic.  The Defendant International Crisis Group, focusing on the word "crony," argued, in much the same manner as Global Witness argues here, that the statements, to the extent they were defamatory at all, were mere opinion.  The Court of Appeals rejected this assertion, for the reasons articulated here by Christiana Tah and Randolph McClain. Such imputations of bribery and corruption are perfectly capable of verifiability.  Courts do it all the time: "But regardless of whether that epithet is verifiable standing alone, the question here is the verifiability of ICG's assertions that the plaintiff 'gave' 'support' to Milosevic (sentence 6), and that he gave support 'in exchange for favorable treatment' (as the prior panel summarized the reasonably understood meaning of the relevant sentences, see 494 F.3d at 1091). To resolve the issue of 'verifiability,' we need not probe arcane matters of epistemology; both propositions are verifiable in the practical sense that our legal system is ready to make decisions on the basis of how such issues are resolved-decisions profoundly impacting people's lives." *Jankovic II*, 593 F.3d at 27, *citing Jankovic v. International Crisis Group*, 494 F.3d 1080, 1091 (D.C. Cir. 2007) ("*Jankovic I*")

To punctuate the point made in *Jankovic*, the government of Liberia here understood its investigation into the payments at issue as a *bribery investigation*, which it launched in response to what the government of Liberia understood as allegations of bribery made by Global Witness, ultimately concluding in no uncertain terms that the payments to Christiana Tah, Randolph McClain, and other HTC members were *not* bribes.  *Special Committee Report* at 13.  Complaint ¶ 81.

### D.      The Entire Context of the Report Supports the Bribery Imputation

The third *Ollman* factor moves from the allegedly defamatory language itself to "the full context of the statement—the entire article or column, for example—inasmuch as other, unchallenged language surrounding the allegedly defamatory statement will influence the average reader's readiness to infer that a particular statement has factual content."  *Ollman*, 750 F.2d at 979.  As demonstrated in the careful explication of the entire Global Witness *Catch me if you can* Report above (which will not be repeated here), *everything* in the Global Witness Report was deliberately calculated to lead readers to the conclusion that Global Witness is asserting, *as a fact*, that the payments made to Christiana Tah and Randoph McClain were bribes.

### E.      The Broader Social Context Supports the Imputation of Bribery

### 1.      No Full Disclosure Existed

Finally, the fourth *Ollman* factor focuses on the "broader context or setting in which the statement appears."  *Id.*  The Court in *Ollman* particularly focused on the genre of the publication. "Different types of writing have, as we shall more fully see, widely varying social conventions which signal to the reader the likelihood of a statement's being either fact or opinion."  The fourth *Ollman* factor cuts overwhelmingly against Global Witness.

Global Witness, like International Crisis Group in *Jankovic*, sought immunity on the theory that it had fully disclosed the predicate facts upon which its purported "opinion" was based.   In rejecting this argument in *Jankovic II*, the Court of Appeals correctly observed, at the threshold, that under the Supreme Court's landmark decision in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990) "the First Amendment gives no protection to an assertion 'sufficiently factual to be susceptible of being proved true or false,' *id.* at 21, even if the assertion is expressed by implication in 'a statement of 'opinion,'" *Jankovic II*, 593 F.2d at 27, *quoting Milkovich*, 497 U.S. at 21.

Cutting to the chase, the Court in *Jankovic II* exposed the flaw in the reasoning of the International Crisis Group, which is *exactly* the flaw in the position of Global Witness advanced here.   The predicate facts that were allegedly fully disclosed to readers, in both instances, ultimately offered no logical support for the so-called "opinions" they purported to justify.   In Zepter's case, the *Jankovic II* Court explained, the government materials upon which the International Crisis Group claimed to have relied upon and fully disclosed did not offer any justification for the assertion that Zepter was a corrupt crony of Milosevic or that Zepter had supported Milosevic in exchange for favorable treatment.

Exactly the same disconnection exists here.   It is undisputed that Christiana Tah and Randolph McClain received checks for $35,000, along with others paid similar bonuses for the successful conclusion of the Exxon Block 13 deal.   But Global Witness cannot prevail in this case merely because it disclosed the facts surrounding those payments, when there is absolutely *nothing* in anything disclosed by Global Witness to support the additional defamatory imputation that the payments were bribes, or otherwise corrupt. What is missing for Global Witness is exactly parallel to what was deemed missing for International Crisis Group in *Jankovic II.* The Court in *Jankovic II*, for example, drew an explicit parallel to allegations of bribery:

23

> Similarly, whether support is offered in exchange for favorable treatment is analogous to the factual inquiry underlying the offense of bribery. See 18 U.S.C. § 201(b) ("Whoever ... directly or indirectly, corruptly gives, offers or promises anything of value to any public official ... with intent ... to influence any official act ... shall be fined ... or imprisoned for not more than fifteen years, or both."). If such points are verifiable enough to be the bases for prolonged detention, they are surely (at least in the potentially defamatory constructions understood by the prior panel) verifiable enough for defamation liability.

*Jankovic II*, 593 F.2d at 28.  The Court then exposed the flaw in the proffered "full disclosure" of

the International Crisis Group:

> As part of its "opinion" argument, ICG says that the "factual basis for the connection between Zepter and the Milosevic regime that this Court held could be gleaned from [Report 145] is fully disclosed to the reader," and that therefore ICG should be immune under the doctrine that "a statement of opinion that is based upon true facts that are revealed to readers ... [is] generally ... not actionable so long as the opinion does not otherwise imply unstated defamatory facts." ICG Br. at 29 (quoting *Moldea I*, 15 F.3d at 1144-45). But as we explained above, the proposition that we said a reasonable reader could derive from Report 145-that Zepter supported the Milosevic regime or "the parallel structures that characterised his regime"-is based on ICG's assertions in sentences 5 and 6 that Zepter or Zepter Banka appeared on the frozen assets list because of support that was provided to Milosevic. Though Zepter Banka did appear on the frozen assets list, there is no evidence in the record that its appearance was based upon support for Milosevic, as opposed its simply being a financial institution in the region (and therefore automatically listed).

