**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                     )

**CHRISTIANA TAH,** *et al.,*            )
                                     )

            **Plaintiffs,**            )
                                     )

               **v.**                   )        **Civil Action No. 18-2109 (RMC)**
                                     )

**GLOBAL WITNESS**            )
**PUBLISHING, INC.,** *et al.,*        )
                                     )

            **Defendants.**           )
_____ )

## MEMORANDUM OPINION

In 2013, a high-level team of officials of the Government of Liberia helped negotiate the successful sale of off-shore oil drilling rights to the ExxonMobil Corporation. The Liberian government then awarded bonuses of $35,000 from the proceeds to senior members of the negotiating team, including former Liberian Minister of Justice and Attorney General Christiana Tah and former Chief Executive Officer of the National Oil Company of Liberia Randolph McClain. Corruption-watchdog Global Witness of London and its U.S. arm, Global Witness Publishing, Inc., issued a report that is alleged to imply that Minister Tah and Mr. McClain had effectively received bribes to facilitate the sale. Minister Tah and Mr. McClain sue the two Global Witness entities for defamation. Although the Court agrees that the report implies bribery, and takes as true that bribery did not occur, the contents of the report are protected speech under the First Amendment and cannot sustain a defamation claim. Accordingly, the Court will dismiss the Complaint.

# I. BACKGROUND

## A. The Block 13 Negotiations

"Block 13" is rectangular plot of territory in the ocean waters off the coast of Liberia. In the belief that Block 13 held valuable oil reserves, the National Oil Company of Liberia (NOCAL), the Liberian government-owned corporation responsible for awarding oil licenses, agreed in 2007 to license the development of Block 13 to Broadway Consolidated PLC (Broadway Consolidated), for which Liberia would receive a share of the oil production. Broadway Consolidated failed to make headway in the work over the next three years, however, so in 2010 Liberia sought another buyer to take over the license on terms more favorable to the country. ExxonMobil expressed interest.

Negotiations between ExxonMobil and Liberia were conducted on Liberia's behalf by the Hydrocarbon Technical Committee (HTC or Committee), a governmental body which was created by statute "to superintend the negotiations between entities such as Exxon and the government of Liberia, through its state-owned oil company NOCAL." Compl. [Dkt. 1] ¶ 24. At the time of the negotiations, the HTC had six members, including Presidential Legal Advisor Seward M. Cooper and the Plaintiffs, Minister Tah and Mr. McClain. Mr. McClain served as its Chair.

Exxon was unwilling to acquire drilling rights in Block 13 directly from Broadway Consolidated, in part due to rumors of corruption surrounding the original license. However, in 2013 Exxon agreed to an arrangement whereby a third party, Canadian Overseas Petroleum Limited (COPL), purchased the license from Broadway Consolidated and Exxon purchased it from COPL, with an additional payment directly to Liberia. In this manner, Exxon paid $120 million for Block 13 with approximately $50 million going to Liberia itself. Plaintiffs allege that "the Liberian government saw the Exxon deal as an historic victory for the Liberian

people, in which the government of Liberia would for the first time receive a substantial payment for the sale of extraction rights." *Id.* ¶ 22.

After the negotiations with Exxon were finalized, Liberian President Ellen Johnson Sirleaf instructed, unsolicited, NOCAL to pay bonuses to the government employees who had participated. *Id.* ¶ 25. Mr. McClain asked Mr. Cooper and Minister Tah, who are both lawyers, if such payments were lawful. Both agreed that they were. Thereafter, the Board of Directors of NOCAL adopted a resolution directing payment of $500,000 in bonuses, made from the proceeds of the negotiations, to HTC and NOCAL officials and staff. Payments were made to over 140 employees, including office staff, custodial workers, and drivers. However, the largest bonuses, $35,000 each, went to the six members of the HTC.

**B. The Global Witness Report**

Global Witness is a non-profit, non-governmental organization based in London which conducts operations in the United States through its offices in Washington, D.C., known as Global Witness Publishing, Inc. Global Witness specializes in "global witness investigation" and its mission centers on "exposing economic networks behind conflict, corruption, and environmental destruction." *Id.* ¶ 4-5.

In March 2018, Global Witness published an investigative report titled "Catch me if you can: Exxon's complicity in Liberian oil sector corruption and how its Washington Lobbyists fight to keep oil deals secret." Compl., Ex. A, Global Witness, Catch me if you can (2018) (Report) [Dkt. 1-1]. The Report, which remains available online, was 35 pages long and included 125 footnotes documenting the 2013 sale of a license to Exxon to develop Block 13, as well as the history of Block 13 more generally. The Report used the sale of Block 13 as a case study to discuss the value of Section 1504 of the Dodd-Frank Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010), a law of the United States. Section 1504 requires oil, gas, and mining companies to

disclose payments made to foreign governments—the types of disclosures which Global Witness says make the investigation of the Block 13 sale possible and which companies like Exxon oppose. *See* Report at 11.