> *Id., quoting Moldea v. New York Times Co.*, 15 F.3d 1137 (D.C. Cir. 1994), *modified*, 22

F.3d 310 (D.C. Cir. 1994). Just as in *Jankovic*, in this case a reasonable reader could draw the

conclusion that Global Witness was accusing Christiana Tah and Randolph McClain of taking

bribes, and just as in *Jankovic*, nothing in the predicate facts disclosed lends any support for that

damning accusation.  To the contrary, Global Witness deliberately signaled to its readers that it

was in possession of evidence that it had *not* disclosed in the report, which supported its damning

accusations.  Page 7 of the *Catch me if you can*  Global Witness Report thus made the bald

assertion:" Evidence seen by Global Witness also suggests that Exxon's 2013 deal was surrounded

by unusual, large payments. This evidence shows that, in the month following the sale of Block

13 to Exxon and COPL, Liberia's oil agency paid $210,000 to Liberian officials who authorized the deal." *Catch me if you can* at 7.  Complaint ¶ 38.  This statement manifestly implies the existence of *undisclosed* facts, couched in the code words Global Witness adopted to communication allegations of bribery.

Under District of Columbia Law, an incomplete disclosure disqualifies a defendant from the shelter of the opinion defense.  Instead, "to claim this form of protection from liability, the facts on which the purported opinion is based must be accurate and complete." *Competitive Enterprise Institute v. Mann*, 150 A.3d 1213, 1246 (D.C. 2016).  When statements ostensibly couched as hyperbole or opinion convey defamatory facts, the statements are actionable and the suit must not be dismissed.  *Id.* at 1247 ("Even allowing for the use of hyperbole in the public discussion about global warming, we conclude that the statements in Mr. Simberg's article that Dr. Mann acted dishonestly, engaged in misconduct, and compared him to notorious persons, are capable of conveying a defamatory meaning with the requisite constitutional certainty and included statements of fact that can be proven to be true or false.").

### 2.    The Genre of the Global Witness Report Supports the Imputation of Bribery

Finally, in applying the fourth factor in *Ollman*, this Court should consider the genre of the Global Witness Report, and how Global Witness presents itself, and presented this Report, to the world.  This was no editorial in the *The Washington Post* or *The Wall Street Journal*.  This was no skit on *Saturday Night Live*. *See Milkovich* 497 U.S. at 32-33 (Brennan, J., dissenting) ("Certain formats—editorials, reviews, political cartoons, letters to the editor—signal the reader to anticipate a departure from what is actually known by the author as fact."), *citing Ollman v. Evans*, 750 F.2d, at 986, and Rodney Smolla, *Law of Defamation* § 6.12(4), n. 252 (1990) (collecting cases).  In contrast, investigative reports such as the Global Witness report present themselves to the

marketplace, particularly to policy-makers and decision-makers in the public and private sector, as serious independent *fact-finders*.

According to its published mission statement, Global Witness specializes in "global witness investigation." Complaint, ¶ 5. The mission of Global Witness is "exposing economic networks behind conflict, corruption, and environmental destruction." Complaint, ¶ 5. Pointedly, *Catch me if you can* presented itself to readers as detailed watchdog investigative fact-finding, a report tailored to members of Congress, federal agencies, and the larger public setting out what Global Witness had *found* regarding the oil transactions in Liberia. Again, the *Jankovic* litigation is instructive. Global Witness is an organization precisely like the International Crisis Group in *Jankovic*, which produced a report precisely like the report giving rise to the *Jankovic* litigation. *See also Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 277–78 (D.D.C. 2017) ("It is also significant that, unlike in *Abbas I*, the statements at issue in the instant case were published as part of an editorialized documentary that features a discernable theme and a story line— circumstances that, together, more readily imply that the reported statements represent the tested positions of the investigators.")

### III. THE FALSE LIGHT CLAIM RESTS ON STATEMENTS "OF AND CONCERNING" THE PLAINTIFFS

The lead argument advanced by Global Witness for dismissal of the false light claims brought by Christiana Tah and Randolph McClain is that the allegations made by Global Witness that the payments of $35,000 to them were corrupt are not "of and concerning" Christiana Tah or Randolph McClain. *Motion to Dismiss* at 27-28. Global Witness asserts that the "of and concerning" element of a false light claim is identical to the "of and concerning" element of a defamation claim. Global Witness is correct. On this issue, the parties have no quarrel.

It is obvious that the defamation claim brought by Christiana Tah and Randolph McClain, grounded in the supposition that the *Catch me if you can* Report was susceptible to the reasonable reading that the two of them were guilty of receiving bribes, was "of and concerning" them. Global Witness does not assert the contrary. So the question then becomes, if the defamation claim arising from the allegation that the $35,000 payments to Christiana Tah and Randolph McClain were bribes is plainly "of and concerning" the two Plaintiffs, how on earth can the false light claims, based on the *same payments* to the *same plaintiffs*, be anything other than "of and concerning" those same plaintiffs? On this score, the Global Witness Motion to Dismiss is just incoherent.

In the interest of efficiency, in pleading their false light claim, Christiana Tah and Randolph McClain followed the customary and entirely appropriate practice of re-pleading and incorporating by reference their lengthy allegations in their defamation count. Lest there be any misunderstanding, however, they also specifically alleged that the *Catch me if you can* Report, in repeatedly and incessantly using terms such as "large, unusual payments," "suspicious payments," and "corruption" to describe the Exxon Block 13 deal and Christiana Tah's and Randolph McClain's participation in the Exxon Block 13 negotiation, was directed specifically at them. Complaint ¶ 105.