The Report presented a less-than-innocent version of the history and licensing of Block 13. According to Global Witness, Block 13 was "born in the shadows," *id.*, and the Report suggested that the "untested" Broadway Consolidated was awarded the initial Block 13 license "because the company was likely part-owned by government officials with the power to influence the award of oil licenses." *Id.* at 12. Global Witness believed this partial ownership by Liberian government officials continued through the sale of Block 13 to COPL. The Report further asserted that the licensing of Block 13 to Broadway Consolidated was ratified by the Liberian legislature only after NOCAL spent $118,400 in lobbying fees in 2006 and 2007, which Liberia's General Auditing Commission later determined were actually bribes for favorable votes. *Id.* at 16.

According to the Report, when Exxon became interested in acquiring the license to develop Block 13, Exxon chose to structure the acquisition through COPL as an intermediary because it had "concern over issues regarding US anti-corruption laws" and believed that "Liberian shareholders/beneficial owners of [Broadway Consolidated] may have been government officials at the time of the allocation." *Id.* at 20. The Report opined that "Exxon proposed to use COPL as a go-between that would, Exxon appears to have thought, shield it from any US legal risks posed by Block 13." *Id.* The Report described the complex movement of funds and property interests constituting Exxon's purchase of development rights in Block 13. It also stated that COPL's relationship with Broadway Consolidated may not have been fully at arm's-length and called for an investigation of Exxon by authorities in the United States, Canada,

4

the United Kingdom, and Liberia to determine whether Exxon had violated any anti-corruption laws. *Id.* at 27-28.

In addressing the Liberian government's role in the 2013 license transfers, the Report stated that NOCAL made "unusual, large payments" to Liberian government officials "in connection with the 2013 award of Block 13" and emphasized those payments made to members of the HTC, connecting the relative size of the payments, the definition of bribery in Liberian law, and NOCAL's history of bribery payments in 2006 and 2007. *Id.* at 30. The Report also included a chart prepared by Global Witness that identified the roles six HTC and NOCAL officers played in the negotiations with Exxon and naming each of them.

Global Witness sought pre-publication comments from the HTC and NOCAL officials; excerpts of those comments, which denied that the bonuses were bribes, were included in the Report. The Report acknowledged that "Global Witness has no evidence that Exxon directed NOCAL to pay Liberian officials, nor that Exxon knew such payments were occurring," *id.* at 31, and conceded that over 140 staff members received such bonuses, but concluded:

> The vast majority of these payments were smaller than those made to HTC members by two orders of magnitude. Also, unlike payments to the HTC members, these staff payments were not made to people who signed the Exxon deal.

*Id.* at 32. Among a host of recommendations, the Report called for Liberian authorities to investigate "whether NOCAL violated Liberian law when it distributed payments in 2013 to officials who signed the Block 13 license," and for the Liberian government to "review its policies on bonuses paid to staff." *Id.* at 35.

### C. Report Aftermath

Shortly thereafter, several news organizations, including Newsweek and Front Page Africa, published summaries of the Report with headlines such as "Rex Tillerson's Exxon

Mobil Involved in Corrupt Oil Deals in Liberia, Investigation Reveals." Compl. ¶ 72 (quoting

Christina Maza, *Rex Tillerson's Exxon Mobil Involved in Corrupt Oil Deals in Liberia,*

*Investigation Reveals*, Newsweek, Mar. 29, 2018, *available at* http://bit.ly/2kCN5IU). As a

result of the Report, the new President of Liberia, George Manneh Weah, appointed a Special

Presidential Committee to investigate. *Id*. ¶ 74 (citing *Report of the Special Presidential*

*Committee Appointed to Examine the March 2018 Global Witness Report of the National Oil*

*Company of Liberia (NOCAL)* (2018) (Special Presidential Committee Report)). The Special

Presidential Committee, which issued its own findings in May 2018, understood its mandate to

be:

> to examine the allegations of March 2018, made by Global Witness
> (GW), . . . that in negotiating the Concession [license] agreement
> between ExxonMobil and the Government of Liberia for Liberia's
> offshore Oil Block LB13, some prominent Liberian government
> officials who led the negotiation received bribe in amounts ranging
> up to US $35,000 each.