Global Witness cites three cases for its claim that the charges that the $35,000 payments to Christiana Tah and Randolph McClain were corrupt were not actually directed to Christiana Tah and Randolph McClain. The three cases are all of a piece. In each of three cases cited by Global Witness, the falsehood was aimed at someone *other than* the plaintiff. Here, in contrast, the falsehood was aimed directly at Christiana Tah and Randolph McClain.

The first case, *Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 138 (D.D.C. 2017), was a suit brought by Oleg Deripaska, a self-described private investor and industrialist, against

the Associated Press, arising from reports concerning the now-notorious activities of the lobbyist and former Campaign Chair for President Donald Trump, Paul Manafort.  The court held that the statements made by the Associated Press, if they alleged criminal activity all, alleged that activity by Manafort, not Deripaska. The court thus concluded, "The article cannot be read to suggest that Deripaska is personally involved in the Trump campaign controversy or is accused of stealing Ukrainian assets." *Id*. at 148.

The second case, *Coles v. Washington Free Weekly, Inc.*, 881 F. Supp. 26, 33 (D.D.C. 1995), is yet another head-fake.  In *Coles* the court dismissed a claim because the allegedly defamatory activities described actions of a plaintiff's client, not the plaintiff.

The third case, *Abbas v. Foreign Policy Group, LLC*, 975 F. Supp. 2d 1, 19 (D.D.C. 2013), similarly held that allegedly defamatory statements aimed at the plaintiff's father, Mahmoud Abbas, the President of the Palestinian Authority, did not appropriately give rise to defamation claims brought by the father's son, Yasser Abbas.

*Derispaska*, *Coles*, and *Abbas* are all examples of failed attempts to impose vicarious defamation liability, or defamation by association, in which the plaintiff is *not* the target of the false statement, but nonetheless seeks to bring a defamation or false light action on the back of someone who is.  These cases are a world apart from the false light claim here.  The Complaint here alleges that the payments of $35,000 to Christiana Tah and Randolph McClain were deliberately characterized by Global Witness as corrupt.  The plain theory of the Complaint is that Global Witness communicated to readers that these payments were outright bribes.  In the false light count, the Complaint makes parallel allegations that Global Witness portrayed these same payments to these same Plaintiffs as grease-the-palms corruption.

Whether the payments were outright bribes or softer corrupt influencers, they payments were made to the Plaintiffs, and Global Witness portrayed those payments as evil.  It takes two to tango.  A corrupt payment from A to B clearly is "of and concerning" B.  The Court in *Derispaska* held that the AP article was at most about bad things Manafort did.  In contrast, allegations of corrupt payments automatically implicate both the payor and the payee.  The false light claims alleged here are manifestly "of and concerning" Christiana Tah and Randolph McClain, and should not be dismissed.

### IV.  THE FALSE LIGHT CLAIMS SHOULD NOT BE DISMISSED AS OPINION

In asserting that the false light claims should be dismissed as non-actionable opinion, Global Witness simply reprises the identical arguments it raised in asserting that the imputations of bribery that form the gist and sting of the defamation claims are opinion.  As reprise merits reprise, Christiana Tah and Randolph McClain oppose the "opinion defense" interposed by Global Witness on the false light claims for the same reasons they oppose the "opinion defense" on the their defamation claims.   Thus for all the reasons explained in detail as to why Global Witness is wrong in the application of the *Ollman v, Evans* standard as to the defamation claims, Global Witness is wrong in the application of *Ollman* as to the false light claims.

One additional point, peculiar to the false light claim, however, is worthy of emphasis.  The defamation tort and false light torts may be kissing cousins, but they are not identical twins.  To state a claim for false light invasion of privacy under District of Columbia law, a plaintiff must show: "(1) publicity; (2) about a false statement, representation or imputation; (3) understood to be of and concerning the plaintiff; and (4) which places the plaintiff in a false light that would be offensive to a reasonable person." *Doe v. Bernabei & Wachtel, PLLC*, 116 A.3d 1262, 1267 (D.C. 2015).  Defamation and false light are "often analyzed in the same manner, at least where the

plaintiff rests both his defamation and false light claims on the same allegations." *Zimmerman v. Al* Jazeera, 246 F.Supp.3d at 273. "Nevertheless, they are two different claims." *Id, citing Weyrich v. New Republic, Inc.,* 235 F.3d 617, 628 (D.C. Cir. 2001) The two torts are "conceptually distinct" Zimmermann, 246 F.Supp. 3d at 273. The "defamation tort redresses damage to reputation," while "a false light privacy tort redresses mental distress from having been exposed to public view." *Id.* at 274-75.

At this early pleading stage, this Court must simply ask itself this threshold question: Is it plausible that these two proud Liberians, Christiana Tah and Randolph McClain, who have labored hard and with integrity to advance the interests of their professions and nation, would *objectively* find it highly offensive to be portrayed as the recipients of corrupt payments to advance the Exxon purchase of Block 13? The answer to that question is surely an easy "yes." The Court must then ask whether, applying the same principles that attach to the distinction between "fact" and "opinion" that animate defamation law, a reasonable jury *could* find that the article alleges that Christiana Tah and Randolph McClain received corrupt payments for their participation in the Exxon Block 13 deal. In making this assessment, this Court must apply the same rules of the game it applies in the defamation context, including decisions such as *Jankovic II*, 593 F.3d 22, which held that imputations that Philip Zepter was a corrupt crony of Slobodan Milosevic were actionable. The Global Witness *Catch me if you can* report accused Christiana Tah and Randolph McClain of "corruption." That charge of "corruption" was not generalized euphemism, but a fact-laden specific allegation of dishonest, fraudulent, and illegal abuse of power in the negotiation and consummation of the Exxon contract for Block 13. The allegations of corruption here are indistinguishable from those held actionable in *Jankovic I* and *II*. Whether these imputations are true or false, or whether they were rendered with the requisite fault, are issues for another day,

following discovery.  At the pleading stage, however all ties go to the plaintiff.  If in doubt, the Court must not throw it out.