*Id*. ¶ 75. It determined that the bonus payments were not bribes under Liberian law. *Id.* ¶ 81.

However, the Special Presidential Committee recommended that the bonus payments to the six

members of the HTC be returned. *Id.* ¶ 83. Plaintiffs believe there is no legal basis to require

them to return the bonuses and have not done so. *Id.*

Based on the negative publicity following the Report, Plaintiffs filed suit in this

Court alleging Defamation *per se* (Count I) and False Light Invasion of Privacy (Count II).

Global Witness moved to dismiss. The matter is now ripe.[1]

---

[1] *See* Defs.' Mot. to Dismiss [Dkt. 11]; Pls.' Resp. to Defs.' Mot. to Dismiss for Failure to State a
Claim (Opp'n) [Dkt. 17]; Reply Mem. in Supp. of Defs.' Mot. to Dismiss for Failure to State a
Claim (Reply) [Dkt. 18].

## II.  LEGAL STANDARDS

### A.  Motion to Dismiss

A motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the adequacy of a complaint on its face.  *See* Fed. R. Civ. P. 12(b)(6).  A complaint must be sufficient "to give a defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted).  To survive a motion to dismiss, a complaint must contain sufficient factual information, accepted as true, to "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).  A court must assume the truth of all well-pleaded factual allegations and construe reasonable inferences from those allegations in favor of the plaintiff.  *See Sissel v. Dep't of Health & Human Servs.*, 760 F.3d 1, 4 (D.C. Cir. 2014).  However, a court need not accept inferences drawn by a plaintiff if such inferences are not supported by the facts set out in the complaint.  *See Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).  Further, a court need not accept legal conclusions set forth in a complaint.  *See Iqbal*, 556 U.S. at 678.

### B.  Applicable Law[2]

"To state a cause of action for defamation, [a] plaintiff must allege and prove four elements:  (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that

---

[2] The Court has diversity jurisdiction over this case because Plaintiffs are residents of Maryland and North Carolina, Global Witness operates out of London and D.C., and the amount in controversy exceeds $75,000.  *See* 28 U.S.C. § 1332.  Venue is proper because D.C. is "a district in which any defendant is subject to the court's personal jurisdiction."  28 U.S.C. § 1391(b)(3).

the statement was actionable as a matter of law irrespective of special harm or that its publication

caused the plaintiff special harm." *Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005) (internal

quotations omitted).[3]  Further, under the First Amendment, public figures suing for defamation

must "demonstrate by clear and convincing evidence that the defendant published the defamatory

falsehood with 'actual malice,' that is, with 'knowledge that it was false or with reckless

disregard of whether it was false or not.'" *Liberty Lobby, Inc. v. Dow Jones & Co., Inc.*, 838

F.2d 1287, 1292 (D.C. Cir. 1988) (quoting *N.Y. Times v. Sullivan*, 376 U.S. 254, 280 (1964)).

"To succeed on a claim of false light invasion of privacy, a plaintiff must show:

'(1) publicity (2) about a false statement, representation, or imputation (3) understood to be of

and concerning the plaintiff, and (4) which places the plaintiff in a false light that would be

offensive to a reasonable person.'" *Armstrong v. Thompson*, 80 A.3d 177, 188 (D.C. 2013)

(quoting *Kitt v. Capital Concerts, Inc.*, 742 A.2d 856, 859 (D.C. 1999)).  "These elements are

similar to those involved in analysis of a defamation claim, and 'a plaintiff may not avoid the

strictures of the burdens of proof associated with defamation by resorting to a claim of false light

invasion.'" *Id.* (quoting *Moldea v. N.Y. Times*, 22 F.3d 310, 319 (D.C. Cir. 1988)).  "In fact,

where the plaintiff rests both his defamation and false light claims on the same allegations, . . .

the claims will be analyzed in the same manner." *Blodgett v. Univ. Club*, 930 A.2d 210, 223

(D.C. 2007).

## III.    ANALYSIS

Plaintiffs allege that Global Witness' Report defamed them by accusing them of

accepting bribes in connection with the negotiations with Exxon that led to that corporation's

---

[3] The parties do not dispute that D.C. substantive law governs this case.  *Cf. Weyrich v. New Republic, Inc.*, 235 F.3d 617, 626-27 (D.C. Cir. 2001) (discussing choice of law in a defamation action brought in a diversity case in D.C.).

acquisition of a license to develop Block 13. Plaintiffs acknowledge that the Report never explicitly accused them of taking bribes. However, they argue that "the totality of the meaning conveyed, through headlines, sub-headings, text and graphics" clearly implied that they took bribes and that reasonable readers could come away with that understanding. Compl. ¶ 34.