## V.   THE ACTUAL MALICE ALLEGATIONS HERE CANNOT BE DECIDED ON THE PLEADINGS.

### A.   Motions to Dismiss are Not the Same as Summary Judgment

The detailed factual allegations of actual malice offered here contrast sharply with the boilerplate conclusory allegations this Court found wanting in *Hourani v. Psybersolutions LLC*, 164 F. Supp. 3d 128, 144 (D.D.C. 2016).  The Compliant exhaustively pleads factual detail supporting plausible allegations of actual—detail that is at the high ed of what any plaintiff  is likely to have at reasonable avail prior to discovery.  The Global Witness position eviscerates the distinction between motions for summary judgment, and motions to dismiss.   Another District Judge of this Court saw through this tactic and rejected it, in *Zimmerman v. Al Jazeera* 246 F. Supp. 3d at 285.  In *Zimmerman,* Judge Jackson correctly recognized the standards applicable to a motion to dismiss, as applied to actual malice allegations in a defamation case.  It is not enough for a defendant to present argument contradicting a plaintiff's allegations of actual malice.  Nor is a court on a motion to dismiss to weigh competing assertions of credibility.  "This standard means that, when faced with two, equally plausible interpretations of the record facts—that Sly's credibility was doubtful given his unequivocal recantation, on the one hand, and that there was no reason to doubt Sly's veracity because his assertions were generally corroborated, on the other— '[t]he court must view the complaint in a light most favorable to the plaintiff.'" *Id., quoting Mizell v. SunTrust Bank*, 26 F.Supp.3d 80, 85 (D.D.C. 2014).

### B.   Global Witness is Making Jury Argument

Christiana Tah and Randolph McClain have alleged that Global Witness deliberately and callously communicated to readers the defamatory accusation that Christiana Tah and Randolph

McClain accepted a bribe even though at the time of its publication of *Catch me if you can* Global Witness was in possession of ample information discrediting the bribery allegation.   Global Witness subjectively *knew* that it had not been able to determine whether or not the payments of $35,000 to Christiana Tah and Randolph McClain were corrupt bribery payments or an innocent and deserved bonuses. Yet without resolving that subjective doubt, and notwithstanding the material in its possession that generated a high degree of subjective awareness that its story was false, Global Witness proceeded to present to readers the defamatory message that in fact Christiana Tah and Randolph McClain had taken bribes.   To advance its sensationalist agenda, Global Witness presented to readers a bribery charge *as if it knew the charge to be true* when in fact *it knew it did not know*.   Complaint ¶ 85.

In its Motion to Dismiss, Global Witness predictably contests these allegations.   That is fine for jury argument, but will not do on a motion to dismiss. "Boiled to bare essence, this line of argument is really nothing more than a rebuttal to the complaint's allegations of fact, which cannot carry the day at the motion-to-dismiss stage because this Court must accept the complaint's allegations as *true*."   *Zimmerman v. Al Jazeera*, 246 F. Supp. 3d at 285 (emphasis in original).

### C.   A Pre-Conceived Story Line is Probative of Actual Malice

### 1.   A Pre-Conceived Story Line has Been Plausibly Alleged

Christiana Tah and Randolph McClain have plausibly alleged that Global Witness had a pre-conceived story line prior to publishing its *Catch me if you can* Report.   Global Witness was already determined to publish a sensational account accusing Exxon of paying bribes in order to secure the purchase of Block 13.   From the thrust of the *Catch me if you can* Report, it is plain that Global Witness was advancing a partisan agenda, designed to embarrass and discredit Exxon, and its former President Rex Tillerson, the CEO of Exxon who had become the Secretary of State of

the United States under President Donald Trump.  The *Catch me if you can* Report, on its cover

page, thus bears the sub-headline: "Exxon's complicity in Liberian oil sector corruption and how

its Washington lobbyists fight to keep oil deals secret."

Global Witness *had already conceived of this story line* before it ever even completed its

investigation.  Global Witness was determined to make its narrative conform to these sensational

allegations.  The telltale proof came in the form of letters written by Jonathan Gant and Global

Witness to Christiana Tah, Randolph McClain, and others, in which Global Witness directly

accused Christiana Tah, and Randolph McClain, and others of accepting bribes in the amount of

$35,000 as the *quid pro quo* to ensure that Block 13 would be sold to Exxon.  The letter to

Christiania Tah, dated March 7, 2018, thus stated bluntly and brazenly, "we believe that the

payment made by NOCAL to you was most likely a bribe, paid as a reward to ensure that LB 13

was negotiated successfully." With extraordinary arrogance, Global Witness sent this letter to

Christiana Tah on March 7, 2018, accusing her of the felonious crime of bribery, and demanding

a reply by Christiana Tah within one week, by 5:00 p.m. on March 14, 2018.  Complaint ¶ 93.

An essentially identical letter was sent by Global Witness to Randolph McClain on March

2, 2018.  That letter demanded a response by 5:00 p.m., March 9, 2018, B.S.T.  The letter to

Randolph McClain also embraced the pre-conceived story line of the Global Witness Report,

stating, "we believe that the payment made by NOCAL to you was most likely a bribe, paid as a

reward to ensure that LB 13 was negotiated successfully."  Complaint ¶ 92. The pre-conceived

story line and agenda that drove the Global Witness publication of *Catch me if you can* is further

evidenced by other correspondence sent by Global Witness to persons involved in the Exxon

negotiations in the weeks prior to publication.  Global Witness, for example, sent letters to other

Liberian officials accusing them of bribery.  Global Witness received cogent responses from

officials other than Christiana Tah and Randolph McClain, including Natty Davis and Robert Sirleaf, carefully explaining that the payments were not bribes, but bonuses appropriately earned given the extraordinary success of the Exxon negotiations.  Complaint ¶ 95. So too, in March 2018, Jonathan Gant at Global Witness sent a message to Susan Maples, one of the American consultants who advised the HTC on the Exxon negotiations, stating that Global Witness believed that the payment of $15,000 to Susan Maples was most likely "a bribe, paid as a reward to ensure that LB 13 was negotiated successfully."  Susan Maples responded by expressing her stunned dismay at the false allegations. Complaint ¶ 95.