"Whether a statement is capable of defamatory meaning is a question of law, but '[i]t is only when the court can say that the publication is not reasonably capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense that it can rule as a matter of law, that it was not libelous.'" *Weyrich*, 235 F.3d at 627 (quoting *White v. Fraternal Order of Police*, 909 F.2d 512, 518 (D.C. Cir. 1990)). Moreover, implied defamation comes with its own particular complications. "District of Columbia law . . . clearly contemplates the possibility that a defamatory inference may be derived from a factually accurate news report." *S. Air Transp., Inc. v. Am. Broad. Cos.*, 877 F.2d 1010, 1014 (D.C. Cir. 1989). But "[b]ecause the Constitution provides a sanctuary for truth, a libel-by-implication plaintiff must make an especially rigorous showing where the expressed facts are literally true." *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580 (D.C. 2000) (quoting *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092-93 (4th Cir. 1993)). Thus, "if a communication, viewed in its entire context, merely conveys materially true facts from which a defamatory inference can reasonably be drawn, the libel is not established." *White*, 909 F.2d at 520. However, "if the communication, by the particular manner or language in which the true facts are conveyed, supplies additional, affirmative evidence suggesting that the defendant *intends* or *endorses* the defamatory inference, the communication will be deemed capable of bearing that meaning." *Id.*; *see also Guilford Transp.*, 760 A.2d at 580 ("The language must not only be reasonably read to

impart the false innuendo, but it must also affirmatively suggest that the author intends or endorses the inference.").

### A. Defamatory Implications of the Report

Although Plaintiffs concede that the Report contained only accurate facts and never specifically described the bonuses as bribes, the Court finds that the Report could reasonably be interpreted to imply that the bonuses were bribes and that the implication was conveyed by the manner in which Global Witness presented its investigation.

The implication began with the cover page. The title "Catch me if you can" clearly suggested wrongdoing, and specifically wrongdoing for which there is not yet enough evidence to convict. Below the title was an image of a businessman running away, already partially off the page, as if almost beyond capture, followed by the caption "Exxon's complicity in Liberian oil sector corruption and how its Washington lobbyists fight to keep oil deals secret." Report (cover page). The Report's first page further framed its contents: "This is a story of bribery, suspected secret shareholders, and an audacious attempt by oil giant Exxon to bypass US anti-corruption laws." *Id.* at 6. Whatever other details the Report offered, these headlines provided the context and conclusions of its authors at Global Witness. *Cf. Afro-Am. Publ'g Co. v. Jaffe*, 366 F.2d 649, 655 (D.C. Cir. 1966) (finding false statements in a newspaper caption "were critical in the total impact of the article"); *id.* ("The article contained other items that were true, but in the setting already described these only reinforced the defamatory impression.").

The Report further framed its discussion of the Block 13 negotiations as evidence of the value of transparency laws covering the oil, gas, and mining industries. Such laws were praised because they allowed Global Witness to see, for example, "how much money Exxon paid to Liberia's oil agency NOCAL, which has a history of corruption." Report at 9. In this way, Global Witness tied ExxonMobil's payments for the acquisition of rights in Block 13 with how

NOCAL shared some of that money with its negotiators, including Plaintiffs. The Report cited "NOCAL's tarnished track record of corrupt deals" to explain that Global Witness "saw there was a risk of bribery and began its investigation." *Id.*

For almost 20 pages, the Report then detailed previous corruption or concerns regarding corruption in the oil sector in Liberia. In that specific context, the Report opined that "[t]here are grounds to suspect that [Broadway Consolidated] obtained Block 13 because the company was likely part-owned by government officials with the power to influence the award of oil licenses." *Id.* at 12; *see generally id.* at 12-15 (describing Liberian officials' possible connections to Broadway Consolidated). The Report also stated that the initial license sold to Broadway Consolidated was ratified by the Liberian legislature only after "NOCAL spent $118,400 to bribe members of the Liberian legislature so that they would approve the award." *Id.* at 16. The Report cast aspersions at Exxon's interest in Block 13, noting suspected "concern over issues regarding US anti-corruption laws." *Id.* at 17. Such concerns, according to the Report, caused Exxon to develop "an ingenious escape plan" "to use COPL as a go-between that would, Exxon appears to have thought, shield it from any US legal risks." *Id.* at 20. The Report warned that "Exxon's attempt to use COPL to shield itself from US anti-corruption laws may have been misguided," *id.* at 27, and advocated investigations by U.S. and Liberian authorities. *Id.* at 29.