### 2.      The Pre-Conceived Story Line Doctrine is Not Mere "Trope"

Global Witness snidely dismisses these allegations of a pre-conceived story line as a "well-worn trope."  *Motion to Dismiss* at 20.  Hubris is no substitute for argument, however, just as "certitude is not the test of certainty."  Oliver Wendell Holmes, Collected Legal Papers, 311 (1918), quoted in *U.S. ex rel. Miller v. O'Leary*, 651 F. Supp. 174, 177 (N.D. Ill. 1986), *aff'd*, 828 F.2d 22 (7th Cir. 1987). What Global Witness derides as "trope" many distinguished courts and jurists have described as sound legal doctrine.  *See, e.g.*, *Gertz v. Robert Welch, Inc.*, 680 F.2d 527, 539 (7th Cir. 1982) (decision on remand from the Supreme Court, finding actual malice in editor's preconceived story line); *Goldwater v. Ginzburg*, 414 F.2d 324, 337, 339 (2nd Cir. 1969) *cert. denied*, 396 U.S. 1049 (1970) (actual malice may be established through circumstantial evidence of a "predetermined and preconceived plan to malign" the plaintiff Barry Goldwater, and "a possible preconceived plan to attack Senator Goldwater regardless of the facts"); *Falwell v. Flynt*, 797 F.2d 1270, 1277 (4th Cir. 1986), *judgment rev'd on other grounds*, *Hustler Magazine, Inc., v. Falwell*, 485 U.S. 46 (1988) ("It is, however, well established that the jury may infer from the totality of the defendant's conduct toward a plaintiff 'a predetermined and preconceived plan to

malign [plaintiff's] character' and cause him injury which is, of course, a functional definition of actual malice."); *Harris v. City of Seattle*, 152 Fed.Appx. 565, 568 (9th Cir.2005). ("Finally, 'evidence that a defendant conceived a story line in advance of an investigation and then consciously set out to make the evidence conform to the preconceived story is evidence of actual malice, and may often prove to be quite powerful evidence.'"), *quoting* Rodney Smolla, *Law of Defamation*, § 3:71; *Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862, 871- 72 (W.D. Va. 2016) ("plaintiff offers evidence that could lead a jury to determine that Erdely had a preconceived story line and may have consciously disregarded contradictory evidence . . ."'evidence that a defendant conceived a story line in advance of an investigation and then consciously set out to make the evidence conform to the preconceived story is evidence of actual malice, and may often prove to be quite powerful evidence.'"), *quoting Harris*, 152 Fed.Appx. at 568.

In order for the *Catch me if you can* Report to have any genuine power to damage Exxon and Secretary of State Tillerson, Global Witness needed to do more than simply establish that Exxon had purchased Block 13, which had *previously* been sold under suspicious circumstances to a prior purchaser, BCP. For if Exxon's purchase of Block 13 was entirely clean, fair, and above-board, paying a fair purchase price without any corruption or bribery, the sensational "indictment" that Global Witness sought to pin upon Exxon would have been attenuated and anemic. That is why the *Catch me if you can* Report is permeated by accusations that Exxon's *current* purchase of Block 13 in 2013 was *also* accomplished through bribery, thereby directly linking Exxon *itself* to the practice of paying or facilitating bribes. The *Catch me if you can* narrative thus repeatedly insists that Exxon knew that the money it was distributing in "disaggregated" sums at the "project level" would be used to distribute bribes. Complaint, ¶ 90.

**D.      Circumstantial Evidence is Sufficient**

As the Supreme Court explained in *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496,

510, (1991) the actual malice inquiry presents a question of fact: "The constitutional question we

must consider here is whether, in the framework of a summary judgment motion, the evidence

suffices to show that respondents acted with the requisite knowledge of falsity or reckless disregard

as to truth or falsity." *Id.* at 513. The Court in *Masson* concluded that "[t]he record contains

substantial . . . evidence, . . . which, in a light most favorable to petitioner, would support a jury

determination under a clear and convincing standard that [the author acted] deliberately or

recklessly." *Id.* at 521.   It simply does not matter, at this stage, that Global Witness has arguments

against the allegations of actual malice.  *Id.* (Malcolm contests petitioner's allegations, and only a

trial on the merits will resolve the factual dispute. But at this stage, the evidence creates a jury

question whether Malcolm published the statements with knowledge or reckless disregard of the

alterations."). "If all a publisher needed to do was to deny the allegation, all implied defamation

suits would be dead on arrival." *Manzari v. Associated Newspapers Ltd.*, 830 F.3d 881, 893 (9th

Cir. 2016)*.*  If this were not the law, "mere swearing could, as a matter of law, defeat any claim to

which the *New York Times* standards are applicable." *Guam Federation of Teachers. v. Ysrael*, 492

F.2d 438, 439 (9th Cir. 1974), *cert. denied*, 419 U.S. 872 (1974), *citing St. Amant v. Thompson*,

390 U.S. 727, 732 (1968). *See also Brown v. Petrolite Corp*., 965 F.2d 38, 47 (5th Cir.1992)

(defendant "cannot automatically insure a favorable verdict by maintaining that it published the

report in good faith."); *Schiavone Construction Co. v. Time, Inc*., 847 F.2d 1069, 1070 (3d

Cir.1988) (same).  As the First Circuit has observed, "[t]he subjective determination of whether [a

defendant] in fact entertained serious doubts as to the truth of the statement may be proved by

36

inference, as it would be rare for a defendant to admit such doubts." *Bose Corp. v. Consumers Union of United States, Inc.*, 692 F.2d 189, 196 (1st Cir.1982), *aff'd*, 466 U.S. 485 (1984).  Federal courts may not resolve disputed questions of fact relating to fault in a defamation case even on a Motion for Summary Judgment, let alone on a Motion to Dismiss.  *See Anderson v. Liberty Lobby*, 477 U.S. 242, 254 (1986). ("The question here is whether a jury could reasonably find *either* that the plaintiff proved his case by the quality and quantity of evidence required by the governing law or that he did not.") (emphasis in original).