As a result, the Report did not cover the roles of the HTC's members, including Plaintiffs, in a vacuum. With its context of historical corruption and suspicions of further corruption, a reasonable reader could have understood the heading of the section, "Monrovia [Liberia], 2013: Awash in cash," with the subtitle "Some Unusual, Large Payments," to be referring to bribery payments in euphemistic language. *Id.* at 30. If such a reasonable reader

missed the point of the titles, the contents of this section of the Report clarified the point. For example, the Report admitted that NOCAL described the challenged payments to staff and the HTC as "bonuses," but then continued to place quotation marks around the word bonuses, *i.e.*, "bonuses," and generally stated that the payments were "called" bonuses instead of endorsing use of that term itself. *See id.* at 30-32. These linguistic choices could be understood to distinguish between NOCAL's use of "bonuses" to hide "bribes," which is what the Report inferred they actually were. The chart prepared by Global Witness and included in the Report tracked payments from Exxon, by which it acquired rights to develop Block 13, to bonuses paid by NOCAL to six Liberian officials involved in the negotiation, including Plaintiffs. *Id.* at 31. The chart specifically listed the amount of each official's bonus and the critical role each of them played in the negotiations, which had the effect of literally drawing a line between Exxon's money, the bonuses, and the sale of the license for Block 13. *See id.* at 31.

The Court finds that a reasonable reader easily could have understood the Report to imply that the 2006-07 bribes and the 2013 HTC bonuses were of a piece. If that were not the case, Global Witness would not have needed to request and include denials of bribery by HTC members in the Report. *Id.*; Compl. ¶ 91 ("The letter . . . stated . . . "we believe that the payment made by NOCAL to you was most likely a bribe."). If that were not the case, the Report would have had no reason to advocate for an investigation of "payments to officials by NOCAL in 2013 to determine whether any Liberian laws may have been broken." Report at 32.

Global Witness argues that the Report explicitly negated any inference that Plaintiffs accepted bribes because it expressly stated that "Global Witness has no evidence that Exxon directed NOCAL to pay Liberian officials, nor that Exxon knew such payments were occurring." *Id.* at 31. First, of course, this statement was about ExxonMobil and not NOCAL,

the actual payor. Second, it did not negate the inference that ExxonMobil's money was, in part, paid as bribes to the NOCAL representatives who signed the lease agreement. However, this statement did admit that the Global Witness suspicions and calls for investigations of ExxonMobil and NOCAL lacked *any* evidence that the former had involvement in monies paid to employees of the latter. At best, it might have been read to leave the question open as to why NOCAL paid such monies to its own personnel.

Global Witness also argues that the Report openly identified bribes associated with other payments in Liberia and that, in the tradition of *expressio unius*, the omission of similar language from descriptions of the payments to Plaintiffs implied that they were *not* bribes. The attempted distinction fails to persuade: whenever the Report explicitly described bribery, it was only after other organizations, such as components of the Liberian government itself, had already reached that conclusion. *See, e.g.*, *id.* at 30 ("These 2006 and 2007 payments have been classified as bribes by the Liberian Government's General Auditing Commission."). The conclusions by others that bribery occurred in other transactions does not diminish the import of the Report that there was bribery—either by NOCAL, Exxon, or both—in connection with the post-negotiation payments to Liberia's chief representatives.

Finally, Global Witness argues that it is only asking "*whether* the payments to Plaintiffs were illegal," and that questions cannot imply defamatory meaning. Reply at 7; *see Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1338 (D.C. Cir. 2015) ("[I]t is generally settled as a matter of defamation law in other jurisdictions that a question, 'however embarrassing or unpleasant to its subject, is not accusation.'") (quoting *Chapin*, 993 F.2d at 1094). *But see id.* at 1339 ("[A] question's wording or tone or context sometimes may be read as implying the writer's answer to that question."). But Global Witness is clearly doing more than

"just asking questions" when it calls for an official investigation by governmental bodies; it reasonably implies that there is evidence to justify an investigation of criminal liability, and thereby potential criminal liability itself. Further, capping the Report with a question only protects the question, not the other statements that imply bribery.

The most compelling evidence that the Report could reasonably be read to suggest bribery is that the Liberian government *actually* understood the Report that way. As the Special Presidential Committee put it:

> His Excellency, George Manneh Weah, President of Liberia, constituted a five-member Special Presidential Committee (SPC) to examine the allegations . . . made by Global Witness (GW) . . . alleging . . . that in negotiating the Concession agreement between ExxonMobil and the Government of Liberia . . . , some prominent Liberian government officials who led the negotiation received bribe in amounts ranging up to US $35,000 each.