Actual malice may be established through circumstantial evidence, and as with other factual issues, the case may be constructed one brick at a time.  "As we have yet to see a defendant who admits to entertaining serious subjective doubt about the authenticity of an article it published, we must be guided by circumstantial evidence.   By examining the editors' actions we try to understand their motives."  *Eastwood v. National Enquirer, Inc.*, 123 F.3d 1249, 1253 (9th Cir. 1999) (using circumstantial evidence to find actual malice).  As Judges of the Court and as the Court of Appeals has recognized, indirect evidence of actual malice will often be all that ever exists.  "[I]t is clear beyond cavil that '[t]he plaintiff can prove the defendant's subjective state of mind through the cumulation of circumstantial evidence, as well as through direct evidence.'" *Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d at 285, *quoting* Jankovic *v. International Crisis Group* (*Jankovic III*), 822 F.3d 576, 589 (D.C. Cir. 2016).

### E.    Evidence of Inconsistency is Probative Circumstantial Evidence

Additional indicia of the existence of actual malice by Global Witness rests in the inexplicably inconsistent manner with which it ultimately treated various participants in the Exxon Block 13 deal.  Global Witness had written to the five consultants involved in advising the HTC, accusing those consultants of also taking bribes to facilitate the Exxon contract.  As set forth above,

certain of those consultants pushed back against Global Witness, asserting that the payments were not bribes, either to the consultants, or any of the employees of NOCAL, or other participants in the negotiations on behalf of Liberia.  In final publication of the *Catch me if you can* Global Witness Report, no accusations against the consultants for taking bribes were included, *even though the consultants had offered explanations aligned with those of the HTC members who responded*.  This internal contradiction, hidden from readers of the Global Witness Report, is powerful evidence probative of actual malice—knowledge of falsity or reckless disregard for truth or falsity.  Complaint ¶ 98.

An additional glaring internal inconsistency probative of actual malice in the *Catch me if you can* Global Witness Report was its stunning failure to include the name of the Legal Advisor to President Sirleaf, Seward Cooper, as among the HTC members who received a $35,000 bonus. Indeed, while the HTC had six members, as Global Witness knew, the sinister chart it displayed to graphically communicate its point that bribe money had flowed from Exxon through NOCAL to the HTC members contained only *five* of the six members, conspicuously leaving out Seward Cooper's name.  This deliberate omission is powerful evidence probative of actual malice, because the entire narrative advanced by the *Catch me if you can* Global Witness Report treating the payments as bribes rather than bonuses would be undermined by evidence that the payments had come voluntarily at the directive of President Sirleaf *after* successful completion of the contract with Exxon as a deserved bonus for a job well done.  Yet this was exactly the conclusion of President Sirleaf's *own legal advisor*, who had been asked to opine, with Christiana Tah, on the legality of the bonus payments.  That legal opinion was *grounded* in the supposition that there was *no quid pro quo*, not even a *demand*, for payment by any HTC member, including Seward Cooper himself.  Thus, a jury could conclude that the conspicuous omission of Presidential Legal Advisor

Seward Cooper's name and title from its *Catch me if you can* Report was a deliberate manipulation to mask from readers a glaring inconsistency in its narrative, a manipulation highly probative of actual malice.  Complaint ¶ 99.

### F.    Vindictive Motive is Probative of Actual Malice

The allegations of the Complaint paint a picture of Global Witness has blinded by its determination to get Exxon, no matter what collateral damage might be done to the honorable reputations of Christiana Tah and Randolph McClain.  This subjective motivation may not be dispositive, but it is certainly probative of actual malice, especially at the early pleading stage.

Common-law "ill will" malice is not the same as constitutional "actual malice."  It is a fundamental axiom of defamation law, however, that common-law ill-will malice is circumstantial evidence *probative* of the existence of actual malice.  *Shoen v. Shoen*, 48 F.3d 412, 417 (9th Cir. 1995) ("ill will is considered circumstantial evidence of actual malice.") Thus "a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence, and it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry." *Harte-Hanks Communications Inc. v. Connaughton*, 491 U.S. 657, 668 (1989) (internal citations omitted).

Christiana Tah and Randolph McClain commend to this Court the cogent analysis Judge McKinnon, joined by then-Judge Antonin Scalia, in a panel decision from the District of Columbia Circuit Court of Appeals.  While his opinion was vacated by the en banc court, nothing in the en banc opinion rejected Judge McKinnon's statement of the law on this point, and it remains sound persuasive authority.  As Judge McKinnon explained:

> The mere existence of a preconceived plan to "get" the subject of a defamatory story does not prove that the publisher acted knowingly or recklessly in publishing false information. But it is beyond question that one who is seeking to harm the subject of a story—whether motivated by simple ill will (*Cochran*), or partisan

39

political considerations (*Sprouse*), or otherwise laudable concern for the safety of the nation (*Ginzburg*), or a mere desire to attract attention and boost circulation (*Butts*)—is more likely to publish recklessly than one without such motive.

*Tavoulareas v. Piro*, 759 F.2d 90, 98 (D.C. Cir. 1985), *vacated and superseded on other grounds by opinion en banc*, 817 F.2d 762 (D.C. Cir. 1987).