Compl. ¶ 3 (quoting Special Presidential Committee Report at 3) (emphasis omitted). Moreover, the Special Presidential Committee articulated its mandate as a duty to "[d]etermine if the individuals specifically and collaterally named in the Report indeed received perquisite, emoluments or benefits, directly or indirectly, on account of any duty required of them by the Government and, if yes, determine whether or not the amount so paid and received constitutes Bribe under our law." *Id.* ¶ 76 (quoting Special Presidential Committee Report at 4) (emphasis omitted). Finally, the Special Presidential Committee summarized the Report as such:

> Clearly, from the preamble, the Report is three-prong:
>
> 1. *The story about Bribery, apparently, involving Liberian officials*;
> 2. Efforts by Exxon to by-pass US Anti-Corruption Law . . . ; and
> 3. About how the United States can support efforts to mitigate corruption in all dealings involving its national corporations and the local countries where these companies operate.

*Id.* ¶ 77 (quoting Special Presidential Committee Report at 11) (emphasis added).[4]

Global Witness notes that "[t]he test . . . is not whether some actual readers were misled, but whether the hypothetical reasonable reader could be (after time for reflection)." *Farah v. Esquire Magazine*, 736 F.3d 528, 537 (D.C. Cir. 2013) (citing *Pring v. Penthouse Int'l, Ltd.*, 695 F.2d 438, 442-43 (10th Cir. 1982) and *New Times v. Isaacks*, 146 S.W.3d 144, 151 (Tex. 2004)); *see also* Lyrissa Barnett Lidsky, *Nobody's Fools: The Rational Audience as First Amendment Ideal*, 2010 U. Ill. L. Rev. 799, 842 (2010) ("[T]he [Supreme] Court clearly endorsed the principle that speakers should not be held liable for 'mis-readings' of their speech by idiosyncratic or unsophisticated audience members.") (citing *Greenbelt Co-op. Pub. Ass'n v. Bresler*, 398 U.S. 6 (1970)). Global Witness correctly cites the test but overlooks that a publication must also be read "in the sense in which it would be understood by the readers to whom it was addressed." *Afro-Am. Publ'g*, 366 F.2d at 655; *see also Farah*, 736 F.3d at 537 (considering the defamatory statements' meaning to a publisher's reader base). In that regard, although not dispositive, the considered views of the investigatory committee formed by the Government of Liberia—which investigation the Report had urged—is insightful. *Cf. Vasquez v. Whole Foods Market, Inc.*, 302 F. Supp. 3d 36, 64 (D.D.C. 2018) ("A plaintiff can rely upon extrinsic evidence to show that listeners understood the statements to pertain to the plaintiff."). In the face of the Special Presidential Committee Report, there is evidence beyond, and

---

[4] Global Witness does not address the Special Presidential Committee Report and, instead, traces "the first appearance in the press of any suggestion that the Report implied bribery . . . [to] a letter written by Minister Tah herself." Reply at 8. But Minister Tah's letter responded to Global Witness' request for comment which explicitly accused her of accepting a bribe, *see* Compl. ¶ 91 ("The letter . . . stated . . . 'we believe that the payment made by NOCAL to you was most likely a bribe.'"), and excerpts from her letter were quoted in the Report. *See* Report at 30 ("'I did not receive money or an offer to pay money from Exxon Mobil for the award of the oil contract.'"). Global Witness' argument that Minister Tah is herself responsible fails because Global Witness clearly originated the accusation itself.

supportive of, what a hypothetical reasonable Liberian official might have understood the Report to mean.

For the reasons above, the Court concludes that Global Witness' Report made a defamatory statement concerning Plaintiffs.

### B. Actual Malice

Global Witness argues that even if statements in the Report were defamatory, those statements cannot form the basis of a defamation claim because they were not published with "actual malice" towards Minister Tah or Mr. McClain. This defense is based upon the First Amendment principle that public officials[5] who sue for defamation must "demonstrate by clear and convincing evidence that the defendant published the defamatory falsehood with 'actual malice,' that is, with 'knowledge that it was false or with reckless disregard of whether it was false or not.'" *Liberty Lobby*, 838 F.2d at 1292 (quoting *Sullivan*, 376 U.S. at 280). "The standard of actual malice is a daunting one." *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1308 (D.C. Cir. 1996). A plaintiff must allege facts that, if proven, provide "clear and convincing evidence" that "would 'permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.'" *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1512 (D.C. Cir. 1996) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)). When a plaintiff alleges actual malice based only upon circumstantial evidence, "the plaintiff must show, by clear and convincing evidence, that when the defendants published the alleged