The *Special Presidential Committee Report* identified the effort to discredit Exxon as the principal thrust of the *Catch me if you can* Report:

> The main thrust of the Global Witness Report, in the opinion of the Committee, is to indict Exxon for its use of alleged unorthodox methods in acquiring Concession License for Natural Resources in poor countries around the world. The Report argued that in acquiring Liberia's offshore Oil Block 13, Exxon may have advertently encouraged corruption and that some Liberian officials involved in the transaction may have engaged in corrupt practices contrary to the laws of Liberia. The Committee observed that a number of the assertions in the GW Report as to the content relating to Liberia are speculative, and that the real object of its Report was not Liberia, but the conduct of Exxon.

*Special Presidential Committee Report* at 11. Again, the views of Judges McKinnon and Scalia are salient. As their opinion explained, the "idea that motive can be evidence of actual malice when it is not an element of the tort" is sound, for the distinction "is akin to that between motive to kill (*e.g.*, greed or hatred) and *intent* to kill in a murder prosecution. They are not the same thing. The second is an element of the crime of murder; the first is evidence admissible to prove that element." *Tavoulareas*, 759 F.2d at 98 n.34 (emphasis in original).

## G.   Ignoring Contrary Evidence is Probative of Avoidance of the Truth

Prior to publication, Global Witness was provided with substantial information undercutting the plausibility of its pre-conceived story line. In its Motion to Dismiss, Global Witness argues that the Complaint's allegations on this point are conclusory and lacking in detail. This is a disingenuous characterization of the Complaint. In any event, it is for this Court to read the Complaint generously, not disingenuously. Thus, Christiana Tah wrote a forceful and

unequivocal letter to Mr. Gant and Global Witness, dated March 12, 2018.  In her letter she told

the truth in blunt detail:

> Bonus payments were authorized by NOCAL's Board of Directors to all NOCAL Staff and others who performed exceptionally in conducting the negotiations on the Exxon Contract. These bonus payments were made long after the Exxon deal was concluded. I understand that even drivers received bonuses. Do you mean to tell me that Exxon was so desperate that it even bribed the drivers?

> I did not receive money or an offer to pay money from Exxon-Mobil for the award of the oil contract related to Block #13; neither am I aware of anyone who may have requested or received a bribe from the aforesaid company, directly or indirectly. The suggestion that there was a "quid pro quo" link between entering into the contract and the payments, by using the term "bribe," is malicious, and appears to be deliberate and purposeful.

> I served the Government of Liberia in the capacity of Attorney General/Minister of Justice for five years and did not at any time solicit concessionaires or any individual or entity seeking a contract with the Government to pay me anything . . .  Complaint, ¶  93

So too, Randolph McClain also forcefully replied to Global Witness.  His reply stated:

> I finally received a March 2, 2018 letter of Global Witness that you forwarded to me via Facebook Messenger. I rarely visit Facebook Messenger for mail communications.  Please forward this response to the unknown contact at Global Witness.

> In the letter sent, Global Witness, in essence, accuses me of accepting a bribe in the form of "a reward to ensure that LB13 was negotiated successfully" with ExxonMobil.  I did not take any bribe in connection with the LB13 ExxonMobil Contract of 2013.  I do not take bribes.  That Contract is acknowledged as a landmark contract and extraordinary enough to be now used as a model for all future contracts of this nature.  Any bonus given by our superiors was in acknowledgement of the Team's extraordinary work after the completion of the landmark Contract . . . . Complaint, ¶  95.

Jeff Wood, another American consultant on the Exxon Block 13 negotiation, also wrote

pointedly to Jonathan Gant to clearly articulate the false premises of the Global Witness bribery

allegations, including very deliberately explaining that the payments made by Exxon, including

the $5 million that went to NOCAL, was in no sense "voluntary," as Jonathan Gant and Global

Witness had asserted, but was a bargained-for payment successfully negotiated by Liberia as part of Exxon's purchase price.   Jeff Wood explained that he would testify as a witness in any defamation action brought against Global Witness regarding the false bribery allegations.   Jeff Wood's statements to Jonathan Gant also made it clear that it was deliberately misleading for Global Witness to equate the bribery allegations surrounding the original purchase of Block 13 by BCP in 2006 and 2007 with the very different bonus payments awarded following the highly successful 2013 Exxon deal.   Jeff Woods' statements also explained how the bonus payments to all NOCAL employees, "all the way down to the drivers and housekeeping staff," was "hardly consistent with an intent to bribe, and completely consistent with the payment of a bonus."   Jeff Wood's communication to Jonathan Gant and Global Witness also painstakingly explained that the suggestion by Global Witness that the payments were corrupt because there had been no similar payments in recent years was entirely baseless, because there had simply been no successful NOCAL sales deals consummated during those years.   There had simply been no success to reward. Complaint, ¶ 97.

### H.   The Plaintiffs Benefit from All Inferences

At the pleading stage, this Court's task is modest, and the Plaintiffs are entitled to the benefit of all inferences.   All it must determine is that these various allegations present *plausible* facts from which a jury might find actual malice.   The facts plainly meet this standard, as they are probative a deliberate avoidance of the truth.   As *Harte–Hanks* points out, "[a]lthough failure to investigate will not alone support a finding of actual malice, the purposeful avoidance of the truth is in a different category." *Harte–Hanks*, 491 U.S. at 688.   "As it turns out, if there is evidence that a defendant had an obvious reason to doubt the veracity of a source, then the defendant's failure to investigate the source's allegation prior to publication can be probative of actual malice."

*Zimmerman v. Al Jazeera*, 246 F. Supp. 3d at 28, *citing McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1507 (D.C. Cir. 1996). "once 'a plaintiff offers evidence that a defendant has reason to doubt the veracity of its source,' then the defendant's 'utter failure to examine evidence within easy reach or to make obvious contacts in an effort to confirm a story demonstrate[s] reckless disregard.'" *Zimmerman v. Al Jazeera* 246 F. Supp. 3d at 281, *quoting Jankovic III*, 822 F.3d at 590. *See also Competitive Enterprise Institute v. Mann*, 150 A.3d 1213, 1260 (D.C. 2016) ("On the current record, where the notion that the emails support that Dr. Mann has engaged in misconduct has been so definitively discredited, a reasonable jury could, if it so chooses, doubt the veracity of appellants' claimed honest belief in that very notion. A jury could find, by clear and convincing evidence, that appellants 'in fact entertained serious doubts' or had a 'high degree of awareness' that the accusations that Dr. Mann engaged in scientific misconduct, fraud, and deception, were false, and, as a result, acted "with reckless disregard" for the statements' truth when they were published.).