---

[5] Global Witness argues that as high-ranking government officials Plaintiffs qualify as public officials. *See* Mem. at 34; *cf. Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966) ("[T]he public official designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility over the conduct of government affairs."). Plaintiffs do not contest this designation and have pled actual malice. *See, e.g.*, Compl. ¶¶ 84, 86.

defamations they were subjectively aware that it was highly probable that the story was '(1) fabricated; (2) so inherently improbably that only a reckless person would have put [it] in circulation; or (3) based wholly on . . . some other source that appellees had obvious reasons to doubt.'" *Lohrenz v. Donnelly*, 350 F.3d 1272, 1283 (D.C. Cir. 2003) (quoting *Tavoulareas v. Piro*, 817 F.2d 762, 788-98 (D.C. Cir. 1987)).

Plaintiffs advance several interlocking theories to support the allegation of actual malice which, in summary, contend that Global Witness had a preconceived story line charging Exxon with corrupt foreign dealings, which it pursued without regard to Plaintiffs. *Cf. Harris v. City of Seattle*, 152 Fed. App'x. 565, 568 (9th Cir. 2005) ("Thus, 'evidence that a defendant conceived a story line in advance of an investigation and then consciously set out to make the evidence conform to the preconceived story is evidence of actual malice, and may often prove to be quite powerful evidence.'") (quoting Rodney A. Smolla, 1 Law of Defamation § 3:71 (2005)).

In this regard, Plaintiffs assert that Global Witness "was already determined to publish a sensational account accusing Exxon of paying bribes in order to secure the purchase of Block 13." Opp'n at 13. The assertion is clear but Plaintiffs offer few facts to support it. They cite the subtitle of the Report, that is, "Exxon's complicity in Liberian oil sector corruption and how its Washington lobbyists fight to keep oil deals secret." Compl. ¶ 87. They also cite the prominent role given by the Report to former Exxon CEO, Rex Tillerson, then U.S. Secretary of State, as well as the Special Presidential Committee's determination that "the real object of its Report was not Liberia, but the conduct of Exxon." *Id.* ¶¶ 88-89 (quoting Special Presidential Committee Report at 11). But the Report's conclusion is not evidence of its conception and a conclusory allegation that there was "a pre-conceived story line is not sufficient to demonstrate actual malice." *Jankovic v. Int'l Crisis Grp.*, 72 F. Supp. 3d 284, 312 (D.D.C. 2014); *see also*

*Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 597 (D.C. Cir. 2016) ("Evidence of . . . preconceived notions about [plaintiff] does little to show actual malice.").

The rest of the evidence is similarly weak. Plaintiffs do not allege any facts establishing or explaining why Global Witness sought to target Secretary Tillerson. Even if they had, "evidence of ill will or bad motives will support a finding of actual malice only when combined with other, more substantial evidence of a defendant's bad faith," which Plaintiffs do not offer. *Tavoulareas*, 817 F.2d at 795. That is, Plaintiffs do not allege facts supporting a culture of reckless reporting and disregard for the truth at Global Witness. More specifically, Plaintiffs identify no facts that have been molded to conform to this preconceived story line, and an "adversarial stance is certainly not indicative of actual malice under the circumstances where, as here, the reporter conducted a detailed investigation." *Id.*; *see also id.* at 796 ("[T]he First Amendment forbids penalizing the press for encouraging its reporters to expose wrongdoing by public corporations and public figures."). Indeed, Plaintiffs contest none of the facts in the Report, even if they disagree with the inference that may be drawn therefrom. *Cf. Gertz v. Robert Welch, Inc.*, 680 F.2d 527, 539 (7th Cir. 1982) ("Stanley conceived of a story line; solicited Stang, a writer with a known and unreasonable propensity to label persons or organizations as Communist, to write the article; and after the article was submitted, made virtually no effort to check the validity of statements . . . , and in fact added further defamatory material based on Stang's 'facts.'"). Without more than is mustered here, there is not "clear and convincing evidence" that Global Witness was aware that its story was fabricated or too improbable to circulate.[6]

---

[6] Because Plaintiffs allege implied defamation, and because they do not contest the underlying facts, the implication of bribery must be reasonable, *i.e.*, not so improbable as to be reckless, or else Plaintiffs could not state a claim.