The letters sent by Global Witness to United States Attorney General Jeff Sessions and to Securities and Exchange Commission Chairman Jay Clayton, with copies of the *Catch me if you can* Global Witness Report, also displayed the partisan sensationalist agenda driving the Global Witness publication. The letter to Attorney General Sessions, entitled "Letter regarding evidence of corruption, Exxon Mobil Corp, and Liberia," for example, included the following recitation:

> There is evidence that, in 2013, Liberian Government officials responsible for signing Exxon's Block 13 purchase received unusual, large payments of $35,000, representing an estimated 160 percent of the officials' annual salary. They were made by Liberia's oil agency (NOCAL) and were likely made from the same bank account into which Exxon had recently deposited funds it owed the government for purchasing Block 13. There is no evidence that Exxon was aware of these payments, although it was aware that bribes had previously been paid by NOCAL to ensure the approval of oil licenses, including Block 13 in 2007.

The letter to Attorney General Sessions unmistakably linked the phrase "unusual, large payments of $35,000" to bribery, by following the phrase with the statement that Exxon "was aware that bribes had previously been paid by NOCAL to ensure the approval of oil licenses, including Block 13 in 2007," thereby plainly communicating that the payments of $35,000 were "bribes" made "to ensure the approval of oil licenses, including Block 13."   Global Witness sent this letter to the Attorney General, which unmistakably was intended to be understood as asserting bribery and corruption in the consummation of the purchase of Block 13 by Exxon, at a time in which Global Witness already knew the credibility of those charges had been discredited and undermined.   An identical letter was sent to the Chairman of the Securities and Exchange Commission, Jay Clayton.  Complaint ¶¶ 99-102.

In the cold calculation that presenting its sensational narrative would advance the reputation of Global Witness as a muckraking transparency organization, Global Witness was willing to recklessly destroy the reputation of Christiana Tah and Randolph McClain. Everything presented in *Catch me if you can* was dramatically and sensationally narrated and displayed to generate the maximum defamatory impact on the minimum of actual verified fact. Such a deliberate strategy of sensationalizing and provocation may be probative of actual malice.  *See, e.g., Curtis Pub. Co. v. Butts*, 388 U.S. 130, 169 (1967) (Opinion of Warren, C.J.) (finding support for existence of actual malice in magazine's adoption of a strategy of embarking "upon a program of 'sophisticated muckraking,' designed to 'provoke people, make them mad.'").  *See also Burnett v. Nat'l Enquirer, Inc.,* 144 Cal. App. 3d 991, 999, 193 Cal. Rptr. 206, 209 (Ct. App. 1983).

## CONCLUSION

In the final analysis, it truly does matter that this is a Motion to Dismiss.  *See Weyrich v. New Republic, Inc*., 235 F.3d 617, 628 (D.C. Cir. 2001) (reversing a dismissal of a defamation

case on the pleadings and remanding to the district court to determine, statement-by-statement, which statements should proceed to discovery).

Christiana Tah and Randolph McClain have exhaustively set forth, in detail, all they know surrounding the facts and circumstances of the Global Witness *Catch me if you can* Report.  For their effort, they have been mocked by Global Witness, but no matter.  What Christiana Tah and Randolph McClain *know* is that they did not take bribes, or act corruptly.  What they *know* is that the world read the Global Witness Report as asserting that they did.  What they *know* is that they and others confronted Global Witness with evidence contradicting the story line that Global Witness appeared headlong determined to publish, no matter what.  Christiana Tah and Randolph McClain have plausibly pled every element of their claims.  If more is deemed required, is difficult to see how *any* plaintiff in the District of Columbia will ever have a fighting chance of decent redress for the degradation of his or her reputation and human dignity through false sensationalist stories.  It cannot be that such a harsh result is mandated by the Federal Rules of Civil Procedure.  It cannot be that such a harsh result is consistent with the careful balance that our society has struck under the common law and the Constitution.  As the Supreme Court has explained, the protection of "good name protection of his own good name 'reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty.'" *Gertz v. Robert Welch, Inc*., 418 U.S. 323, 341 (1974), *quoting Rosenblatt v. Baer*, 383 U.S. 75, 92 (1966) (Stewart, J., concurring).  Christiana Tah and Randolph McClain urge this Court to deny the Motion to Dismiss, and permit this case to proceed through discovery, safeguarding their rights to pursue redress for the damage to their essential dignity and worth.

Respectfully submitted,

/s/ Rodney A. Smolla
Rodney A. Smolla
4601 Concord Pike
Wilmington, DE 19807
rodsmolla@gmail.com
(864) 373-3882
*Pro Hac Vice*

Arthur V. Medel, Esq.  (D.C. Bar # 416029)
Alima Joned, Esq. (D.C. Bar # 446659)\
MEDEL SANFILIPO
1701 Pennsylvania Avenue, N.W., Suite 200
Washington, D.C. 20006
Tel:  202 683 2008
Cell: 703 945 9137
Fax: 703 991 8014
avmedel@medsanlaw.net
ajoned@medsanlaw.net

*Attorneys for Plaintiffs Christiana Tah and Randolph McClain*

November 30, 2018

**CERTIFICATE OF SERVICE**

I certify that copies were served electronically upon all counsel of record via the ECF system.

/s/ Arthur V. Medel
Arthur V. Medel
*Attorneys for Plaintiffs Christiana Tah and Randolph McClain*

November 30, 2018