Plaintiffs seek to avoid this conclusion by arguing that Global Witness accused them of bribery when it asked for their pre-publication comments on the Report and then ignored their denials. Compl. ¶¶ 91-97. These facts are not enough to show actual malice. That Global Witness had arrived at its conclusion, right or wrong, by the time it reached out for comment and shortly before publication is commonplace and no surprise. More to the point, "publishers need not accept 'denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error.'" *Lohrenz v. Donnelly*, 350 F.3d 1272, 1285 (D.C. Cir. 2003) (quoting *Harte-Hanks Comm'ns, Inc. v. Connaughton*, 491 U.S. 657, 691 n.37 (1989)) (internal quotations omitted).[7] The emptiness of a denial as evidence is particularly apt here because not only did Plaintiffs' denials fail to contest the facts that are in the Report, the Report also included excerpts from Plaintiffs' denials and called out the additional facts on which Plaintiffs' denials relied. *See, e.g.*, Report at 30 ("Block 13 was the only oil license awarded during the period."); *id.* at 32 (acknowledging that "NOCAL also distributed $290,000 in what the agency called bonuses to over 140 members of staff and consultants"); *id.* at 31 ("Global Witness has no evidence that Exxon directed NOCAL to pay Liberian officials, nor that Exxon knew such payments were occurring."). Notably, "reporting perspectives at odds with the publisher's own[] 'tend[s] to rebut a claim of malice, not to establish one.'" *Lohrenz*, 350 F.3d at 1286 (quoting *McFarlane*, 74 F.3d at 1304).

Plaintiffs also argue that malice is evident because the Report targeted them and none of the consultants to the HTC during the negotiations, even though the consultants also

---

[7] For this same reason, the HTC consultants' corroborating denials had no more effect on evidence of malice than Plaintiffs' own. *See Lohrenz*, 350 F.3d at 1285 (corroborating denials did not give defendant "'obvious reasons' to doubt the veracity of her publication").

received bonuses. But the Report stated its rationale for focusing on Plaintiffs and not others: "unlike payments to the HTC members, these staff payments were not made to people who signed the Exxon deal." Report at 32. Plaintiffs find no caselaw to support the argument that a defendant's failure to accuse more persons of illegal conduct makes an accusation against a few more or less malicious. Moreover, Plaintiffs' theory of actual malice is that Global Witness had a preconceived story line targeting Exxon, not Plaintiffs. In that context, it is especially unclear how selectively naming Plaintiffs, but not the consultants, contributes to that narrative.

Plaintiffs further argue that Global Witness excluded Presidential Advisor Cooper's name from the Report because his advisory opinion that the payments were legal under Liberian law would pose "a glaring inconsistency in [the Report's] narrative." Opp'n 38-39; Compl. ¶ 99. This argument lacks persuasive weight. There are no allegations that Global Witness knew of Mr. Cooper's opinion.[8] The record might be read to suggest that Global Witness acted "on the basis of . . . incomplete information" because it did not know of Mr. Cooper's advice to Plaintiffs. *Lohrenz*, 350 F.3d at 1284. Assuming that to be true, it "does not 'demonstrate with clear and convincing evidence that the defendants realized that their statement was false or that they subjectively entertained serious doubts as to the truth of their statement.'" *Id.* (quoting *Bose Corp. v. Consumers Union of U.S.*, 466 U.S. 485, 511 n.30 (1984)) (internal marks omitted); *cf. St. Amant*, 390 U.S. at 732 ("But to insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones.").

---

[8] As a member of the HTC and recipient of a $35,000 bonus, for the purposes of actual malice Mr. Cooper's legal opinion serves the same purpose as Minister Tah's denial.

Lastly, Plaintiffs argue that their allegations of malice are entitled to a liberal interpretation when evaluated in response to a motion to dismiss. *See* Opp'n at 42-44. True enough. But "actual malice does not automatically become a question for the jury whenever the plaintiff introduces pieces of circumstantial evidence tending to show that the defendant published in bad faith." *Tavoulareas*, 817 F.2d at 789. "Such an approach would be inadequate to ensure correct application of both the actual malice standard and the requirement of clear and convincing evidence." *Id.* Without clear and convincing evidence of actual malice, and only strands of evidence, Plaintiffs' pleadings fail to meet their burden.

## IV.   CONCLUSION

Although Plaintiffs sufficiently plead that the Global Witness impliedly defamed them, their pleadings are insufficient to overcome First Amendment protections for speech. Accordingly, the Court will grant Global Witness' Motion to Dismiss, Dkt. 11, in its entirety. A memorializing Order accompanies this Memorandum Opinion.

Date:  September 27, 2019

_____
ROSEMARY M. COLLYER
United States District Judge